## AFFIDAVIT

Henry Watkins, pursuant to 28 U.S.C. §1746, deposes and states as follows:

1. I am plaintiff in this case. I am taking this affidavit to respond to defendants' claim in their summary judgment motion that my deposition testimony is inconsistent with my affidavit regarding whether I tried to invoke the alternative dispute resolution process.

2. This affidavit is taken in order restate our involvement in the alternative dispute resolution process. My prior affidavit is consistent with my deposition testimony and with my complaint in this case.

3. In my deposition I was asked whether I tried to invoke the alternative dispute resolution process from the settlement or made any claims or complaints concerning discrimination and/or harassment at the Board since the settlement. I testified truthfully that my attorneys had done so.

4. As I said repeatedly, e.g. in my Complaint and answers to interrogatories (Exhibit A), I and other parties to the Agreement attempted to invoke the ADR process <u>in contemporaneous situations</u>; as we repeatedly complained about discrimination and retaliation against us to the Affirmative Action Officer LeDelle Ingram and Thomas Marshall, the Director of Personnel, from 1995 to 2001.

F:\Watkins\Pleadings\AFFIDAVITHenry Watkins 6-26-06.wpd

EXHIBIT 1

5. Additionally, my attorney contemporaneously, attempted to invoke the ADR process and was told that we could not invoke the process and must handle any complaints through the Union. In addition, Scott Roy told us the Board was unwilling to meet to address our concerns.

6. Despite the complaints of myself, my attorneys, and the other parties and our attempts to invoke the ADR process, the Board never did so.

7. Due to the Board's attitude, it became clear that any ADR process would be unconscionable and/or fruitless.

8. After years of trying to work through the ADR process by myself, my attorneys and by the other parties, it was clear from defendants' repeated refusals to pursue the ADR process that it was futile and defendants had abandoned the process or never implemented it in the first place.

9. As I stated in my complaint, my deposition testimony and my affidavit, I did not again seek to invoke the ADR process instead of filing this suit because it would have been futile.

Executed this 26th day of June, 2006, pursuant to the penalties for unsworn perjury. I state the foregoing to be true and correct.

*[signature]*
HENRY WATKINS

F:\Watkins\Pleadings\AFFIDAVITHenry Watkins 6-26-06.wpd

<s>

```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
            - - - - - - - - - - - - - - - - - - - -

                                          CIVIL ACTION
   LEON DINGLE                            93-CV-5478
   ERNEST C. HOLMES                       93-CV-5927
   DARRYL E. RANKIN                       93-CV-5698
   HOWRHU M. SELF                         93-CV-5779
   HENRY R. WATKINS                       93-CV-5926
   HENRY WILLIAMS, JR.                    93-CV-5696

            -vs-

   PENNSYLVANIA BOARD OF PROBATION
   AND PAROLE, ALAN CASTOR, JR.,
   CHAIRMAN, FRED W. JACOBS, FORMER
   CHAIRMAN, HAROLD SHALON, DISTRICT
   DIRECTOR, RONALD ZAPPAN, DEPUTY
   DISTRICT DIRECTOR, DANIEL SOLLA,
   DEPUTY DISTRICT DIRECTOR, PAUL DESCANO,
   DIRECTOR, ROBERT YERGER, DIRECTOR OF
   PERSONNEL
   - - - - - - - - - - - - - - - - - - - -


                   Oral Deposition of

                     LeDELLE INGRAM



                     July 19, 2000




              DEBRA G. JOHNSON & ASSOCIATES
                    800 Joshua Court
              Moorestown, New Jersey 08057
                      856-778-1758
                    FAX 856-778-7890
```

Debra G.      ociates
856-778-1      778-7890


</s>

```
 1   aware of, or do you mean that that was your
 2   reason for being aware of it?
 3   A.        That was my reason for being aware
 4   of it.  It was a confidential document.
 5   Q.        Right.
 6             Now, did you receive any
 7   complaints of discrimination or retaliation
 8   from any of the plaintiffs?
 9             MR. BLONDMAN:  Receive after
10        the settlement agreement was
11        signed?
12             MR. SUGARMAN:    Right.
13             THE WITNESS:  Yes.
14                  -  -  -
15   CONTINUATION
16   BY MR. SUGARMAN:
17   Q.        Did you receive any -- from whom
18   did you receive complaints?
19   A.        I received a complaint from
20   Mr. Henry Williams, and also Mr. Henry
21   Watkins, and as I recall, I think Mr. Ernest
22   Holmes.
23   Q.        One complaint from each?
24   A.        Yes, as I recall.
```

