IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

HENRY WATKINS,                          :
                                        :    NO.  02-CV-2881
          Plaintiff,                    :
                                        :
          v.                            :
                                        :
PENNSYLVANIA BOARD OF                    :
PROBATION & PAROLE,                      :
EDWARD JONES, and MICHAEL BUKATA,        :
                                        :
          Defendants.                   :
                                        :

---

MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' SUMMARY JUDGMENT MOTION</u>

TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

II.   DEFENDANTS' STATEMENT OF UNCONTESTED MATERIAL FACTS IN
      SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT . . . . . . . 2

      A.   The Parties . . . . . . . . . . . . . . . . . . . . 2

      B.   The 1993 Lawsuit . . . . . . . . . . . . . . . . . . 4

      C.   The Board's Discipline Process . . . . . . . . . . . 5

      D.   Performance Reviews . . . . . . . . . . . . . . . . 8

      E.   Mr. Watkins' Claims . . . . . . . . . . . . . . . . 10

      F.   The Assignment Of Cases . . . . . . . . . . . . . . 11

      G.   Clerical Support For Mr. Watkins' Unit . . . . . . 12

      H.   Counseling And Discipline . . . . . . . . . . . . . 14

      I.   The April 2000 Counseling Sessions . . . . . . . . 16

      J.   The May 2000 Discipline . . . . . . . . . . . . . . 17

      K.   The June 2000 Discipline . . . . . . . . . . . . . 18

      L.   The October 2000 Discipline . . . . . . . . . . . . 19

      M.   The November 2000 Discipline . . . . . . . . . . . 20

      N.   The July 2001 Termination Of Employment . . . . . . 21

      O.   Mr. Watkins' Admitted That He Failed To Properly
           Perform His Job Duties . . . . . . . . . . . . . . 22

      P.   Mr. Watkins Efforts To Gain Employment . . . . . . 23

III.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . 27

      A.   Mr. Watkins' § 1983 Claims Against The Board, Mr.
           Jones And Mr. Bukata, In Their Official
           Capacities, Should Be Dismissed As A Matter Of Law
           . . . . . . . . . . . . . . . . . . . . . . . . . 27
      B.   Mr. Watkins' Claims Of Retaliation Should Be
           Dismissed Because He Did Not Engage In Protected

Conduct Or Fails To Establish A Connection Between
His Protected Activity And Any Adverse Employment
Action . . . . . . . . . . . . . . . . . . . . . . 28

    1.   Protected Activity . . . . . . . . . . . . . . 29

    2.   Adverse Employment Action . . . . . . . . . 32

    3.   Causal Connection . . . . . . . . . . . . . . 33

C.   Mr. Watkins' Hostile Work Environment Claims
Fail Because He Cannot Establish The Requisite
Severe and Pervasive Conduct . . . . . . . . . . . 37

D.   Mr. Watkins' Claims For Discrimination Should Be
Dismissed Because He Failed To Produce Evidence Of
Disparate Treatment . . . . . . . . . . . . . . . 40

    1.   Mr. Watkins Does Not Identify Any Actions By
Defendants That Establish Any Suggestion That
Mr. Watkins Was Suspended And/Or Terminated
Based On Race . . . . . . . . . . . . . . . . 43

    2.   Mr. Watkins Does Not Present Sufficient
Comparitors To Survive Summary Judgment . . . 44

E.   Mr. Watkins' Conspiracy Claim Fails As A Matter Of
Law . . . . . . . . . . . . . . . . . . . . . . . 47

    1.   Mr. Watkins' Claim For Conspiracy Against The
Board And Mr. Jones And Mr. Bukata, In Their
Official Capacities Should Be Dismissed Under
The Doctrine Of Sovereign Immunity . . . . . 47

    2.   Mr. Watkins' Claim For Conspiracy Against The
Board And Mr. Jones And Mr. Bukata, In Their
Official Capacities, Should Be Dismissed As A
Matter Of Law Because An Entity And Its
Agents Cannot Conspire With Themselves . . . 48

    3.   Mr. Watkins' Claim For Conspiracy Against Mr.
Jones And Mr. Bukata Fails As A Matter Of Law
Because There Is No Discrimination . . . . . 49

F.   Mr. Watkins' Claims Against The Board And
Mr. Jones, And Mr. Bukata, In Their Official
Capacities Should Be Dismissed Because They Are
Barred By Qualified Immunity . . . . . . . . . . . 50

G.   Mr. Watkins Is Not Entitled To Front Pay Or Back

Pay Because He Failed To Mitigate His Damages By
Not Applying For Any Positions Of Employment . . . 52

H.    Plaintiff's Claim For Punitive Damages Should Be
Dismissed . . . . . . . . . . . . . . . . . . . . . 55

1.    Plaintiff's Claim For Punitive Damages Should
Be Dismissed Against The Board And Mr. Jones
And Mr. Bukata, In Their Official Capacities,
As A Matter Of Law . . . . . . . . . . . . . . 55

2.    Mr. Watkins' Claim For Punitive Damages
Against Mr. Jones And Mr. Bukata In Their
Individual Capacities Should Be Dismissed
Because There Is No Evidence Of Evil Motive
Or Intent . . . . . . . . . . . . . . . . . . 56

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . 58

Defendants, the Pennsylvania Board of Probation and Parole (the "Board"), Willie E. Jones (improperly pled as Edward Jones)("Mr. Jones") and Michael Bukata ("Mr. Bukata")(collectively the "Defendants"), respectfully submit this Memorandum of Law in Support of their Motion For Summary Judgment to dismiss with prejudice Plaintiff, Henry Watkins' ("Mr. Watkins") Second Amended Complaint.

I.    <u>PRELIMINARY STATEMENT</u>

Mr. Watkins invokes our country's laws against race discrimination and retaliation in this lawsuit.  Those laws resulted after much suffering and bloodshed by African Americans. No doubt, history has taught us that these laws have proved a powerful and purposeful weapon against our country's continuous battle against race discrimination.  Unfortunately, those exalted laws also have been exploited by individuals who are unwilling to be accountable for their own mistakes and would rather excuse them by crying racism.

Here, Mr. Watkins failed to do his job.  He even admits that he "could have done better" and that he did some things wrong. Yet, he refuses to accept responsibility for these actions. Instead, he contends that Mr. Jones and Mr. Bukata are racist.

The undisputed facts simply do not trigger any of these important rights.  The Board first tried to counsel Mr. Watkins to get him to improve his performance.  Next, the Board engaged

in progressive disciplinary measures designed to correct Mr. Watkins' performance deficiencies. When these measures failed, the Board had no choice but to fire Mr. Watkins because he simply refused to do his job.

The material facts are not in dispute. Mr. Watkins is accountable for the consequences of his actions. Race never entered into the process. Accordingly, Summary Judgment dismissing the entire complaint with prejudice is proper.

## II.    DEFENDANTS' STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### A.    **The Parties**

1.    The Board is an independent agency of the Commonwealth of Pennsylvania. It has the statutory authority to parole and reparole, and commit and recommit offenders, who are sentenced to a maximum of two or more years and violate the terms of their sentence. See Exhibit 1.

2.    The Board maintains its central office or headquarters in Harrisburg, Pennsylvania. See Exhibit 2.

3.    The Board is organized into several different regions and districts. Id.

4.    This case concerns the Philadelphia District with its primary location at 1400 Spring Garden Street, Philadelphia, Pennsylvania. Id. The Philadelphia District is part of the Eastern region. Id.

5.   At all relevant times, Thomas Costa (caucasian) served as the Director of the Eastern Region.  Id.

6.   The Philadelphia District is divided into separate divisions and each division is further divided into units.  Id.

7.   Mr. Jones (caucasian) is employed by the Board as a District Director for the Board's Philadelphia District.  He has held that position since April of 1997.  As District Director, Mr. Jones is responsible for the Philadelphia District.  Id.

8.   Mr. Bukata (caucasian) was employed by the Board as a Deputy District Director.  As a Deputy District Director, Mr. Bukata was in charge of the Northwest Division of the Philadelphia District from March 1997 to January 9, 2004, when he retired.  See Exhibit 3 at 6:9-21.

9.   Mr. Bukata was responsible for reviewing cases to issue warrants, issuing release orders and subpoenas, and essentially, ensuring that supervisors in the Northwest division did their jobs properly.  See id. at 6:22-7:1, 9:3-23.

10.   Mr. Watkins, an African American, worked for the Board from October 1973 until August 2001.  See Exhibit 4 at ¶5.  The Board hired Mr. Watkins as a Parole Agent in October 1973.  See id.

11.   The Board promoted Mr. Watkins to the position of Parole Supervisor in 1998 pursuant to the terms of a confidential settlement agreement.  See id.; Exhibit 5 at 26:7-26:13.

12.   As a supervisor, Mr. Watkins was a member of the

American Federation of State, County and Municipal Employees, a labor union which was party to a collective bargaining agreement with the Board.  See Id. at 16:10-16.

13.  Beginning in July 1999, Mr. Bukata became Mr. Watkins' direct supervisor.  Mr. Jones supervised Mr. Bukata.  See Exhibit 2.  Mr. Watkins supervised a unit of parole agents in the Northwest division.  Id.

14.  Parole agents are the Board employees who have direct contact with the offenders and monitor the offenders' compliance with their parole terms.  Id.

15.  The Board terminated Mr. Watkins' employment on August 3, 2001.  See Exhibit 4 at ¶ 5.

**B.    The 1993 Lawsuit**

16.  In 1993, Mr. Watkins and others sued the Board and various Board employees for race discrimination (the "1993 Lawsuit").  See Exhibit 5 at 19:23-20:9.

17.  Mr. Watkins did not sue Mr. Jones or Mr. Bukata in the 1993 Lawsuit and he did not make any allegations against them. See id. at 24:12-21.

