**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

───────────────────────────────

| | |
|---|---|
| **HENRY WATKINS** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :  **NO. 02-CV-2881** |
| | : |
| **PENNSYLVANIA BOARD OF PROBATION** | : |
| **& PAROLE, EDWARD JONES, AND** | : |
| **MICHAEL BUKATA** | : |
| | : |
| **Defendants.** | : |

───────────────────────────────

## <u>ORDER</u>

AND NOW, this ____ day of _____, 2006, upon consideration of defendants' Motion for Summary Judgment and plaintiff's response thereto,

It is ORDERED that the Motion is DENIED in its entirety.


BY THE COURT,


_____
John P. Fullam, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

─────────────────────────────────

HENRY WATKINS                          :
                                       :
            Plaintiff,                 :
                                       :
      v.                               :    NO. 02-CV-2881
                                       :
PENNSYLVANIA BOARD OF PROBATION        :
& PAROLE, EDWARD JONES, AND            :
MICHAEL BUKATA                         :
                                       :
            Defendants.                :

─────────────────────────────────

**PLAINTIFF'S ANSWER TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff answers defendants Motion for Summary Judgment as follows:

1-3.    Admitted.

4.    Admitted in part.  Admitted that the Amended Complaint contained such counts.  Denied to the extent that defendants might assert that the Amended Complaint is limited in any way by their summarization.

5-11.    Admitted

12.  Denied.  This averment is a conclusion of law to which no response is required.  To the extent that any response may be required it is denied.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.

13.  Denied.   This averment is a conclusion of law to which

F:\Watkins\Pleadings\Resp.IROG

no response is required.  To the extent that any response may be
required it is denied.  Watkins was discipline and terminated as
retaliation for his complaints about racial discrimination.
Plaintiff incorporates his Memorandum in Opposition to Summary
Judgement attached hereto.

14.  Denied.  This averment is a conclusion of law to which
no response is required.  To the extent that any response may be
required it is denied.  The climate of racial harassment,
discrimination and retaliation at the Parole Board is well
documented, including, but not limited to numerous affidavits,
deposition testimony, and jury verdicts in favor of complaining
plaintiffs.  Plaintiff incorporates his Memorandum in Opposition
to Summary Judgement attached hereto.

15.  Denied.  This averment is a conclusion of law to which
no response is required.  To the extent that any response may be
required it is denied.  There is a great deal of evidence that
the decision to terminate Watkins was racially motivated
including, but not limited to evidence of disparate treatment in
the allocation of resources, disparate treatment regarding
discipline, and the deposition testimony and affidavits of
witnesses. Plaintiff incorporates his Memorandum in Opposition to
Summary Judgement attached hereto.

16.  Denied.   This averment is a conclusion of law to which
no response is required.  To the extent that any response may be
required it is denied.  Immunity does not bar liability for

federal claims.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.

17.  Denied.  This averment is a conclusion of law to which no response is required.  To the extent that any response may be required it is denied.  Defendants conspired to discriminate and retaliate against Watkins.  The underlying counts should be upheld.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.

18.  Denied.  This averment is a conclusion of law to which no response is required.  To the extent that any response may be required it is denied.  Immunity is not applicable to intentional torts and violations of constitutional rights.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.

19.  Denied.  This averment is a conclusion of law to which no response is required.  To the extent that any response may be required it is denied.  Watkins has applied for other jobs, networked and explored starting his own business in efforts to mitigate his damages.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.

20.  Denied.  This averment is a conclusion of law to which no response is required.  To the extent that any response may be required it is denied.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.

21.  Denied.  This averment is a conclusion of law to which

no response is required.  To the extent that any response may be required it is denied.  Defendants intended to discriminate and retaliate against Watkins in violation of his constitutional rights. There is a great deal of evidence that the decision to terminate Watkins was racially motivated including, but not limited to evidence of disparate treatment in the allocation of resources, disparate treatment regarding discipline, and the deposition testimony and affidavits of witnesses.  Plaintiff incorporates his Memorandum in Opposition to Summary Judgement attached hereto.


    WHEREFORE, plaintiff respectfully requests that this Honorable Court deny defendants' Motion for Summary Judgment in its entirety.


                                    /S/ rjs1531
                                ROBERT J. SUGARMAN
                                Counsel for Plaintiff

OF COUNSEL:

SUGARMAN & ASSOCIATES, PC
11th Floor, Robert Morris Bldg.
100 North 17th Street
Philadelphia, PA 19103
215-864-2500

Date: December 13, 2006

F:\Watkins\Pleadings\Resp.IROG

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **HENRY WATKINS** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :     **NO. 02-CV-2881** |
| | : |
| **PENNSYLVANIA BOARD OF PROBATION** | : |
| **& PAROLE, EDWARD JONES, AND** | : |
| **MICHAEL BUKATA** | : |
| | : |
| **Defendants.** | : |

---

**MEMORANDUM IN OPPOSITION TO
DEFENDANTS' THIRD MOTION FOR SUMMARY JUDGMENT.**

Plaintiff submits this memorandum in opposition to the
Defendants' Third Motion for Summary Judgment.

**INTRODUCTION**

The Pennsylvania Board of Probation and Parole is a sick
institution.  It is infected with a chronic and institutionalized
culture of racism and retaliation.  In the early 1990's, several
agents, including Plaintiff Henry Watkins banded together to
stand up to that racism; to demand that the Board be held
accountable for its errors and neglect and cut out the illness.
In 1996, it appeared that they had succeeded; a settlement was
reached, a new Chairman appointed and a stated commitment had
been made to rooting out institutionalized racism.

However, in short course any hope for the promised treatment
and remission quickly faded.  The new Chairman was replaced,

reformers demoted or terminated, no one was held accountable, and even the terms of the settlement were disregarded.

That racism and retaliation has come back as strong as ever can be no more clear than in the opening lines of Defendants' brief in support of now their third motion for summary judgment. While paying what can only be a disingenuous homage to civil rights protections, the defendants do what bullies and oppressors have done best for all time; they attack and blame the victim.

Their rationalization is unclear.  Maybe they hope that the oppressed will tire under their glare and wilt away; Maybe they believe that justice will become jaded and turn a deaf ear; Maybe it is just a blinding arrogance that prefers to hold its head beneath the sands.

Whatever the cause, the effect is quite certain. Astonishingly, the Board has never reviewed Jones' conduct for discrimination in the face of numerous claims, and numerous settlements.  To the contrary, instead of rooting out the illness, the defendants have systematically removed or forced out all those who have stood up to their discrimination.  Not one of the original plaintiffs remains.  The Auditor General's report, the treatment of white employees and the punishment of all those who complain of or testify about discriminatory practices all show a deliberate intention or at least tolerance of a systematic pattern of racial discrimination and retaliation at the Board.

**STATEMENT OF FACTS**

Defendants now file their third Motion for Summary Judgment. In support of their Motion they list 159 contentions which they allege are "uncontested material facts." This section is deceptive because many paragraphs are in fact contested and the "facts" are construed in a self-serving and unfair light. (Pursuant to the standard of summary judgment, this spin must be disregarded as the Court is required to view the facts in the light most favorable to the non-moving party.)

Moreover, the defendants have selectively culled the facts to leave out numerous facts, which cannot be denied and show that the defendants instituted a systematic campaign of racial harassment, discrimination and retaliation which ultimately led to the discriminatory and retaliatory termination of Watkins. Accordingly, unless specifically admitted, plaintiff denies that the "facts" are uncontested and/or material.

The facts show, plaintiff, Henry Watkins, is a former African-American employee of the Pennsylvania Board of Probation and Parole. (The "Parole Board"). (Defendant's Facts at ¶7). He was hired as a parole agent and served in that position from 1973 until 1998. (Defendant's Facts at ¶10-11). Watkins and five others sued the Board in 1993 for race discrimination. (Defendant's Facts at ¶16). In 1998, Watkins was promoted to Supervisor as a part of the terms of the settlement agreement.

(Defendant's Facts at ¶11).  Watkins was terminated in 2001.
(Defendant's Facts at ¶15).

Defendant Bukata was Watkins' immediate supervisor from July
1999 until his termination in 2001. (Defendant's Facts at ¶13).
Edward Jones is a District Director at the Parole Board.
(Defendant's Facts at ¶7).  Jones was Watkins' ultimate
supervisor.  (Defendant's Facts at ¶13).

Watkins is just one more victim (a repeat victim) of an
institutionalized culture of discrimination and retaliation that
led to his firing.  There is a great deal of evidence showing
that he was disciplined and terminated based on racial
discrimination and retaliation.

## A.    OVERT DISCRIMINATION AGAINST WATKINS

While a supervisor under defendants Jones and Bukata at the
Parole Board, Watkins' unit was unfairly overloaded and denied
support staff. Watkins believed this to be a discriminatory
practice aimed at retaliating against Watkins for his prior
protests of discrimination and he complained to Jones and Bukata,
as while as their superiors about this treatment. (Watkins
Affidavit, Ex A at ¶ 1).

The withholding of support staff shows clear discrimination
and retaliation.  While Watkins was a supervisor, the secretary
for Watkins' unit was injured.  She went out on leave and his
unit did not have a secretary. (Watkins Affidavit, Ex A at ¶ 2).

He  made requests to both Bukata and Jones that they provide another secretary to replace her. (Watkins Affidavit, Ex A at ¶ 3).

Though he had no secretary for a year, Watkins' unit was required to ensure that the clerical work was done. Watkins was severely reprimanded if ever the statistical codes were not up to date on a file. This happened 2-3 times.(Watkins Affidavit, Ex A at ¶ 23).

Other supervisors, white supervisors, were not required to maintain this clerical work as up to date as Watkins even though they had secretaries. Watkins once saw more than 100 files listed as blank at one time and no one was reprimanded for it.  (Watkins Affidavit, Ex A at ¶ 24).

Despite Watkins' requests he was not provided a Secretary for a year.(Watkins Affidavit, Ex A at ¶ 4).  Other white supervisors were provided with secretaries; some had two.  If one left, the secretary was routinely replaced.(Watkins Affidavit, Ex A at ¶ 5).  Another Supervisor in Watkins' division, Stuart Greenberg, was without a secretary for six months while he was also without a secretary. Watkins was without a secretary for about four months before Greenberg's secretary left.  (Watkins Affidavit, Ex A at ¶ 6).

Greenberg and Watkins interviewed secretaries at the same time.  (Watkins Affidavit, Ex A at ¶ 7).  Though Watkins had been

F:\Working-DOCS-Sugarman\Watkins\Pleadings\Answer Summ Judge 12-5.wpd

without a secretary for four months longer than Greenberg, after we interviewed secretaries together, he was provided with one of the secretaries that was hired, but he was not provided a replacement secretary until two months after Greenberg. (Watkins Affidavit, Ex A at ¶ 8-9).

The caseloads also make a clear showing of discrimination and retaliation.  Watkins' caseload was always the highest in the division. He usually had almost 600 parolees in Watkins' unit. Watkins' unit would never get lower than about 490 parolees. (Watkins Affidavit, Ex A at ¶ 10).  White supervisors Donna Henry, Mark Weinstein and James Ellis generally had 350-425 parolees in their unit. (Watkins Affidavit, Ex A at ¶ 11).

Likewise, James Burton, another African American Supervisor, experienced the same excessive workload; around 600 parolees. (Watkins Affidavit, Ex A at ¶ 12).

When Watkins complained about the caseload, Bukata and Jones refused to do anything and blamed Watkins for the caseload. (Watkins Affidavit, Ex A at ¶ 28).  When Supervisor Ellis complained about his caseload, though lower than Watkins', they redistricted the entire division.(Watkins Affidavit, Ex A at ¶ 29).

Additionally, during Watkins' time as a Supervisor, his unit was redistricted three times.  This was more than any other Supervisor. (Watkins Affidavit, Ex A at ¶ 18). When a unit is

redistricted all cases are transferred in a mass transfers of
cases.  These mass transfers entailed the transferring of a whole
caseload from one supervisor to another supervisor.  Often, the
White supervisor would not even be required to update his cases
before the transfer.  However, Watkins was required to make sure
that all outgoing cases were in perfect shape. (Watkins
Affidavit, Ex A at ¶ 19).  On one such occasion, Watkins came
into his office to find that there were 300 new cases on his desk
which had not been properly updated. (Watkins Affidavit, Ex A at
¶ 20).  He believes these redistricting were used to harass,
discriminate and retaliate by imposing tremendous work
requirements that could not be kept up with. (Watkins Affidavit,
Ex A at ¶ 21).