1  agreement?
2  A.     I don't understand.
3  Q.     Did you receive any different
4  instructions as to compliance with the
5  settlement agreement as a result of that
6  interaction --
7  A.     No.
8  Q.     -- with Mr. Scicchitano?
9  A.     No. That was all information for
10 the attorney in terms of the AFSCME issues.
11 Q.     Did Mr. Scicchitano get a copy of
12 the settlement agreement?
13 A.     I don't know.
14 Q.     Do you know whether Mr. Scicchitano
15 ever had any discussions with anybody else in
16 the Board in regard to that?
17 A.     I can't speak for Mr. Scicchitano.
18 Q.     Do you have any information as to
19 whether he did?
20 A.     Not that I can recall.
21 Q.     All right.
22         Now, did you receive -- you
23 indicated that you also received complaints
24 regarding the settlement from Mr. Watkins; is

1  that correct?
2  A.      I indicated I received a complaint
3  from Mr. Watkins.
4  Q.      What happened in regard to
5  that complaint in terms of how it was
6  administered?
7          Did you -- were you able
8  to -- did you take any steps to resolve that
9  complaint informally?
10 A.      As I recall, Mr. Grant Freeman who
11 was working for my office currently at that
12 time, handled a lot of the interviews and the
13 initial report and Mr. Watkins and I finished
14 it up, and Mr. Watkins was given a closure
15 letter based on whatever we found or didn't
16 find.
17 Q.      Did that terminate your involvement
18 in that matter?
19 A.      Yes, I tried to finish -- finalize
20 it with the letter saying what the findings
21 were.
22 Q.      Now, does Mr. Freeman still work
23 for the Parole Board?
24 A.      Yes, he does.

1   Q.          What is his position at this time?
2   A.          To the best of my knowledge, he
3   works in the eastern regional office with the
4   regional director in institutional parole
5   manager.
6   Q.          Did his -- do you know, have any
7   idea why his he was transferred out from
8   under your responsibility?
9   A.          I was told that Mr. Freeman had
10  a problem getting along with me because I
11  required him to do his job in the manner for
12  which he was hired, and he was upset about it
13  and he wanted to be transferred somewhere
14  else.
15  Q.          Who was it that he was having
16  trouble getting along with?
17  A.          He said it was me.
18  Q.          Did you have any trouble getting
19  along with him?
20  A.          I had a problem with Mr. Freeman
21  producing quality work.
22  Q.          Can you describe what the problem
23  was?
24  A.          Mr. Freeman was not accurate in

```
 1   interviews when he did discrimination
 2   complaints.  He didn't follow direction.
 3   He made assumptions, put them in writing.
 4   Did not follow facts.  There was -- his
 5   performance was well documented by my --
 6   by myself.
 7   Q.        Did Mr. Freeman file any type of
 8   complaint against your documentation or
 9   against your evaluation?
10   A.        No, he signed his evaluation.
11   Q.        Sorry?
12   A.        No, he signed his evaluation and
13   did he not disagree with it.
14   Q.        Did Mr. Freeman ever state whether
15   his -- he had problems in carrying out his
16   functions due to the -- due to the management
17   in your Philadelphia office?
18   A.        I don't understand that question.
19   Q.        Did he ever state whether -- to you
20   -- that problems or attitudes or behavior of
21   people in the Philadelphia office made it
22   difficult for him to do his job?
23   A.        No.
24   Q.        All right.
```

1  Do you know if Mr. Watkins
2 received a closure memorandum?
3  Do you know if he received
4 the transfer?
5 A. I don't understand your question.
6 Q. Do you know if -- what was the
7 result of Mr. Watkins' complaint?
8 A. I have no idea. It was some years
9 ago.
10 Q. Now, you mentioned that Mr. Holmes
11 made a complaint, one or more.
12 A. I think Mr. Holmes did make a
13 complaint.
14 Q. What happened as a result of
15 Mr. Holmes' complaint?
16 A. I do not recall.
17 Q. Did Mr. Self make a complaint?
18 A. No.
19 Q. Did Mr. Rankin make a complaint?
20 A. No.
21 Q. Are you sure Mr. Rankin never made
22 a complaint to you?
23  MR. BLONDMAN: After Watkins'
24 agreement was signed?