18.  Mr. Watkins and the Board settled the 1993 Lawsuit in 1995 ("1995 Settlement Agreement") without any admission of liability.  See id. at 19:23-20:18.

19.  Aside from "rumor mill" and assumed "leakage" of information at the Board, Mr. Watkins is not aware that Mr. Jones

has any knowledge of the 1995 Settlement Agreement or its contents.  See id. at 43:24-46:7.

20.  Mr. Watkins is not aware that Mr. Bukata has any knowledge of the 1995 Settlement Agreement or its contents.  See id. at 42:16-43:2.

      C.  **The Board's Discipline Process**

21.  The Board has a disciplinary process that outlines the procedures that must be followed before an employee may be disciplined for failure to comply with Board policies or procedures.  See Exhibit 2.

22.  Under the Board's Process, if a supervisor believes that an employee has violated a Work Rule, Board Policy, the Board's Code of Conduct, or a Commonwealth-wide policy, the supervisor is required to contact the Labor Relations Coordinator or the Director of the Personnel Division regarding how to proceed. Id.

23.  At all times relevant herein, Maria Marcinko (caucasian) was the Director of the Personnel Division.  Id.

24.  At all times relevant herein, Thomas Marshall (African American) was the Labor Relations Coordinator.  Id.

25.  The Labor Relations Coordinator or the Director of the Personnel Division then advises the supervisor whether a Pre-disciplinary Conference ("PDC") should occur.  Id.

26.  If a PDC is to occur, the employee is notified in

writing of the date of the PDC and the reason(s) for it.  Id.

27.  By definition, and in practice, a PDC is not a disciplinary action.  Id.

28.  The PDC is then conducted, giving the employee an opportunity to respond to the alleged work violation with a union representative present.  Id.

29.  After a PDC is completed, a report is prepared and sent to the Director of Personnel and the Labor Relations Coordinator for their review and action.  Id.

30.  After review, the Labor Relations Coordinator makes a recommendation to the Director of the Personnel concerning whether discipline is justified, and, if so, the type of discipline.  The Director of Personnel then provides her own independent determination of whether there was a violation.  She also provides a recommendation of the appropriate level of discipline if there was a violation.  Id.

31.  The Director of the Personnel Division then forwards her recommendation to the Director, Bureau of Human Resources, and the Director, Office of Probation and Parole Services, who either approve or disapprove her recommendation and return it to her.  Id.

32.  At all times relevant herein, Gary Scicchitano (caucasian) was the Director, Bureau of Human Resources, and James Robinson (caucasian) was the Director, Office of Probation and Parole Services.  Id.

33.  Only after all these steps are completed does the Director of the Personnel Division instruct the Labor Relations Coordinator to compose a discipline letter for the Regional Director's signature.  Id.

34.  An immediate supervisor cannot impose discipline.  Id.

35.  Discipline may include a written reprimand, suspension or termination.  Id.

36.  The Board generally employs a progressive discipline process.  This means that discipline generally starts with a written reprimand, then progresses to suspensions of increasing lengths and ultimately termination.  Id.

37.  A written reprimand does not result in any downgrade in title, status or pay and does not impact an employee's eligibility for promotion.  Id.

38.  An employee, like Mr. Watkins, could challenge any discipline action taken by the Board by:  (a) filing a grievance pursuant to the collective bargaining agreement; (b) submitting a complaint to the Board's affirmative action officer, Ms. LeDelle Ingram (African American); and/or (c) filing a complaint with the Pennsylvania Civil Service Commission (an entity separate from the Board) pursuant to 71 Pa. Cons. Stat. § 741.95(a) (1989). See Exhibit 5 at 154:7-25.

39.  Mr. Watkins knew that each of these avenues of relief was available to him.  Id.

**D.    Performance Reviews**

40.  Mr. Watkins alleges that prior to 1995 he always received a satisfactory rating on his employee performance review ("EPR").  See Exhibit 4 at ¶ 6.

41.  Mr. Watkins's EPR for 1994, which was completed by his supervisor, Joseph Scott (African American), reflects an overall rating of "unsatisfactory".  See Exhibit 6.

42.  Likewise, Mr. Watkins' received an "unsatisfactory" rating in five out of seven categories in his 1993 EPR, which was also completed by Mr. Scott.  See Exhibit 7.

43.  Neither Mr. Jones nor Mr. Bukata had any involvement in Mr. Watkins' 1993 or 1994 performance reviews and they had no supervisory responsibility over him or his supervisor, Mr. Scott, at the time of those reviews.  See Exhibit 2.

44.  Mr. Watkins' performance reviews can be summarized as follows:

| YEAR | OVERALL RATING | SUPERVISOR | REVIEWER |
|------|----------------|------------|----------|
| 1993 | Unsatisfactory in 5/8 categories | Joseph Scott (African American) | Ronald Zappan (Caucasian) |
| 1994 | Needs improvement | Joseph Scott (African American) | Ronald Zappan (Caucasian) |
| 1995 | Needs improvement | Joseph Scott (African American) | Ronald Zappan (Caucasian) |

| YEAR | OVERALL RATING | SUPERVISOR | REVIEWER |
|------|----------------|------------|----------|
| 1996 | Satisfactory | Stephen Batcho (Caucasian) | Ronald Zappan (Caucasian) |
| 12/96-6/97 | Satisfactory | Dan Solla (Caucasian) | Willie E. Jones (Caucasian) |
| 1998 | Needs improvement | Michael Bukata (Caucasian) | Willie E. Jones (Caucasian) |
| 1999 | Needs improvement | Michael Bukata (Caucasian) | Willie E. Jones (Caucasian) |
| 2000 | Unsatisfactory | Michael Bukata (Caucasian) | Willie E. Jones (Caucasian) |
| 2001 | Unsatisfactory | Michael Bukata (Caucasian) | Willie E. Jones (Caucasian) |

45.   Although Mr. Watkins alleges that he did not have a chance to voice his concerns regarding the results of his EPR, he testified that his EPR in 1999 was changed by Mr. Bukata after Mr. Watkins voiced his concerns to Mr. Jones and Mr. Bukata.  See Exhibit 5 at 258:22-260:11.

46.   Likewise, Mr. Watkins' allegations that Mr. Bukata never advised him of performance issues prior to issuing an EPR is unfounded because Mr. Bukata sent hundreds of e-mails to Mr. Watkins outlining deficiencies in his performance.  See Exhibit 8.

47.   Mr. Watkins did not experience a loss of pay or benefits  and did not miss any promotional opportunities as a result of any of these performance reviews.

**E.    Mr. Watkins' Claims**

48.  Mr. Watkins' complaints concern events that occurred between July 1999, when Mr. Bukata supervised him, and August 2001, when the Board terminated his employment.  See generally Exhibit 4.

49.  Mr. Watkins makes two basic complaints.  He complains that Defendants discriminated against him because he is African-American and that Defendants retaliated against him because he complained about race-related matters.  Id.

50.  Mr. Watkins made two complaints on race-related matters.  First, he filed the 1993 lawsuit.  Second, he contends that he made a verbal complaint of race based discrimination during a November 2000 grievance hearing.  See Exhibit 5 at 177:12-178:3.

51.  Mr. Watkins contends that the Defendants engaged in a variety of actions against him because of his race and race-related complaints.  Those actions are:

        a.    the assignment of too many cases to his unit;

        b.    the denial or lack of clerical support for his
              unit;

        c.    the imposition of discipline;

        d.    the imposition of unfair performance reviews;

        e.    the denial of one-on-one supervision.

See generally Exhibit 4.

**F.    The Assignment Of Cases**

52.  The Board assigns a parolee to a particular unit based

upon the residence of that parolee.  <u>See</u> Exhibit 5 at 81:8-16.

53.  In particular, the Board uses census tracts, that are established by the federal government to assign a parolee to a particular unit.  If a parolee lives in a census tract that is assigned to a unit, then that parolee is assigned to that unit for supervision.  <u>See</u> Exhibit 3 at 46:15-47:5.

54.  Thus, the assignment of parolees to a particular unit is determined by the parolee's residence and not any subjective or selective basis.  Obviously, the Defendants do not control where a parolee resides.

55.  Periodically, the Board reassigns census tracts from one unit to another if it is determined that one unit has more parolees than another unit.  <u>See</u> Exhibit 3 at 46:15-47:5 and Exhibit 5 at 78:21-81:21.

56.  In addition, within a unit, the supervisor is responsible for reassigning parolees among his agents in that unit if certain agents have too many cases.  <u>Id.</u> at 68:24-69:16.

57.  This reassignment process occurs periodically during the course of any year in an effort to balance each unit's and each agent's workload.  <u>Id.</u>

58.  Mr. Watkins concedes that it is his responsibility to manage the workload in his unit among his agents.  <u>See</u> Exhibit 19.

59.  Mr. Watkins also concedes that the Defendants did engage in this reassignment process for his unit.  <u>See</u> Exhibit 5

at 64:22-65:13.

### G.    Clerical Support For Mr. Watkins' Unit

60.  Mr. Watkins complains that he had insufficient clerical support while he served as a Parole Supervisor in the Northwest Division working for Mr. Bukata.  See Exhibit 4 at ¶19.

61.  When Mr. Watkins began in that job, the Board assigned Dierdra Gardner ("Ms. Gardner") to serve as the clerical support person for Mr. Watkins' unit.  See Exhibit 5 at 59-62:24.

62.  Unfortunately, Ms. Gardner suffered a non-work related injury that made her unable to perform her job.  See id. at 68:14-69:24 and Exhibit 3 at 63:15-64:22.

63.  For a period during Ms. Gardner's absence, the Board did not assign a clerical support person to work directly for Mr. Watkins' unit.  See Exhibit 5 at 67:7-12.