   Additionally, when Watkins' unit was redistricted, it was
redistricted to progressively more dangerous areas of the city.
Watkins started in Manayunk and Roxborough and, by the end, was
redistricted to the worst sections of north Philadelphia.(Watkins
Affidavit, Ex A at ¶ 22).

   As further harassment, Bukata would enter Watkins' office
while he was not there and search through Watkins' desk.(Watkins
Affidavit, Ex A at ¶ 25).

   Bukata also refused to offer any training or answer
questions when Watkins asked him about policies, procedures or
for advise.  (Watkins Affidavit, Ex A at ¶ 26).  He would

reprimand Watkins and humiliate him if Watkins asked for advise.
(Watkins Affidavit, Ex A at ¶ 27).

**B.   THE HISTORY OF DISCRIMINATION AND RETALIATION AGAINST WATKINS AND OTHER AFRICAN AMERICANS.**

An epidemic of continuing racism and retaliation was documented by the Administrative Office of the Governor in two investigations in the first years of the Casey administration, 1988-1993. (1993 Report, Ex B; Sugarman Affidavit, Ex C at ¶ 2). The harassment, discrimination and retaliation against Watkins resulting ultimately in his termination stems from his complaints about discrimination at the Board starting in 1993 with the lawsuit against the Board and continuing through his termination.

The 1993 lawsuit, actually six consolidated discrimination cases referred to as <u>Williams et al. v. Parole Board</u>, 93 CV 5696, was settled in 1995.  In that case, Judge O'Neill, in his opinion dealing with the Motion for Preliminary Injunction, found that the plaintiffs were likely to succeed on the merits. (Sugarman Affidavit, Ex C at ¶ 3).  Accordingly, after many years of racial discrimination and retaliation by the Board, the Board, under Governor Casey and his appointee, African-American Chairman Allen Castor, finally came to grips with the problem. (Sugarman Affidavit, Ex C at ¶ 2-3).

Chairman Castor in fact, personally negotiated and signed the Settlement Agreement (with outside Board counsel, Sugarman Affidavit, Ex. C at ¶ 4).  He also installed an African-American,

Calvin Ogletree, a longtime professional at the Parole Board who had been a leader of the effort against discrimination and retaliation, as Chief of Staff of the Board.  (Castor Dep at 11-2, Ex D; Sugarman Affidavit, Ex. C at ¶ 5).

Mr. Castor personally involved the head of personnel of the Board, a hold over, an African American, Thomas Marshall, in the settlement negotiations.  (Marshall dep at 40-1, Ex E; Sugarman Affidavit, Ex. C at ¶ 4).  This all came to a conclusion in 1995.

Among the provisions of the Settlement Agreement was one requiring the Board to promote a number of plaintiffs involved, including plaintiff Watkins, as vacancies arose.  (Defendant's Facts at ¶11).

By the time vacancies arose, however, Governor Casey had been replaced by Governor Ridge, in January 1997.  (Sugarman Affidavit, Ex. C at ¶ 7). Over the next three years, the Ridge administration completely undid the changes which Chairman Castor had accomplished.  (Sugarman Affidavit, Ex. C at ¶ 7-8). Chairman Castor was removed, Mr. Ogletree was removed, and even Mr. Marshall was demoted. (Castor Dep., Exhibit D at 21-2, 83-4; Marshall Dep at 8, Ex F; Sugarman Affidavit, Ex. C at ¶ 17).  In 1997, the new chairman, William Ward, installed a new District Director in Philadelphia, defendant Jones, first in 1996-1997, and then, after that appointment was invalidated by the Civil Service Commission, again later in 1997. (Scicchitano Dep at 9-

F:\Working-DOCS-Sugarman\Watkins\Pleadings\Answer Summ Judge 12-12.wpd

10, Ex G; Sugarman Affidavit, Ex. C at ¶ 8).

As District Director, Jones was responsible for appointing Mr. Watkins under the provisions of the settlement agreement, (Scicchitano Dep at 100, Ex G) but later denied he was aware of it. (Jones' testimony and later trial testimony in Russ-Tobias) Pursuant to the deposition of Ronald Zappan, Mr. Jones' preexisting Deputy District Director, Mr. Jones stated he was going to get the prior plaintiffs and he was not interested in the settlement agreement. (Trial Test N.T. 5/5/05, at 39, Ex. H)

In this context, Watkins and other of the affected agents came to return to counsel and began to complain through the chain of command. (Sugarman Affidavit, Ex. C at ¶ 15). They knew of no designated officer for the ADR process set up under the settlement agreement. Mr. Marshall denied involvement. (Marshall Dep at 43-4, Ex. E). As shown infra, LaDelle Ingram, the Board's EEO officer, admitted that she and the Board never actually complied with any of the terms of the ADR agreement. (Ingram dep, Exhibit I at 26-7, 32-4, 36, 39-40, 64, 72-3, 84-6).

It is significant that none of the original plaintiffs remain employed by the Board. Plaintiff Watkins was fired, and the other individuals all retired due to hostile work environment. (Sugarman Affidavit Exhibit C; Affidavits of Watkins Ex J; and Burton, Ex K). One white supervisor who was asked to participate in the retaliation against plaintiffs, Hugh Young,

testified that it was known that the Board was "out to get" the original plaintiffs. (N.T. 5/13/05, at 75, Ex L).

None of the original plaintiffs remain employed by the Board because they were targeted for removal by the defendants in retaliation for their complaints of discrimination.  Watkins is no different.

This is, unfortunately, a continuation of the discrimination documented in the first Governor's report on the Sentinels in Criminal Justice discrimination complaint (Watkins is one of the Sentinels) authored in 1988.  (Exhibit M).  That report concluded that blacks were disparately impacted by the Board's policies. It found the major issue of concern was meeting eligibility requirements for the 501 promotion without examination and becoming eligible for the interview process.  The report concludes that the 501 test was a tool used by supervisors to manipulate the system and to selectively choose the candidates of their choice (Exhibit M; page 1, paragraph 6); i.e. white candidates.  Accordingly, the report found minorities receive parole supervisory positions at a lower rate than non-minorities. It also found the criteria in ratings were not applied uniformly. There is a lack of uniformity within the MSPT System.

The report found that discrimination is a factor because the promotion process uses subjective criteria in the review which hinders black agents' ability to advance. (Exhibit M; Page 3,

paragraph 1). The blacks were discriminated against because the rating systems procedure allows managers to consistently prefer whites based on the subjective evaluations. This resulted in a pattern of discrimination against minorities. The report found supervisors consistently give white agents higher evaluations. (Exhibit M; page 3, paragraph 3).

Accordingly, in 1988, the Bureau of Affirmative Action found that a disparate impact against minorities in receiving promotions does exist in PA Board of Probation and parole and made seven recommendations to fix the problem. (Exhibit M; page 6, paragraph 7).

Unfortunately, the Board refused to remedy those problems. In 1993, a second report was issued. (Exhibit B). The 1993 report found that the Board has failed to and/or refused to implement reform because the report was disregard from the top levels. (Exhibit B; Page 1). It stated that agents had no knowledge of what was done relative to recommendations of 1988 report. (Exhibit B; Page 2). Training was never implemented. In fact, the report expressly found that the head of Philadelphia probation and parole office disregarded the report and refused to gave little to no credence to report.

The 1993 report also found that minorities had suffered retaliation as a result of the 1988 Complaint and report. It found discriminatory practices intensified as a result of

previous report. (Exhibit B; Page 2).  Instead of increasing

opportunity for black agents, black agents encountered more

written reprimands and lower review ratings. *Id.*  The were denied

and made ineligible for Promotions by these reprimands. Again,

reassignment was only used as means of discipline for black

agents.  It found the frequency of agent transfers within

Philadelphia district was excessive. (Exhibit B; Page 13).

Astonishingly, **76 written reprimands were issued to Parole agents**

**between February 1987 and December 1992.  All 76 were addressed**

**to nine black agents.**

The report found the performance evaluations for 87-88 and

90-91 revealed a significant decrease in overall ratings for

black agents; indicating retaliation. Overall ratings for white

agents improved.

White agents were left undisciplined or even reviewed; the

Philadelphia office would audit one or two black agents within a

each unit but not the white agents. **Between 1988-1992 ten agents**

**were suspended, all ten were black.** (Exhibit B; Page 15.)  In the

end, little effort was exerted to implement recommendations of

initial 1988 report.  At most, 2 of 7 recommendations were

implemented as of 1993 report.

Watkins and five other agents filed suit in 1993 and, in

1994, this court, Judge O'Neill presiding, found that retaliation

was a problem at the Board.  He found that the members of the

Sentinels (Watkins was a Sentinel) were more likely to be discriminated against. (Exhibit N at 4). He found the 1993 Plaintiffs were disciplined after meeting to discuss hiring and promotion practices with regard to race. (Exhibit N at 5).

The affidavits and testimony of Board employees shows that the discrimination and retaliation continues today. Ronald Zappan, a white deputy director, states that defendant Jones instituted a policy of harassment against black supervisors and agents who had been complaining of discrimination. (Exhibit O at ¶ 6). He also testified consistently in <u>Russ Tobias v. Parole Board</u>, that Jones' stated he was going to get the prior plaintiffs and he was not interested in the settlement agreement. (Trial Test N.T. 5/5/05, at 39, Ex. H).

Zappan averred that, with proper training and adequate staff, including clerical support staff, Watkins would perform well. (Exhibit O at ¶ 8). Zappan told Jones this, but Jones insisted that Watkins be disciplined. Because it was not warranted, Zappan refused to impose heavy discipline on Darryl Rankin, Henry Watkins, and Howhru Self, all African American, as defendant Jones demanded. (Exhibit O at ¶ 9). Instead, he provided defendant Jones with truthful information regarding understaffing and lack of training. (Exhibit O at ¶ 9).

Zappan states and testified that Jones demanded he bring unwarranted charges against black men involved in previous

discrimination charge. (Exhibit O at ¶ 7).  He testified that, after refusing those demands, Zappan's supervisors implemented a continuing program of systematic retaliation against him. (Exhibit O at ¶ 14).  His secretary was reassigned and he received a poor performance evaluation for the first time in 26 years of employment. (Exhibit O at ¶ 16).  He was suspended in violation of Board policy, which was reversed by the Civil service commission. (Exhibit O at ¶ 20).  Ultimately, Zappan was forced to retire because of hostile work environment that became intolerable. (Exhibit O at ¶ 22).

Henry Williams Affidavit corroborates the discrimination. He avers that the Board, including Jones, systematically discriminated against him in retaliation for the 1993 case. (Exhibit P at ¶ 5).  Like Watkins, he was punished with an excessive workload; being assigned upwards of 260 cases. (Exhibit P at ¶ 6).  This is the same workload as an entire unit of some white supervisors.  Williams was transferred to the absconder unit, which currently has five agents and one supervisor. (Exhibit P at ¶ 7). Williams used to have to handle alone with one Ernest Holmes. No increase in caseload. (Exhibit P at ¶ 7). He avers that black employees were more frequently and severely disciplined than white employees. (Exhibit P at ¶ 7).  The pattern of institutionalized discrimination and retaliation forced Williams to retire. (Exhibit P at ¶ 10).

Howrhu Self is another of the 1993 plaintiffs.  In his
Affidavit, Self avers that he witnessed and endured repeated
systematic discrimination by Jones. (Exhibit Q at ¶ 5).  Again,
he was punished with a disparately high caseload.  He was
responsible for at least 400 cases.  He received written
reprimand for lateness to a hearing, while white agent was
similarly late received no reprimand. (Exhibit Q at ¶8). He
corroborates that black employees were more frequently and
severely disciplined than white employees. (Exhibit Q at ¶ 8).
Self was refused pay for his overtime hours while white employees
were paid overtime. (Exhibit Q at ¶ 9).  Despite his tremendous
case load.  Holmes was forced to share a state vehicle while
white agents, some with less than 1/5 the caseload, had their own
vehicles.   Like Williams, the pattern of institutionalized
discrimination and retaliation forced Self to retire. (Exhibit Q
at ¶ 12).

James Burton, a black supervisor, was also forced to retire.
(Exhibit R at ¶ 1).  He testified that, upon his being hired as
district director, Jones created a systematic policy of
discrimination and retaliation. (Exhibit R at ¶ 8).  As a
supervisor Burton was unfairly disciplined for events that
occurred while he was on vacation. (Exhibit R at ¶ 4).
His supervisor made racially derogatory remarks about him, but he
never complained about statements for fear of retaliation.

(Exhibit R at ¶ 31).  When Burton complained about a racial
offensive t-shirt being worn by white agents, his supervisors
refused to do anything about it. (Exhibit R at ¶ 35-9).