COMMONWEALTH of PENNSYLVANIA
**Board of Probation and Parole**

P.O. Box 1661
3101 N. Front Street
Harrisburg, PA 17105-1661

March 6, 1998

Mr. Robert J. Sugarman
Sugarman & Associates
Attorneys at Law
7th Floor, Robert Morris Building
100 North 17th Street
Philadelphia, PA 19103

Dear Mr. Sugarman:

In light of your recent correspondence in which you presented a proposed agenda and an indication of the proposed participants, please be advised that the "Concerned Staff of the Philadelphia District Office," pursuant to Act 195, must be referred to AFSCME as their designated collective bargaining representative.

Should you have any concerns with respect to specific cases in relation to which you function as counsel, please do not hesitate to contact me.

Sincerely,

K. Scott Roy
Acting Chief Counsel
Office of Chief Counsel

KSR:djw

cc: Chairman William F. Ward

EXHIBIT 3

0257

```
                    IN THE COURT OF COMMON PLEAS
                  PHILADELPHIA COUNTY, PENNSYLVANIA
                              -----

HENRY WATKINS                    )  APRIL TERM, 2002
                                 )
                                 )
         vs.                     )
                                 )
                                 )
                                 )    ORIGINAL
PENNSYLVANIA BOARD OF            )
PROBATIONS AND PATROL AND        )
EDWARD JONES AND MICHAEL BUKATA) #002927
                              -----
                      Friday, June 4, 2004
                              -----
```

Oral deposition of ROBERT SUGARMAN, ESQUIRE, taken pursuant to notice, was held at The Law Offices of Miller, Alfonso & Raspanti, 1818 Market Street, Suite 3402, Philadelphia, Pennsylvania, commencing at 4:00 p.m., on the above date, before SHEILA KLOS, a Registered Professional Reporter and Commissioner of Deeds in The Commonwealth of Pennsylvania.

-----

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

EXHIBIT 4

1   Bates #0257.

2   A.      Right.

3   Q.      Now, that, if I understand your position in the
4   case, is one of the letters that you contend supports
5   your client's claim that the alternative dispute
6   resolution procedures in the settlement agreement were
7   futile; is that correct?

8   A.      Right.  That's one of them.

9           (Whereupon, Exhibit-3 was marked
10          for identification.)

11  BY MR. BENEDETTI:

12  Q.      Here is Exhibit-3 which is your Bates Number
13  258 and 259, a letter that you wrote to Mr. Roy dated
14  February 19th of 1998.  Is that another letter that
15  supports your client's contention that the ADR provisions
16  were futile?

17  A.      Yes.

18  Q.      Then finally based upon the same responses to
19  the Request for Admissions we are looking at which are
20  Exhibit-2, you identified Ms. Ingram's deposition
21  testimony of February 19th of 2000 as another document or
22  piece of evidence that supports your client's contention
23  that the ADR provisions are futile; is that correct?

24  A.      Correct.

1               (Whereupon, Exhibit-4 was marked

2           for identification.)

3    BY MR. BENEDETTI:

4    Q.          Here is Exhibit-4 which is a copy of that

5    testimony that you referred to.

6    A.          Right.

7    Q.          If I'm not mistaken, you were good enough to

8    give me the page numbers beginning at Page 71 you said.

9    A.          Yes.

10   Q.          You wanted to add something?

11   A.          No.  No.

12   Q.          Could you just help me understand, starting at

13   Page 71 is what you identify, your client identifies in

14   his responses to Request for Admissions.  From which line

15   on Page 71 and then where does it end?  Which part of

16   Ms. Ingram's testimony do you contend supports your

17   client's futile contention?