64.  Mr. Bukata did, however, immediately request that the Board assign a clerical support person to Mr. Watkins' unit and he made his personal secretary, Ramona Alexander (nee Sterling) ("Ms. Alexander") available to Mr. Watkins' unit.  See Exhibit 3 at 62:8-16.

65.  Ms. Alexander sat approximately 300 to 400 feet away from Mr. Watkins on the same floor.  See Exhibit 5 at 73:4-73:15.

66.  Mr. Watkins had telephone and email access to Ms. Alexander.  See id. at 73:16-74:7.

67.  Mr. Watkins and his agents would "put all the work in [their] box in [their] unit and on occasion [Ms. Alexander] would come back and pick it up unless it was an emergency."  See id. at 74:14-74:19.

68.  Ms. Alexander maintained a log of the work that she completed.  See Exhibit 9.  Mr. Watkins agrees that maintaining a log was a sound practice and he has no reason to doubt the accuracy of the log.  See Exhibit 5 at 76:25-78:12.

69.  In addition, Mr. Jones approved overtime for other clerical support personnel to attend to the work in Mr. Watkins' unit.  See Exhibit 5 at 70:16-71:14.

70.  Approximately one year after Ms. Gardner was first unable to work due to her injury, Mr. Jones assigned Brenda Yarborough ("Ms. Yarborough") to work as Mr. Watkins' unit secretary.  See id. at 67:7-68:6.

71.  Mr. Watkins describes Ms. Yarborough as "a good secretary" and "very professional."  See id. at 72:3-72:6.

72.  Ms. Yarborough worked for Mr. Watkins' unit until Mr. Watkins' employment with the Board was terminated.  See id. at 72:10-72:19.

73.  Stuart Greenberg (caucasian) was a supervisor who was also supervised by Mr. Bukata.  See Exhibit 2.

74.  Mr. Greenberg was also subject to working conditions that required his unit to operate without specifically assigned

clerical assistance.  See Exhibit 10.


**H.    Counseling And Discipline**

75.  During the time Mr. Watkins was supervised by Mr.
Bukata,  the following individuals were involved in the
discipline process:

**Stuart Greenberg** (supervisor)(caucasian)

| DATE | ACTION | SUBJECT MATTER |
|---|---|---|
| March 30, 2000 | Counseling Session<br><br><br><br>no Discipline | Failure to exercise supervisory oversight with regards to the preparation of a Panel Hearing Summary Report and monitoring Sweet case. |
| April 17, 2000 | (PDC)<br><br><br><br><br><br>Written Reprimand | Failed to: properly monitor cases on a Parolee; prepare a subordinate agent for Violation Hearing; arrange a timely transfer of a Parolee |
| September 19, 2001 | Counseling Session<br><br>no Discipline | alleged sexual harassment and inappropriate behavior |

**Robert Joachim** (supervisor)(caucasian)

| DATE | ACTION | SUBJECT MATTER |
|------|--------|----------------|
| June 1, 1999 | Counseling Session<br><br>no Discipline | absent without leave; leaving work early. |

**James Burton** (supervisor)(African American)

| DATE | ACTION | SUBJECT MATTER |
|------|--------|----------------|
| January 22, 2001 | Pre-disciplinary Conference (PDC) | Conducting a counseling session for Agent Mirman and Agent Boyd without discussing with Personnel. |

**John Smith** (Agent)(caucasian)

| DATE | ACTION | SUBJECT MATTER |
|------|--------|----------------|
| December 1, 1999 | PDC | Violation of various Code of Conduct Sections with regards to Maria Wellmon and Loretta Slade. |
| January 13, 2000 | 2nd PDC<br><br>Termination | Violation of various Code of Conduct Sections (sexual and physical)with regards to Maria Wellmon and Loretta Slade. |

See Exhibit 2.

76. In addition, from 1998 until 2002, approximately 46 caucasian employees were counseled or disciplined as compared with approximately 21 African American employees. See Exhibit 11.

77. After Mr. Bukata became Mr. Watkins' supervisor in July of 1999, Mr. Watkins was subject to the following actions:

| DATE | ACTION | SUBJECT MATTER |
|---|---|---|
| April 18, 2000 (See infra, ¶¶ 73-81) | Pre-disciplinary Conference ("PDC") Counseling only, no Discipline | Failure to complete Employee Performance Review for Agent Lloyd Knight and failing to requisition safety equipment for Agent Knight. |
| May 31, 2000 (See Section 82-88) | PDC Written Reprimand | Failed to properly monitor and execute orders concerning Green case. |
| June 21, 2000 (See Section 89-94) | PDC 1 Day Suspension | Failed to timely comply with directives and unsatisfactory performance standards. |
| October 5, 2000 (See Section 95-101) | PDC 3 Day Suspension | Failed to monitor case of James. |
| November 16, 2000 (See Section 102-108) | PDC 5 Day Suspension Final warning | Failed to forward completed request for leave and failed to follow orders given regarding processing a leave request. |
| July 5, 2001 (See Section 109-116) | PDC Termination | *Failed to properly monitor case of Pitts; *Failed to comply with order to see Mr. Bukata and failed to return a list with "max" expiration dates for cases; and *Failed to monitor case to ensure timely hearing and failure to follow instructions. |

See Exhibits 12, 13, 14, 15, 16 and 17.  In addition, Mr. Bukata and Mr. Watkins exchanged hundreds of e-mails and reports concerning other performance failures for which Mr. Watkins was not disciplined or subject to a PDC.  See Exhibit 8.

I.    **The April 2000 Counseling Sessions**

78.    Mr. Watkins supervised Lloyd Knight (African American), a parole agent in his unit.  See Exhibit 12 at bates No. PPB-00628.

79.    As part of his supervisory duties, Mr. Watkins was required to conduct an employee performance review (EPR) for Mr. Knight.  Id. at bates no. PPB-01689.

80.    The EPR was necessary to complete the process of Mr. Knight's promotion and enable him to receive his pay raise.  Id. at bates no. PPB-00205.

81.    Mr. Watkins failed to complete Mr. Knight's EPR on time.  Id. at bates no. PPB-00628.

82.    Mr. Watkins failed to complete it despite repeated reminders from the Board's central office and Mr. Bukata.  Id. at bates no. PPB-01685.

83.    As a result, Mr. Knight's pay raise was delayed.  Id.

84.    Mr. Watkins also was charged with failure to obtain timely safety equipment for Mr. Knight.  Id.

85.    Consequently, on April 18, 2000, Mr. Bukata conducted a PDC with Mr. Watkins concerning Agent Knight's EPR and safety equipment issues.  Id. at bates no. PPB-00205

86.    Despite the seriousness of Mr. Watkins' actions/inactions, no discipline was imposed.  Id. at bates no. PPB-02429.

J.    **The May 2000 Discipline**

87.  Mr. Watkins supervised the case of parolee, Derrick Green, beginning in September 1999.  See Exhibit 13 at bates no. PPB-01659.

88.  In November 1999, criminal charges were dismissed against Mr. Green.  Id. at bates no. PPB-00597.

89.  On February 2, 2000, staff at SCI-Pittsburgh requested information from Mr. Watkins concerning Mr. Green.  Mr. Watkins did not respond to the request.  Id. at bates no. PPB 00597.

90.  The same request was repeated on February 29, 2000, March 21, 2000, May 9, 2000 and May 18, 2000.  Mr. Watkins again did not respond.  Id. at bates no. PPB-00597-98.

91.  On March 22, 2000, Mr. Bukata directed Mr. Watkins to arrange for a violation hearing, which he did not do.  Id. at bates no. PPB-00598.

92.  Consequently, on May 31, 2000, Mr. Bukata held a PDC with Mr. Watkins.  When given a chance to explain his actions during the PDC, Mr. Watkins stated that he "had just not gotten to it."  Id. at bates no. PPB-00598.

93.  As a result, a written reprimand was issued to Mr. Watkins for his repeated failures.  Id.  at bates no. PPB-01641-42.  This written reprimand did not result in any pay, benefit, or status loss and did not make him ineligible for any promotions.  See Exhibit 2.

94.  Mr. Watkins did not challenge any aspect of this

discipline through the grievance procedure, the Board's affirmative action office or the civil service commission.  <u>See</u> Exhibit 5 at 154:18-25; 156:24-158:3.

### K.    <u>The June 2000 Discipline</u>

95.  Mr. Bukata directed Mr. Watkins to conduct a counseling session with one of Mr. Watkins' agents and to prepare a memorandum concerning that session.  <u>See</u> Exhibit 14 at bates no. PPB-02076.

96.  Mr. Watkins contends that he did conduct the counseling session.  He admits, however, that he failed to prepare the memorandum.  <u>Id.</u> at bates no. PPB-02076.

97.  Mr. Bukata directed Mr. Watkins to explain in writing why parolee reports were so late and why Mr. Watkins failed to respond to requests for information from a supervisor at a correctional institution.  <u>Id.</u> at bates no. PPB-02076.

98.  Mr. Watkins stated that he had no reason for these failures.  <u>Id.</u> at bates no. PPB-02076.

99.  Consequently, on June 21, 2000, Mr. Bukata conducted a PDC with Mr. Watkins concerning these issues.  <u>Id.</u> at bates no. PPB-02075.

100. As a result, a one day suspension was imposed on Mr. Watkins for these matters.  <u>Id.</u> at bates no. PPB-02446.

101. Mr. Watkins did not challenge any aspect of this discipline through the Board's affirmative action office or the

civil service commission.  <u>See</u> Exhibit 5 at 167:14-168:2.

102. Mr. Watkins "believes" he filed a grievance, but has produced no evidence to support his belief.  <u>See</u> Exhibit 2; Exhibit 5 at 167:17-20.  The Board has no evidence concerning any such grievance.  <u>See</u> Exhibit 2.