Burton averred that he was excluded from "business lunches"
because of his race. (Exhibit R at ¶ 49).  Like Watkins, his unit
was overloaded with work; responsible for 532 cases while white
supervisors had between 281-384. (Exhibit R at ¶ 57).
Comparatively, Watkins unit was assigned at least 490 cases.
(email October 6, 2000, defendants' Exhibit 7).

Also like Watkins, despite the gross disparity of caseload,
his supervisors refused to hire clerical staff for his unit.
(Exhibit R at ¶ 68).

The pattern continues with Darryl Rankin.  After the 1995
Settlement his unit was given no equipment. (Exhibit S at ¶ 6-7).
Rankin had to get desks donated by a friend to have desks for his
unit and repair broken and discarded phones to have phones.
(Exhibit S at ¶ 7).  Like so many other blacks who complained of
discrimination, he saw his secretary relocated and not replaced.
(Exhibit S at ¶ 8).

Rankin was Transferred to Solla's unit. Like Williams, he
was excluded from "business lunch meetings" (Exhibit S at ¶ 12,
13).  Like the other black employees, Jones and his supervisors
also put everything in writing, no informal complaints. (Exhibit
S at ¶ 14).  Conversely, white employees were able to handle

concerns informally without a record being created.  Like
Williams and Self, the pattern of institutionalized
discrimination and retaliation forced Rankin to retire. (Exhibit
S at ¶ 16).

Victoria Roadcloud, shows the same pattern of transfers to
undesirable units; a unit in shambles (Exhibit __ at ¶ 8),
excessively high caseloads and repeated discriminatory
reprimands. (Exhibit T at ¶ 15).  As per the M.O. she was
terminated as a result of investigation report falsely claiming
she falsified documents. (Exhibit T at ¶ 19). Roadcloud was on
disability leave at the time and did not even know of the PDC.
(Exhibit T at ¶ 18). She was never even allowed to see report.
(Exhibit T at ¶ 18, 20).

The Affidavit of Rosalind Russ-Tobias shows that she was
subjected to the same discriminatory transfer as Roadcloud and
successfully fought the transfer. (Exhibit U at ¶ 10-15).  As
retaliation, Jones requested an OPR investigation of her, based
on a fictitious complaint from Mr. Umberger. (Exhibit U at ¶ 22,
51).  She was falsely accused of falsifying documents, misusing
commonwealth vehicle, and maintaining two drivers licenses.
(Exhibit U at ¶ 40).  In 2005, a jury found in her favor and
ruled that Jones and the Board had discriminated against her

By now the pattern of discrimination and retaliation is
clear.  When a black employee complains about discrimination the

Board takes certain steps.  They increase the caseload.  The remove secretarial support.  When the caseload and the lack of support start to take their toll, they look for mistakes; mistakes that white employees would not be formally or as severely punished for.  The harass the black employee about the mistakes.  Then they set up a kangaroo court style PDC. Discipline is issued; harsher discipline than is given to white employees.  This pattern then continues until the employee resigns under the pressure or the Board thinks that it has created enough of a pretext to terminate.

Against this backdrop, the Auditor General's Probation and Parole Audit was issued in 2003.  It showed an overall very poor performance review for the entire Board. (Exhibit V at 32).  The report concluded that the Board was generally deficient in performing its duties, including agents universally not keeping track of defenders, lack of documentation and poor performance all around. (Exhibit V at cover letter summary).  The Board has almost 350 agents to monitor nearly 24,000 offenders. (Exhibit V at 36). This works out to 71 offenders per agent.  During the time Watkins was a supervisor, the report found the Board

> did not document parole investigations, insufficiently supervised paroled prisoners, lost track of nearly 1,600 offenders, did a poor job of collecting supervisory fees, inadequately monitored parolee and probationer court-ordered payments for victim restitution, and did little to increase employment opportunities for parolees.  (Exhibit V at cover letter summary).

_____Thus, it is clear that it was also very easy for the defendants to discipline whomever they wanted because the whole system was failing.  This gave defendants a very easy environment for them to discriminate and retaliate against Watkins at will.

## ANSWER TO DEFENDANT'S "UNDISPUTED FACTS"

### The Parties

1-3. Admitted.

4.    While it is admitted that the case concerns the Board's Philadelphia office, the complained of discrimination, harassment and retaliation is a symptom of institutionalized racism that is not solely confined to the Philadelphia Office. Moreover, it is averred that Board was organized as a single unit in terms of personnel policies and Mr. Jones reported to and worked with the Central Personnel Unit, and collaborated with that Unit in regard to employee relations.  Actions taken by the Board at the Harrisburg headquarters and other offices across the state are relevant to this case.  For example, the Auditor General's report showed a state wide failure to comply with the standards of the Board which affected the vast majority of the agents. (Exhibit V).  This report, not confined to the Philadelphia office is direct evidence of the disparate treatment of white employees, who make similar mistakes to those

that defendants used as a pretext to terminate Watkins.

5-8. Admitted.  However, asserted that the Board cannot selectively rely on terms of a "confidential" settlement.  If the Board is relying on those terms it should be found to have waived the confidentiality provision.

9.   Admitted that Bukata was Watkins' supervisor.  Denied that defendants' summary of job duties is complete. His job also included training and advising and providing support for supervisors.  Also denied as to its materiality.

10-12.   Additional material fact is that Ronald Zappan was Mr. Watkins' indirect Supervisor from 1993-1996.  Mr. Zappan had been a defendant in the 1993 case.  He refused Mr. Jones' direction to discriminate and retaliate against Mr. Watkins and/or other African American agents who have previously sued the Board.

13-15.   Admitted. The Board had discriminated against Mr. Watkins continuously from 1998 until the time of his termination.

### The 1993 Lawsuit

16.   Denied as stated. The six African American agents sued the Board for discrimination and retaliation. The Court, per Judge Thomas O'Neill, found after Preliminary Injunction Hearing, that the Plaintiff has established the probability of success on the issue of retaliation. (See Exhibit N). This is

one of the many facets of the pattern of discrimination and retaliation against employees at the Board.

17.   Materiality denied, in that neither Mr. Jones or Mr. Bukata was in the position to discriminate against Plaintiff at that time, but was placed in the position of supervision over Plaintiff after the settlement was implemented.

18.   It is admitted that the lawsuit was settled.  Averred that the Board committed to substantial monetary and other compensation to Plaintiff and others while refusing to admit liability.  Again, however, the Board is relying on the terms of a "confidential" settlement and should be found to have waived the confidentiality provision.

19-20.   Denied that it is material whether Watkins had knowledge as to what Jones and Bukata knew about the Settlement Agreement.  Watkins testified that the Settlement agreement was common knowledge within the Parole Board. (Watkins Deposition at 43-4).  Denied, in that Mr. Watkins has become aware of his retaliation against him at the order of Mr. Jones through the sworn testimony of Ronald Zappan, circumstantially, and also Mr. Jones' motivation, the 1995 Settlement Agreement.  Further, the sworn testimony of the personnel director of the Board, Gary Schiccitano was that Mr. Jones had to have known of the Settlement Agreement, because he was responsible for implementing it, e.g., promoting Mr. Watkins.

## **Discipline Process**

21.   Denied. The Board process is different from the written procedures.   The Board utilizes discipline process as a means of retaliation, as was determined by the jury in <u>Russ-Tobias vs Board</u>.   The disciplinary process is not followed consistently.   Many employee commit violations and there is no action taken  against them.

22-37. Admitted that the process existed on paper but denied as to its materiality, in that the Board predetermined the invocation and outcome of the discipline process on a regular basis.  Supervisors do not always contact the labor relation coordinator when a work rule is violated.  Further denied that there was relief available and averred that the outcome was predetermined.  Further denied that there was any real avenue of relief available through the Equal Opportunity Office of the Board, and that the office never acted on a single complaint for over twenty years, as admitted by Ladell Ingrim. It is denied in that a PDC outcome is predetermined in cases where the Board's personnel wishes, and results and adverse action or record against an agent.

Discipline does not have to be progressive.  Moreover, supervisors can impose discipline by a abuse of the system.  It is specifically denied that written reprimand do not hurt an employee's chance for promotion.  Numerous witnesses have

testified that the Board policy precludes promotion for three years after a written reprimand.    Moreover, the reprimand was used to support Watkins' suspension and termination, a clear pay, benefit and status loss.

39. Denied for the reasons set forth in the above answers. Admitted that the Board utilized a Pre-Disciplinary Conference in the process of terminating Watkins.    However, the process was a pretext.  The real reason that Watkins was terminated was for racial discrimination and retaliation motives. Independent denied that not disciplinary denied that written reprimand is no effect on promotion. Moreover, this paragraph is not supported in any way by the cited testimony and is not relevant.

### Performance Reviews

40-44.    Denied as stated. Averred that the time period 1991-1994 was the time period in which the Board was held to have probably discriminated and retaliated against Mr. Watkins (and the other Plaintiffs in the 1993 action). Denied, therefore, that the performance reviews are material or are admissible, except to prove the pattern of discrimination in retaliation.

Averred that the 1999-2001 reviews were discriminatory and retaliatory. Further averred that Mr. Watkins was hobbled and despite the opportunity to achieve his desired and potential good performance by the Board's action in discriminating and

retaliating against him, which included denying him training in support, necessary to perform. Therefore, any shortfall was not Mr. Watkins responsibility. (Note in addition to the statements regarding the parties that the Deputies who supervise the Supervisors were responsible for training the Supervisors and ensuring that they had proper support, and the supervisors were responsible for maintaining control and other numerous responsibilities for monitoring cases, as well as agents.)

Watkins averred that he received satisfactory evaluations from Daniel Solla, his supervisor prior to Bukata.  The records cited by defendants substantiates this averment.   The record also shows that he received satisfactory evaluations from Supervisor Batcho.  It appears that the Watkins did not correctly remember the dates that Solla was supervising him. However, it is clear that Watkins' job rating was satisfactory under the two supervisors who supervised Watkins prior to defendants.  Once he was promoted pursuant to the settlement agreement, his ratings immediately changed.

45. Watkins' allegation, unreferenced, is that Mr. Bukata and Mr. Jones denied him the opportunity to receive a fair evaluation, and fair consideration of his concerns. The fact that he was ultimately able to have a meeting does not negate the substance of the allegation.  Moreover, the result of the meeting was Mr Jones stated that he would not change Watkins'

evaluation; the change that was made was minor and did not
affect the overall evaluation.

46.   Denied in that Mr. Bukata refused access to Mr.
Watkins, in disparity with other supervisors, in order to
address individual concerns, and instead simply peppered Mr.
Watkins with statements of inadequacy in specific cases, which
statements did not offer or provide any basis for allowing Mr.
Watkins to improve, especially when combined with the denial of
resources, i.e., a secretary, and combined with case overload.
Mr. Watkins allegation is not cited, but the allegation is that
Mr. Bukata refused to make himself available, in disparity with
other supervisors, for discussion of matters of concern.

Emails were sent as part of a continuing campaign of
harassment.  The Auditor General's report shows that the Parole
Board was so overworked that any person could have been cited
for any number of deficiencies in work performance.  Yet, the
defendants targeted the plaintiff based on his race and his
protests against race discrimination, including, the lawsuit
from 1993-5 and later complaints made to defendants.

By Board policy, Mr Butaka was required to meet with me to
review performance on a quarterly basis, but no meeting was
never held.

47.   Denied as stated.  Pursuant to the subjective process
of promotion at the Board negative reviews hurt an employee's

chances for promotion.  Moreover, these reviews were and are
being used in support of the discipline and termination.
Problems started when Jones was made district director.

### E. MR. WATKINS' CLAIMS

48. Denied as stated, in that the claims also encompass
the previous settlement of the lawsuit and the events involved
therein, which gave rise to retaliation, as claimed in this
case. The claims in this case commenced when Mr. Watkins was
promoted by Mr. Jones pursuant to the Settlement Agreement
(which Mr. Jones incredibly denies knowledge of). The Settlement
Agreement calls for Mr. Watkins to be promoted to Supervisor in
the second available opening, thus superseding the Board's (and
Mr. Jones') normal hiring process.

49. Denied as stated, in that Mr. Watkins "complaints"
were in fact included in the 1993 lawsuit, and the settlement
thereof favorably to Mr. Watkins in 1995.

50. Denied. Mr. Watkins made numerous complaints of
racial discrimination and retaliation prior to at, during, and
throughout the 1993 lawsuit.  His complaints resulted in two
investigations by the Governor Office and Administration, both
which found Mr. Watkins and other had been victims of racial
discrimination and retaliation on a systematic basis by the
Board. The settlement in 1995 promised an end to this pattern
and practice. Mr. Watkins was then promoted in 1998 pursuant to

the settlement, whereupon the pattern of discrimination and retaliation recommenced. He also made other complaints after the retaliation recommenced.