18   A.          The general discussion on 71 to 74 supports

19   that she did not utilize or employ the procedures of the

20   dispute resolution program.  The statement, Did you have

21   reference to the procedures of the settlement agreement?

22   No, I didn't.  Why?  I didn't have the agreement to look

23   at.  Then she never gets -- she says, I didn't do

24   anything about his issues.  By that time he had retired.

1  witness to do that work. I'm here as a witness. I'm not
2  here as a lawyer. So, no, as a witness I'm refusing to
3  do that. I have not received any requests from you to
4  supplement the answer.
5  Q.     The answer speaks for itself. It identifies a
6  single page, and we'll stick to that single page. If your
7  client chooses to expand its answer after this, we'll be
8  stuck with it.
9         Other than the February 19, 1998 letter
10 that Mr. Roy wrote to you and the March 6th, 1998 letter
11 that you wrote to Mr. Roy which was marked and Ms.
12 Ingram's testimony, are there any other documents or
13 information that you know of that support your client's
14 contention that the ADR provisions in the settlement
15 agreement are futile?
16 A.     Yes. Since the time that we answered that, we
17 had some events that occurred in another case of another
18 one of the plaintiffs named Henry Williams. In our
19 effort to enforce the settlement agreement in that case
20 which has been pending before Judge O'Neill, we were
21 directed to prepare a compendium of information as to
22 what had transpired in connection with that effort to
23 enforce the agreement. We searched through old files and
24 found some more documents which when I was getting ready

1  for the deposition here today, refreshed my recollection
2  as to the whole history of what was reflected in LeDelle
3  Ingram's deposition relating to Mr. Williams which
4  further corroborates the answer and refreshes my
5  recollection as to what Mr. Watkins was referring to
6  because he and Mr. Williams were in touch with each
7  other.
8  Q.        Can you point to something specific, a
9  document, a piece of testimony?
10 A.        Yeah.  It is an affirmative action complaint
11 filed by Henry Williams through The Board on April 25th,
12 1996.  There is a two-page question and answer that
13 appears to be an interview that was marked at LeDelle
14 Ingram's deposition part of her transcript dated May
15 20th, 1996.  There is a letter from me to Mark Blondman
16 B-L-O-N-D-M-A-N, counsel for The Board dated July 9,
17 1996.  There is a letter from LeDelle Ingram to Henry
18 Williams dated September 13th, 1996.  There is a
19 memorandum to LeDelle Ingram from Henry Williams dated
20 July 18th, 1997.  There is a memorandum again from
21 Williams to Ingram dated August 7, 1997.  There is a
22 letter from Virginia Thomas -- sorry, Veronica Thomas to
23 Henry Williams dated August 14th, 1997.  There is a memo
24 from LeDelle Ingram to Gary Scicchitano,

1   S-C-I-C-C-H-I-T-A-N-O dated December 24th, 1997. There
2   is a letter from Alaine Williams, A-L-A-I-N-E Williams of
3   Willard Williams to Mark Blondman dated December 4th,
4   1997. There is a letter from Alaine Williams to Mark
5   Blondman dated September 10, 1997. There is another
6   letter from Alaine Williams to Mark Blondman dated June
7   6th, 1997. There is a letter dated January 5, 1998 from
8   me to William Ward, Chairman of The Board. There is a
9   EEO complaint dated February 11, 1998 signed by Henry
10  Williams. There is a letter from LeDelle Ingram to Henry
11  Williams dated February 26, 1998. There is a
12  discrimination complaint dated March 19, 1998 by Henry
13  Williams. There is a resignation letter from Henry
14  Williams to Roy Jones dated May 15th, 1998 and there is a
15  petition of Henry Williams filed in the District Court on
16  December 10th, 1998. There is the answer of defendants
17  to that petition in the Williams case filed on February
18  1, 1999. The depositions of Marcinko dated November 29,
19  2000. Deposition of James Robinson of December 6th,
20  2000.
21  Q.        Are they both in the Williams case?
22  A.        All this is in the Williams case.
23  Q.        Thank you.
24  A.        The deposition of Maureen Welsh taken on