      **L.**    <u>**The October 2000 Discipline**</u>

103. The failure to hold a timely revocation hearing exposes the Board to civil liability.  <u>See</u> Exhibit 15.

104. A revocation hearing for a parolee under Mr. Watkins' supervision was not held in a timely fashion.  <u>Id.</u> at bates no. PPB-03672.

105. Consequently, on October 5, 2000, Mr. Bukata conducted a PDC with Mr. Watkins.  <u>Id.</u> at bates no. PPB-02587-88.

106. During the PDC, Mr. Watkins was not truthful, which is contrary to the Board's code of conduct.  <u>Id.</u>

107. During the PDC, Mr. Watkins admitted that he did not have any controls in place to enable him to schedule a timely revocation hearing.  <u>Id.</u>

108. As a result, a three day suspension was imposed on Mr. Watkins for these failures.  <u>Id.</u> at bates no. PPB-02342-43.

109. Mr. Watkins did not challenge any aspect of this discipline through the Board's affirmative action office or the civil service comission.  <u>See</u> Exhibit 5 at 176:7-17.

110. While Mr. Watkins grieved this discipline, his

grievance does not allege a race-based motive for the discipline. See Exhibit 22.

111. Mr. Marshall (African American) heard Mr. Watkins' grievance. See Exhibit 5 at 178:15-179:3.

112. At the grievance, Mr. Watkins was represented by Paul Rich of the union. Id. at 179:4-12.

113. The Board denied the grievance.

114. Neither Mr. Watkins nor the union challenged the Board's decision to deny the grievance.


**M.    The November 2000 Discipline**

115. Leave slips are Board forms prepared, in part, by an employee who is requesting time off from work. See Exhibit 16.

116. Supervisors, like Mr. Watkins, are required to review and approve these requests and forward them to the Board's timekeeper so that the Board has accurate records of the leave time available for its employees. Id.

117. Mr. Watkins failed to process 14 leave slips that encompassed a nine month period, 298 hours of chargeable time, and six different agents. Id.

118. Mr. Watkins claims that he misplaced these leave slips.

119. Mr. Bukata, however, found all 14 of these leave slips on Mr. Watkins' desk, in plain view. Id.

120. Consequently, on November 16, 2000, Mr. Bukata conducted a PDC with Mr. Watkins for failing to process requests

for leave from his agents.  Id.

121. As a result, a five day suspension was imposed on Mr. Watkins for the failures.  Id.

122. Mr. Watkins did not challenge any aspect of this discipline through the Board's affirmative action office, or the civil service comission.  See Exhibit 5 at 176:7-17.

123. While Mr. Watkins grieved this discipline, his grievance does not allege a race-based motive for the discipline. See Exhibit 23.

124. Mr. Marshall (African American) heard Mr. Watkins' grievance.  See Exhibit 5 at 200:7-15.

125. At the grievance, Mr. Watkins was represented by Paul Rich of the union.  Id. at 200:4-11.

126. The Board denied the grievance.

127. Neither Mr. Watkins nor the union challenged the Board's  decision to deny the grievance.

### N.    The July 2001 Termination Of Employment

128. Between February 2001 and June 2001, Mr. Watkins again failed to monitor a parolee's case resulting in another untimely hearing, the third such incident in a year.  See Exhibit 17.

129. On September 6, 2000, Mr. Watkins was issued a traffic citation while using a Board vehicle.  Id.

130. Mr. Watkins failed to satisfy that citation or timely report it to the Board.  Id.

131. Mr. Bukata directed Mr. Watkins to meet with him on or before June 26, 2001 concerning the citation.  Id.

132. Mr. Watkins ignored Mr. Bukata's direction.  Id.

133. On June 28, 2001, Mr. Watkins failed to provide Mr. Bukata with a report that Mr. Bukata requested from him.  Id.

134. Consequently, on July 5, 2001, Mr. Bukata conducted a PDC with Mr. Watkins.  Id.

135. As a result of his inactions, the Board terminated Mr. Watkins' employment effective August 3, 2001.  Id.

136. Mr. Watkins did not challenge any aspect of this discipline through the grievance process, the Board's affirmative action office or the civil service commission.  See Exhibit 5 at 224:20-25.

### O.   Mr. Watkins' Admitted That He Failed To Properly Perform His Job Duties

137. After reviewing his discipline history at his deposition, Mr. Watkins conceded that he could have done a better job:

      Q.   Do you think you did anything wrong at all?

      A.   Sure

. . .

Yes.  I could have done better.  I wish
that I had

. . .

Q.    But in terms of the particular instances
      for which you were disciplined . . . do
      you [accept] responsibility for any of
      those things going wrong?

A.    Yes.

Q.    Because you failed to do something?

A.    Yes some of them . . . the parking
      tickets, I did do that . . . some late
      investigations.

See Exhibit 5 at 230:1-231:13.


P.    **Mr. Watkins Efforts To Gain Employment**

    138. Mr. Watkins' efforts to gain employment since his July

2001 termination to date include:

    •    going to City Hall administration building five to
         six times to check the posted positions;

    •    reviewing job positions posted on the internet
         three times per month;

    •    receiving job listings from a website;

    •    word of mouth;

    •    reading the paper everyday;

    •    going to one job fair; and

> • speaking with Alumni job placement at Delaware State University.

See Exhibit 5 at 274:1-293:4.

139. Although Mr. Watkins cannot recall the jobs that were available at City Hall, he did not believe any of the City Hall jobs to be "appropriate" based on his age and education.  See id. at 275:16-276:6; 278:5-13.

140. Mr. Watkins did not apply for any jobs that were posted on any internet websites including the sites for a historically black college, the US Government, and Monster.com.  See id. at 277:6-18; 277:24-278:4 and 283:24-285:25.

141. Mr. Watkins cannot recall the names of any other websites that he visited in an effort to find employment.  See id. at 277:11-17.

142. Mr. Watkins has not produced any writings to document his job search.  See id. at 279:13-280:3.

143. The only potential employer that Mr. Watkins can recall is the government.  See id. at 278:21-279:10.

144. Mr. Watkins cannot remember the name of the career service entity that allegedly sent him weekly job listings.  See id. at 280:19-24.

145. Mr. Watkins did not print out any job listings.  See id. at 281:7-16.

146. At the time of Mr. Watkins' deposition, April 3, 2003, he intended to apply for a job at the Warrant Service Unit for Philadelphia.  See id. at 283:24-285:25.

147. Mr. Watkins never produced evidence that he did, in fact, apply for a position with the Warrant Service Unit.

148. As of April 3, 2003, Mr. Watkins had gone to a job fair "last year" "somewhere downtown", but he did not apply for any jobs.  See id. at 286:25-287:11.

149. Mr. Watkins subscribes to the Philadelphia Inquirer and looks at the employment listings every Sunday.  See id. at 287:14-17.

150. Mr. Watkins has never applied for any jobs listed in the Philadelphia Inquirer.  See id. at 287:18-21.

151. At the time of Mr. Watkins' deposition, April 3, 2003, he intended to apply for a position with Delaware State University.  See id. at 289:3-25.

152. Mr. Watkins has not produced any evidence that he applied for a position with Delaware State University.

153. Mr. Watkins also testified that he was considering returning to school to enhance his credentials.  Id. at 290.

154. Mr. Watkins has produced no evidence to support any effort to return to school.

155. Mr. Watkins, as recently as July of 2006, stated his efforts to obtain employment were:

> Watkins has continually reviewed the want-ads
> in the newspaper and on the internet in an
> attempt to find employment in his field.  He
> has also networked with business associates
> and contacts in order to try to find a
> position.  Watkins has not been offered any
> position. Watkins is now in the
> exploratory/planning stages of opening his

own business.

See Exhibit 18.

156. Despite these alleged efforts, Mr. Watkins has not submitted a single application for employment since his termination in August 2001.

157. Mr. Watkins' job duties as a Supervisor with the Board included reviewing reports, assigning caseloads, conducting conferences with employees and clients, developing sanctions for clients, working closely with employees to develop their skills, answering the telephone, taking telephone messages, making referrals over the telephone, training new employees, assisting agents in making contacts with clients, evaluating the performance of agents, taking urine samples, preparing weekly overtime reports, maintaining contacts with the neighborhood and local police.  See Exhibit 19.

158. Mr. Watkins testified that he looked at employment advertisements for positions involving social work with the Government, and with the Warrant Service Unit in Philadelphia. See Exhibit 5 at 278:14-279:8; 283:15-23.

159. As recently as July 13, 2006, employment was available as a probation officer for the United States Government.  See Exhibit 20.  Moreover, even a cursory review of employment advertisements show ample job opportunities for someone with Mr.

Watkins' experience.  <u>See</u> Exhibit 21.[1]

---

[1]    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once the moving party meets its burden of demonstrating the absence of any genuine issue of material fact (1986), Fed. R. Civ. P. 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 323 (1986).  <u>See also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255.  Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  <u>See</u> <u>id.</u>, 477 U.S. at 252.

III. <u>LEGAL ARGUMENT</u>

    **A.   Mr. Watkins' § 1983 Claims Against The Board, Mr. Jones And Mr. Bukata, In Their Official Capacities, Should Be Dismissed As A Matter Of Law**

A state is not a person within the meaning of § 1983. <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 60 n.1 (1989).  As held by the Supreme Court, "in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.'" <u>Id.</u>  (citing <u>Wilson v. Omaha Tribe</u>, 442 U.S. 653, 667 (1979)(citations omitted)).  Similarly, state officials are not subject to Section 1983 claims when acting in their official capacities. <u>See</u> <u>Irizarry</u>, 1999 WL 269917, at *4 (citing <u>Will</u>, 491 U.S. 58, 64, 71 (1989)).[2]  <u>See also</u> <u>Stinson</u>, 1998 WL 964215, at *4(holding same). The Supreme Court explained that, "obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." <u>Will</u>, 491 U.S. at 71 (citing <u>Brandon v. Holt</u>, 469 U.S. 464, 471 (1985)).  As such, it is no different from a suit against the state itself. <u>Id.</u> (internal citations omitted).