Prior to that, Mr. Watkins have been supervised by Mr. Zappan, who refused Mr. Jones' commands to "get" Mr. Watkins and other Plaintiffs in the 1993 suit who was still working for the Board. After attempting to keep his head down and after being promoted in the face of discrimination and retaliation, Mr. Watkins filed this suit in 2002 for this discrimination and retaliation.

51.  Denied as stated, Mr. Watkins alleges racial discriminatory and retaliatory actions based on, inter alia, the Board's policy of discrimination, which is related to his complaint, and on retaliation, which includes retaliation for the 1993 lawsuit, and the Board being required make substantial adjustments, including promoting Mr. Watkins as results of the actions brought forth in that suit.

## F. The Assignment of Cases

52.  Denied as stated, and that the Board also adjusts the boundaries of different units based on workload. Therefore, is not he measure of the workload of the different units, because the residents are shifted from one unit to another.  Moreover, Jones and the Board controlled how many and what census tracts each unit has.

F:\Working-DOCS-Sugarman\Watkins\Pleadings\Answer Summ Judge 12-13.wpd

53.   Denied as stated, the Board can assign more agents to a given unit.

54.   Denied for the reasons set forth in 52 and 53.

55.   Admitted.

56.   Denied as stated, and that the supervisors did not control the number of available agents.

57.   Admitted.

58.   Admitted, but averred that the Board denied Mr. Watkins the resources necessary to maintain adequate agent supervision, i.e. to avoid over assigning.

59.   Admitted, but averred that the process is not followed strategically to adjust agents. Averred further that Philadelphia office was substantially overloaded as a whole, so adjustments can put in line of units or agents could not undo the effect of excessive burdens on the victims as a whole. Defendants allowed Watkins' unit to have more cases then other units.  This was a pattern of retaliation against black who stood up to discrimination used against Watkins, Williams, Rankin and Holmes.

## Clerical Support for Mr. Watkins Unit

60.   Denied as stated, in that Mr. Watkins alleges that the denial of clerical support was disparate, retaliatory and discriminatory.

61-63. Admitted

64.    Denied, in that Ms. Alexander was not actually available to support Mr. Watkins' unit, because she was not located in Mr. Watkins' unit, and because she had substantial other duties.    This offer was a sham which proved to be unworkable.

65.    Admitted. Ms. Alexander was more than a football field away from Mr. Watkins, and therefore realistically unavailable.

66.    Admitted, but averred that telephone and e-mail access to clerical support person is irrelevant where there is a necessary to physically exchange paper work on a regular basis.

67.    Admitted, and averred that such an arrangement is designed for inadequate performance, where the main function of the supervisor is to facilitate paperwork and paper interaction and to communicate same to agents, and to have to leave the unit and walk more than a block away means that there is no direct contact between the clerical, supervisor, and the parole agent, and no opportunity for grounding the corner to provide timely and effective interaction. Moreover, such communication was permitted for the time which Ms. Alexander was actually available.

The fact that Ms. Alexander was not generally available, does not show the timing or the effectiveness of the relationship.

68.    Denied to the reasons set forth in 67.

69.    Denied as stated, and that approval of overtime for other personnel was rare, and ineffective, as compared with actual

needed support. Especially since those assigned have the limited ability to provide adequate support due to their unfamiliarity with the case load and the facts.

70. Admitted that Mr. Watkins was without a secretary for one full year out of the two and half years and that he was required to generate substantial secretarial supported work, without excuse, without reason, and for retaliatory purposes.

71. Admitted

72. Admitted.

73. Admitted.

74. Denied. Proof of 74 is demanded at trial, as such as information within the sole knowledge of defendants. While Greenberg was without a secretary for six months Watkins was without a secretary for a full year and Watkins' secretary left about four months before Greenberg's secretary left.

Moreover, despite the fact that Watkins' secretary left four months prior to Greenberg's, they interviewed secretaries at the same time and, after they interviewed secretaries together, he was provided with one of the secretaries that was hired, but Watkins was not provided a replacement secretary until two months after Greenberg. (See Affidavit, Exhibit A).

75. Admitted that Caucasians individuals were occasionally disciplined, but averred that the discipline was disproportionate and was discriminatory and the Caucasians were treated

preferentially.

Averred further that Burton sued and settled a claim for discrimination in regard to his treatment at the Board.

Denied that these were the only violations in the division during the time Watkins worked there.  Numerous other violations occurred and were unpunished because they were dealt with informally and/or ignored because the perpetrators were white.

76.  Denied within the sole knowledge of the defendants. Further, denied that the number of Caucasian is statistically of sufficient significance, especially within the variety of alleged violation, the severity of the violation, and the defenses offered, to constitute any kind of statistical significance, in the admissibility of such data, is therefore denied.

77.  Denied as stated, and that the statement of "subject" implies guilt in every situation, and also implies lack of justified circumstances, and equality.  Denied in that further "performance failures" are not proved or established, and in fact represented defendant's failures of training, adequate resources, and/or normal errors, and not "performance failures".  Averred further that the Board has been shown to have a ninety percent(90%) performance failure rate by the Auditor General's audit of the Board, showing that it was truly disparate and singled out Mr. Watkins.

## The April 2000 Discipline

78.  Admitted.

79.  Admitted.

80.  Denied.  Watkins received a memo from personnel that he would receive his raise effective on a certain date unless he recommended against it.

81.  Denied.  Watkins completed the evaluation when he was instructed to do it.

82.  Denied.  Watkins did complete the evaluation.

83.  Denied as within the Board's sole knowledge.  Averred that it is Watkins' understanding that the raise was not delayed.

84.  Denied as stated.  Admitted that Mr. Watkins was charged, but denied that he failed.  Watkins ordered the equipment and issued the rest from supplies on hand.  Knight already had a bullet resistant vest from his previous employment.

85.  Admitted that a session was held, denied that it was in consequence of Mr. Watkins' action, but rather in pursue of retaliation and discrimination. See 84.

86.  Denied that the any actions or inaction were serious and averred further that they were in the normal level of performance within the Board.  See 84.

## The May 2000 Discipline

87.  Denied in that the supervisor was the agent. Averred further that Mr. Watkins had hundreds of indirect supervises, if indeed they were supervises at all.

88-91.    Denied and proof is demanded at trial. Denied that the any actions or inaction were serious and averred further that they were in the normal level of performance within the Board.

92.    Denied that Bukata accurately reported the conference. Admitted that a PDC was held, denied that it was in consequence of Mr. Watkins' action, but rather in pursue of retaliation and discrimination.

93.    Admitted that a reprimand was issued, denied that it was in consequence of Mr. Watkins' action, but rather in pursue of retaliation and discrimination. Denied that the reprimand did not result in any pay, benefit or status loss or interfere with promotions.    Numerous witnesses testified that the written reprimand precludes promotion for three years.    Moreover, the reprimand was used to support Watkins' suspension and termination, a clear pay, benefit and status loss.

94.    Denied.    This averment is not consistent with Watkins' testimony.    Moreover, Watkins testified that he had challenged the discipline through the union.

### The June 2000 Discipline

95-97.    Denied and proof is demanded at trial. Denied that the any actions or inaction were serious and averred further that they were in the normal level of performance within the Board.

98.    Denied.    Watkins explained the reasons for any errors.

99. Denied that Bukata accurately reported the conference. Admitted that a PDC was held, denied that it was in consequence of Mr. Watkins' action, but rather in pursue of retaliation and discrimination.

100. Admitted that a suspension was issued, denied that it was in consequence of Mr. Watkins' action, but rather in pursue of retaliation and discrimination.

101. Denied as stated.  Admitted that no formal complaint was filed with the Civil Service Commission or Affirmative Action Office.

102. Denied as stated.  Watkins filed a grievance.

### The October 2000 Discipline

103. Denied as stated.  This is a legal conclusion which is not supported by the record.  Denied that this was the basis of any discipline but rather discipline was issued in pursuit of retaliation and discrimination.   This can be no more clear than by the continued employment and antagonization of defendant Jones.  Jones' intentional campaign of discrimination and retaliation has resulted in numerous lawsuits, including hundreds of thousands of dollars in judgments against the Board and numerous undisclosed settlements.  Yet, despite the loss of hundreds of thousands of dollars in civil liability, Jones has not been disciplined or terminated.

104. Denied and proof is demanded at trial. Denied that the

any actions or inaction were serious and averred further that
they were in the normal level of performance within the Board.

105. Admitted that a PDC was held, denied that it was in
consequence of Mr. Watkins' action, but rather in pursue of
retaliation and discrimination.

106. Denied.  Watkins was truthful at all times.

107. Denied.  Watkins did have controls.  Any error was an
oversight due to the impossible work conditions forced upon
Watkins as retaliation for his complaints about discrimination.

108. Admitted that a suspension was issued, denied that it
was in consequence of Mr. Watkins' action, but rather in pursue
of retaliation and discrimination.

109. Denied as stated.  Admitted that no formal complaint
was filed with the Civil Service Commission or Affirmative
Action Office.

110. Denied.  Watkins did allege discrimination.

111-113.  Admitted.

114. Denied.  Watkins instructed the union to challenge
they did not and they did not inform him of their failure to
challenge.

### The October 2000 Discipline

115-116.. Admitted.

117. Denied as stated.  Watkins did partially process the
leave slips.  Denied that the any actions or inaction were

serious and averred further that they were in the normal level
of performance within the Board.

118. Denied that the any actions or inaction were serious
and averred further that they were in the normal level of
performance within the Board.

119. Denied.  Watkins is not aware of where Bukata found
the leave slips.  Strict proof is demanded at trial.

120. Admitted that a PDC was held, denied that it was in
consequence of Mr. Watkins' action, but rather in pursue of
retaliation and discrimination.

121. Admitted that a suspension was imposed, denied that it
was in consequence of Mr. Watkins' action, but rather in pursue
of retaliation and discrimination.

122. Denied as stated.  Admitted that no formal complaint
was filed with the Civil Service Commission or Affirmative
Action Office.

123. Denied.  Watkins recalls writing discrimination on
grievance form.

124-126.  Admitted.

127. Denied. Watkins instructed the union to file a
challenge they did not and they did not inform him that they had
so failed.

128.

129. Denied as stated.  Admitted that one ticket was issued

to a car which was assigned to Watkins.  However, it was
Watkins' practice to loan the car to other staff while he was in
the office.  He never saw the ticket and only learned of it
months later.

130. Denied.  Watkins went to parking authority and
requested a hearing on the ticket when he found out.  He was
told the because of the age of the ticket he would have to
request the hearing in writing. I wrote the letter and gave a
copy to Bukata.  Bukata was informed by phone and memo and copy
of the letter.

131. Admitted.

132. Denied.  Watkins was on leave at the time.

133. Denied.  Watkins was on leave at the time of the
report.

134. Admitted that a PDC was held, denied that it was in
consequence of Mr. Watkins' action, but rather in pursue of
retaliation and discrimination.

135. Denied in total; specifically and in general. Mr.
Watkins was not terminated as the result of any failures to
perform on his part. As stated in the complaint and as restated
herein, Mr. Watkins was terminated because of Board policies of
discrimination and retaliation against him.

This policy started in the 1980 as documented by the
Governors Office of administration (Exhibits A & B).

It continued into the 1990s as documented in the opinion of
Honorable Thomas O'Neill in the 1993 case. It resumed in 1997-
1998 after Mr. Jones was appointed to be the District Director
in Philadelphia. As documented by Mr. Zappin's testimony in the
Russ-Tobias case Mr. Jones instructed to act against "those
people", who have been involved in the previous suit and others,
and threatened Mr. Zapps with action against him and Mr.
Zappan's did not comply. It was common knowledge throughout the
agency that the agents who had sued was the subject of
retaliation. (Mr. Zappan's and Mr. Young). This discrimination
and retaliation during the time period in question was
determined by an unanimous jury in Russ-Tobias in 2005. The
period in question was 2001 to 2002, the same time period in
which Mr. Watkins was terminated.

As stated in the Affidavits of all the Plaintiffs in the
1993 case who remain alive, Mr. Watkins and the rest of them
were all subject to this discrimination and retaliation.

As stated in the testimony of Mr. Holman, Ms. Roadcloud,
and Mr. Hodge, Mr. Rankin in this case. This discrimination and
retaliation against African American was rife throughout the
Board. This is corroborated by Ms. Chantalese Mirman, a white
agent, as well as by Mr. Zappan, a white supervisor.