1  January 24th, 2001.

2  Q.    Let me stop you there.  Who is Ms. Welsh?

3  A.    She was Mr. Henry Williams' supervisor.

4  Q.    Do you know at which point in time?

5  A.    Sorry?

6  Q.    Do you know at which points in time Ms. Welsh
7  was Mr. Williams' supervisor?

8  A.    1997, around then.  That's probably, that's all
9  I know of at this time.  I just want to add I knew at the
10 time that there was more history, but I had completely
11 forgotten the details.  So when I started thinking about
12 this deposition, I realized that we had gathered all of
13 that stuff.  I went back and saw that it all revolves
14 around, not all, but a lot of it revolves around and
15 evolves out of the fact that The Board was not pursuing
16 the implementation of the settlement agreement.  And that
17 in fact one reason why they weren't doing it was because
18 The Union objected.  The Union, The Union indicated to
19 The Board that they would treat it as a breach of
20 contract because it was in their view inconsistent with
21 the agreements, procedures in The Union contract.  Those
22 were our conversations that I had with Mark Blondman in
23 1997, '98.  That's why in my view, it was futile to
24 pursue the ADR approach.

ROBERT SUGARMAN, ESQUIRE

Q. Did any of the documents that you just identified for us reference Mr. Watkins; to your knowledge?

A. That, I couldn't tell you. Well, I can tell you that the letter to Chairman Ward does, not by name but by inclusion in the group. The others may. I can't tell you.

Q. I'm asking you for your recollection. I'm not asking you to read every page of every document right now.

A. Right.

Q. To your recollection, do any of the documents reference the ADR provision in the 1993 settlement agreement?

A. Yes.

Q. Do you know which ones, off the top of your head?

A. The letters from Alaine Williams to Mark Blondman, the letter to Mr. Ward.

Q. Your letter to Ward?

A. Right.

Q. Okay.

A. LeDelle Ingram's documents dance around it. I don't know if they specifically say ADR.

1  Q.        All I want is the ones that mention the ADR
2  provision in the settlement agreement?
3  A.        Mention?  I would say they all involve it.
4  Whether they mention it or not, it's implicit.
5  Q.        Can you dig out for me the Williams letters to
6  Blondman and your letter to Ward.
7  A.        I believe the motion on behalf of Williams
8  filed with The Court also.  My letter to Mark Blondman
9  dated July 9th, 1996 started the whole thing.  Let me
10 look at that one real quick.  I don't know if that's
11 true.  That came in the early stages.  I was also writing
12 to Mr. Ward around that time.  It basically made it clear
13 that ADR was not to be pursued.
14 Q.        Who made that clear, Mr. Sugarman?
15 A.        Mark Blondman, Alaine Williams, LeDelle Ingram
16 at least, maybe others as well.
17 Q.        How did Mr. Blondman make it clear?
18 A.        Mark said to me that The Union had serious
19 problems with the ADR and The Board didn't know whether
20 they were going to be able to implement it because The
21 Union was making noises that was going to be a violation
22 of the Collective Bargaining Agreement.
23 Q.        Did The Board or any of its representatives
24 including Mr. Blondman ever say that The Board had a

```
 1  problem implementing the ADR provisions?  Not The Union,
 2  The Board.
 3  A.         LeDelle Ingram's memo of December 24th, 1997
 4  indicates it.
 5  Q.         Can I see that one?
 6  A.         That's a memo from LeDelle Ingram to
 7  Scicchitano.
 8             Let me correct something.  My
 9  correspondence with Mr. Ward started when he was
10  appointed.  I believe he was appointed in and around
11  '98.  I believe that's when I contacted him, but I'm not
12  sure of that.
13  Q.         Are there any other documents?
14  A.         I have listed them all.
15  Q.         That references the ADR provision?
16  A.         I really am not going to -- yeah.  Well, the
17  Williams letters.
18  Q.         Can I see those?
19  A.         Yeah.  June 6th, '97 three-page letter --
20  four-page letter.  Sorry.  Yes.  The June 6th letter is a
21  three-page letter.
22             MR. SUGARMAN: Let the record show I'm
23         handing these documents to Mr. Benedetti as
24         I'm referencing them that he may or may not
```