—————————————

    [2]   Although claims may be brought under Section 1983 against state officials in their official capacities for prospective injunctive and declaratory relief, <u>see</u> <u>Will</u>, 491 U.S. at 71 n. 10, that analysis is inapplicable here, as injunctive relief has not been requested.

Thus, as a matter of law, Mr. Watkins' § 1983 claims against the Board, Mr. Jones and Mr. Bukata, in their official capacities, must be dismissed because such claims are prohibited.

**B.    Mr. Watkins' Claims Of Retaliation Should Be Dismissed Because He Did Not Engage In Protected Conduct Or Fails To Establish A Connection Between His Protected Activity And Any Adverse Employment Action**

Mr. Watkins seems to assert retaliation claims against the Defendants under 42 U.S.C. § 2000e-3C ("Title VII"), 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983").[3] The analysis of a retaliation claim under any of these laws is identical. See, e.g., Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001); Khair v. Campbell Soup Co., 893 F. Supp. 316, 335-36 (D.N.J. 1995) (noting that with respect to retaliation claims, "[t]he Civil Rights Act of 1991 extended § 1981 to the reaches of Title VII.").

To prevail on a retaliation claim, Mr. Watkins must show that he: 1) engaged in a protected activity (including the activities enumerated by Title VII); 2) there was an adverse employment action contemporaneous to, or subsequent to, the protected activity; and 3) there is a causal connection between

---

[3]    Defendants opposed Plaintiff's Motion to Amend his Complaint to assert claims under § 1981 through § 1983. Defendants argued that no independent § 1981 claim can be made pursuant to Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989). The Court granted Plaintiff's Motion to Amend without an opinion. Accordingly, Defendants incorporate their argument that Plaintiff's § 1981 claims are barred under Jett, assuming that the Court has not rejected this argument already.

the two.  See Abramson v. William Patterson Coll. of NJ., 260
F.3d 265, 286 (3d Cir. 2001); Weston v. Commonwealth of Pa., 251
F.3d 420, 430 (3d Cir. 2001); Cardenas, 269 F.2d at 263.

### 1.   Protected Activity

Mr. Watkins claims that he engaged in protected conduct when
he: 1) complained about the lack of clerical support, and that
agents were assigned too many parole cases; 2) filed the 1993
lawsuit; 3) settled the 1993 lawsuit; and 4) allegedly made a
verbal complaint of discrimination at a November 2000 grievance
hearing.  The Defendants concede that Mr. Watkins engaged in
protected conduct when he filed the 1993 lawsuit and allegedly
made a verbal complaint of discrimination at a November 2000
grievance hearing.[4]  The other activities, however, are not
protected conduct as a matter of law.

An activity is protected when an employee opposes an
unlawful employment practice under Title VII, or when an employee
makes a charge, testifies, assists, or participates in an
investigation, proceeding, or hearing under Title VII.  See Clark
County Sch. Dist. v. Breeden, 532 U.S. 268, 269 (2001).  Even
though the opposed practice need not actually be unlawful, the
employee must "reasonably believe" that the practice violated
Title VII.  Id.  Thus, a "general complaint of unfair treatment

---

[4]     Defendants do not waive their right to contest the
validity of the alleged verbal complaint at trial.

does not translate into a charge of illegal discrimination." See Slagle v. County of Clarion, 435 F.3d 262, 265 (3d Cir. 2006).

In Slagle, the court found that the plaintiff was not protected under Title VII because his complaints were only "general complaints" even though his complaint to the EEOC stated that he had been discriminated against because "of whistleblowing, in violation of [his] civil rights, and invasion of privacy." Id. at 263. Compare Clark County Sch. Dist., 532 U.S. at 269-70(providing no protection for the plaintiff because one isolated sexually suggestive comment necessitated by the work process could not reasonably be thought to be violative of Title VII) and Zappan v. Pa. Bd. of Prob. And Parole, 152 Fed.Appx. 211, 218(3d Cir. 2005)(finding no protected conduct when the plaintiff complained about his supervisor's general instruction to discipline subordinates who were not doing their jobs) with Kachmar v. Sungard Sys.,Inc., 109 F.3d 173, 177-78 (3d Cir. 1997)(providing protection when an employee specifically complained about adverse treatment of women) and Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1078, 1085(3d Cir. 1996)(providing protection when the employee made numerous complaints about race based discrimination, which included being called "one of them," "another one," and "poor people.").

The settlement of the 1993 lawsuit is not protected activity. A settlement is not an opposition to unlawful conduct,

nor is it participation in an investigation regarding same. In fact, any evidence concerning a settlement is inadmissible. See F.R.E. 408. Thus, elevating a settlement to protected conduct status contradicts F.R.E. 408 by discouraging parties from settling civil rights cases if they can later be used as a basis for retaliation. The protected conduct is the lawsuit itself and not the settlement of the lawsuit.

Mr. Watkins' complaints about having too many parolees is not protected conduct. At best, the assignment of cases may be a consequence of engaging in protected conduct. It is not protected conduct itself because it does not invoke any of the concerns embodied in the retaliation laws.

Similarly, Mr. Watkins' complaint of a lack of clerical support or agent assistance does not constitute protected conduct. Again, those actions may result from protected conduct but are not themselves protected by law.

Accordingly, the only protected conduct to support Mr. Watkins' retaliation claim is the 1993 lawsuit and the alleged verbal complaint that was made after Mr. Watkins' November 2000 suspension.


2.    Adverse Employment Action

Mr. Watkins asserts that a variety of Defendants' actions are adverse employment actions. The Defendants concede that Mr. Watkins was subject to the following four adverse employment

actions: 1)June 21, 2000 - 1 day suspension; 2)October 5, 2000 - 3 day suspension; 3)November 16, 2000 - 5 day suspension; and 4)August 3, 2001 - termination.  Any other alleged adverse employment action, however, is denied because no other action, such as a PDC, verbal warning, counseling session, written reprimand, bad reviews, large case loads, or lack of clerical staff significantly changed the terms of Mr. Watkins' employment. Indeed, Mr. Watkins did not lose any pay or benefit as a result of these alleged actions.

An adverse employment action "is one which is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" See Cardenas, 269 F.3d 251 at 263 (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)).  Moreover, the Supreme Court described a significant change in employment status as a "hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." Weston, 251 F.3d at 431 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 749 (1998)).  The Third Circuit, however, has specifically found that written reprimands are not adverse employment actions when they do not change or alter a condition of employment.  See id. at 431.

Accordingly, Mr. Watkins' suspensions and termination are the only adverse employment actions at issue in this case.

3.    Causal Connection

Mr. Watkins' retaliation claims are reduced to the 1993 lawsuit and the alleged November 2000 verbal complaint of discrimination as "protected conduct", and the June 21, 2000, October 5, 2000, and November 16, 2000 suspensions and the August 3, 2001 termination as "adverse employment actions". Mr. Watkins' retaliation claims still fail because he cannot establish the requisite causal connection between his protected conduct and the adverse employment actions.  Indeed, the employment actions occurred at least seven years after the 1993 lawsuit.  Similarly, the November 2000 verbal complaint was made after all of the suspensions and about ten months before the termination.

The analysis to determine if there is a causal connection, is fact specific and usually turns on temporal proximity and ongoing antagonism.  See Abramson, 260 F.3d at 288 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000).  See also Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)(holding that while temporal proximity is sufficient to establish a causal link, a plaintiff can also establish a causal link if his employer engaged in a pattern of antagonism in the intervening period.)

In Weston, the plaintiff was unable to establish a causal link when his most recent protected activity occurred on April 25, 1997 and his first adverse employment action occurred on June

12, 1998.  Weston, 251 F.3d at 431.  See also Krouse v. Am.
Sterilizer Co.,
126 F.3d 494,  504 (3d Cir. 1997)(finding that a nineteen month
interlude between protected activity and the alleged adverse
employment action was insufficient, as a matter of law, to
support an inference of causation); Kachmar, 109 F.3d at 178
(citing Robinson, 982 F.2d at 894-95) (expressing doubt that
discharge could be causally linked to an employee's protected
activity taken almost two years previously); Van Houten v.
Principi, 106 Fed. Appx. 134, 138 (3d Cir. 2004)(finding an eight
month passage of time too long to raise an inference of
causation.))[5] C.F. Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d
Cir. 1989)(inferring causation when discharge occurred two days
after notice of filing of claim with the EEOC); Shellenberger v.
Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003)(finding a
request for a reasonable accommodation that occurred 10 days
before termination, combined with comments made to her during the
conversation where she was terminated, was sufficient to
establish a prima facie case of retaliation).

     Without an inference of causation based on timing, a
plaintiff may show discriminatory animus in the interim.  Weston,

---

[5]     The Third Circuit considers non-published opinions as
persuasive authority.  See City of Newark v. U.S. Dep't. of Labor,
2 F.3d 31, 33 n.3 (3d Cir. 1993) ("[a]lthough we recognize that
this unpublished opinion lacks precedential authority, we
nonetheless consider persuasive its evaluation of a factual
scenario virtually identical to the one before us in this case").

251 F.3d at 432.  See also Kachmar, 109 F.3d at 177 (finding circumstances where the cumulative effect  was a pattern of antagonism from the time of the protected activity until the time of the adverse employment action one year later).  The Weston court, however, did not find a pattern of antagonism when the alleged incidents did not "portend any future retaliation, as it did in Kachmar when the plaintiff was threatened to "start looking for another job."  Weston, 251 F.3d at 432.