Mr. Watkins was treated in the discriminatory and
retaliatory fashion as set forth in the complaint and herein,

and in his Affidavit (Attached as Exhibit ). The reason given
for Mr. Watkins termination was pretextual. The Board
continuation of harassment, retaliation and discrimination
supersede the reasons given by the Board for its actions, as a
matter of fact and law. The facts regarding these issues are in
genuine and material dispute. Certainly, the issue they dispute
is material, and requires a trial. Summary Judgment cannot be
granted where circumstances, and even direct evidence, show that
there was discrimination and retaliation, and such evidence is
substantial and genuine. The Board's Motion fails to deal with
this evidence at all.

136. Admitted as before those agencies.  Those actions are
challenged herein.

137. Denied as stated.  This is an incomplete statement of
the testimony.  Everybody makes mistakes.  Watkins is honest and
accepts responicbility for his mistakes.  However, his mistakes
were not the motivating factor in his termination.  They were
the result of the discrimination and retaliation that he
suffered at the hands of defendants.  Denied that the any
actions or inaction were serious and averred further that they
were in the normal level of performance within the Board.

138. Denied as stated.  Agreed that Watkins took such
actions.  Denied that the list is complete.  Averred that
Watkins applied for at least two jobs.

139-140.  Admitted.

141. Denied.

142. Admitted.

143. Denied.

144. Denied.

145. Denied.

146. Admitted.

147. Denied as stated.  It is not clear whether documentation was ever requested or would normally be available, especially.

148. Admitted.

149. Admitted.

150. Admitted.

151. Admitted.

152. Denied as stated.  It is not clear whether documentation was ever requested or would normally be available, especially.

153. Admitted.

154. Denied as stated.  It is not clear whether documentation was ever requested or would normally be available, especially.

155. Admitted.

156. Denied.  Watkins has applied for at least two applications for hearing examiner positions in Philadelphia and

Norristown. (Watkins Affidavit, Ex A at ¶ 13).

    157. Admitted.

    158. Admitted.

    159. Denied.  This document dump is offensive and sloppy.
A cursory review of the positions defendants claim are ample
reveals that such positions were not available to Watkins.
Exhibit 20 excludes anyone over 37; Watkins is 56.  Moreover, a
cursory review of the other ads offered shows that most, if not
all were for positions that Watkins could not apply for.  For
example, various ads require a:

- Masters Degree in mental health,

- masters in child care,

- five years experience in mental health,

- one or more years experience in providing care to persons
  with developmental disabilities,

- four years experience with elderly,

- experience in early childhood programs,

- social work license,

- masters in social work,

- specialty in job placement for food services,

- experience in home services to families and children,

- One ad is for welders, machinists and shipfitters.

    Additionally, at least two ads are duplicates and at least
eight are from before Watkins was terminated.

Further, of the very few positions that even list salary, most are for $20,000-35,000 per year and range all the way down to $7 per hour. Watkins was making $63,000 per year when he was terminated. (Watkins Affidavit, Ex A at ¶ 15). Clearly, a position that pays $14,000/year is not equivalent. Moreover, Watkins is currently on pension, earning $36,000 year. (Watkins Affidavit, Ex A at ¶ 16). Thus, if he were to go off of his pension and take the lower paying jobs, his damages would actually be higher. This dump of ads is just an arrogant and careless effort to further humiliate Watkins.

## STANDARD OF DECISION

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court's role when adjudicating a motion for summary judgment "is not himself to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Id.* at 249.

The burden is on the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates an absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323; <u>LaRose v. Philadelphia Newspaper, Inc.</u>, 21 F.Supp.2d 492, 497 (E.D.Pa. 1998).

In deciding a motion for summary judgment, the Court must consider the evidence in the light most favorable to the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.

## **<u>ARGUMENT</u>**

The defendants cannot meet the very clear standard for summary judgment.  The Court is not to weigh the evidence. <u>Anderson</u>, 477 U.S. at 248. It must construe all evidence in favor of Watkins. <u>Anderson</u>, 477 U.S. at 255. Summary judgment can only be granted if there is "no genuine issue as to any material fact." *Id.*

In this case there are clearly issues of fact regarding the motive for the termination and discipline of Watkins.  There are numerous disputed issues of material fact including:

1.    Whether the motive for employment actions taken against Watkins was discrimination and retaliation?

2.    Whether Watkins was targeted for discipline and

termination because of his action in protesting racism at the Board?

    3.

    4.

As shown below, at the very least, summary judgment must be denied because there are genuine issues of material fact.

## I.   ALL DEFENDANTS ARE PROPER DEFENDANTS ON THE SECTION 1983 CLAIM.

The Section 1983 claims should be read to include:

- A claim against Bukata and Jones in their individual capacity for violations of Section 1983 under color of law.
- A claim against all defendants for all prospective relief the Jury and/or this Court finds necessary, including but not limited to reinstatement.

Defendants assert that the Board and the individual defendants in their official capacity cannot be liable under Section 1983 because they are not persons for the purposes of Section 1983. (Brief at 29).  <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 109 S.Ct. 2304 (U.S.Mich. 1989).  Plaintiff concurs that this is the law if limited to the extent that the count seeks retrospective damages against the defendants in their official capacity.  The Second Amended Complaint, therefore, should be read not to include any <u>Section 1983</u> *retrospective claims* against the Board or Jones or Bukata *in their official capacities.*

However, it is also crystal clear that Bukata and Jones are

proper defendants in their individual capacity for violations of Section 1983 under color of law.  Hafer v. Melo, 112 S.Ct. 358, 359-60, 502 U.S. 21, 21-2 (U.S. 1991).

Additionally, prospective relief, i.e., reinstatement, is not precluded.  See Kentucky v. Graham, 473 U.S. 159, 167 n14, 105 S.Ct. 3099 (U.S. 1985)(holding official-capacity actions for prospective relief are not treated as actions against the State) citing Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)(Attorney General proper defendant in official capacity for prospective relief).

Therefore, Count I should be read to include claims under Section 1983 (in addition to all Section 1981 claims) for retrospective relief against Bukata and Jones in their individual capacities and for prospective relief against the Board and Bukata and Jones in their official capacities.

## II.  WATKINS' CLAIMS FOR RETALIATION UNDER TITLE VII, SECTION 1981 AND SECTION 1983 MUST BE DECIDED BY THE JURY.

Watkins brings claims for retaliation under Title VII, Section 1981 and Section 1983.  The prima facie standard for retaliation requires the plaintiff to show:

> (1) the employee engaged in a protected employee activity;
> (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and
> (3) a causal link exists between the employee's protected activity and the employer's adverse action. Abramson v. William Paterson College of New Jersey, 260 F.3d 265 (C.A.3 2001).

Defendants admit that elements one and two are satisfied. They argue that plaintiff has failed to produce evidence to satisfy element three.  Defendants also make an argument that the settlement of the 1993 case and complaints about inequitable working conditions are not protected activity and that certain other facts alleged do not, standing alone, satisfy the adverse employment action element.  There is no merit to their arguments.

**PROTECTED ACTIVITY**

Defendants admit that Watkin's participation in the 1993 lawsuit was a protected activity.  They also admit that his complaints of discrimination were protected activities.  However, they argue that the settlement of the 1993 lawsuit is not a protected activity and that Watkins' complaints about inequitable working conditions were not protected activities.  (Brief at 31).

Protected activities under Title VII are situations where an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a).  A formal letter of complaint to an employer or the EEOC is not the only way to meet the protected activity criterion. Barber v. CSK Distribution Services, 68 F.3d 694, 702 (3d Cir.1995). Protected activities include formal charges of discrimination, "as well as informal protests of discriminatory employment practices, including making complaints to management····" Sumner v. United States Postal Serv.,

899 F.2d 203, 209 (2d Cir.1990). It is necessary to analyze the message conveyed, rather than "the medium of conveyance." Barber, 68 F.3d at 702.  Barber held that informal protests of discriminatory employment practices, including "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who filed formal charges" constitutes "protected activity" under Title VII.  Barber, 68 F.3d at 702 (citing Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).

Here, the 1993 lawsuit cannot be separated from all phases of the suit.  The protected activity did not terminate in 1993 with the filing of the Complaint.  The statute prohibits retaliation for "all actions taken in pursuit or participated in any manner in an investigation, proceeding, or hearing".  It is undisputed that the 1993 lawsuit was a protected activity. Negotiating and agreeing on settlement is a manner of pursuing and participating in a discrimination proceeding.  In fact, those actions may have had the most impact on the Board as the Board agreed to concessions relating to promotions, ending discrimination and preventing retaliation.  The settlement, is a manner of participation in the 1993 lawsuit, and is clearly also a protected activity.

Case law agrees. In Westerman v. General Nutrition Corp.,

2005 WL 3454325, 2 (W.D.Pa. 2005)(Ambrose, CJ), the defendant argued that a settlement agreement is not a protected activity. In rejecting this argument, the Court held that it did not matter whether a settlement agreement itself is a protected activity because it "is beyond dispute that the filing of a complaint with the EEOC constitutes protected activity." *Id. citing* <u>Barber</u>, 68 F.3d 694, 702 (formal complaint constitutes "protected conduct").

In <u>Wise v. Overhead Door Corp.</u>, 2006 WL 648776 (N.D.Ga. 2006), the Northern District of Georgia decided a similar issue. There, the Court held that temporal proximity of termination to the settlement of a lawsuit and testimony that the defendant stated it was determined to get rid of the plaintiff as retaliation for the settlement and lawsuit was sufficient evidence of retaliation and denied summary judgment.

Herein, Deputy Director Zappan testified that he was directed to target the former 1993 plaintiffs for disciplinary proceedings in order to build a record to terminate them on. (Trial Test N.T. 5/5/05, at 39, Ex. H). This is retaliation. Thus, as in <u>Wise</u>, the settlement cannot be divided from the original lawsuit; it is a continuation of the protected activity which did not end until the settlement.

Likewise, Watkins' complaints about inequitable working conditions were protected activity. "Protesting what an employee believes in good faith to be a discriminatory practice is clearly

protected conduct." <u>Aman v. Cort Furniture Rental Corporation</u>,
85 F.3d 1074, 1085 (3d Cir. 1996).  Thus, by complaining that his
unit was being unfairly overloaded and denied support staff was
protected activity because he was protesting what he believed to
be a discriminatory practice.

### ADVERSE EMPLOYMENT ACTION

Defendants admit that the suspensions and termination were
adverse employment actions but argue that some adverse actions
that they took were not adverse employment actions.  Their
argument however, is based on cases that have been overruled
and/or distinguished by the Supreme Court.  In <u>Burlington</u>
<u>Northern and Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405 (U.S.
2006), the Supreme Court recently rejected the very arguments
that the defendants rely upon.

The Supreme Court in <u>Burlington</u> held that "the
anti-retaliation provision, unlike the substantive provision, is
not limited to discriminatory actions that affect the terms and
conditions of employment." *Id.* at 2413.  It concluded that the
"scope of the anti-retaliation provision extends beyond
workplace-related or employment-related retaliatory acts and
harm" and **held that any action is an adverse employment action**
**where "a reasonable employee would have found the challenged**
**action materially adverse, 'which in this context means it well**
**might have dissuaded a reasonable worker from making or**

**supporting a charge of discrimination**.'" *Id.*

Burlington held that a rescinded 37 day suspension was still an adverse employment action even though rescinded. It also found that a reassignment to different duties, even though still within the same job was an adverse employment action. In so holding, the Supreme Court cited with approval decisions finding adverse employment actions for: excluding an employee from a weekly training lunch, Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (C.A.7 2005); changing an employee's work schedule, *Id.*; refusing, contrary to policy, to investigate death threats, Rochon v. Gonzales, 438 F.3d 1211, 1217-1218 (C.A.D.C.2006); and filing false criminal charges, Berry v. Stevinson Chevrolet, 74 F.3d 980, 984, 986 (C.A.10 1996).

Moreover, the defendants' arguments are contrary to the case law of this District. In McLaughlin v. Com. of Pennsylvania, 1999 WL 58658 (Ludwig, J) (E.D.Pa. 1999), Judge Ludwig held that "testimony that officers made false disciplinary reports is sufficient to establish an adverse employment action." Likewise, in Inzaina v. Federal Reserve Bank of Philadelphia, 76 Fair Empl. Prac. Cas. (BNA) 1538 (Gawthrop, J)(E.D.Pa.1998), Judge Gawthrop denied summary judgment and held that genuine issues of material fact exist as to adverse employment action where negative evaluations were placed in the plaintiff's employment records. Likewise, in Lazic v. University of Pa., 513 F.Supp. 761, 767-69

(Broderick, J) (E.D.Pa. 1981), Judge Broderick held that the deletion of positive references in plaintiff's file constitutes unlawful retaliation.