In Weston, the plaintiff, a male culinary service officer at the State Correctional Institute at Graterford, complained of sexual harassment by his female co-worker and resultant teasing by his other co-workers.  Id. at 424.  After complaining internally and to the EEOC, the Weston plaintiff received a one day suspension and a three day suspension.  Id. at 431.  The court found that all adverse employment actions were discrete responses to particular occurrences and there was no causal connection.  Id. at 432.

Based on the above, it is clear that Mr. Watkins' only protected activity that pre-dated his first adverse employment action, which  occurred in June of 2000, took place when he filed his lawsuit in 1993.  There is no temporal proximity between a 1993 complaint and an adverse action in mid-2000.[6]  Because, as a

_____

[6]    There is no evidence that Mr. Jones or Mr. Bukata were aware of Mr. Watkins' prior lawsuit, and as such there is no claim of retaliation if the alleged perpetrators were not even aware of the protected activity.

matter of law, there can be no inference of retaliation based on the lack of temporal proximity, Mr. Watkins bears the burden of proving ongoing antagonism from the time of the protected activity until the adverse employment action.  Mr. Watkins, however, has limited his claims to those actions that began when Mr. Bukata became his supervisor, which did not occur until 1999. There is a six year hiatus between the protected activity and any possible "pattern of antagonism" by the defendants. Thus, Mr. Watkins cannot meet his burden of proof, and his claim should be dismissed.

Assuming arguendo that Mr. Watkins' next protected activity took place during the grievance hearing relating to his November 2000 suspension, the only adverse action that occurred <u>after</u> that protected activity is his termination in August of 2001, close to ten months later.  <u>See</u> <u>Van Houten</u>, 106 Fed. Appx. at 138 (holding that an eight month passage of time is too long to raise an inference of causation).

For the reasons set forth above, there is no inference of retaliation because there is no temporal proximity between comments made during a grievance hearing in November of 2000 and/or termination in August of 2001.  Moreover, there are no facts to suggest ongoing animus between November 2000 and August 2001, and as such, Mr. Watkins' claims must be dismissed.

**C.    Mr. Watkins' Hostile Work Environment Claims Fail Because He Cannot Establish The Requisite Severe And**

## Pervasive Conduct

Mr. Watkins seems to assert hostile work environment claims based on Title VII, Section 1981 and Section 1983.  The analysis of those claims under any of those statutes is identical.  See, e.g., Verdin v. Weeks Marine, Inc., 124 Fed. Appx. 92, 94 (3d Cir. 2005); Ocasio v. Lehigh Valley Family Health Ctr., 92 Fed. Appx 876, 879-80 (3d Cir. 2004).  Mr. Watkins bases his hostile work environment claims on essentially the same conduct he contends constitutes adverse employment actions:

— Lack of staff and clerical support;

— The assignment of too many cases;

— The lack of one-on-one supervision; and

— The discipline imposed on him by the Board.

Mr. Watkins makes these claims despite the following undisputed facts:

— Mr. Bukata requested a replacement for Mr. Watkins' injured secretary;

— Mr. Bukata made his personal secretary, Ms. Alexander, available to Mr. Watkins and his unit;

— Mr. Watkins offers no criticism of Ms. Alexander's work and concedes that her maintenance of a work log was beneficial;

— Mr. Jones approved overtime for secretaries from other units to assist Mr. Watkins and his unit;

— The Board assigned Ms. Yarborough as the secretary for Mr. Watkins and his unit and Mr. Watkins found her work satisfactory and found her to be professional;

— Case loads in the various units in his division

       were reassigned periodically to address unbalanced
       workloads;

   —  Mr. Watkins could reassign cases among his agents
       to balance their caseloads;

   —  Mr. Watkins exchanged numerous e-mails with
       Mr. Bukata and personally met with him several
       times to discuss his performance issues;

   —  Mr. Watkins admits that he failed to perform and
       could have done a better job in certain aspects of
       his job that ultimately led to discipline by the
       Board;

   —  Mr. Watkins never filed a single written complaint
       of discrimination despite having three avenues
       available to him for such a complaint (grievance,
       affirmative action office and civil service); and

   —  Mr. Watkins advises that he made a verbal report
       of discrimination at a grievance hearing, although
       no one (including union leaders representing
       Mr. Watkins) who attended that hearing recalls
       such a report.

   Thus, his claims cannot constitute a hostile work
environment based in large part by his own admissions.

   Title VII prohibits a discriminatorily hostile work
environment.  See Aman, 85 F.3d at 1081-82.  A workplace is
hostile when it objectively "is permeated with discriminatory
intimidation, ridicule, and insult that is sufficiently severe or
pervasive to alter the conditions of the victim's employment and
create an abusive working environment."  Harris v. Forklift
Serv., 510 U.S. 17, 21 (1993)(quoting Meritor Savings Bank, FSB
v. Vinson, 477 U.S. 57, 65, 67 (1986))(internal quotations
omitted).  See also  Aman, 85 F.3d at 1082 (finding a prima facie
Title VII hostile work environment claim when defendants made

inherently racial remarks and insults to plaintiffs on a daily basis and when plaintiffs were subjected to false accusations of favoritism and incompetence).

In determining whether an environment is hostile or abusive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance." Weston, 251 F.3d at 426(citing Harris, 510 U.S. at 23). See also Aman, 85 F.3d at 1083 ("[T]he pervasive use of derogatory and insulting terms directed at members of a protected class generally, and addressed to those employees personally, may serve as evidence of a hostile environment.").

Courts have dismissed hostile work environment claims when a defendant's behavior was clearly offensive but was not clearly discriminatory. See Walton v. Mental Health Assoc. of S.E. Pa., 168 F.3d 661, 667 (3d Cir. 1999). Likewise, hostile work environment claims fail when the alleged incidents are irregular and discrete. See, e.g., Cronin v. Martindale Andres & Co., 159 F. Supp. 2d 1, 7 (E.D. Pa. 2001)(summary judgment proper when defendant's behavior toward plaintiff was better characterized as isolated rather than pervasive and regular); King v. Sch. Dist. of Phila., No. 00-CV-2503, 2001 WL 856948, at * 5 (E.D. Pa. July 26, 2001)(finding no hostile work environment when the nature and content of the discrimination was not pervasive and

regular).

At no time during any of these alleged instances was Mr. Watkins subjected to behavior that could be considered objectively offensive.  Moreover, none of the alleged instances: occurred with frequency; were permeated with discriminatory intimidation, ridicule and insult; or were physically threatening or humiliating. See Weston, 251 F.3d at 426; Cronin, 159 F. Supp. 2d at 7.  Thus, Mr. Watkins allegations, both individually and cumulatively, fail to rise to the level of hostile work environment.  Accordingly, Mr. Watkins' hostile work environment claim fails and should be dismissed as to all Defendants.

D.  **Mr. Watkins' Claims For Discrimination Should Be Dismissed Because He Failed To Produce Evidence Of Disparate Treatment**

Mr. Watkins alleges that Defendants discriminated against him based on his race.  Disparate treatment claims of race discrimination under § 1983,[7] § 1981 and Title VII require the application of a mixed motive or burden-shifting/pretext analysis.  See Watson v. SEPTA, 207 F.3d 207, 214-15 (3d Cir. 2000)(applying analysis to Title VII claims); Lloyd v. City of Bethlehem, No. Civ. A. 02-CV-00830, 2004 WL 540452, at *3-4 (E.D. Pa. Mar. 3, 2004)(applying analysis to § 1981 claims).

---

[7]    By its terms, §1983 does not create any substantive rights, but rather, it "provides remedies for deprivation of rights established elsewhere."  City of Oklahoma City, 471 U.S. at 816 (citing Baker, 443 U.S. at 140, 144 n.3 (1979)).

A plaintiff must "clear a high hurdle to qualify for a mixed motives instruction". Walden v. Ga-Pac Corp., 126 F.3d 506, 513 (3d Cir. 1997). Only after a plaintiff shows that his employer acted unlawfully, and "not merely on the basis of a prima facie showing" can he shift the burden of persuasion to the employer. Id. (internal citations and quotations omitted). A "mixed motive" case is present only when the "evidence is sufficient to permit the factfinder that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." Id. (citing Griffiths v. CIGNA Corp, 988 F.2d 457, 470 (3d Cir. 1993)). See also Watson, 207 F.3d at 215 (describing the standard in a mixed motive case as "the unlawful motive was a 'substantial motivating factor' in the adverse employment action")(internal quotations omitted).

On the other hand, the Watson court describes the standard in a burden-shifting/pre-text analysis as "the impermissible factor was 'a determinative factor' in the adverse employment action". Id. (internal quotations omitted). To establish a case of disparate treatment under the burden-shifting/pretext framework, which was established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, (1973), a plaintiff must show the following:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's

rejection....'  Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.... While the burden of production may shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citations omitted).

A plaintiff may establish a prima facie case by showing:

(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was either not hired or fired from that position[8]; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class.

Id. at 410-11 (citations omitted) (quotations omitted).  The elements of a prima facie case, however, depend on the facts of the particular case.  Id. at 411.  Thus, a disparate treatment claim can be established "when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion . . ."  Dill v. Runyon, Civil Action No. 96-3584, 1997 WL 164275, at *3 (E.D.Pa. Apr. 3, 1997)(citation omitted).

Mr. Watkins fails to establish a prima facie case of

---

[8]    The third element of a prima facie case of disparate treatment may be established if the plaintiff shows that he suffered an adverse employment action.  Id. at 411.

disparate treatment based on racial discrimination under either the heightened mixed motive framework, or the burden-shifting/pretext framework.  Specifically, he has produced only circumstantial evidence, and as such, his claims must be analyzed under a pretext analysis.  Mr. Watkins fails to produce evidence of a prima facie case of discrimination because he:  (1) has failed to identify adverse employment actions under circumstances that give rise to an inference that he was the subject of unlawful discrimination; and (2) has failed to show that he was singled out and treated less favorably than others similarly situated.