Finally, the Courts have "emphasized that courts should not analyze the employer's individual acts in isolation, but rather should examine the acts collectively in deciding whether there has been adverse employment action." Hartman v. Sterling, Inc., 2003 WL 22358548 (E.D.Pa. 2003).

Pursuant to Burlington, the test is whether the actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  It is axiomatic that, of course, any reasonable worker might be dissuaded from making or supporting a charge of discrimination if the worker knows that the employer may retaliate by initiating pre-disciplinary conferences, issuing verbal warnings, requiring counseling sessions, issuing written reprimands and bad reviews, increasing the worker's case load to excessive levels, withholding support staff and then suspending and terminating them.  These actions cannot be extracted from and must be viewed in whole with the termination, the suspensions, and all other actions complained of.

Applying these standards, it cannot be denied that, at the very least, issues of material fact exist as to whether the actions defendants seek to except are adverse employment actions.

The jury can find that pre-disciplinary conferences, verbal
warnings, counseling sessions, written reprimands, and bad
reviews are all disciplinary measures which would dissuade any
reasonable person.  This is especially true where there is
evidence that these actions are being taken and/or documented in
order to support termination.   The defendants' own brief
supports an inference that these actions were taken in order to
punish Watkins and build a case for termination because they are
the very actions the defendants now cite in support of their
pretext case for termination.  The jury can infer that any
reasonable person would be deterred and intimidated by such
actions and, therefore, that pursuant to the Supreme Court's
holding in Burlington, all these actions are adverse employment
actions.

**CAUSATION**

    In Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d
Cir.2000), the Third Circuit recognized that the facts and
contexts of each case are important in determining whether there
is a causal relationship.  Temporal proximity alone is not the
only factor showing causal connection when temporal proximity is
not "unusually suggestive." Id. at 280.  "When there may be a
valid reason why the adverse employment action was not taken
immediately, the absence of immediacy between the cause and
effect does not disprove causation." Kachmar v. SunGard Data

<u>Sys.</u>, 109 F.3d 173, 178 (3d Cir.1997).

In <u>Robinson v. S.E. Pa. Transp. Auth.</u>, 982 F.2d 892, 895 (3d
Cir.1993) the Third Circuit held that an "intervening pattern of
antagonism" during the period between the protected activity and
the adverse employment action can prove causation.  Two main
factors in finding the causal link necessary for retaliation:
timing and evidence of ongoing antagonism.  <u>Abramson v. William
Paterson College of New Jersey</u>, 260 F.3d 265 (C.A.3 2001) *citing*
<u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir.1997) (
"[T]emporal proximity ⋯ is sufficient to establish the causal
link⋯ a plaintiff can [also] establish a link between his or her
protected behavior and subsequent discharge if the employer
engaged in a pattern of antagonism in the intervening period.").

That there was a pattern of antagonism between the protected
behavior and the termination is well documented.  During the time
the 1993 lawsuit was pending (1993-5), Watkins was harassed with
retaliatory negative job reports. (Defendants' Facts at 45).
After the lawsuit was settled, Watkins received satisfactory
ratings.  But, when Chairman Castor was fired as chairman, Jones
came in and Watkins was promoted pursuant to the agreement,
Watkins was continually a victim of antagonism with negative work
reviews, denial of training and support staff, etc.. (Defendants'
Facts at 45).  Defendants admit that they "sent hundreds of
emails to Mr. Watkins outlining deficiencies in his performance."

(Defendants' Facts at 46).  Hardly a day went by when the
defendants were not antagonistic to him.

The evidence shows that Watkins' unit was overloaded with
cases.  Though the Board argues that this is a coincidence of the
census, it admits that the Board had the power to and did
regularly reassign and redistribute the caseloads over the course
of each year.  Yet, due to defendants' antagonism, Watkins' unit
continued to be overloaded.

Despite being overloaded, Watkins was deprived of a
secretary for his unit for a period of at least one year, without
cause.  (Defendants' Facts at 70).

Watkins was also subject of continuous harassment through
the disciplinary proceedings.  He was the subject of such
proceedings five times in 2000 alone. (Defendants' Facts at 75).
During the three years Bukata supervised Watkins, no other
employee was subjected to disciplinary proceedings more than
three times, while Watkins was targeted six times. (Defendants'
Facts at 75).  Moreover, white employees with serious infractions
were generally either not disciplined or, once, given a written
warning. (Defendants' Facts at 75).  The only white employee to
be terminated had sexually harassed two female agents and he was
not terminated until his second PDC for the same offense.
(Defendants' Facts at 75).

All this is brought into context by the testimony of Ronald

Zappan, Mr. Jones' preexisting Deputy District Director.  He
testified in the Russ-Tobias case that Jones stated he was going
to get the prior plaintiffs (including Watkins) and directed
Zappan to target them for disciplinary proceedings in order to
build a record to terminate them on. (Trial Test N.T. 5/5/05, at
39, Ex. G).  This was possible because of the overall
ineffectiveness of the Board.  As shown by the Auditor General's
report, most employees were overworked to the point that they
could not comply with Board policies.  Thus, any employee could
be targeted for termination by constructing a pretext record and
the testimony shows that Jones had instructed that plaintiffs
from the 1993 suit should be so targeted.

All these facts clearly create, at a minimum, an issue of
material fact as to whether Watkins was targeted for termination
and discipline as retaliation for his participation in the 1993
suit and his later complaints of discrimination at the Board.  It
must be the jury's obligation to resolve this issue.

### III. MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON WHETHER THERE WAS A HOSTILE WORK ENVIRONMENT AT THE BOARD.

Defendants contend that plaintiff's hostile work environment
allegations claim must be dismissed for lack of severe and
pervasive conduct. (Defendants' Memorandum at 39-42).  Defendants
are wrong.

The law is that when the workplace is permeated with
"'discriminatory intimidation, ridicule, and insult' that is

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment', Title VII is violated". <u>National Railroad v. Morgan</u>, 122 S.Ct. 2061, 2074 (2002) (quoting <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993)) (internal citations omitted). Whether a hostile work environment exists is a "mixed question of law and fact". <u>Richardson v. New York State Department of Correctional Service</u>, 180 F.3d 426, 436 (2d Cir. 1999) (quoting <u>GAF Corp. v. Heyman</u>, 724 F.2d 727, 737 (2d Cir. 1983); <u>Jordan v. Clark</u>, 847 F.2d 1368, 1375 (9th Cir. 1988), *cert. denied*, 488 U.S. 1006 (1989). The Second Circuit in <u>Richardson</u> held that this issue is especially well suited for jury determination. <u>Richardson</u>, 180 F.3d at 436.

In <u>Jensen v. Potter</u>,435 F.3d 444 (C.A.3 2006), the Third Circuit held that "the cognizability of a discrimination claim founded upon a hostile work environment is well-established." It found a hostile work environment alone is an adverse employment action because "discriminatory ridicule or abuse can so infect a workplace that it alters the terms or conditions of the plaintiff's employment." *Id.* The test requires the balancing of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Applying the facts, the

<u>Jensen</u> Court reversed the lower court's grant of summary judgment and held that defendants' frequent insults constituted an issue of material fact as to hostile work environment. *Id.*

Herein, there is a plethora of evidence of hostile work environment at the Board, including:

- The Board's 1988 and 1993 investigations finding that discrimination was a problem preventing black advanctment and promotion at the Board.  The 1993 Report finding that the Board had done nothing to remedy the problems itemized in the 1988 report or to implement its recommendations.

- Zappan's testimony that he had been directed to target the former plaintiffs from the 1993 suit.

- Watkins's testimony that his unit was overloaded and denied support staff as discrimination and retaliation for his earlier complaints about discrimination.

- The disparate treatment of white employees from black employees in the implementation of discipline and promotions.

- The jury verdict finding discrimination and retaliation at the Board in Russ Tobias.

- The affidavits of Burton, Williams, Self and Watkins describing the disparate treatment and harassment they encountered at the Board after the settlement.

- The fact that all prior plaintiffs were forced out of the

> Parole Board, as well as persons sympathetic to the
> plaintiffs.

- Defendants admit that they sent hundreds of negative emails to Watkins.

Defendants rely on <u>Cronin v. Martindale Andres & Co.</u>, 159 F.Supp.2d 1,7 (E.D.Pa. 2001) and <u>Walton v. Mental Health Assoc. of Southeastern Pennsylvania</u>, 168 F.3d 661 (3d Cir. 1999). (Brief at 41-2). However, these cases are very different from this case. Here there is genuine evidence that the workplace at the Board was permeated with "discriminatory intimidation, ridicule, and insult." Mirman, Rankin, Self, Russ-Tobias, Roadcloud and others so testified. Unlike the situation in <u>Cronin</u>, defendants' behavior towards plaintiff (and other African American employees) cannot be characterized as an isolated incident, but was pervasive and continuous conduct. In <u>Cronin</u>, the Court held that the employer's mere exclusion of plaintiff, a female, from a company golf outing in favor of a male employee and a joke made by one employee regarding the number of women allowed to play in the tournament, do not constitute "pervasive and regular" conduct of a hostile work environment. <u>Id.</u> at 7.

<u>Cronin</u> is far from this case. Here the defendants have continually perpetuated and condoned a racially hostile work environment. The pattern here against plaintiff is sufficient in itself. When considered with the numerous out of court

settlements of racial discrimination claims, including a
settlement with Watkins, and numerous constructive discharges
(forced early retirements) of African American employees e.g.
Rankin, Self, Hodge, there is clearly evidence of a hostile work
environment.

    Walton is also different.  In that case, the Court found
that there was a mere "personality conflict" between the employee
and her supervisor.  Id. at 667.  Here, the behavior Watkins was
subjected to, as a result of the individual defendants' conduct,
was serious and objectively offensive.  The instances occurred
with frequency, were humiliating, and were permeated with
discriminatory intimidation, ridicule, and insult.  Defendant
Bukata maintained a hostile and abusive work environment by
demeaning plaintiff in front of fellow supervisors and his
subordinates and by refusing plaintiff relief from the disparate
caseload and clerical support. Defendants admit that they sent
Watkins hundreds of emails. (defendants' facts at 70).  Moreover,
defendants refused to address concerns about plaintiff's
performance informally, but would impose disciplinary action,
including written and verbal warnings, and eventually a
suspension, thereby denying plaintiff any opportunity to correct
any inadequacies until it was too late to avoid an adverse
record.

    Contrary to defendants' contentions, therefore, the law

sustains plaintiff's claim for race-based hostile environment. Defendants' actions, as alleged, clearly rise to the level of a racially hostile work environment under <u>Harris</u>.  The evidence must be viewed in the light most favorable to the plaintiff and left for the jury to decide.

## IV.  MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON DISCRIMINATION.

The standard for a discrimination claim under Section 1981, 1983, and Title VII is well established.  As applied to Title VII and employment discrimination cases, the Supreme Court and the Third Circuit have made it clear that the burden is divided according to the burden for trial, with the issues established as follows:

    i.   The plaintiff must carry a burden to show sufficient evidence of prima facia case and/or retaliation, i.e., for the retaliation, or action against a discriminatory action which is protected; followed by action adverse to employment motivated by retaliation;

    ii.   The defendant must provide evidence to show a basis independent of discrimination and/or retaliation.

    iii. The plaintiff must then "come forward with evidence" showing that the true motivation is at least in <u>substantial part pretextual</u>, not the alleged independent grounds.  E.g. <u>Fuentes v. Perskie</u>, 32 F.3d 759 (3rd Cir. 1994)

**A.   THERE ARE MATERIAL ISSUES OF FACT AS TO WHETHER THE TRUE MOTIVATIONS FOR WATKINS' TERMINATION WERE DISCRIMINATION AND RETALIATION.**

Defendants wrongly argue that Watkins "offers no proof that the supervisors who terminated [him] made their decision on the basis of race."  To argue that there is no such proof the defendants must have buried their heads in the sand and decided to ignore the law. Indeed they misstate the legal rule by ignoring that the prohibitive motive need not be the only motive; but allows for mixed motive, requiring only that the improper motive be a substantive part.

The defendants' arguments are offensive and internally contradictory.  Though they boldly and offensively argue that plaintiff is "exploiting" civil rights laws because he is "unwilling to be accountable for [his] own mistakes and would rather excuse them by crying racism", (Brief at 1) they turn around and argue irreconcilably that Watkins has failed to present evidence to support discrimination because he was willing to "accept responsibility" for some "things going wrong."

The truth is that Watkins is willing to accept responsibility for any mistakes that he made. But, responsibility is not the same as accepting blameworthiness. Moreover, the defendants' argument fails because the evidence supports finding that those mistakes were not the reason for his discipline and termination, or at least not the sole substantial reason.