> 1.    Mr. Watkins Does Not Identify Any Actions By
>       Defendants That Establish Any Suggestion That
>       Mr. Watkins Was Suspended And/Or Terminated Based
>       On Race

Mr. Watkins wants this Court to sustain a claim for race discrimination but offers no proof that the supervisors who terminated the employment of Mr. Watkins made their decision based on race.  Just because Mr. Watkins was suspended and terminated from his employment and is African American, does not mean that he has established a claim of race discrimination.  Mr. Watkins has offered no evidence of racist comments or actions.  Indeed, Mr. Watkins admits that he did not always perform his job and that he was late in his performance:

> Q. Do you think you did anything wrong at
> all?

A. Sure

     . . .

  Yes.  I could have done better.  I wish
that I had

     . . .

Q. But in terms of the particular instances
for which you were disciplined . . . do you
[accept] responsibility for any of those
things going wrong?

A. Yes.

Q. Because you failed to do something?

A. Yes some of them . . . the parking
tickets, I did do that . . . some late
investigations

See Exhibit 5 at 230:1-231:13.


    2.   Mr. Watkins Does Not Present Sufficient
        Comparitors To Survive Summary Judgment


    Mr. Watkins contends that Defendants treated caucasian employees differently and did not suspend or terminate their employment for the same violations attributed to Mr. Watkins that led to his suspensions and termination of employment.  This simply is not true.  The facts and records show that, as a matter of law, the "comparitors" named by Mr. Watkins are not comparitors.

    To survive summary judgment for a disparate treatment claim, a comparitor must be "similarly situated" to the putative plaintiff.  "To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in

the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it . . . [and] must be similarly situated in all 'material respects.'" Dill, 1997 WL 164275, at *4 (quotations omitted).

Specifically, comparators should have worked with the same supervisor, have been subjected to the same standards, and have engaged in the same conduct." Jones v. Hosp. of Univ. of Pa., No.Civ.A. 03-CV-4938, 2004 WL 1773725, at *6 (E.D.Pa. Aug.5, 2004) (citations omitted). In Jones, the plaintiff offered four comparators, but none were found to have been engaged in the same conduct. Id. at *6-7. Specifically, the Jones plaintiff was terminated for sleeping while on a one-on-one suicide watch of a patient. Id. Two of her comparators were found asleep on the job, but one was asleep during a break time, and the other was found sleeping while observing a non-suicidal patient. Id. Another comparator left a patient unattended and was supervised by a different supervisor than the Jones plaintiff, and the last comparator was found reading a magazine, not sleeping. Id.

Mr. Watkins identified Stuart Greenberg and Donna Henry as comparitors. Neither one is a proper comparitor. Specifically, Mr. Greenberg fails the "similarly situated" requirement to be a proper comparitor because he did not engage in the same conduct. Both Mr. Greenberg and Mr. Watkins were supervised by Mr. Bukata. When each failed to properly monitor a case, they received the

exact same discipline - a counseling session.  When they both engaged in the same conduct a second time, they both received the same "discipline" - a written reprimand.

Mr. Greenberg, however, did not repeat the above conduct, whereas Mr. Watkins continued to fail to monitor his cases, and committed other acts of insubordination.  As a result of his third, fourth and fifth failures to do his job, Mr. Watkins was disciplined.  Mr. Greenberg did not fail to do his job a third, fourth and fifth time.  Moreover, Mr. Watkins alleges, without evidence, that Mr. Greenberg was assigned clerical assistance while he was not.  This is not true as Mr. Greenberg complained to Mr. Bukata that his unit lacked clerical assistance.  Therefore, Stuart Greenberg is not a proper comparitor.

Mr. Watkins alleges that Donna Henry is a proper comparitor and that she was assigned secretarial support while he was not.  Ms. Henry is not a proper comparitor because she is not similarly situated.  Ms. Henry's unit's secretary was not injured and unable to work.  In other words, if Ms. Gardner, Mr. Watkins' secretary, had not gotten injured, Mr. Watkins would have had, like Ms. Henry, uninterrupted clerical assistance.  Mr. Watkins cannot use Ms. Gardner's injuries to create a comparitor situation with Ms. Henry.  Plaintiff cannot satisfy his initial burden of establishing disparate treatment based on race with these "comparitors."

E.    **Mr. Watkins' Conspiracy Claim Fails As A Matter Of Law**

      1.    Mr. Watkins' Claim For Conspiracy Against The Board And Mr. Jones And Mr. Bukata, In Their Official Capacities Should Be Dismissed Under The Doctrine Of Sovereign Immunity

The Commonwealth of Pennsylvania is immune from civil action unless such immunity is specifically waived by statute. 1 Pa. C.S.A. § 2310; 42 Pa. C.S.A. § 8521 et seq. See Frazier v. Southeastern Pennsylvania Transportation Authority, 868 F. Supp. 757, 761 (E.D. Pa. 1994). The Board enjoys immunity as a Commonwealth party. Mr. Jones and Mr. Bukata, acting within the scope of their employment, also enjoy immunity as Commonwealth parties. See 42 Pa. C.S.A. § 8501; Silver v. Pa. State Parole Agent, No. CIV.A.94-3142, 1995 WL 542181 (E.D.Pa. Sept. 12, 1995); McClellan v. Frazier, No. Civ.A.91-5899, 1992 WL 163295 (E.D.Pa. July 6, 1991); Rogers v. Pa. Bd. of Prob. and Parole, 724 A.2d 319, 323-24 (Pa. 1999). In Faust v. Commonwealth of Pennsylvania, 592 A.2d 835, 839 (Pa. Commw. 1991), the court found a state agency and its employees to be immune from a 42 U.S.C. § 1985 civil conspiracy claim based on the deprivation of civil rights.

There are limited exceptions to the Board's immunity provided for by statute. See 42 Pa. C.S.A. § 8522(a)-(b). Moreover, any exceptions must be strictly construed and narrowly interpreted. See Brown v. Blaine, 833 A.2d 1166, 1173 (Pa. Commw. 2003). None of those exceptions apply to Mr. Watkins'

claims of conspiracy because the claim does not arise "out of a negligent act" and because it is not one of the specifically enumerated statutory exceptions.

       2.    Mr. Watkins' Claim For Conspiracy Against The Board And Mr. Jones And Mr. Bukata, In Their Official Capacities, Should Be Dismissed As A Matter Of Law Because An Entity And Its Agents <u>Cannot Conspire With Themselves</u>

An agency cannot conspire with itself. <u>See, e.g.</u>, <u>Thompson Coal Co. v. Pike Coal Co.</u>, 412 A.2d 466, 473 (Pa. 1979)(finding no conspiracy between an individual shareholder and the corporation); <u>Rutherford v. Presbyterian-Univ. Hosp.</u>, 612 A.2d 500, 508 (Pa. Super. Ct. 1992)(holding that "agents of a single entity cannot conspire among themselves"). The only applicable exception to this rule is when the individual agents act in "pursuit of their own interests and not for the benefit" of the entity. <u>See</u> <u>Pursel v. Parkland Sch. Dist.</u>, 40 Pa. D.&C.4th 129, 140 (2005)(citing <u>Castle v. Crouse</u>, No. CIV. A. 03-5252, 2004 WL 257389, *5 (E.D.Pa. Feb. 11, 2004)).

Mr. Watkins' complaint alleges a conspiracy involving the Board, Mr. Jones and Mr. Bukata in their official capacities, and Mr. Jones and Mr. Bukata in their individual capacities. The claims against the Board and the individuals in their official capacities must be dismissed because an entity cannot conspire with itself or its agents. Moreover, an official capacity suit is nothing more than a suit against the entity itself. <u>See</u>

Hightower v. City of Phila., No. CIV A. 95-4490, 1995 WL 678661, at *5 (E.D.Pa. Nov. 13, 1005).  Therefore, as a matter of law, these claims should be dismissed.


       3.   **Mr. Watkins' Claim For Conspiracy Against Mr. Jones And Mr. Bukata Fails As A Matter Of Law Because <u>There Is No Discrimination</u>**

"Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." <u>Pursel</u>, 40 Pa. D.&C. 4th at 139 (citing <u>McKeeman v. Corestates Bank N.A.</u>, 751 A.2d 655, 660 (Pa. Super. Ct. 2000)).

Mr. Watkins' civil conspiracy claim must fail as a matter of law because his underlying causes of action fail for the reasons set forth herein, and absent a cause of action for a particular act, Mr. Watkins cannot sustain his civil conspiracy claims against Mr. Jones and Mr. Bukata.


     **F.   Mr. Watkins' Claims Against The Board And Mr. Jones, And Mr. Bukata, In Their Official Capacities Should Be <u>Dismissed Because They Are Barred By Qualified Immunity</u>**

The United States Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Qualified immunity is an immunity from suit rather than a mere defense to liability. <u>See</u>

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

The Third Circuit has distilled the United States Supreme Court's qualified immunity decisions into a three-part test. The three inquiries are: (1) whether the plaintiff alleged a violation of his constitutional [or statutory] rights; (2) whether the right alleged to have been violated was clearly established; and (3) whether a reasonable official knew or should have known that the alleged action violated plaintiff's rights. See Rouse v. Plaintier, 182 F.3d 192, 196-97 (3d Cir. 1999).

Because Mr. Watkins has failed to satisfy the necessary threshold inquiry of establishing that his rights were violated, the entire case must be dismissed as to Mr. Jones and Mr. Bukata, individual employees, because they are entitled to qualified immunity. See Siegert V. Gilley, 500 U.S. 226, 233 (1991). See also Torres v. United States, 200 F.3d 179, 187 (3d Cir. 1999)(agents who acted lawfully in handcuffing a suspect while executing a warrant were entitled to qualified immunity with respect to claims stemming from the conduct because there was no deprivation of a constitutional right).