Circumstances support an inference that defendants singled plaintiff out.  Circumstantial evidence is valuable per <u>Desert Palace v. Costa</u>,  539 U.S. 90 (2003).  The Auditor General's report very clearly shows that in general  agents and supervisors were making mistakes because they were handling too many cases. The evidence shows the Board merely exploited this situation to single out Watkins as a pretext for discriminatory and retaliatory termination.

Unfortunately, it cannot be said that the Board is willing to take responsibility for its mistakes.  Now, almost 20 years after the first report detailing discrimination at the Board, except for a brief period in 1995-96, the Board has failed and, in fact, refused to eliminate discrimination at the Board and punish and/or remove the discriminators. Indeed, as found by the jury in Russ-Tobias (Exhibit W) the Board has systematically practiced discrimination and retaliation, especially in 2001-2002, and Jones has been the key practitioner.

The essence of cases where motive is an issue is that direct proof of motive is rarely available, and that circumstantial evidence is essential.  The Supreme Court has emphasized the use of circumstantial evidence in discrimination cases.  <u>Desert Palace v. Costa</u>,  539 U.S. 90 (2003); see also <u>Fuentes v. Perskie</u>, 32 F.3d 759 (3rd Cir. 1994).  As the Third Circuit recognized in <u>Josey v. John H. Hollingsworth Corp.</u>, 996 F.2d 632,

638 (3d Cir. 1993), there seldom is direct "smoking gun" evidence of discrimination.  However, motive is capable of direct inference from a pattern of behavior. *See also* <u>U.S. Postal Service Bd. of Governors v. Aikens</u>, 460 U.S. 711, 103 S.Ct. 1478 (U.S.D.C. 1983)("there will seldom be eyewitness testimony as to the employer's mental processes").

Accordingly, the law in the Third Circuit, as elsewhere, clearly provides that discrimination and retaliation incurred by other employees is proof of the general atmosphere at the place of employment as well as motive and intent. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3rd Cir. 1994).  The Third Circuit in <u>Fuentes</u> established the rule.  It held that the plaintiff could prove that an:

> illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision . . . by showing that . . . the employer has discriminated against other members of his protected class or other protected categories of persons. *Id.* at 765.

In <u>Glass v. Philadelphia Elec. Co.</u>, 34 F.3d 188, 195 (3rd Cir. 1994), the Third Circuit held:

> Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices. . . In discrimination cases. . . such background evidence may be critical for jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive. <u>Glass</u>, 34 F.3d at 195 *citing* <u>Estes v. Dick Smith Ford, Inc.</u>, 856 F.2d 1097, 1103 (8th Cir.1988).

Herein, the testimony by Zappan is direct evidence of

F:\Working-DOCS-Sugarman\Watkins\Pleadings\Answer Summ Judge 12-13.wpd

pretext.  Moreover, the Auditor General's report shows that Watkins was singled out, though the Board generally had similar problems.  The affidavits and testimony of Watkins and other African American employees of the Board all show a deeply entrenched culture of racial discrimination and retaliation.

Once this discrimination is shown, the cause of connection to the ultimate adverse employment action, is clear.  There is no reason to believe that, absent discriminatory and retaliatory motives, there would have been any investigation and none of the issues would have turned up, and there would not have been any termination.

## B.   THERE IS SUBSTANTIAL EVIDENCE OF DISPARATE TREATMENT.

Defendants argue that Watkins's discrimination claim should be dismissed because he has failed to provide sufficient comparators.  This is not true.  First, it must be pointed out that disparate treatment is only one factor which might be used to prove race discrimination.  As shown above, 3 to 20, there are material issues of disputed fact which, separate from the disparate impact theory of recovery, show that the motivation for Watkins' discipline and termination was discrimination and retaliation.

The evidence also precludes summary judgment relating to disparate impact.

The cases defendants rely upon are inapplicable.  In <u>Dill v. Runyon</u>, 1997 WL 164275 (E.D.Pa. 1997) the nine employees offered plaintiff all had been laid off whereas the plaintiff had been fired for cause.  Likewise, in <u>Jones v. Hospital of University of Pennsylvania</u>, 2004 WL 1773725 (E.D.Pa. 2004), the plaintiff was terminated for sleeping while on suicide watch of a patient. The other employees in that case were caught sleeping on breaks, not on suicide watch.  Moreover, this was the third time Jones was caught sleeping on suicide watch.  <u>Dill</u> and <u>Jones</u> are not applicable because, herein, Watkins was treated differently from similarly situated white employees and terminated on pretext.

The evidence of disparate treatment applies to similarly situated employees.  Defendants argue that Donna Henry is not a valid comparator because Henry's secretary was never injured and that is why Henry did not have to go without secretarial support. This is absurd.  Watkins was not denied secretarial support for a day, or a week or even a month; he was without a secretary for an entire year.  During the same time, Henry always had a secretary. It is just absurd to allege that Henry is not similarly situated because her secretary was not injured.  When Watkins' secretary was injured, Bukata and/or Jones could have hired a temp within hours or hired a new secretary within days.  Instead, as retaliation for his complaints of discrimination, defendants sought to punish Watkins by making his work more difficult and

withholding support staff.

Likewise, Stuart Greenberg is also in a substantially similar situation.  He is alleged to have been without a secretary for a period of time as well.  This is very relevant in that it will tend to show how quickly Greenberg's need was accommodated compared to Watkins.

Further Greenberg is also an appropriate comparator because he was in the same job position and was not disciplined for infractions much more serious than any Watkins was ever accused of.  Greenberg was accused of sexual harassment.  After a PDC, no discipline was given.  While the defendants argue that Greenberg is not similar because he did not have as many disciplined violations as Watkins, this is one of very issues which makes Greenberg a useful comparator.  As documented in the Auditor General's report found that the Board employees were overall deficient in performing their duties, including not keeping track of defenders, lack of documentation and poor performance all around. (Exhibit V).  Greenberg and other white supervisors were disciplined less often because informal forms of correction were used with white agents and supervisors, whereas the defendants formally documented and prosecuted the same violations of policies against Watkins and other black agents and supervisors.

Moreover, both Greenberg and Henry are perfect comparators for the size of caseload.  Other white supervisors are as well.

For example, Burton's affidavit shows white supervisors were assigned between 281-384 cases. (Exhibit R, Affidavit at 57). (Burton is African American).  Watkins unit, however, was assigned at lease 490 cases (email October 6, 2000, defendants' Exhibit 8)(11) and generally 600 (Exhibit A).  Likewise, Burton's unit was responsible for 532 cases.

Further, the Auditor General's report showed that the Board has approximately 350 agents to monitor approximately 24,000 offenders. (Exhibit V).  This works out to 71 offenders per agent.  However, Watkins unit had 5 agents and 490 offenders, an average of 98 offenders, which is almost 40% more offenders than the average unit.

Thus, not only are Greenberg and Henry appropriate comparators, the Auditor General's report also provides substantial evidence that the similarly situated white employees were treated differently.  Genuine issues of material fact exist regarding disparate treatment to preclude summary judgment and require decision by the jury at trial.

## V.    THE JURY SHOULD DECIDE THE COUNT FOR CONSPIRACY.

## A.    THE BOARD AND BUKATA AND JONES IN THEIR OFFICIAL CAPACITIES.

Defendants argue that the conspiracy count should be dismissed against the Board and Bukata and Jones in their official capacities because defendants are protected by sovereign

immunity, an agency cannot conspire with itself.  They concede that this does not apply to Bukata and Jones in their individual capacities.

Plaintiff's conspiracy count should not be dismissed. Defendants are not protected by sovereign immunity.  In <u>Nevada Dept. of Human Resources v. Hibbs</u> 538 U.S. 721, 123 S.Ct. 1972 (U.S. 2003), the Supreme Court held that Congress responded to this country's history of discrimination and retaliation "by abrogating States' sovereign immunity in Title VII of the Civil Rights Act of 1964."  Herein, defendants are accused of conspiracy to violate Title VII, Section 1981 and Section 1983. The Court should find that Congress has abrogated any state law immunity for conspiracy to violate Title VII.

Additionally, the theory that employees of an agency cannot conspire with the agency does not apply.  Defendants rely on <u>Thompson Coal Co. v. Pike Coal Co.</u>, 488 Pa. 198, 412 A.2d 466 (Pa. 1979).  That case is completely different.  <u>Thompson</u>, a state case, did not hold that employees of a agency can never conspire; it held that a defendant who was sole shareholder and sole officer of a corporation could not be found to have conspired with the corporation.  There was no other physical person; just the fiction of the corporation which was, in essence, him.  Herein is a totally different situation.

In Dupree v. Hertz Corp., 419 F. Supp. 764 (E.D. Pa. 1976)(Newcomer), this Court held that a corporation can conspire with its agents in violation of § 1985 when discriminatory policy where the corporation involves large number of separate offices within corporation. *See also* Rackin v. University of Pennsylvania, 386 F. Supp. 992 (E.D. Pa. 1974)(*abrogated on another point of law)* (Weiner) (plaintiff claimed numerous university employees engaged in long-term conspiracy to deny plaintiff tenured position on university faculty because of plaintiff's sex; because conduct of defendants consisted of numerous overt acts, conduct could not be considered single act of single legal entity); Jackson v. University of Pittsburgh, 405 F.Supp. 607, 613 (M.D.Pa. 1975) (actions of the individually named trustees and officers of university were not the actions of a single entity). Judge Newcomer held that because the defendant was a large corporation with numerous separate offices, the complaint alleges a broad policy of discrimination rather than a single discriminatory act, and the plaintiff is not challenging a specific, formally adopted corporate policy, the conspiracy count was not barred by the single entity rule.   Those same factors are here.

Herein, the Board is a huge organization, not a small corporation owned by a sole investor who never acted with another living person.  There are numerous offices with hundreds of

employees spread across the entire state.  Moreover, just the
Philadelphia district is divided into multiple offices and units.
The complaint alleges a pervasive and long standing practice of
discrimination evidenced by numerous acts against African
Americans in general and Watkins in particular.  Further, it is
not a formal agency policy that is attacked, but a practice which
has evolved from the illegal concerted actions of the defendants.
As in <u>Dupree</u>, the single entity rule is not applicable.

**B.    BUKATA AND JONES IN THEIR INDIVIDUAL CAPACITY.**

Bukata and Jones argue that the conspiracy count should be
dismissed as against them in their individual capacities because
there is no proof of discrimination.  Defendants Bukata and Jones
are clearly liable for conspiracy under Section 1985 and 1986 of
the Civil rights act which provide a cause of action for
conspiracy to violate civil rights. The defendants' argument that
there is no evidence of discrimination is unavailing and
disingenuous.  As shown above, at 3 through 20, material issues
of fact exist to support the counts of discrimination and
retaliation.  Accordingly, those issues must be decided at trial
by the jury.

**VI.    DEFENDANTS JONES AND BUKATA ARE NOT ENTITLED TO QUALIFIED
        IMMUNITY.**

Defendants contend that defendant Jones and Bukata are

entitled to qualified immunity as Board employees.  (Defs' Mem. at 52-3). The Court already decided this issue in denying qualified immunity on defendants' Motion to Dismiss.  Even if the issue is still open, there can be no doubt that qualified immunity does not apply because the right to be free from discrimination is very clear and, it cannot be denied that racially based discrimination and retaliation, resulting in professional discipline and termination, is in violation of that right and any reasonable person would know that such is a violation.

A public official's otherwise illegal actions are protected by qualified immunity only if he can show that his offending conduct did not "violate clearly established statutory or constitutional rights which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants have the burden to prove that they are protected by qualified immunity.  Id.  Jones and Bukata, have not met their burden to show that they are entitled to such immunity. At the very least, their knowledge and intent are disputed issues of material fact for the jury.

The Third Circuit has enunciated a three part test to determine whether defendants are entitled to qualified immunity:

> i.   whether the plaintiff alleged a violation of his constitutional rights;
> ii.  whether the right alleged to have been violated was clearly established in the existing law at the

> > > time of the violation; and
> >
> > iii. whether a reasonable official knew or should have
> >      known that the alleged action violated the
> >      plaintiff's rights. <u>Rouse v. Plantier</u>, 182 F.3d
> >      192, 196-97 (3d Cir. 1999).
> >
> > iv.

Clearly, Watkins has alleged a violation of his constitutional rights. As shown supra, 3 to 20, there is a dispute of material facts as to whether Watkins was terminated based on racial discrimination and retaliation. Moreover, the right to be free from discrimination and retaliation based upon race in the workplace, is well grounded in the law and widely known to the public for many years now. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, (C.A.3 1990)(right to be free of discrimination based upon sex in the workplace is well grounded in law and widely known to the public); <u>Holmes v. McGuigan</u>, 2005 WL 884978 (E.D.Pa. 2005)(Baysolon, J.)(clear on its face that qualified immunity does not apply to racial discrimination claim); <u>Abuhouran v. Acker</u>, 2005 WL 1532496 (E.D.Pa. 2005)(Yohn) (right to be free from discrimination is clearly established right).