Even assuming a statutory violation, the right at issue is not clearly established and no reasonable official would have known that his actions violated such a right. Specifically, Mr. Jones and Mr. Bukata could not reasonably have known that they were violating Mr. Watkins' statutory or constitutional rights when:

- Mr. Bukata issued negative performance evaluations in response to perceived poor work performance;

- Mr. Jones concurred with Mr. Bukata's assessment;

- Cases and employees were assigned to Mr. Watkins' supervision.

- Mr. Watkins' unit's clerical person was injured and Mr. Bukata offered Mr. Watkins the use of his own secretary.

- The Board, through its multiple layer disciplinary process, suspended and terminated Mr. Watkins.

None of these violations equate to a violation of a known statutory or constitutional right about which either Mr. Jones or Mr. Bukata should have known. Accordingly, they are entitled to qualified immunity.


G.    **Mr. Watkins Is Not Entitled To Front Pay Or Back Pay Because He Failed To Mitigate His Damages By Not Applying For Any Positions Of Employment**

Mr. Watkins failed to mitigate his damages. Defendants must demonstrate that: 1) there was substantially equivalent work available; and 2) Mr. Watkins did not exercise reasonable diligence to obtain employment. See Booker v. Taylor Milk Co., Inc., 63 F.3d 860, 864 (3d Cir. 1995). To this end, substantially equivalent work is that which offers "virtually identical promotional opportunities, compensation, job responsibilities, and status." Id. at 866 (citing Sellers v. Delgado Coll., 902 F.2d 1189, 1193 (5th Cir. 1990)). In Booker, the defendants met their burden by producing employment postings

for similar type positions (laborers) even though those postings
did not contain information about specific job responsibilities,
benefits or promotional opportunities.  See id.  It was clear
from the postings, however, that the positions offered would not
require the plaintiff to "go into another line of work."  See id.

Reasonable diligence is evaluated in "light of the
individual characteristics of the claimant and the job market."
Id. at 865.  The plaintiff in Booker did not exercise reasonable
diligence when his only efforts were to "read the help-wanted
ads," "constantly and continuously look for employment," and
remain active with an employment agency.  See id.  The Booker
court pointed out that the plaintiff, in the three plus years
since his termination, had not completed a single job
application.  See id.

Substantially equivalent employment was available.
Mr. Watkins' job description while employed at the Board included
such skills as reviewing reports, assigning caseloads, conducting
conferences with employees and clients, developing sanctions for
clients, working closely with employees to develop their skills,
answering the telephone, taking telephone messages, making
referrals over the telephone, training new employees, assisting
agents in making contacts with client, evaluating the performance
of agents, taking urine samples, preparing weekly overtime
reports, maintaining contacts with the neighborhood and local
police.  See Exhibit 14.  Furthermore, Mr. Watkins testified that

he looked at employment advertisements for positions involving social work with the Government, and with the Warrant Service Unit in Philadelphia.  <u>See</u> Exhibit 5 at 278:14-279:8; 283:15-23.

A cursory review of employment advertisements from the most recent newspaper shows that substantially equivalent work was and is available.  In fact, as recently as July 13, 2006, employment was available as a probation officer for the United States Government.  <u>See</u> Exhibit 20.

There is no genuine issue of fact in dispute that Mr. Watkins failed to use due diligence to mitigate his damages.  Mr. Watkins testified that the only efforts that he has taken to mitigate his damages are:

- going to City Hall administration building five to six times to check the posted positions;

- reviewing job positions posted on the internet three times per month;

- receiving job listings from a website;

- word of mouth;

- reading the paper everyday;

- going to a job fair;

- speaking with Alumni job placement at Delaware State University.

Mr. Watkins specifically testified that he never filled out any employment applications.  Mr. Watkins, as recently as July of 2006, stated his efforts to obtain employment were the same as above, but added that he is now in the "exploratory/planning stages of opening his own business."

Clearly, Mr. Watkins' "efforts" are even less than those taken by the plaintiff in <u>Booker</u> where the court found a failure to mitigate damages. Five years have passed since Mr. Watkins' employment with the Board was terminated. Not once in those five years has he filled out an employment application. Thus, Mr. Watkins failed to mitigate his damages, and this Court should enter an Order so stating, and instruct the jury as a matter of law, that Mr. Watkins failed to mitigate his damages.

### H. **Plaintiff's Claim For Punitive Damages Should Be Dismissed**

1. Plaintiff's Claim For Punitive Damages Should Be Dismissed Against The Board And Mr. Jones And Mr. Bukata, In Their Official Capacities, As A Matter Of Law

Federal law bars the recovery of punitive damages against governments, government agencies and political subdivisions. <u>See Dickerson v. City of Phila.</u>, No. 98-2109, 1998 WL 40162, at *1 (E.D.Pa. Jul. 9, 1998)(citing <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 259 (1981)). <u>See also</u> <u>Law v. Luzerne Intermediate Unit 18</u>, No. CIV. A. 3:05-CV-2171, 2006 WL 1455730, at *4 (M.D.Pa. May 25, 2006)("the law is clear that a governmental entity cannot be liable for punitive damages under Title VII"); <u>Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist.</u>, 670 F.2d 1 (1st Cir. 1982)("we conclude that 'both history and policy' support municipal immunity from damages under § 1981").

Moreover, punitive damages may not be recovered on "official capacity" claims because those claims are analogous to a claim against the government.  See Hightower, 1995 WL 678661, at *5(citing Kentucy v. Graham, 473 U.S. 159, 165-66 (1985)).  See also 42 Pa. C.S.A. §8528.

Mr. Watkins' Second Amended complaint contains one "wherefore paragraph," wherein he requests punitive damages.[9] Therefore, to the extent that Mr. Watkins seeks punitive damages against the Board,[10] or against Mr. Jones and Mr. Bukata in their official capacities, such claims must be dismissed as a matter of law.

> 2.    Mr. Watkins' Claim For Punitive Damages Against Mr. Jones And Mr. Bukata In Their Individual Capacities Should Be Dismissed Because There Is No Evidence Of Evil Motive Or Intent

Punitive damages "by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter

---

[9]    Mr. Watkins' Second Amended Complaint also asks for the following relief:

> (a) Loss of income, plus interest, including loss of fringe benefits, health insurance, retirement contributions, and lost seniority rights; (b) Compensatory damages; (c) Prejudgment interest, attorneys' fees and costs . . . (e) Such other legal and equitable relief as is just and proper.

[10]    The Board is an agency of the Commonwealth of Pennsylvania.  See Reider v. Pa. Bd. of Prob. and Parole, 514 A.2d 967, 970 (Pa. Commw. Ct. 1986).  See also 61 P.S. § 331.2.

him and others from similar extreme conduct." City of Newport, 453 U.S. at 266. To establish a claim of punitive damages in a civil rights suit against individual defendants, a plaintiff must show that the defendants were "motivated by evil motive or intent" or that the conduct "involves reckless or callous indifference to the federally protected rights of others." Russoli v. Salisbury Township, 126 F. Supp. 2d 821, 873 (E.D. Pa. 2000)(citations omitted). Punitive damages should be reserved "for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensation damages." Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir. 1978) (denying punitive damages for employer's termination employee for policy violation).

Moreover, our Courts have expressed concern that punitive damages should not be assessed against an individual defendant when that party is indemnified by a government entity. See Keenan v. City of Phila., 983 F.2d 459, 477 (3d Cir. 1993)(Higginbotham, J., dissenting)("we must be extremely careful that we not open a backdoor to the city's treasury when the Supreme Court has closed the front door"). In addition, the deterrent nature of punitive damages is lost when the defendant does not pay. See id. at 479-80 ("giving as punitive damage award to a plaintiff where the individual defendant does not pay fails to punish that individual defendant. Taxpayers, not the offenders are punished").

Mr. Watkins has not met the high burden necessary to impose punitive damages on Mr. Jones and Mr. Bukata personally because he has offered no evidence of evil motive or intent.  Even assuming as true the allegations set forth by Mr. Watkins, the actions or inactions of Mr. Jones and Mr. Bukata are not "evil". Mr. Watkins has not offered any evidence to show that any actions were race-based or discriminatory in any way.  To the contrary, the evidence shows that there was a multi-layered discipline process in place that was evenly administered amongst African Americans and Caucasians.  Thus, Mr. Watkins should not be permitted to advance a claim for punitive damages.

IV.  <u>CONCLUSION</u>

Based on the foregoing, Defendants respectfully request that the Court enter Defendants' proposed Order for Summary Judgment against the plaintiff, Henry Watkins.

Respectfully submitted,

MILLER, ALFANO & RASPANTI, P.C.

BY: _____
    GINO J. BENEDETTI, ESQUIRE
    LISA R. MARONE, ESQUIRE
    Attorney I.D. Nos. 59584,
    200305
    1818 Market Street, Suite 3402
    Philadelphia, PA 19103
    (215) 972-6400

    Attorney for Defendants,
    Pennsylvania Board of Probation and
    Parole, Willie E. Jones and Michael
    Bukata

Dated: October 25, 2006

<u>CERTIFICATION OF SERVICE</u>

I certify that a true and correct copy of the foregoing Defendants' Motion for Summary Judgment, and supporting Memorandum of Law with Exhibits have been served on this date on the individual and in the manner listed below:

**<u>VIA HAND DELIVERY</u>**

Robert J. Sugarman
11th Floor, 100 No. 17th Street
Robert Morris Building
Philadelphia, PA 19103

Attorney for Plaintiff

BY: _____
GINO J. BENEDETTI, ESQUIRE
LISA R. MARONE, ESQUIRE
Attorney I.D. Nos. 59584, 200305
Miller, Alfano & Raspanti, P.C.
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 972-6400

Attorneys for Defendants,
Pennsylvania Board of Probation and
Parole, Willie E. Jones and Michael
Bukata

Dated: October 25, 2006