Defendants contend that it is not clear that their conduct violated plaintiff's constitutional or statutory rights. (Defs' Mem. at 53). Their argument can only be disingenuous. The defnedants made a similar argument in Andrews. There, the Third Circuit held:

> it appears that [defendants] are attempting to

argue that because this is a close case as to whether
they had the necessary discriminatory intent or took
any discriminatory actions, they should receive the
benefit of the doubt. This is not the purpose of
qualified immunity. The purpose is to protect public
officials from liability in situations involving
extraordinary circumstances and where they neither knew
nor objectively should have known the appropriate legal
standard. <u>Harlow</u>, 457 U.S. at 819, 102 S.Ct. at 2738.

Thus, qualified immunity is not to be imposed lightly.  In

Karnes v. Skrutski, 62 F.3d 485 (C.A.3 1995), the Third Circuit

held that, where there is a material issue of disputed fact as to

whether the defendants actions were in violation of

constitutional rights, qualified immunity must be denied.  There,

the defendants were police officers who argued that their

detention of the plaintiff was based on probable cause because

they believed "vegetable matter" in plaintiff's car was

marijuana.  The Court held that a "jury will have to weigh the

defendants' contention" against the plaintiff's assertion that

noone could reasonable believed this to be true and that

defendants stated they did not believe it was true.

Herein, defendants dodge and misconstrue the issues of this

case.  The issue is not whether it is a violation of

constitutional rights to discipline and terminate an employee.

The main issue in this case is whether the defendants may

discriminate against an African American employee and discipline

and terminate him on the basis of his race and as retaliation for

his standing up against discrimination.

Defendant Bukata treated plaintiff differently than his
White peers when he assigned a disproportionate caseload and
refused to adequately supply his unit with support staff, to list
but a few of the examples.  Defendant Jones was made aware of
Bukata's actions, and condoned the actions.

A reasonable official would have or should have known that
he was violating plaintiff's rights by treating plaintiff
differently because of his race.  A jury will have to weigh
defendants' assertion of non-discriminatory motives against
plaintiff's evidence of pretext, discrimination and retaliation.
Therefore, defendants' claim of qualified immunity should be
denied.

Moreover, the law is clear that individual defendants do not
have qualified or other immunity in their official capacities
under Title VII.  Sheridan v. E.I. Dupont de Nemours and Co., 100
F.3d 1061 (3d Cir. 1996).  Furthermore, individual defendants do
not have qualified immunity under Section 1981 "when [they]
intentionally cause an infringement of rights protected by
Section 1981, regardless of whether the [employer] may also be
held liable." Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir.
2001) (quoting Al-Kharzraji v. Saint Francis Coll, 784 F.2d 505,
518 (3d Cir. 1986); Phillips v. Massey, 197 F.Supp.2d 207, 224
(E.D.Pa. 2002).  If the individual defendants were "personally
involved" in the alleged discrimination", and if they

"intentionally caused" the infringement of plaintiff's Section 1981 rights, or if "they authorized, directed, or participated" in the discriminatory conduct, they may be held personally liable under Section 1981.  <u>Al-Kharzraji</u>, 784 F.2d at 518.

Here, defendant Bukata was "personally involved" in the discrimination, as he was plaintiff's supervisor, and was in charge of assigning the disparate caseload to plaintiff. Furthermore, he was "personally involved" in the decision to deny plaintiff clerical support, despite the fact that White supervisors were provided with such support.  Bukata was also personally involved in all discipline up to and including Watkin's termination.  These are just a few examples of defendant Bukata's personal involvement in the discrimination against plaintiff.  Moreover, not only was defendant Jones "personally involved" in the discrimination, but he also "directed" and "authorized" the discriminatory conduct.  After being made aware of the problems, via plaintiff's written and verbal complaints made directly to Jones, he refused to take action to ameliorate the situation, despite the fact that he was and is the District Director, and clearly had the authority to do so.

Zappan's testimony makes it clear that Jones directed Bukata to engage in the discriminatory conduct and perpetuate the discriminatory, hostile environment and retaliation at the Parole Board.  Moreover, Jones' refusal to take action to correct the

continuous pattern and practice of harassment and retaliation against African American employees amounts to approval of the conduct.

## VII  WATKINS HAS COMPLIED WITH ANY DUTY TO MITIGATE DAMAGES.

Defendants argue, based on Booker v. Taylor Milk Co., Inc., 64 F.3d 860 (C.A.3 1995), that Watkins should be precluded from being awarded front pay or back pay for failure to mitigate damages.  This argument is wholly erroneous and misstates the holding of Booker.  The law is clear the employer has the burden of proving a failure to mitigate.  Robinson v. SEPTA, Red Arrow, 982 F.2d 892, 897 (3d Cir.1993)(Employer failed to meet burden); Anastasio v. Schering Corp., 838 F.2d 701, 707-08 (3d Cir.1988)(Burden on employer to prove failure to mitigate).

To meet its burden, an employer must demonstrate that 1) substantially equivalent work was available, and 2) the Title VII claimant did not exercise reasonable diligence to obtain the employment. *Id.* Substantially equivalent work is defined as "that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." Booker at 867.

Defendants make a sloppy and/or disingenuous effort to show that other positions are available for plaintiff to apply for that are "substantially equivalent." (Brief at 55).  On there

very face, many of the exhibits offered by Defendants actually disprove their argument.  Exhibit 20, the advertisement for a position as a probation officer for the US government expressly states that applicants must be under 37 years old.  Watkins is 56.  He is not eligible for this position.

Moreover, the other advertisements listed by defendants were not for "substantially equivalent work."  The positions listed are mostly for minimum wage jobs.  Many of the jobs are for security guard positions. Many fail to indicate pay rate or duties.  There is no listing of duties. Thus, the defendants have failed to meet their duty to show that these positions were substantially equivalent.  These are unskilled entry level positions.  Watkins is a skilled worker, with more than 25 years experience.

A cursory review of the other ads offered shows that most, if not all were for positions that Watkins could not apply for. For example, some ads require a Masters Degree in mental health, a masters in child care, five years experience in mental health, one or more years experience in providing care to persons with developmental disabilities, four years experience with elderly, experience in early childhood programs, social work license, masters in social work, specialty in job placement for food services, experience in home services to families and children, One ad is for welders, machinists and shipfitters.  At least two

ads are duplicates.  Many even come from before Watkins was terminated.

Further, of the very few positions that even list salary, most are for less than $35,000 per year and range all the way down to $7 per hour.  Watkins was making $63,000 per year when he was terminated.  Clearly, a position that pays $14,000/year clearly is not equivalent.  Moreover, Watkins is currently on pension, earning 36,000 per year.  Thus, if he were to go off of his pension and take the lower paying jobs, his damages would actually be higher.

As stated, the burden is on the defendants to show lack of mitigation.  Watkins has testified that he has constantly sought employment since his termination.  The truth is it is very hard for a person who is terminated at 51 to find substantially similar employment.  This careless dump of documents by the defendants cannot meet their burden.  At a minimum, whether Watkins has acted to mitigate his damages is a dispute of material fact.  However, based on his undisputed testimony, Watkins has applied for other jobs, but has not been offered any.

Finally, Defendants fail to advise the Court that <u>Booker</u> held that the "plain language of section 2000e-5 shows that amounts that could have been earned with reasonable diligence should be used to reduce or decrease a back pay award, not to wholly cut off the right to any back pay." See 42 U.S.C. § 2000e-

5(g)(1).  Despite this express holding, defendants rely on <u>Booker</u>
to argue that back pay and front pay should be completely denied.

Clearly, issues of material fact exist as to whether
substantially equivalent employment was or is available.  This
must be proven at trial.  Further, the jury should determine the
extent to which, if any, the alleged failure to mitigate would
reduce damages. There is no evidence offered as to when, if ever,
Watkins should have been able to achieve equivalent employment.
As Booker made clear, failure to mitigate serves to "decrease a
back pay award, not to wholly cut off the right to any back pay."
These issues can only be decided by the jury at trial.  Summary
judgment should be denied.


## VIII PUNITIVE DAMAGES ARE PERMITTED AGAINST BUKATA AND JONES IN THEIR INDIVIDUAL CAPACITIES

### The Board.

Defendants argue that punitive damages are not permitted
against the Board or Bukata and Jones in their official
capacities.  It is admitted that punitive damages are not
permitted against the Board.

### Individual Defendants

Defendants Bukata and Jones are liable for punitive damages
in their individual capacity.  punitive damages may be awarded
under 42 U.S.C. § 1983 "when the defendant's conduct is shown to
be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).  Defendants argue that the plaintiff cannot prove the malice element.

The Defendant's argument puts the rabbit in the hat.  They argue that there is no malice because their action was not race based or discriminatory.  (Brief at 59).  However, as shown supra at 3 through 20, this is a matter for the jury and there certainly are issues of material fact as to whether the defendants' actions were race based or discriminatory.

This argument must be rejected.  The plaintiff will show that the defendants' actions were race based harassment, discrimination and retaliation.  If the jury believes Zappan's testimony, that Jones ordered deputy directors (like Bukata) to target the former plaintiffs from the 1993 discrimination suit for retaliatory discipline and ultimately for termination, it is axiomatic that it will find the element of malice satisfied. Moreover, there is a substantial amount of evidence of discrimination offered.  The experiences of Watkins, Williams, Self, Russ Tobias, Burton and Holman all show a history of discrimination and retaliation at the Board.  In fact, the jury in Russ-Tobias expressly found Jones was guilty of acting with malice by awarding punitive damages in that case.

Defendants also argue that punitive damages are not

available against the individual defendants because the Board may
pay a punitive damages award against the individual defendants.
Their argument is a misapplication of a dissenting opinion <u>Keenan
v. City of Philadelphia</u>, 983 F.2d 459, 477 (C.A.3 1992).  It is
not the law.  The majority in Keenan upheld the punitive damages
award.  In Keenan, punitive damages were awarded, but no evidence
had been presented to show the defendants' economic worth.  The
majority held that this issue had been waived.

     Moreover, not even Judge Higginbotham supported the
defendants' argument.  His dissent argued that the majority
should not have held this issue waived because of the importance
of the issue of defendants' economic worth.  He argued that
without such evidence there was a danger that municipalities
would be held liable for large punitive damages awards that the
individual defendants could not pay. He did not argue that
punitive damages should not have been imposed.  In fact, he
expressly upheld them and stated:

> **I agree with Part IV A of the above opinion that the
> conduct of Grasso, Stoner, and Gallagher establishes
> their liability for punitive damages**. . . . However, I
> dissent because the extraordinary magnitude of the
> punitive damages in this case cannot be sustained on
> this record which is devoid of evidence of the
> defendants' financial net worth.

     Thus, this <u>dissenting</u> opinion on which the defendants rely
only stands for the argument that the plaintiff should show the
economic worth of the defendants so that the award would be an

appropriate award that they, not the government, should be required to pay.  The law is very clear (and the dissent agreed) that punitive damages are appropriate against defendants in their individual capacities.


## CONCLUSION

As shown, discrimination and retaliation infect the Board to its deepest levels.  Watkins comes before this Court now seeking a cure.  He has done his part.  Despite years of delays and hardball litigation, he has stood firm and will not wilt. Justice now must be allowed to employ its best resources, including trial before a jury of Watkins' peers, to bring the sickness to light, to weigh and diagnose the evidence.  Then, at least in this case, the Board will be forced to stare its problems in the eye and make a decision that this time it will stick to its rehabilitation and cast off the sick cloud which has plagued it for so long.

For the foregoing reasons, the Court should deny the defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

_/S/ rjs2651_____
ROBERT J. SUGARMAN
Counsel for Plaintiff


OF COUNSEL:

SUGARMAN & ASSOCIATES, PC

11th Floor, Robert Morris Bldg.
100 North 17th Street
Philadelphia, PA 19103
215-864-2500

Date: December 13, 2006

## **CERTIFICATE OF SERVICE**

I, Carl W. Ewald, certify that I delivered a copy of the Plaintiff's Answer and Memorandum in Opposition to Defendants' Third Motion for Summary Judgment to the following counsel by **first-class mail** on this date:

Gino J. Benedetti, Esquire
Miller, Alfano & Raspanti, P.C.
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 972-6400

_CWE 6250_____
CARL W. EWALD

Dated: December 13, 2006