## AFFIDAVIT

Henry Watkins, pursuant to 28 U.S.C. §1746, stated that the answers to Defendants' purported "undisputed statements of material fact are true to the best of his knowledge information and belief and further deposes and states as follows:

1. While a supervisor under defendants Jones and Bukata at the Parole Board, my unit was unfairly overloaded and denied support staff. I believed this to be a discriminatory practice aimed at retaliating against me for my prior protests of discrimination and I complained to Jones and Bukata, as while as their superiors about this treatment.

2. While I was a supervisor, the secretary for my unit was injured. She went out on leave and my unit did not have a secretary.

3. I made requests to both Bukata and Jones that they provide another secretary to replace her.

4. Despite my requests I was not provided a Secretary for a year.

5. Other white supervisors were provided with secretaries; some had two. If one left, the secretary was routinely replaced.

6. Another Supervisor in my division, Stuart Greenberg, was without a secretary for six months while I was also without a secretary. I was without a secretary for about four months before Greenberg's secretary left.


EXHIBIT
A

## AFFIDAVIT

Henry Watkins, pursuant to 28 U.S.C. §1746, deposes and states as follows:

1.    While a supervisor under defendants Jones and Bukata at the Parole Board, my unit was unfairly overloaded and denied support staff.  I believed this to be a discriminatory practice aimed at retaliating against me for my prior protests of discrimination and I complained to Jones and Bukata, as while as their superiors about this treatment.

2.    While I was a supervisor, the secretary for my unit was injured.  She went out on leave and my unit did not have a secretary.

3.    I made requests to both Bukata and Jones that they provide another secretary to replace her.

4.    Despite my requests I was not provided a Secretary for a year.

5.    Other white supervisors were provided with secretaries; some had two.  If one left, the secretary was routinely replaced.

6.    Another Supervisor in my division, Stuart Greenberg, was without a secretary for six months while I was also without a secretary.  I was without a secretary for about four months before Greenberg's secretary left.

7.    Greenberg and I interviewed secretaries at the same time.

8.    Though I had been without a secretary for four months longer than Greenberg, after we interviewed secretaries together, he was provided with one of the secretaries that was hired, but I was not.

9.    I was not provided a replacement secretary until two months after Greenberg, who is white.

10.   Additionally, my caseload was always the highest in the division.  I usually had almost 600 parolees in my unit.  My unit would never get lower than about 490 parolees.

11.   Supervisors Donna Henry, Mark Weinstein and James Ellis generally had 350-425 parolees in their unit.   They were all white supervisors.

12.   James Burton, another African American Supervisor, experienced the same excessive workload.  He usually had around 600 parolees.

13.   Since I was terminated I applied for at least two positions; as a hearing examiner in Norristown and Philadelphia.

14.   Though I regularly search for employment, I have not been able to find suitable employment.

15.   I was making $63,000 per year as a Supervisor at the Parole Board.

16.   I now make approximately $36,000 per year from my pension.

17. At the time I was terminated I was 51 years old and am now 56.

18. During my time as a Supervisor, my unit was redistricted three times. This was more than any other Supervisor.

19. When a unit is redistricted all cases are transferred in a mass transfers of cases. These mass transfers entailed the transferring of a whole caseload from one supervisor to another supervisor. Often, the White supervisor would not even be required to update his cases before the transfer. However, I was required to make sure that all outgoing cases were in perfect shape.

20. On one such occasion, I came into my office to find that there were 300 new cases on my desk which had not been properly updated.

21. I believe these redistricting were used to harass, discriminate and retaliate by imposing tremendous work requirements that could not be kept up with.

22. Additionally, when my unit was redistricted, it was redistricted to progressively more dangerous areas of the city. I started in Manayunk and Roxborough and, by the end, was redistricted to the worst sections of north Philadelphia.

23. Though I had no secretary for a year, my unit was required to ensure that the clerical work was done. I was severely reprimanded if ever the statistical codes were not up to

date on a file. This happened 2-3 times.

24. Other supervisors, white supervisors, were not required to maintain this clerical work as up to date as me even though they had secretaries. I once saw more than 100 files listed as blank at one time and no one was reprimanded for it.

25. Bukata would enter my office while I was not there and search through my desk.

26. Bukata refused to offer any training or answer questions when I asked him about policies, procedures or for advise.

27. He would reprimand me and humiliate me if I asked for advise.

28. When I complained about the caseload, Bukata and Jones refused to do anything and blamed me for the caseload.

29. When Ellis complained about his caseload, though lower than mine, they redistricted the entire division.

30. Bukata would not come to my staff meetings which were in the same building as his office. But, he would go to staff meetings for Donna Henry, which were 8-9 miles away.

31. Bukata was constantly adversarial to me and would oppose any suggestion or request that I made.

32. The 1993 plaintiffs have all been forced to retire or terminated.

33. Jones transferred Dingle, myself and Holmes to Bukata's supervision. I believe we were transferred to Bukata because he

conspired with Bukata to force us all out.

Executed this 13th day of December, 2006, pursuant to the penalties for unsworn perjury.  I state the foregoing to be true and correct.

_____
HENRY WATKINS

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
OFFICE OF ADMINISTRATION
510 Finance Building
Harrisburg, PA 17120-0018

July 9, 1993

We have completed the investigation of the discrimination
plaint filed against the Pennsylvania Board of Probation and
ole.

The following are the Conclusions and Recommendations reached
a result of the investigation.

## Conclusions

ere are two primary allegations to this complaint:  1)
na_ement did not implement the recommendations included in
e 1988 investigation report, and 2) retaliation occurred
a result of the complaint filed by the Sentinels in
iminal Justice in February, 1988.  We will deal first with
sues relating to the recommendations.

## Implementation of Recommendations

It is clear from the facts of this case that Fred C.
Jacobs, Chairman of the Pennsylvania Board of Probation
and Parole in 1988, had very little if any confidence in
the investigation and subsequent investigation report
relating to the 1988 complaint of discrimination filed
against the management of the Philadelphia District
Office.  Mr. Jacobs' description of the report as

AFFIRMATIVE ACTION/
CONTRACT COMPLIANCE

EXHIBIT 3

EXHIBIT
3

unsubstantiated hearsay" set the tone for what originally occurred when it became necessary for administrative/management staff to implement the recommendations. When we look at the responses from administrative/management staff relative to what was done to implement the recommendations. Moreover, Probation and Parole Agents, minority as well as nonminority, have no knowledge of what was done relative to the recommendations.

Based on the facts of this case, a reasonable person could conclude that little effort was exerted to implement the recommendations included in the 1988 investigation report. Consequently, only two of the seven recommendations can be considered as implemented.

Retaliation

As noted under recommendations above, incomplete efforts were made by management of the Philadelphia District Office to correct the disparate impact finding of the 1988 investigation. The continuance of discriminatory practices against the nine complainants rose to the level of retaliation particularly in those areas where discriminatory practices intensified as noted in the forms of retaliation reported by the complainants.

Based on the facts in this case, a reasonable person would conclude that retaliation did occur, substantiating a finding of probable cause. Specifically, retaliation is (or is not) noted with respect to the following forms of retaliation as outlined in the complaint:

Denial of Promotions. This form of retaliation was realized by issuance of more written reprimands and suspensions and lower ratings on performance evaluations for Black agents than for similarly situated white agents.

We find no validity to the claim that Black agents were more frequently reassigned than similarly situated white agents, or that Black agents were reassigned to units with higher case loads. We did find, however, that reassignment was used as a means of discipline only with Black agents.

withdrawal of assigned state vehicles. Again, we note that this form of discipline has occurred only with Black Agents. Although some form of discipline may have been warranted, in most cases reviewed the removal of an assigned vehicle for late milage reports appears to be excessive discipline.

Harassment. We find harassment in all of the aforementioned in this section of the report; i.e., excessive written reprimands and suspensions, lower performance evaluation ratings, reassignment as a form of discipline and withdrawal of assigned state vehicles.

Recommendations

The recommendations included with the 1988 investigation report should be revisited and implemented as rapidly as possible. The affirmative action officer should be the lead person. She, in collaboration with the Bureau of Affirmative Action/Contract Compliance should develop a process for monitoring the implementation of these seven recommendations as well as the ensuing recommendations.

2. The Pennsylvania Board of Probation and Parole should give consideration to appointing regional affirmative action/ contract compliance officers: one for Eastern and Western Pennsylvania with the current affirmative action officer serving as their supervisor and covering the Central Region.

3. The next two openings in supervisory positions at the Philadelphia District Office should be targeted for minorities.

4. Expunge all reprimands from the personnel files and records of the complainants.

5. Stress management training should be provided to all Philadelphia District Office employes. These seminars should be offered on an annual basis.

6. All managers and supervisors assigned to the Philadelphia District Office should be required to attend training with respect to: 1) managing a culturally diverse work force; 2) conflict resolution and management; and 3) motivating employes.

will follow-up on these recommendations. Please
tand that these recommendations are not binding to the
final agreement must be reached before any recommen-
s are implemented.

ease contact me at (717) 783-1130 if you have any
ions or comments.

Sincerely,

Richard C. Jones, III, Director
Bureau of Affirmative Action/
Contract Compliance

Honorable Joseph L. Zazyczny

Table of Contents

Page No.

Introduction                                                          1

Methodology                                                           2

Complaint and Complainants                                            4

Findings of Fact and Facts Bearing Upon the Case                     5

Conclusion                                                           12

Recommendations                                                      14

## Methodology

...se investigators assigned to this case utilized a coordinated... ...order to confirm or deny the complainants' allegations. ...aches were (1) interviews of all relevant employes; (2) ...pertinent Pennsylvania Board of Probation and Parole ...ten policies and documents including performance eva- ...nd written reprimands; and (3) a comparison of what ...relative to reprimands and performance evaluations of a ...imilarly situated white Probation and Parole Agents ...o the Philadelphia District Office between February, 1988 ...er, 1992.

...views were conducted with 42 employes. All interviewees ...gned to the Philadelphia District Office with the exception ...dministrative staff assigned to the Harrisburg Central ...Position titles, the race and sex of the interviewees are as...

...tion and Parole Agents:  Total 25

|  |  |  |  |
|---|---|---|---|
|  |  | White Male | 8 | Hispanic Male | 1 |
| ...k Male | 11 | White Female | 2 |
| ...k Female | 3 |  |  |

...on and Parole Agent Supervisors:  Total 10

|  |  |  |  |
|---|---|---|---|
|  |  | White Male | 7 |
| ...k Male | 2 | White Female | 1 |

...trict Director:  White Male

...uty District Director:  Two White Males

...rector, Bureau of Supervision:  White Male

...rector, Bureau of Administrative Services:  White Male

...ree Specialist:  Black Male

...ffirmative Action Officer:  Black Female

and data reviewed are as follows:

...mance evaluations and Written reprimands for
...46 Probation and Parole Agents.

...robation and Parole Agents Reassignments Within the
...hiladelphia District.

...chedule of all Philadelphia District Office Employes
...y Race, Sex, Work Unit and Length of Employment.

...emoranda: "Monitoring Field Operations Through
Inspections and Reviews", May 3, 1984; "Interview
Questions", January 11, 1989; "Payroll Stuffer For
January 18, 1989 Pay Data", January 13, 1989.

...anagement Directive 505.18, "Maintenance Access and
Release of Employe Information".

Schedule For Submitting Form STD-554, "Monthly Automotive
Activity Report".

Pennsylvania Board of Probation and Parole, Manual of
Operations and Procedures: Chapter 8, "Discipline" and
Chapter 12, "Automotive Operations".

...entinels In Criminal Justice Discrimination Investiga-
...ion Report, November 1988".

Memorandum: "Sentinels in Criminal Justice Report";
to Richard C. James, III, Director, Bureau of Affirmative
Action/Contract Compliance, from Fred W. Jacobs, Chairman,
Pennsylvania Board of Probation and Parole, December 16,
1988.

Memorandum: "Sentinels in Criminal Justice Report", to Fred
W. Jacobs, Chairman, Pennsylvania Board of Probation and
Parole, from Richard C. James, III, Director, Bureau of
Affirmative Action/Contract Compliance, January 5, 1989.

"Proceedings From the Meeting Between Senior Black Probation
and Parole Agents and the Bureau of Affirmative Action/
Contract Compliance, September 16, 1992.

A comparative analysis was conducted of the performance eva-
...ion scores of the complainants as a group with a randomly
...cted group of similarly situated white Probation and Parole
...ts to determine if the Black agents were discriminatorily given
...r scores. The same approach was utilized to ascertain if Black
...ts were administered written reprimands more frequently than
...ilarly situated white agents.

## Complaint and Complainants

...laints in this case are nine, senior, Black Probation ...le Agents assigned to the Philadelphia District Office of the ...ania Board of Probation and Parole.   The complainants are: ...cle, Ernis Holmes, Leonard Lyons, Benjamin Montgomery, Calvin ..., Darryl Rankin, Edward Self, Henry Watkins and Henry Williams.

...complaint is that the noted Probation and Parole Agents have ...iced retaliation perpetrated against them by the management of ...ladelphia District Office.   The complainants state that this ...tion resulted from the fact that in February, 1988, they filed ...a Bureau of Affirmative Action/Contract Compliance a discrimi- ...complaint against the Philadelphia District Office management. ...plainants further state that retaliation took the following

denial of promotions;

more frequent written reprimands and suspensions than simi- larily situated white Probation and Parole Agents;

lower ratings on performance evaluations than similarily situated white Probation and Parole Agents;

...assignment to units with higher case loads and more fre- quent reassignment than similarily situated white agents;

withdrawal of state vehicles which has never occurred to similarily situated white Probation and Parole Agents; and

harassment.

Moreover, the complainants allege that none of the corrective ...ons recommended by the Bureau of Affirmative Action/Contract ...liance as a result of a disparate impact finding in the 1988 ...stigation have been implemented by management of the Philadelphia ...rict Office.

Findings of Fact and Fact Bearing Upon the Case

F ruary 8, 1988, Probation and Parole Agents assigned to a Philadelphia District Office of the Pennsylvania Board of obation and Parole Filed with the Bureau of Affirmative tion/Contract Compliance, a class action complaint based on ce, class and sex. The core of the complaint was discrimi- tion in the promotional process within the Philadelphia strict Office.

he Bureau of Affirmative Action/Contract Compliance con- ucted an investigation and issued an investigation report on ovember 22, 1988. The report found, among other things, hat " . . disparate impact against minorities does exist n the Pennsylvania Board of Probation and Parole".

The Bureau of Affirmative Action/Contract Compliance issued the following seven corrective recommendations in its investigation report of November 22, 1988.

a.) The Personnel Director/Affirmative Action Officer should provide MSPT training to all Parole Supervisors in the Philadelphia District Office. Subsequent to training, the MSPT evaluation documents should be approved by the Personnel Director/Affir- mative Action Officer prior to implementation.

b.) A uniform criteria for evaluation of employes' per- formance i.e., Exceeded Objective, Generally Met Objective, Did Not Meet Objective, should be deve- loped and applied consistently throughout the agency.

c.) The Personnel Officer and the Affirmative Action Officer should develop a one-day or more training package to be presented to the Agents and. Supervisors. The training should include Grievance Procedures; 501 Promotion Without Examination; Performance Evaluations; Upward Mobility, and Civil Service Rules and Regulations as part of the require- ments for a minimum of 40 hours of training annually for Probation and Parole employes.

d.)  Agents should be given copies of Management Directive
     580.19, Promotion in the Classified Service without
     Examination, dated April 1, 1985.

e.)  Supervisors should be encouraged to promote employes
     through upward mobility within their own division or
     units.  When the same employes consistently bid on
     vacant positions, and continually get rejected, the
     opportunity for the perception of discrimination may
     occur.

f.)  Questions should be developed before the Interview
     Team reviews the Certified List of Eligible can-
     didates and submitted to the Personnel Director for
     approval prior to implementation.

g.)  The Affirmative Action Officer should be more visible
     in all of the Regional Offices by scheduling on-site
     visits.

On December 16, 1988, in response to the investigation report
of November 22, 1988, Fred W. Jacobs, Chairman, Pennsylvania
Board of Probation and Parole directed a memorandum to
Richard C. James, III, Director, Bureau of Affirmative
Action/Contract Compliance in which he referred to the
investigation report as "unsubstantiated hearsay" and
questioned the practicability of the corrective recommen-
dations.

On September 16, 1992, a group of seven, Black Probation and
Parole Agents assigned to the Philadelphia District Office
met with Mr. James, and staff from the Bureau of Affirmative
Action/Contract Compliance.  In this meeting, the agents
stated that they were being retaliated against by management
of the Pennsylvania Board of Probation and Parole and as a
result of the 1988 complaint of discrimination that they
filed against the Pennsylvania Board of Probation and Parole.
The seven complainants attending this meeting were as
follows:  Leon Dingle, Ernest Holmes, Leonard Lyons, Calvin
Crabtree, Jr., Darryl Rankin, Henry Watkins and Henry Williams,
Jr. all classified as Agent II's.

Current (January, 1991) assigned su-
visors and administrators, Pennsylvania Board of Proba-
District Office of the Pennsylvania relative to sex and race:
Parole reflects the following

<u>Agents: Total - 82</u>

|  |  |  |
|---|---|---|
|  | 67 | 82% |
| Male: | 24 | 29% |
| Black | 41 | 50% |
| White | 2 | 3% |
| Hispanic |  |  |
|  | 15 | 18% |
| Female: | 7 | 8% |
| Black | 8 | 10% |
| White |  |  |
|  | 33 | 40% |
| Minority | 49 | 60% |
| Nonminority |  |  |

<u>Supervisory Staff: Total - 15</u>

|  |  |  |
|---|---|---|
|  | 14 | 93% |
| Male: | 3 | 20% |
| Black | 11 | 73% |
| White |  |  |
|  | 1 | 7% |
| Female: | 1 | 7% |
| White |  |  |

~~inistrative~~

~~a?~~                    3        100%

white

e document "Probation and Parole Agent Reassignments within
e Philadelphia District" provided by the Pennsylvania Board
? Probation and Parole reveals that between January 1, 1988
1d December 31, 1992, 53 agents were reassigned for a total of
7. transfers. The ethnic/racial composition of the agents
transferred reflects the following:

|  |  |  |
|---|---|---|
|  | 16 | 30% |
| Black Male | 27 | 51% |
| White Male | 2 | 4% |
| Hispanic Male | 3 | 7% |
| Black Female | 5 | 9% |
| White Female |  |  |
|  | 21 | 40% |
| Minority | 32 | 60% |
| Nonminority |  |  |

Interview statements from agents as well as the document "Parole
Agent Reassignments within the Philadelphia District Office"
reveal that agents were transferred for the following reasons:

   a)  for coverage where a particular unit was under-
       staffed;

   b)  realignment to actual work unit as opposed to
       the Philadelphia District Office in general;

   c)  correction of assignment (a paper transaction only)
       where agents were placed in the wrong unit; and

   d)  as part of corrective discipline for agents perceived
       by management as not working up to standards.

rview statements reveal that the Philadelphia District
r, Harold Shalon, occasionally transfers agents
if I think the agent is not doing the job". This
son for transfer was used four times between February,
8 and December, 1992.   The four agents transferred for
s reason were all black:   Leon Dingle, Calvin Ogletree,
thu Self and Henry Williams.

erview question responses reveal that the frequency of agent
ansfers within the Philadelphia District was excessive. This
servation was made by Linwood Fielder, Staff Specialist who was
sponsible for providing technical assistance and management
nsultation to the Philadelphia District Office. Mr. Fielder
ported his findings to his supervisor, John Burke, Director,
reau of supervision.  Mr. Burke advised District Director
alon to discontinue the practice without prior approval from
is office.

ocumentation provided by the Pennsylvania Board of Probation
nd Parole relating to written reprimands administered to a
roup of 26 Probation and Parole Agents assigned to the
Philadelphia District Office between February, 1987 and
December 1992, reveals that 76 written reprimands were admin-
istered to this group.   All 76 were addressed to nine Black
agents in the group.

P  formance evaluations conducted on 26 Probation and Parole
Agents assigned to the Philadelphia District Office between
January, 1987 and December 31, 1992 reveal that Black Agents
tended to be rated lower than similarly situated white agents.

Performance evaluations conducted on 26 Probation and Parole
Agents assigned to the Philadelphia District Office for 1987-88
compared with performance evaluations conducted on 24 agents for
1990-91 reveal a significant decrease in the overall ratings for
Black agents than for similarly situated white agents.   During
these same periods of time, the overall ratings for performance
evaluations of white agents improved.

Interview question responses from administrative staff as
well as Probation and Parole Agents reveal the following
relative to the recommendations included in the 1988 discrimina-
tion investigation report:  recommendations two and five were not
implemented; one and three were partially implemented; while
four, six and seven were implemented.

...erview responses from Probation and Parole Agent supervisors
...d to the Philadelphia District Office reveal that most
...that discipline for submission of late mileage reports would
...progressive, that occasional lateness is not a serious issue;
...ever, continued late submission and/or nonsubmission could
...ult in the removal of state vehicles from agents.

...ur Probation and Parole Agents assigned to the Philadelphia
...istrict Office have had their state vehicles removed for various
...asons between January, 1988 and December 1992. All of the sub-
...ected agents were black: Leon Dingle, Ernie Holmes, Harold
...unter and Henry Williams.

...nterview responses of administrative and supervisory staff
...veal that receipt of a written reprimand by a Probation and
...role Agent precludes that agent from being promoted for three
...ears from date of issuance of the written reprimand.

...The majority of written reprimands administered to nine Black
...Probation and Parole Agents noted in fact 13 above related to the
...following areas:  failure to complete assigned task, mishandling
...of clients' cases, nonsubmission of initial supervisory reports,
...failure to document arrest of clients, failure to submit agent
...activity sheets in a timely manner, and overdue progress and con-
...duct reports.

...tten reprimands administered to Probation and Parole Agents
...between January, 1988 and December, 1992 reveal that no written
...reprimands were administered to 11 randomly selected white agents
...during this period of time.

...Interview responses from supervisory staff and Probation and
...Parole Agents assigned to the Philadelphia District Office
...indicate that the average case load for agents assigned to
...general units is 160 and for agents assigned to speciality
...units, the average is 45.

...The memorandum "Monitoring Field Operations Through Inspections
...and Reviews" reveals that the Harrisburg Headquarters Office
...of the Pennsylvania Board of Probation and Parole has standard
...written procedures for monitoring District Offices including
...audits of Probation and Parole Officers.

...The interview response of the staff specialist assigned to the
...Philadelphia District Office indicate that he conducted desk
...audits of all Probation and Parole Officers within a given
...unit whenever it was necessary to audit one or more agents
...within that unit.

review responses of Probation and Parole Agents assigned to Philadelphia District Office as well as the documents proceedings from the Meeting Between Senior Black Probation P_le Agents and the Bureau of Affirmative Action/Contract liance" indicate that frequently, supervisors assigned to Philadelphia District Office would audit one or two Black its within a given unit but not the white agents.

erview responses of supervisors as well as managers assigned the Philadelphia District Office reveal that the lead agent each unit is selected at the discretion of the supervisor that selection is not primarily based on seniority.

mentation provided by the Pennsylvania Board of Probation and le relating to suspensions administered to a group of 26 bation and Parole Agents assigned to the Philadelphia District ice between January, 1988 and December, 1992 reveals that ten nts were suspended. All ten agents were Black.

25

## Conclusion

...re two primary allegations to this complaint: 1) management
...plement the recommendations included in the 1988 investigation
...& 2) retaliation occurred as a result of the complaint filed by
...els in Criminal Justice in February, 1988. We will deal first
...s relating to the recommendations.

### ...entation of Recommendations

...clear from the facts of this case that Fred C. Jacobs, Chairman
...e Pennsylvania Board of Probation and Parole in 1988, had very
...e if any confidence in the investigation and subsequent investi-
...n report relating to the 1988 complaint of discrimination filed
...st the management of the Philadelphia District Office. Mr..
...s' description of the report as "unsubstantiated hearsay" set the
...for what eventually occurred when it became necessary for
...nistrative/management staff to implement the recommendations.
...we look at the responses from administrative/management staff
...tive to what was done to implement the recommendations, we note
...their responses were inconsistent. Moreover, Probation and
...le Agents, minority as well as nonminority, have no knowledge of
...was done relative to the recommendations.

...ed on the facts of this case, a reasonable person could conclude
...t little effort was exerted to implement the recommendations.
...luded in the 1988 investigation report. Consequently, only two of
...seven recommendations can be considered as implemented.

### ...taliation

...noted under recommendations above, incomplete efforts were made by
...nagement of the Philadelphia District Office to correct the
...scurate impact finding of the 1988 investigation. The continuance
...discriminatory practices against the nine complainants rose to the
...vel of retaliation particularly in those areas where discriminatory
...ractices intensified as noted in the forms of retaliation reported by
...he complainants.

...ased on the facts in this case, a reasonable person could conclude
...hat retaliation did occur, substantiating a finding of probable
...ause. Specifically, retaliation is (or is not) noted with respect to
...he following forms of retaliation as outlined in the complaint:

Denial of Promotions. This also issuance of more written reprimands and lower ratings on performance evaluations for Black agents than similarly situated white agents.

We find no validity to the claim that Black agents were more frequently reassigned than similarly situated white agents, or that Black agents were reassigned to units with higher case loads. We did find, however, that reassignment was used as a means of discipline only with Black agents.

Withdrawal of assigned state vehicles. Again, we note that this form of discipline has occurred only with Black Agents. Although some form of discipline may have been warranted, in most cases reviewed the removal of an assigned vehicle for late mileage reports appears to be excessive discipline.

Harassment. We find harassment in all of the aforementioned in this section of the report: i.e., excessive written reprimands and suspensions, lower performance evaluation ratings, reassignment as a form of discipline and withdrawal of assigned state vehicles.

## AFFIDAVIT OF COUNSEL

Robert Sugarman, pursuant to 28 U.S.C. §1746, deposes and says:

1.   I am counsel for the plaintiff herein.

2.   I served as counsel for Mr. Watkins and five other African American agents associated with "Sentinels for Criminal Justice" in 1993-1995.  That proceeding arose from systematic discrimination and retaliation which had been documented in two reports of the Governor's office of Administration under Governor Casey.  The second report documented the retaliation that had occurred after the first report was issued.

3.   In the six consolidated cases, Judge O'Neill had determined on Motion for Preliminary Injunction that the plaintiffs would probably succeed on the merits. (He declined to issue an injunction, because he concluded that in employment cases, such discrimination and retaliation is compensable through other means.)

4.   After Judge O'Neill's opinion, I personally negotiated the settlement of that case which is the subject of this motion with counsel for the Board, Marc Brookman, Esquire, and the Chairman of the Board, Alan Castor, and the then head of personnel, Thomas Marshall.

5.   Mr. Castor indicated that he wished to change the culture of the Board, and indeed had appointed Mr. Ogletree as

F:\Watkins\Pleadings\Affidavit of Counsel 5-19


EXHIBIT
C

his Chief of Staff.  Both Mr. Castor and Mr. Marshall are African Americans.  Both had long professional histories in law enforcement and parole work.

6.   Signed in 1995, the agreement required Mr. Watkins and other plaintiffs to be provided with promotions and/or new jobs when vacancies became available, in consideration of the prior discrimination.

7.   Before a vacancy became available for Mr. Watkins, Mr. Castor was removed as Chairman.  He was removed by Governor Ridge almost immediately after Governor Ridge took office.  The new Chairman, William Ward, and/or the intermediate acting chairman removed Calvin Ogletree.  Calvin Ogletree was Chief of Staff, and a prior member of the Sentinels who had instituted litigation against the Board which was settled for undisclosed consideration. (I am not personally familiar with the consideration.  However, after his settlement, Mr. Ogletree was promoted to Chief of Staff by Chairman Castor.

Mr. Ogletree's removal was protested to the EEOC and other channels.  Mr. Ogeltree consulted me about representing him in approximately 2000, but before anything could be done, Mr. Ogletree succumbed to a terminal illness.  As he was dying, he terminated his representation and intentions to pursue this case.

8.   The new Chairman, Mr. Ward, instituted various personnel changes directly and indirectly.  One of them was to install Mr. Jones, the defendant, as District Director in

F:\Watkins\Pleadings\Affidavit of Counsel 5-19-06.wpd

17. Mr. Marshall was removed as Director of Personnel. Neither Mr. Marshall nor anyone else at the Board had any knowledge of who was responsible for implementing the ADR provision of the settlement agreement.

The Board did not, as we learned, have any process for implementing the ADR provision.

18. Lead counsel, Mr. Roy, referred Mr. Watkins to the union process, which was pursued but did not succeed.

As a result of these unsuccessful efforts, we were convinced that any further efforts under the ADR process would be futile.

19. Neither Mr. Castor nor Mr. Marshall, nor Mr. Ogletree, all of whom are African American, had any charges asserted against them upon which to base their removal. It was clear that the personnel structure and culture which had existed at the Board prior to Mr. Castor's efforts to reform the Board; had reasserted themselves.

20. Testimony in the Russ-Tobias case tried before Judge O'Neill in May 2005 established that the Board, under the current top leadership as well as Mr. Jones, has practiced systematic discrimination and retaliation against African Americans. Although the verdict was set aside based on the Court having intertwined Section 1981 issues (which the Court later reversed itself and held was not in the cause of action), with the Title VII issues in Russ-Tobias, the Court denied a motion for new trial or for judgment based on evidentiary adequacy and held that

the evidence of systematic discrimination and retaliation by the Board was fully supportive of the jury's verdict.

21.  The jury also found that Mr. Jones was guilty of discrimination and retaliation.

The evidence before the jury included substantial testimony from other victims of discrimination.  However, Mr. Watkins was precluded from testifying because Judge O'Neill held on the defendant's Motion in Limine, that persons having present disputes with the Board would not be permitted to testify.

22.  At the trial, Mr. Zappan and Hugh Young, both white mid-level executives under Mr. Jones, testified that Mr. Jones had stated that he would pursue his desire to "get" the individuals who had been Sentinels.

23.  Mr. Zappan also testified that when he had reported his concerns up the line to the office of the Chairman, he was told to keep his head down and do his job, and no action was taken in response to his concerns.

The information stated herein came to me at various times from 1997 (when Mr. Castor and Mr. Ogletree were removed) through 2005.

24.  By 1998, however, I was sufficiently aware of the foregoing lack of interest in pursuing ADR to conclude that any further efforts under the ADR process, which I had initiated, would be futile.

25.  My first action was to file a motion to enforce the

F:\Watkins\Pleadings\Affidavit of Counsel 5-19-06.wpd

settlement and/or for breach of the settlement with Judge O'Neill on behalf of another prior plaintiff, Henry Williams. Mr. Williams had retired instead of continuing to face what he found to be a hostile work environment. Mr. Williams' motion was dismissed by Judge O'Neill in 2005 for lack of jurisdiction.

26. Because Mr. Watkins was actually terminated, I determined that an independent action would be more productive than an effort to enforce the settlement agreement.

27. Efforts by Mr. Williams with my counseling in 1998, Mr. Ogletree's problems (of which I was aware), Mr. Watkins' treatment, and my own inability to make productive contact, showed me that further pursuit of the ADR would be futile.

Executed this 19th day of May, 2006, pursuant to the penalties for unsworn perjury. I state the foregoing to be true and correct.

ROBERT J. SUGARMAN



**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2        - - - - - - - - - - - - - - - - - - - -

 3   HENRY WATKINS          NO. 02-CV-2881

 4        -vs-

 5   PENNSYLVANIA BOARD OF
     PROBATION & PAROLE, EDWARD
 6   JONES and MICHAEL BUKATA
          - - - - - - - - - - - - - - - - -
 7
              Thursday, December 12, 2002
 8               - - - - -

 9        Oral sworn testimony of ALLEN CASTOR,
10   was taken pursuant to Notice at the law
11   offices of SUGARMAN & ASSOCIATES, 100 North
12   17th Street, Robert Morris Building, 11th
13   Floor, Philadelphia, PA 19103, on the above
14   date before DEBRA G. JOHNSON-SPALLONE, CSR,
15   RPR, Commissioner of Deeds, Notary Public
16   in and for the State of New Jersey, and a
17   Federally Approved Reporter of the United
18   States District Court commencing at or about
19   11:00 a.m.
20
                   ********
21        Certified Shorthand Reporting Services
                 Arranged Through
22         DEBRA G. JOHNSON & ASSOCIATES
                 800 Joshua Court
23          Moorestown, New Jersey 08057
                   856-778-1758
24              FAX 856-778-7890

        DEBRA G. JOHNSON & ASSOCIATES
        856-778-1758 FAX 856-778-7890
```

**3**

```
 1              I N D E X

 2   WITNESS                          PAGE

 3   ALLEN CASTOR

 4   Examination by Mr. Sugarman....       4

 5   Examination by Ms. Parda....      103

 6

 7

 8

 9              E X H I B I T S

10   P-1    Letter, 3-8-93

11   P-2    Report

12   P-3    Letter, 9-14-93

13   P-4    Agreement

14

15

16

17

18

19

20

21

22

23

24

        DEBRA G. JOHNSON & ASSOCIATES
        856-778-1758 FAX 856-778-7890
```

**2**

```
 1   APPEARANCES:

 2

 3   SUGARMAN & ASSOCIATES
     BY:  ROBERT J. SUGARMAN, ESQUIRE
 4   100 North 17th Street
     Robert Morris Building
 5   11th Floor
     Philadelphia, PA  19103
 6
     Representing the Plaintiff
 7

 8

 9   MILLER, ALFANO & RASPANTI, PC
     BY:  JENNIFER A. PARDA, ESQUIRE
10   1818 Market Street
     Suite 3402
11   Philadelphia, PA  19103

12   Representing the Defendants

13

14
15
16
17
18
19
20
21
22
23
24

        DEBRA G. JOHNSON & ASSOCIATES
        856-778-1758 FAX 856-778-7890
```

**4**

```
 1          - - - - - - - -
 2        P R O C E E D I N G S
 3          - - - - - - - - - - -
          - - -
 4        (It is stipulated and agreed
 5   by and between counsel that
 6   and certification of the within
 7   deposition be waived; and that all
 8   objections, except as to the form
 9   of the question, be reserved until
10   the time of trial.)
11
12          - - - -
13        ALLEN CASTOR, after having
14   been first duly sworn as a witness,
15   testified as follows:
16          - - - -
17        MS. PARDA: I also have to
18   request that this transcript is to
19   be entered as sealed given the
20   confidential nature of the 1995
21   settlement agreement.
22        In other words, any portion
23   of the deposition that may be used
24   during the course of these
        DEBRA G. JOHNSON & ASSOCIATES
        856-778-1758  FAX 856-778-7890
```



9

1  responsible officer?
2  A.    Absolutely. Correct.
3  Q.    Now, at some time did you serve as
4  Chairman?
5  A.    I did.
6  Q.    When was that?
7  A.    That would be from February of 1993
8  until June 30, 1995.
9  Q.    What were the circumstances of your
10  termination as Chairman?
11  A.    New administration had come to
12  power in Harrisburg and they decided that
13  they wanted to make a change and put their
14  own person in charge.
15  Q.    Now, who was that person at that
16  time?
17  A.    Chairman or the Governor?
18  Q.    The Chairman.
19  A.    Chairman. Nicholas Milar.
20  Q.    Now, was your term as a Board
21  member a fixed term or was it at the pleasure
22  of the governor?
23  A.    No, it was a fixed term.
24  Q.    Was your term as a Chairman a

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

10

1  fixed term or was it at the pleasure of the
2  governor?
3  A.    Chairman serves at the pleasure of
4  the governor.
5  Q.    For how long did your fixed term
6  continue after you ceased to be the Chairman?
7  A.    Approximately four years.
8  Q.    Did you and have you been
9  reappointed?
10  A.    I have.
11  Q.    When were you reappointed?
12  A.    I was reappointed in June of 1999.
13  Q.    When does that term expire?
14  A.    June of 2005.
15  Q.    Now, Mr. Castor, have you -- in
16  your capacity as Chairman, did you have
17  responsibility for overseeing the staff and
18  dealing with matters of staff administration?
19  A.    Yes.
20  Q.    Did you have the authority to
21  appoint anybody to be in charge of staff
22  administration?
23  A.    Yes.
24  Q.    Did you appoint somebody?

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

11

1  A.    I did.
2  Q.    Who did you appoint?
3  A.    At that time I made an Executive
4  Director position and that would have been
5  Calvin Ogletree.
6  Q.    What race or background is
7  Mr. Ogletree?
8  A.    Calvin was black.
9  Q.    What was the -- what was his
10  experience with the agency at that time?
11  MS. PARDA: Objection to
12  form.
13  You can go ahead and answer.
14  THE WITNESS: Calvin's
15  experience with the agency at that
16  time?
17  Well, with me as Chairman,
18  it was pretty good. Made certain
19  that Calvin's unique and many
20  talents were utilized especially
21  when supporting my mission to move
22  the agency forward.
23  MR. SUGARMAN: I appreciate
24  that answer. My question was a

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

12

1  pure question.
2  - - -
3  CONTINUATION
4  BY MR. SUGARMAN:
5  Q.    What I meant, speaking factually,
6  what experience did he have at the time you
7  appointed him to that job; that is what I
8  meant to ask?
9  A.    Oh, okay.
10  Calvin had been -- prior to
11  coming to the agency, had been a Philadelphia
12  police officer for a number of years in the
13  City of Philadelphia. He was a parole agent
14  with the agency. Had been a parole agent for
15  a number of years and had acquired a wide
16  variety of skills. He became a training
17  officer with the agency and at the -- I
18  believe -- no. I still don't remember that
19  clearly.
20  And at my appointment by the
21  governor, at that time Governor Casey as
22  Chairman, I made Calvin one of my senior
23  managers. In fact, the senior manager of
24  the agency, Executive Director.

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

21

1  that.
2  Q.        All right.
3  A.        I don't remember that.
4  Q.        Now, when the governor replaced
5  you, was action taken to replace
6  Mr. Ogletree?
7            MS. PARDA: Objection to
8       form.
9            Go ahead.
10           THE WITNESS: Yes.
11           - - -
12 CONTINUATION
13 BY MR. SUGARMAN:
14 Q.        What was that action?
15 A.        He was -- please be more specific
16 if you don't mind.
17 Q.        What action was taken with respect
18 to Mr. Ogletree?
19 A.        Well, he was no longer Executive
20 Director on July 1st, and he was removed back
21 to his civil service position, which was
22 training officer within the training division
23 of the agency.
24 Q.        Did he make any complaint to

22

1  anybody about that?
2            MS. PARDA: Objection to
3       form.
4            You can answer.
5            THE WITNESS: Yes.
6            - - -
7  CONTINUATION
8  BY MR. SUGARMAN:
9  Q.        What complaint did he make?
10 A.        To my knowledge, he did civil
11 service complaints. I'm certain he did some
12 EEOC issues, and I know he pursued legal
13 recourse.
14 Q.        Were you ever asked to provide any
15 information in regard to his complaints
16 either by him or by the Board?
17           In other words, did
18 anybody -- well, first let me break that
19 down.
20           Did Mr. Ogletree make any
21 requests to you for factual or supportive
22 information that he felt would support his
23 case, either directly or through counsel?
24 A.        Yes.

23

1  Q.        Did you provide any information?
2  A.        I was deposed on a few occasions
3  and to the extent that I had records at that
4  point, I provided them with that.
5  Q.        Do you recall who deposed you; was
6  it the Mattioni office?
7  A.        This is going to sound bizarre.
8            I have been deposed so many
9  times. I have a strong recollection of being
10 deposed by your -- by your firm here. I
11 believe it was on his behalf. I know I have
12 appeared at so many civil service hearings
13 in which it was Mattioni's firm, but whether
14 the deposition was with him or with you, I
15 don't remember.
16           I believe and I know we
17 don't like to speculate, I believe I was
18 deposed at least once, but that is a belief.
19 Q.        I don't believe I deposed you on
20 Calvin's behalf.
21 A.        It was not you. I mean, it was
22 here, but it was not you.
23 Q.        Oh.
24 A.        Well, this is the first time I

24

1  believe --
2  Q.        I don't believe it was on Calvin's
3  behalf.
4  A.        Maybe on someone else's behalf.
5  Q.        I think it might have been for
6  Henry Williams.
7  A.        Could have been. Its just been so
8  many of them.
9  Q.        Yeah. Okay.
10           - - -
11 (Discussion held off the record.)
12           - - -
13 CONTINUATION
14 BY MR. SUGARMAN:
15 Q.        Did you ever reach a conclusion as
16 to whether Mr. Ogletree's removal was or had
17 any aspects of racial discrimination?
18           MS. PARDA: Objection to the
19      form.
20           You can answer.
21           THE WITNESS: No, I didn't
22 reach a conclusion on that.
23           - - -
24 CONTINUATION

81

1    in '87 -- scratch that -- '82, my District
2    Director told me; hey, make certain that
3    everybody is functioning. If they are not,
4    whip them into shape. Maybe they need to go.
5            That is not inconsistent
6    with the agency, but I had not heard that
7    Mr. Jones said that directly.
8    Q.        Right.
9            Did you hear that Mr. Jones
10   had been authorized and told directly to
11   retaliate against any African Americans who
12   had made complaints about discrimination in
13   the Board?
14           MS. PARDA: Objection to
15       form.
16           You can answer.
17           THE WITNESS: Absolutely
18       not.
19           - - -
20   CONTINUATION
21   BY MR. SUGARMAN:
22   Q.        Do you know that Mr. Watkins was
23   terminated?
24   A.        No, I thought you were retired.
         DEBRA G. JOHNSON & ASSOCIATES
         856-778-1758  FAX 856-778-7890

82

1    I did not know that. I was under the
2    assumption he retired.
3    Q.        Where did you get that impression?
4    A.        He was not here. I asked around
5    and I thought he had retired. I didn't know
6    he was terminated.
7    Q.        Now, did you hear any complaints
8    about Mr. Watkins' performance as a
9    supervisor?
10           MS. PARDA: Objection to
11       form.
12           You can answer.
13           THE WITNESS: No. No, I
14       didn't hear anything about him as
15       a supervisor.
16           - - -
17   CONTINUATION
18   BY MR. SUGARMAN:
19   Q.        Mr. Thomas Marshall was director of
20   personnel?
21   A.        Personnel.
22   Q.        Right.
23           Did he hold that position
24   when you became Chairman or did you appoint
         DEBRA G. JOHNSON & ASSOCIATES
         856-778-1758  FAX 856-778-7890

83

1    him to that position?
2    A.        He was in that position when I
3    became Chairman.
4    Q.        He is African-American, right?
5    A.        He is.
6    Q.        Do you know the circumstances under
7    which he was no longer the Chairman; I mean
8    -- sorry --
9    A.        Personnel Director.
10   Q.        -- Personnel Director?
11   A.        Right.
12           MS. PARDA: I am going to
13       object to the form.
14           You can answer.
15           THE WITNESS: Do I know the
16       circumstance?
17           MR. SUGARMAN: Yeah.
18           THE WITNESS: I believe he
19       was removed from that job soon
20       after I was removed from the
21       Chairmanship.
22           - - -
23   CONTINUATION
24   BY MR. SUGARMAN:
         DEBRA G. JOHNSON & ASSOCIATES
         856-778-1758  FAX 856-778-7890

84

1    Q.        Who was he replaced by?
2    A.        Originally a gentleman by the name
3    of -- I believe it was Gary Schiccatanno. So
4    Gary Schiccatanno.
5    Q.        What is Mr. Marshall's race?
6    A.        Mr. Marshall is black.
7    Q.        What is Schiccatanno?
8    A.        Mr. Schiccatanno is white.
9    Q.        Did you ever hear of any
10   investigation since your removal as Chairman
11   of whether there was a pattern and practice
12   of racial discrimination in the senior levels
13   of the Board?
14           MS. PARDA: Objection to
15       form.
16           You can answer.
17           THE WITNESS: Whether or not
18       the senior staff was doing that or
19       was --
20           MR. SUGARMAN: Or whether it
21       was being done by the Board in
22       regard to senior staff?
23           THE WITNESS: I'm really
24       lost. Would you rephrase it?
         DEBRA G. JOHNSON & ASSOCIATES
         856-778-1758  FAX 856-778-7890

COPY

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - - - - - - - - - - - - - - - - -

JAMES D. BURTON        NO. 02-CV-2573

-vs-

PENNSYLVANIA BOARD OF
PROBATION & PAROLE, et al
- - - - - - - - - - - - - - - - - - -
- - -
Thursday, November 7, 2002
- - - - -

Oral sworn testimony of THOMAS MARSHALL,
was taken pursuant to Notice at the law
offices of SUGARMAN & ASSOCIATES, 100 North
17th Street, Robert Morris Building, 11th
Floor, Philadelphia, PA 19103, on the above
date before MARYBETH KENNEDY, a Certified
Court Reporter, commencing at or about 10:00
a.m.

DEBRA G. JOHNSON & ASSOCIATES
800 Joshua Court
Moorestown, New Jersey 08057
856-778-1758
FAX 856-778-7890

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

**Page 2**

APPEARANCES:

SUGARMAN & ASSOCIATES
BY: DEBBIE L. GOLDBERG, ESQUIRE
100 North 17th Street
Robert Morris Building
11th Floor
Philadelphia, PA 19103

Representing the Plaintiff

MILLER, ALFANO & RASPANTI, PC
BY: JENNIFER A. PARDA, ESQUIRE
1818 Market Street
Suite 3402
Philadelphia, PA 19103

Representing the Defendants

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

**Page 3**

I N D E X

WITNESS                              PAGE

THOMAS MARSHALL
Examination...
  By MS. GOLDBERG            4

E X H I B I T S

Marshall 1    8/7/00 letter    34
Marshall 2    1/5/00 memo      47
Marshall 3    1/25/01 letter   78

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

**Page 4**

- - - - - - - -
P R O C E E D I N G S
- - - - - - - - - - - - - -
- - -
(It is stipulated and agreed
by and between counsel that sealing
and certification of the within
deposition be waived; and that all
objections, except as to the form
of the question, be reserved until
the time of trial.)
- - -
THOMAS MARSHALL, after
having been first duly sworn as a
witness, was examined and testified
as follows:
- - -
EXAMINATION
- - -
BY MS. GOLDBERG:
Q.     Good morning, Mr. Marshall.
A.     Good morning.
Q.     My name is Debbie Goldberg. I
represent James Burton in a suit he has

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890


EXHIBIT
E

37

1 resulted from this recommendation?
2 A. Yes.
3 Q. In the July 25th memo you note that
4 the PDC was conducted by Mr. Solla alone
5 without the assistance of a deputy or a
6 supervisor; is that correct?
7 A. That's correct.
8 Q. What action was taken as a result
9 of that or in response to that problem?
10 A. I had a conversation with
11 Mr. Solla, I had a conversation with
12 Mr. Solla's supervisor that we should have
13 two people in a pre-disciplinary conference
14 for the sake of taking documentation. It's
15 important that he should have someone in
16 there with him.
17 Q. When you say, "Mr. Solla's
18 supervisor," you're referring to Mr. Jones?
19 A. Yes.
20 Q. And what was their response?
21 A. I don't recall what his response
22 was at the time.
23 Q. Was another pre-disciplinary
24 conference held as a result of that problem?

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758  FAX 856-778-7890

1 conference?
2 A. I didn't see a problem with it
3 because Mr. Solla was his supervisor.
4 Q. So you saw no need for the
5 pre-disciplinary conference to be held again?
6 A. No, I didn't.
7 Q. In what circumstances would you
8 decide that a pre-disciplinary conference had
9 to be held again because only one superviso
10 attended?
11 MS. PARDA: Objection to
12 form.
13 THE WITNESS: I believe, I
14 stated before that, if a
15 pre-disciplinary conference would
16 have been held by someone other
17 than an individual in his chain of
18 command in the Philadelphia
19 District Office, I would have
20 suggested that they have another
21 one. Mr. Solla is his supervisor.
22 If a deputy outside of his chain of
23 command would have held this PDC
24 would have instructed him to hold

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758  FAX 856-778-7890

negotiating a
agents in 19
A. Yes,
Q. Do y
Board agent
A. Not
Q. Was
agents?
A. Yes,
Q. Was
agents?
A. Yes,
Q. Was
agents?
A. Yes,
Q. Was
agents?
A. Yes.
Q. Was
A. Yes.
Q. And
agents?
A. Yes,
Q. Was
DEBRA G
856-77

38

1 A. No. Mr. Solla was Mr. Burton's
2 supervisor. Now, if someone other than
3 Mr. Solla would have had this
4 pre-disciplinary conference who was not in
5 Mr. Burton's chain of command, we would have
6 had another one, as I stated before. This
7 person is his supervisor.
8 Q. Is it correct you testified earlier
9 that two people are required to .--
10 A. Two people, yes, we want two people
11 in there.
12 Q. If you could just let me finish the
13 question, because she can't take down my
14 question and your answer at the same time.
15 A. I'm sorry.
16 Q. I'll afford you the same
17 opportunity to respond.
18 Let me just restate my
19 question. Did you testify earlier that two
20 people must attend the conference, a
21 supervisor and his supervisor?
22 A. Yes, that's what I testified to.
23 Q. So was there a problem with the
24 fact that only Mr. Solla attended this

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758  FAX 856-778-7890

1 another one.
2 ...
3 CONTINUATION
4 BY MS. GOLDBERG:
5 Q. Do you know what disciplinary
6 action was taken against Agents Boyd and
7 Mirman regarding these issues?
8 A. I don't recall. I know there was
9 counseling sessions with the individuals, bu
10 I don't recall if there was any other action
11 taken.
12 Q. Were you involved in negotiating a
13 settlement between the Parole Board and a
14 group known as the sentinels in 1995?
15 A. I was not involved in negotiating a
16 settlement with a group of individuals called
17 the Sentinels of Justice in 1995.
18 I was involved in
19 negotiating a settlement with six parole
20 agents who worked for the Board of Probation
21 and Parole. There was no such thing, as far
22 as we're concerned, as the Sentinels of
23 Justice.
24 Q. Okay. So you were involved with

DEBRA G. JOHNSON & ASSOCIATES
856-778-1758  FAX 856-778-7890

remember th
A. No.
Q. I thi
to ensure tha
implemented

CONTINUATI
BY MS. GOLD
Q. Are
agreement w
A. Yes,
Q. Who
ensure that t
implemented

to fo

resp
that
impl
DEBRA G
856-77

**41**

em with it
supervisor.
d for the
to be held again

ices would you
ry conference had
ly one superviso

Objection to

S: I believe, I
if a
nference would
someone other
n his chain of
iladelphia
uld have
have another
supervisor.
of his chain of
ve held this PDC,
ed him to hold
ASSOCIATES
-778-7890

negotiating a settlement with six Board agents in 1995?
A. Yes, I was.
Q. Do you recall the names of those Board agents?
A. Not all of them, no.
Q. Was Leon Dingle one of those agents?
A. Yes, he was.
Q. Was Earnest Holmes one of those agents?
A. Yes, he was.
Q. Was Darryl Rankin one of those agents?
A. Yes, he was.
Q. Was Howrhu Self one of those agents?
A. Yes.
Q. Was Henry Watkins?
A. Yes.
Q. And was Henry Williams one of those agents?
A. Yes.
Q. Was there anyone else that you can
DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

**42**

isciplinary
nts Boyd and
es?
there was
individuals, but
other action

negotiating a
e Board and a
in 1995?
negotiating a
ividuals called
95.
in
six parole
ard of Probati
h thing, as far
ntinels to

volved with
SSOCIATES
778-7890

remember that I have not mentioned?
A. No.
Q. I think I mentioned six.
Whose responsibility was it to ensure that the settlement was implemented, settlement agreement?
MS. PARDA: Objection.
MS. GOLDBERG: Strike that.
---
CONTINUATION
BY MS. GOLDBERG:
Q. Are you aware that a settlement agreement was entered into?
A. Yes, I am.
Q. Whose responsibility was it to ensure the settlement agreement was implemented?
MS. PARDA: Same objection to form. Go ahead.
THE WITNESS: Pardon?
MS. GOLDBERG: Whose responsibility was it to ensure that the settlement agreement was implemented or complied with?
DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

**43**

1  MS. PARDA: Same objection
2  to form.
3  THE WITNESS: That's the
4  responsibility of the Board's legal
5  staff as far as I know. I don't
6  get involved in that.
7  ---
8  CONTINUATION
9  BY MS. GOLDBERG:
10 Q. Do you know whether the settlement
11 agreement was implemented or enforced?
12 A. I have no direct knowledge of what
13 any part of that settlement agreement was
14 implemented.
15 Q. So did you have any
16 responsibilities regarding the implementation
17 or enforcement of the settlement agreement?
18 A. The only responsibility I had as
19 far as that settlement was concerned was in
20 regard to some discipline that was issued to
21 those agents that were supposed to be removed
22 from their personnel files.
23 Q. And that was your only
24 responsibility with regard to the
DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

**44**

1  implementation of the agreement?
2  A. Yes.
3  Q. Did you have any responsibilities
4  regarding any mediation or arbitration
5  requirements?
6  A. No.
7  Q. Besides what you just told me, did
8  your job duties change at all as a result of
9  the settlement agreement; or did you take on
10 any other responsibilities as a result of it?
11 A. No.
12 Q. Did you ever ask anybody whether
13 you had any additional responsibilities under
14 the terms of the settlement agreement?
15 A. No, I did not.
16 Q. Did you ever ask anybody whether
17 the personnel office had any additional
18 responsibilities regarding the implementation
19 of the agreement?
20 A. No, I did not.
21 Q. I think you may have answered this,
22 but do you know who was in charge of
23 implementing the agreement?
24 A. I already answered that. It would
DEBRA G. JOHNSON & ASSOCIATES
856-778-1758 FAX 856-778-7890

# ORIGINAL  *1*

1        IN THE UNITED STATES DISTRICT COURT
2   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
    - - - - - - - - - - - - - - - - - - - - -

3                                   CIVIL ACTION
    LEON DINGLE                     93-CV-5478
4   ERNEST C. HOLMES                93-CV-5927
    DARRYL E. RANKIN                93-CV-5698
5   HOWRHU M. SELF                  93-CV-5779
    HENRY R. WATKINS                93-CV-5926
6   HENRY WILLIAMS, JR.             93-CV-5696

7        -vs-

8   PENNSYLVANIA BOARD OF PROBATION
    AND PAROLE, ALAN CASTOR, JR.,
9   CHAIRMAN, FRED W. JACOBS, FORMER
    CHAIRMAN, HAROLD SHALON, DISTRICT
10  DIRECTOR, RONALD ZAPPAN, DEPUTY
    DISTRICT DIRECTOR, DANIEL SOLLA,
11  DEPUTY DISTRICT DIRECTOR, PAUL DESCANO,
    DIRECTOR, ROBERT YERGER, DIRECTOR OF
12  PERSONNEL
    - - - - - - - - - - - - - - - - - - - - -

13

14              Oral Deposition of

15              THOMAS MARSHALL

16

17

18              July 19, 2000

19

20

21

22      DEBRA G. JOHNSON & ASSOCIATES
              800 Joshua Court
23      Moorestown, New Jersey 08057
                856-778-1758
24          FAX 856-778-7890



```
 1   the Director of Human Resources.

 2   Q.        You still report to him now?

 3   A.        No, I report to the Director of

 4   Personnel Division who is Mary Marcinko.

 5   Q.        Who does she report to?

 6   A.        She reports to Gary Scicchitano.

 7   Q.        Right.

 8             So was your -- were your

 9   transfers considered lateral or demotion?

10   A.        My promotion -- my transfer from

11   Personnel Director to Labor Relations

12   Coordinator was a demotion, yes.

13   Q.        What was the reason for that?

14   A.        The reason was that, in the

15   organizational reorganization at that time

16   when Mr. Scicchitano came in, was that they

17   wanted individuals with a criminal justice

18   background.

19   Q.        What, did Mr. Scicchitano had a

20   criminal justice background?

21   A.        Yes, he does.

22   Q.        You did not?

23   A.        No.

24   Q.        Was the job description changed
```

**[Page 1]**

1     IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3  - - - - - - - - - - - - - - - - - - - -

4

5  ROSALIND RUSS-TOBIAS    NO. 04-CV-00270

6

7        -vs-

8

9  PENNSYLVANIA BOARD OF PROBATION

10  and PAROLE, EDWARD JONES, FRANK

11  HARGERUM and MICHAEL MOYER

12  - - - - - - - - - - - - - - - - - - - -

13        - - -

14     Wednesday, August 25, 2004

15        - - -

16

17  DEPOSITION OF: A. GARY SCICCHITANO

18        - - -

19

20

21       ********

      Certified Shorthand Reporting Services

22       Arranged Through

      DEBRA G. JOHNSON & ASSOCIATES

23       800 Joshua Court

      Moorestown, New Jersey 08057

24       (856)778-1758

      FAX (856)778-7890

**[Page 3]**

1  APPEARANCES:    COPY

2

3

4  SUGARMAN & ASSOCIATES

5  BY: ROBERT J. SUGARMAN, ESQUIRE

6  100 North 17th Street

7  11th Floor

8  Robert Morris Building

9  Philadelphia, PA 19103

10

11  Representing the Plaintiff

12

13

14

15  OFFICE OF ATTORNEY GENERAL

16  COMMONWEALTH OF PENNSYLVANIA

17  BY: CLAUDIA M. TESORO, ESQUIRE

18  Litigation Section

19  21 South 12th Street

20  3rd Floor

21  Philadelphia, PA 19107

22

23  Representing the Defendants

24

**[Page 2]**

Oral Deposition of A. GARY SCICCHITANO, was taken pursuant to Notice at the law offices of SUGARMAN & ASSOCIATES, 100 North 17th Street, 11th Floor, Robert Morris Building, Philadelphia, PA 19103, on the above date before DEBRA G. JOHNSON-SPALLONE, CSR, RPR, Commissioner of Deeds, Notary Public in and for the State of New Jersey, and a Federally Approved Reporter of the United States District Court commencing at or about 11:08 a.m.

**[Page 4]**

1       I N D E X

2  WITNESS          PAGE

3  A. GARY SCICCHITANO

4  Examination by Mr. Sugarman....  5

5  Examination by Ms. Tesoro...... 104

6

7

8       E X H I B I T S

9  Scicchitano-1  Letter

10  Scicchitano-2  E-mail Document

11  Scicchitano-3  Report

12

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT G

from the time I got to the Board.  I did not
know him prior to that.

Q.       What was his previous capacity?

A.       He had been at Allentown for a
period of time and I do not recall exactly
where he was immediately prior to becoming
District Director.

Q.       Do you remember that his
appointment as District Director was set
aside by Civil Service Commission?

A.       I don't believe it was set aside.

Q.       Do you recall that there was an
appeal taken to the Civil Service Commission?

A.       Yes, I did, but I don't believe it
was set aside at all.

Q.       You think it was sustained?

A.       I believe that it was held to be a
valid appointment.

Q.       Was there a previous iteration that
was set aside without going to the Civil
Service Commission?

A.       Of Mr. Jones' promotion --

Q.       Right.

A.       -- to District Director?

---

10

---

Q.       Yeah.

A.       Not that I recall.

                 MR. SUGARMAN:  Let me see
         Jones.

                 - - -

         (Discussion held off the record.)

                 - - -

CONTINUATION
BY MR. SUGARMAN:

Q.       All right.

         Mr. Jones is testifying in the
Zappan Case on page six of his deposition;
"were you at any time removed from that
position?

         Yes, I was.

         What was the basis of the removal?

         Civil Service stated that they
asked to be removed from that position.

         What was the reason given?

         Something to do with past practice,
the way I was hired."

         Does that refresh your
recollection?

A.       No, it does not.

---

1   Q.       What is your position with the
2   Board?

3   A.       I'm Director of Human Resources.

4   Q.       What is the responsibility of
5   Director of Human Resources?

6   A.       Oversight of Personnel Division,
7   the Safety Officer, the EEO Office, the
8   County Firearms Commission.

9   Q.       What is the County Firearms
10  Commission?

11  A.       County Firearms Commission is a
12  commission which was enacted several years
13  ago to ensure proper training of County
14  Probation Officers in the use of firearms.

15  Q.       When you say EEO and personnel and
16  human -- what was the other category?

17  A.       Training.

18  Q.       Sorry.

19  A.       Training.

20  Q.       Training.  Sorry.

21  A.       And the Safety Office reports
22  directly to me.

23  Q.       What is your relationship, if any,
24  to Mr. Read's office?

---

12

---

1   A.       None.

2           He has no direct reporting
3   responsibility to me.

4   Q.       What is the authority of the Office
5   of Human Relations Office to initiate
6   investigations by Mr. Read's department?

7   A.       The Human Resources Office?

8   Q.       Yeah, your office.

9   A.       If a complaint is forwarded up
10  through the chain of command, or made
11  directly to me, I will review it with the
12  appropriate office director and a decision
13  will be made whether to forward it on to the
14  Office of Professional Responsibility for an
15  investigation.

16  Q.       Who is the appropriate office
17  director as it relates to complaints arising
18  from the Philadelphia District Office?

19  A.       That would be the Director of the
20  Office of Probation and Parole Services.

21  Q.       Who would that be at the present
22  time?

23  A.       John Tuttle.

24  Q.       What responsibility do you have

---

Exhibits

**21**

1 Q.        What did he tell you about it?

2 A.        That I should become aware of it,

3 the information regarding their suits.

4 Q.        And what did you do to become aware

5 of it?

6 A.        I was -- there was a file in my

7 office, a confidential file, that is; the

8 person responsible for the records, personnel

9 actions that I would have been privy to and

10 reviewed documents in that file.

11 Q.        Did you discuss any of that with

12 Mr. Castor or Mr. Ogletree or Ms. Ingram at

13 that time?

14 A.        Not that I recall.

15 Q.        Did you discuss it with anybody,

16 other than Mr. Newmyer?

17 A.        I don't believe so.

18 Q.        What did you do to make sure that

19 the Board complied with that agreement?

20 A.        Well, we took a number of actions

21 from the time I got there to ensure that the

22 Board complied with the provisions that were

23 in that settlement.

24           There were some issues regarding

**22**

1 promotions and there were some issues

2 regarding individuals' rights to appeal

3 actions in uncommon ways.

4 Q.        What did you do to implement it, as

5 you say?

6 A.        Well, depending on the

7 circumstances that came up, we -- we abided

8 by the settlement agreement.

9 Q.        What?  Give me some examples if you

10 will of what you did to comply with it.

11 A.        I recall one individual, and I

12 don't recall which one was involved in that

13 settlement, who was promoted as a result of a

14 stipulation that he be offered the next

15 available position for example.

16           That is just one example.

17 Q.        Was that Mr. Watkins or Mr. Rankin?

18 A.        I don't recall, Mr. Sugarman.

19 Q.        Okay.

20           How did you go about making sure

21 that happened?

22 A.        Well, when the vacancy became

23 available, we approached the employee and --

24 is it okay if I move this?

**23**

1 Q.        Oh, yeah.  Please.  I'm sorry.

2 A.        We approached that individual and

3 did as specified in the settlement.

4 Q.        Who did that -- how did you do it,

5 directly or did you have someone else do it?

6 A.        No.  It would have been people who

7 worked in my office.

8 Q.        And did they work with or consult

9 with the District Director?

10 A.        I would suspect that that was the

11 case.  Although, I can't certainly attest to

12 that without talking to them.

13 Q.        And when Mr. Jones became -- at any

14 time up until the present, did you take any

15 action, or do you know of any action that

16 was taken to make Mr. Jones aware of the

17 settlement agreement?

18 A.        I don't -- I don't recall.

19 Q.        Did you have somebody in your

20 office who was responsible for ensuring that

21 the settlement agreement was complied with?

22 A.        Ultimately, I would say I was

23 responsible for it, but I delegated much of

24 that to the individuals who are directly

**24**

1 involved in such things as the promotion of

2 an individual.  And, again, I do not recall

3 which person that would have been.  It has

4 been quite some time.

5 Q.        Are you aware of a provision in the

6 settlement agreement relating to handling of

7 disputes?

8 A.        I know that there was a unique

9 dispute resolution in there, but, again, its

10 been quite some time since I looked at it, so

11 I do not recall the specifics.

12 Q.        Did you do anything to implement

13 that?

14 A.        I believe there may have been some

15 instance where one of the individuals may

16 have exercised his rights under that, but I

17 would have to check on that.

18 Q.        Well, I'm asking if you did

19 anything to implement it?

20 A.        I don't, again, remember exactly

21 how that is worded, and I do not recall any

22 involvement in that directly.

23 Q.        Did you become aware of Mr. Zappan

24 complaining that Mr. Jones was requesting or

97

1   needed to have knowledge of.
2   Q.         Did you tell Mr. Jones about it?
3   A.         Did I tell Mr. Jones about what?
4   Q.         About the settlement.
5   A.         No.
6   Q.         Well, how could he -- wouldn't he
7   have implementation responsibility?
8   A.         Well, I think Mr. Jones was aware
    of that settlement without me telling him
    about it.
            I guess that's the point I want --
    Q.         How do you think he would become
    aware of it?
    A.         I don't know.  It's a Philadelphia
    settlement.  I don't know.
            I mean, there was specific cases,
    as I mentioned earlier, that required us to
    do certain things, such as promotion and
    things like that, which we did, and we did
    successfully.
    Q.         Do you have any reason to believe
    that Mr. Jones was aware of the settlement?
    A.         I would just be guessing, and I
    won't do that.

98

    At the time that he was hired, was
    given any briefing on what was going on in
    e Philadelphia Office by anybody?
            I have no idea.
            Whose responsibility would it be to
    sure that he was briefed on whatever was
    ng on in the Philadelphia Office?
            That would be his supervisor, the
    tional Director.
            Was that Veronica Thomas at the
    ?
            Yes, it would have been.
            Nobody in Harrisburg would be
    nsible to brief Mr. Jones?
            Well, certainly if there were hot
    s at the time, we would have discussed
    with them.
            I don't recall doing so with him.
            Maybe members of my staff talked to
    out specific issues, but I don't -- I
    ecall myself speaking to him about any
    cs.
            Well, was there a person that you
    to ensure that the settlement was

99

1   complied with?
2   A.         Well, as I said earlier, those
3   documents are secured in my office, and I
4   had access to those and depending on the
5   circumstances, different members of my
6   staff would have been given different
7   responsibilities to make sure that we were in
8   compliance.
9   Q.         Well, Mr. Jones was going to be the
10  District Director in Philadelphia, wouldn't
11  it be important to make sure that he was
12  aware?
13  A.         Well, I'm not saying he was not.
14  He may very well have been, and I believe he
15  probably was.
16  Q.         Why do you believe that?
17  A.         Because I think along the lines --
18  the actions that we took to effectuate these
19  settlement agreements or settlement
20  stipulations, that Mr. Jones appeared very
21  knowledgeable of what was required.
22  Q.         For example, what?
23  A.         Well, for example, the promotion  I
24  keep bringing up, because that is the one I

100

1   remember, and unfortunately, I don't recall
2   exactly whose it was, but we did it and
3   Mr. Jones was aware of the need to do that,
4   and then made it happen in conjunction with
5   my staff.
6   Q.         Now, Mr. Costa wrote a memorandum
7   to the Bureau of Affirmative Action Contract
8   Compliance in 1993 in response to one of
9   their reports about discrimination and
10  retaliation in the Board.
11          By the way, have you ever seen the
12  report of the Office of Administration from
13  1993, relating to discrimination and
14  retaliation in the Board?
15  A.         I believe I have.  I would have to
16  look at it, but I believe I have.
17  Q.         All right.
18          Mr. Costa says in September '93,
19  Phase I of the cultural diversity training
20  for managers has been completed.  My staff
21  Development Director in concert with the
22  Affirmative Action Officer and Personnel
23  Director are developing additional criteria
24  for ongoing training for supervisors and

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

ROSALIND RUSS-TOBIAS,                    )        Civil Action 04-0270
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )
                                         )
PENNSYLVANIA BOARD OF                    )
PROBATION AND PAROLE, EDWARD             )
JONES, FRANK MARGERUM, and               )
MICHAEL MOYER,                           )        Philadelphia, PA
                                         )        May 5, 2005
            Defendants.                  )        10:45 a.m.
                                         )

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS N. O'NEILL, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        ROBERT J. SUGARMAN, ESQUIRE
                          SUGARMAN & ASSOCIATES
                          Robert Morris Building
                          100 North 17th Street
                          Philadelphia, PA   19103

For the Defendants:       CLAUDIA M. TESORO, ESQUIRE
                          OFFICE OF THE ATTORNEY GENERAL
                          21 South 12 Street
                          Third Floor
                          Philadelphia, PA   19107-3603

Audio Operator:           CHARLES J. ERVIN

Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey   08026-0129
                          Office:   (856)  435-7172
                          Fax:      (856)  435-7124
                          E-mail:   dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.



EXHIBIT
H

1    THE COURT: You may have to lead him a little with

2  permission in order to -- you may have to lead him a little --

3    MR. SUGARMAN: Yeah.

4  BY MR. SUGARMAN:

5  Q  Was there an issue that --

6    THE COURT: -- in order to avoid what I've

7  prohibited.

8    MR. SUGARMAN: Right.

9  BY MR. SUGARMAN:

10  Q  Was there an issue of targeting these individuals based on

11  their past protests against the Board having discriminated and

12  retaliated?

13  A  I believe there was.

14  Q  And how could you tell us as opposed to it being a general

15  statement about people not doing their jobs? What about --

16  well, let me ask you. Did he identify certain individuals to

17  you?

18  A  There were three individuals that were basically being

19  targeted, yes.

20  Q  And those were individuals who were known to you to have

21  previously been engaged in protesting discrimination at the

22  Board?

23  A  Yes, I did.

24  Q  And also protesting retaliation, is that correct?

25  A  That's correct.

COPY

1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - - - - - - - - - - - - - - - -

3
                              CIVIL ACTION
4   LEON DINGLE              93-CV-5478
    ERNEST C. HOLMES         93-CV-5927
    DARRYL E. RANKIN         93-CV-5698
5   HOWRHU M. SELF           93-CV-5779
    HENRY R. WATKINS         93-CV-5926
6   HENRY WILLIAMS, JR.      93-CV-5696

7       -vs-

8   PENNSYLVANIA BOARD OF PROBATION
    AND PAROLE, ALAN CASTOR, JR.,
9   CHAIRMAN, FRED W. JACOBS, FORMER
    CHAIRMAN, HAROLD SHALON, DISTRICT
10  DIRECTOR, RONALD ZAPPAN, DEPUTY
    DISTRICT DIRECTOR, DANIEL SOLLA,
11  DEPUTY DISTRICT DIRECTOR, PAUL DESCANO,
    DIRECTOR, ROBERT YERGER, DIRECTOR OF
12  PERSONNEL
- - - - - - - - - - - - - - - - - - - -

13

14              Oral Deposition of

15              LeDELLE INGRAM

16

17

18              July 19, 2000

19

20

21

22      DEBRA G. JOHNSON & ASSOCIATES
23           800 Joshua Court
         Moorestown, New Jersey 08057
24             856-778-1758
            FAX 856-778-7890



EXHIBIT
I

*Debra*                    *...sociates*
*856-778...*              *...778-7890*

1  aware of, or do you mean that that was your

2  reason for being aware of it?

3  A.          That was my reason for being aware

4  of it.  It was a confidential document.

5  Q.          Right.

6                  Now, did you receive any

7  complaints of discrimination or retaliation

8  from any of the plaintiffs?

9                  MR. BLONDMAN: Receive after

10            the settlement agreement was

11            signed?

12                  MR. SUGARMAN:  Right.

13                  THE WITNESS: Yes.

14                  -   -   -

15  CONTINUATION

16  BY MR. SUGARMAN:

17  Q.          Did you receive any -- from whom

18  did you receive complaints?

19  A.          I received a complaint from

20  Mr. Henry Williams, and also Mr. Henry

21  Watkins, and as I recall, I think Mr. Ernest

22  Holmes.

23  Q.          One complaint from each?

24  A.          Yes, as I recall.

1    occurred with Mr. Williams?

2    A.          No, I do not.

3    Q.          Do you have any record of that, the

4    contact that resulted in your sending out

5    form 486 to him?

6    A.          There is usually a cover letter

7    that goes out with the form.

8    Q.          All right.

9               Do you have a copy of that

10   cover letter?

11   A.          I don't have any documents with me.

12   Q.          All right.

13              You treated this P-4 as a

14   document that agreed to an investigation, is

15   that correct?

16   A.          Yes.

17   Q.          All right.

18              Did you complete the

19   investigation and recommendation within

20   twenty work days of receipt?

21   A.          I do not recall.

22   Q.          You did not submit the report and

23   recommendation to the Chairman of the Board,

24   is that correct?

1    A.        I did not report to the Chairman of

2    the Board.

3    Q.        I understand that.  I'm not asking

4    you that, though.

5                   I'm just asking if you

6    submitted a copy of the report and

7    recommendation to the chairman?

8    A.        Not that I recall.

9    Q.        Did the chairman ever act on the

10   recommendation and report?

11   A.        I have no knowledge of that.

12   Q.        Did you consult with anybody as to

13   whether you needed to submit the report and

14   recommendation to the chairman?

15   A.        My reporting instructions, as I

16   indicated, was to Michael Neumyer.  I no

17   longer reported directly to the chairman.

18   Q.        Did you discuss with anybody or did

19   you communicate with anybody the contents of

20   the settlement agreement which states that;

21   upon completion the AAE shall submit a copy

22   of the report and recommendation to the

23   Chairman of the Board; page nine,

24   paragraph --

1    twenty work days of April 15?

2    A.         I have no idea.

3    Q.         April 25th, 1996?

4    A.         I have no idea.

5    Q.         Did you make any effort to comply

6    with the requirement for resolution of the

7    complaint within twenty work days of receipt

8    of the completed and signed form STD 482?

9    A.         I do not know since I do not

10   remember the dates at this time.

11   Q.         All right.

12              Now, section 6 F also

13   states; upon completion the AAE shall submit

14   a copy of the report and recommendation to

15   the complainant."

16              Did you submit a copy

17   of the recommendation and the report and

18   recommendation to Mr. Williams, your report

19   and recommendation --

20   A.         I don't know.

21   Q.         -- that went to Mr. Neumyer?

22   A.         I do not recall.

23   Q.         Were you aware of section 6 F of

24   the settlement agreement that had that

1   obligation?

2   **A.**          I was aware of the set

3   **Q.**          Were you aware of that

4   requirement?

5   **A.**          I do not recall.

6   **Q.**          Are you aware of that as you sit

7   here today?

8   **A.**          Yes, now that I have seen it again.

9   **Q.**          Did you look at the settlement

10  agreement in determining what your

11  responsibilities were in connection with

12  the processing of Mr. Williams' complaint?

13  **A.**          I recall reviewing that process

14  within 1995, I think it was with Chairman

15  Castor, who I think would get a copy of it

16  because it involved my process.

17  **Q.**          When you received Mr. Williams'

18  complaint, did you consider that this

19  document was controlling upon you?

20  **A.**          I did not recall giving it that

21  consideration.

22  **Q.**          Do you know if Mr. Muller was aware

23  of the terms of the settlement agreement,

24  section six, dealing with the alternate

1  dispute resolution mechanism?

2  A.        I have no knowledge of that.

3  Q.        Is it Mr. Muller that succeeded

4  Mr. Castor?

5  A.        Yes.

6  Q.        How long did Mr. Muller remain the

7  chairman?

8  A.        I do not recall the actual time.

9  It was a short period of time.

10  Q.        Was he still the chairman in

11  November 1996?

12                MR. BLONDMAN: He doesn't

13                want you to guess.  If you know,

14                you know.  If you don't, you don't.

15                THE WITNESS: I do not

16                recall.

17                        -  -  -

18  CONTINUATION

19  BY MR. SUGARMAN:

20  Q.        Who succeeded Mr. Muller?

21  A.        The current chairman, William

22  Moore.

23  Q.        Do you know if he has any knowledge

24  of the contents of the settlement agreement?

1    A.          No, I do not.

2    Q.          Have you ever discussed the

3    settlement agreement with him?

4    A.          No, I have not.

5    Q.          Do you know if anybody else has

6    ever discussed the settlement agreement with

7    him?

8                          MR. BLONDMAN:  Objection.

9            Form of the question.

10                         THE WITNESS: No, I do not.

11                      -  -  -

12   CONTINUATION

13   BY MR. SUGARMAN:

14   Q.          Have you ever discussed the

15   settlement agreement with Mr. Neumyer?

16   A.          I can't recall.

17   Q.          Now, what was the next complaint

18   that you received from Mr. Williams?

19                      I'm sorry.  Excuse me.

20                      Let me go back.

21                      Is this -- I will show you

22   the document marked as P-5, and I will ask

23   you if this is the response to the complaint

24   that you sent to Mr. Williams?

1   A.          This document represents what was
2   found in the investigation as a result of my
3   involvement in the -- investigating the case.
4   Q.          I understand what you are saying,
5   but it doesn't answer my question.
6                   Whose decision is it, yours?
7   A.          This is not a decision.  This is a
8   finding of facts based on --
9   Q.          Whose finding of fact is it?
10  A.          This is mine.
11  Q.          Okay.
12                  Did the Chairman of the
13  Board ever make a finding in respect to the
14  complaint, P-3?
15  A.          Not that I recall.
16  Q.          Was the chairman ever informed of
17  this finding in P-5?
18  A.          I have no idea.
19  Q.          Now, what was the next complaint
20  that was received from Mr. Williams?
21  A.          I do not recall.
22  Q.          All right.
23                  Do you recall the subject of
24  it?

1                    6 B states, quote; "the AAE

2    shall confer with the complainant and other

3    concerned individuals in attempt to resolve

4    the complaint informally."  End of quote.

5                    Did you confer with

6    Mr. Williams as a result of receiving P-7 --

7    A.         Yes, I sent him --

8    Q.         -- before?

9    A.         -- P-6.

10   Q.         Did you confer with him or did you

11   just send him P-6?

12   A.         I talked to him when I received

13   this, and as a result, I needed additional

14   information and I sent him P-6.

15   Q.         All right.

16                    Did you talk to the other

17   concerned individuals before sending P-6?

18   A.         I needed additional information

19   from Mr. Williams --

20   Q.         So you did not?

21   A.         -- first.

22   Q.         You needed -- so you did not talk

23   to other individuals?

24                    MR. BLONDMAN: Before sending

```
1              P-6?

2                      MR. SUGARMAN: Is that right?

3              Before sending P-6.

4                      THE WITNESS: Not that I

5              recall.

6                      MR. SUGARMAN: All right.

7                            - - -

8    CONTINUATION

9    BY MR. SUGARMAN:

10   Q.          Were you aware of the provisions of

11   paragraph 6 B quote; "the AAE shall confer

12   with the complainant and other concerned

13   individuals and attempt to resolve the

14   complaint informally."  Unquote.

15                      Are you aware of that?

16   A.          I do not recall that I was aware of

17   it at the time.

18   Q.          All right.

19                      MR. BLONDMAN:  The witness

20              has asked for a break.  Just a

21              short break.

22                      MR. SUGARMAN: Oh, sure.

23                            - - -

24       (Recess was taken at this time.)
```

1   CONTINUATION

2   BY MR. SUGARMAN:

3   Q.          Do you make any memorandum for your

4   own files or otherwise in which you record

5   what happened in that call, what was said to

6   you?

7   A.          I make a note to my secretary to

8   send Mr. Williams, or whoever calls about a

9   complaint, a complaint form.

10  Q.          I understand that.

11  A.          I wait on the information to be

12  given back to me to deal with as a result of

13  the complaint form.

14  Q.          All right.

15               Now, looking at the

16  settlement agreement, Exhibit P-2, it says

17  when you receive a complaint -- paragraph 6 B

18  of P-2, quote; "the AAE shall confer with the

19  complainant and other concerned individuals

20  in attempt to resolve the complaint

21  informally."  End of quote.

22               Did you do that before

23  sending your letter of P-10?

24  A.          No.

1              I am not even sure that I
2    got information -- additional information
3    from him on the pulled weapon issue either.
4    Look at P-12 for -- correct, this note to
5    myself.
6    Q.        Do you have any recollection of
7    anything you did to follow up on any portion
8    of that complaint?
9    A.        Yes, I do recall the numerous
10   conversations with Mr. Williams, that he
11   called me every week on the week where I had
12   indicated to him that I have been pulled to
13   go to SNL Graterford to investigate a highly
14   sensitive sexual harassment case, and that
15   I would get back to his issues as soon as
16   possible.  I remember telling Mr. Williams
17   that on numerous occasions.
18   Q.        Did you get back to his issues?
19   A.        By that time, Mr. Williams had
20   retired, as I recall.
21   Q.        By what time?  By the time you got
22   back to his issues?
23   A.        I don't understand the question.
24   Q.        You said by that time, and what do

```
 1    you mean by that time?
 2    A.          By the time I'd completed all that
 3    was required of me in terms of the sensitive
 4    sexual harassment incident involving someone
 5    at SNL Graterford, Mr. Williams had retired.
 6    Q.          I see.
 7                Did you -- were you forced
 8    to drop all your other activities in
 9    order to deal with that sensitive sexual
10    investigation --
11    A.          Yes, I was.
12    Q.          -- at Graterford?
13    A.          Yes, I was.
14    Q.          Did somebody step in for you to
15    carry on your other activities during that
16    time period?
17    A.          I am the EEO in the agency.
18    Period.
19    Q.          In your absence, did anybody else
20    -- was anybody else authorized to act in your
21    absence?
22    A.          I am EEO in the agency.  Period.
23    Q.          I am sorry.  That is not an answer
24    to my question.
```

1    and if he -- if this is an issue for him to

2    deal with, please indicate in writing that

3    part of this complaint. So I assume that is

4    in response to that.

5    Q.        All right.

6              What did you do about that?

7    A.        This was still on the back burner

8    with everything else until I completed the

9    sensitive sexual harassment complaint I was

10   assigned from the SNC Graterford parole

11   office.

12   Q.        What are the dates of your

13   involvement in that sensitive sexual

14   harassment complaint at Graterford?

15   A.        I don't know. It was it was couple

16   of months. It was two or three months.

17   Q.        Sorry?

18   A.        It was two or three months.

19   Q.        So during that time period, were

20   you able to make any investigation of that?

21   A.        I don't understand the question.

22   Q.        Of P-12 -- P-13 I mean.

23   A.        No.

24   Q.        Now, was the Graterford

1    investigation, did that involve Kim Heath,

2    H-E-A-T-H, like the candy bar?

3    A.          Yes, it did.

4    Q.          Did you consult this settlement

5    agreement, P-2, in regard to your handling of

6    P-13?

7    A.          I didn't handle P-13.

8    Q.          When you say you did not handle it,

9    you mean you didn't get to it?

10   A.          I didn't get to it.  Mr. Williams

11   then retired.

12   Q.          All right.

13               When you made the

14   decision -- well, were you instructed by

15   somebody to -- I will start again.

16               How did it come about that

17   you devoted all your time after P-12 was

18   received for two or three months to the Heath

19   complaint?

20               MR. BLONDMAN: Objection.

21               By the way, misstates the witness'

22               testimony, but it is within that

23               time frame.  Whether or not the

24               complaint was before or after,

1      hadn't been established.

2              MR. SUGARMAN: Oh.

3                  - - -

4   CONTINUATION

5   BY MR. SUGARMAN:

6   Q.          The two or three months that you

7   were devoted to the Heath complaint, how did

8   it come about that you devoted all of your

9   time to that complaint during that two or

10  three months?

11  A.          I was instructed to immediately

12  begin the Heath investigation and come up

13  with the findings and conclusion.

14  Q.          Were you instructed to put aside

15  all other activities?

16  A.          I was instructed that the Kim Heath

17  case was the priority.

18  Q.          Who gave you that instruction?

19  A.          My instructions were received from

20  Mr. Gary Scicchitano, at the time my current

21  supervisor.

22  Q.          When did you begin to be supervised

23  by Mr. Scicchitano?

24              MR. BLONDMAN: When did you

agreement?

A.        I don't understand.

Q.        Did you receive any different instructions as to compliance with the settlement agreement as a result of that interaction --

A.        No.

Q.        -- with Mr. Scicchitano?

A.        No.  That was all information for the attorney in terms of the AFSCME issues.

Q.        Did Mr. Scicchitano get a copy of the settlement agreement?

A.        I don't know.

Q.        Do you know whether Mr. Scicchitano ever had any discussions with anybody else in the Board in regard to that?

A.        I can't speak for Mr. Scicchitano.

Q.        Do you have any information as to whether he did?

A.        Not that I can recall.

Q.        All right.

            Now, did you receive -- you indicated that you also received complaints regarding the settlement from Mr. Watkins; is

1   interviews when he did discrimination

2   complaints.  He didn't follow direction.

3   He made assumptions, put them in writing.

4   Did not follow facts.  There was -- his

5   performance was well documented by my --

6   by myself.

7   Q.        Did Mr. Freeman file any type of

8   complaint against your documentation or

9   against your evaluation?

10  A.        No, he signed his evaluation.

11  Q.        Sorry?

12  A.        No, he signed his evaluation and

13  did he not disagree with it.

14  Q.        Did Mr. Freeman ever state whether

15  his -- he had problems in carrying out his

16  functions due to the -- due to the management

17  in your Philadelphia office?

18  A.        I don't understand that question.

19  Q.        Did he ever state whether -- to you

20  -- that problems or attitudes or behavior of

21  people in the Philadelphia office made it

22  difficult for him to do his job?

23  A.        No.

24  Q.        All right.

## AFFIDAVIT

I, Henry Watkins, pursuant to 28 U.S.C. § 1746, state as follows:

1.  I was employed by the Pennsylvania Board of Probation and Parole for approximately twenty-eight years until I was fired on August 5, 2001.

2.  My initial position was parole agent.

3.  I was a first rate employee until other African American employees and I settled a racial discrimination case in or about May 1995.

4.  Because of the settlement, I was promoted to supervisor in 1998, after the settlement of the discrimination suit.

5.  From September 1997 through 1998, I reported to Ronald Zappan, a White Deputy District Director in the Northeast Division of the Philadelphia District Office.

6.  For a few months, in 1998 through 1999, I reported to Daniel Solla, a White Deputy District Director in the Northeast Division of the Philadelphia District Office.

7.  From 1999 until I was fired, I reported to Michael Bukata, a White Deputy District Director in the Northeast Division of the Philadelphia District Office.

8.  The Board, through the actions of Edward Jones and Mr. Bukata, repeatedly and continually discriminated against me

F:\Burton.James\Pleadings\Affidavit.Watkins



because of my race, as part of a continuing pattern and practice of discrimination and retaliation, in retaliation for the settlement I reached with the Parole Board in 1995.

9. As part of the pattern of discrimination and retaliation, Michael Bukata refused to meet with me to review my performance evaluations and other performance issues. He merely handed me the evaluations or left a copy for me to sign in my mailbox.

10. As part of the pattern of discrimination and retaliation, more cases were assigned to my unit than the units of White supervisors. James Burton, another African American supervisor, was also assigned more cases than the White supervisors.

11. As part of the pattern of discrimination and retaliation, Bukata refused to assign a secretary to me for approximately one year, which hindered my ability to get the work done, as I was forced to perform clerical duties, as well as my own duties as a supervisor. White supervisors benefitted from the assistance of secretaries. Mr. Burton was also denied clerical support.

12. As part of the pattern of discrimination and retaliation, I made repeated demands to Bukata and Jones for clerical staff. My requests were ignored, as were the repeated

requested of Mr. Burton.

13. As part of the pattern of discrimination and retaliation, Bukata would never address concerns he had about my performance informally, but would impose disciplinary action, including written and verbal warnings, and eventually a suspension, thereby denying me an opportunity to correct any inadequacies until it was too late to avoid an adverse record.

14. The pattern and practice of discrimination and retaliation, as described above, eventually lead to my involuntary termination.

15. I filed a complaint with the Equal Employment Opportunity Commission, which was forwarded to the Pennsylvania Human Relations Commission for dual-filing.

16. A few months ago I brought suit against the Parole Board and several individual defendants for discrimination and retaliation, which is now pending.

17. The Board's pattern and practice of racial discrimination and retaliation has led to numerous suits against the Board, including those of James Burton, Henry Williams, Calvin Ogletree, Joseph Scott, Darryl Rankin, and Leonard Lyons.

18. None of the African American agents who were involved in the 1995 settlement currently work for the Parole Board.

Executed this 17th day of March, 2003, subject to the

penalties for unsworn perjury, I state the foregoing is true and correct.

_____

HENRY WATKINS

4

<u>AFFIDAVIT</u>

I, James Burton, pursuant to 28 U.S.C. § 1746, state as follows:

1.  I was employed at the Pennsylvania Board of Probation and Parole for over eleven years from December 1990 until February 2001, when I was forced to retire by constructive discharge.

2.  My initial position was parole agent.

3.  I had a highly successful record at the Board.  As a result, I was promoted to the position of Parole Supervisor in January 1997.

4.  Until 1993, I successfully reported to James Heisman, who served as a Supervisor in the Philadelphia District.

5.  From 1993 until I was forced to retire, I reported to Daniel Solla ("Solla"), who served as the Deputy District Director of the Philadelphia District.

6.  Defendant Willie E. Jones a/k/a Edward Jones ("Jones") was installed as the District Director in the Philadelphia District in April 1997.  Thereafter, Solla reported directly to Jones.

7.  Allen Castor, an African American male, was replaced as Chairman of the Parole Board in 1996, after settling a prior


EXHIBIT

racial discrimination case.

8.   Sometime soon after, defendant Jones was installed as the District Director, he implemented the new Board policy of discrimination, retaliation, and harassment against African American supervisors and agents, based on race.  This was a Board practice instituted as a result of a successful settlement of a court case brought by several African American board agents who had challenged previous discrimination and retaliation, to resume that prior discrimination, retaliation, and harassment, and in retaliation for Castor's positive actions toward African Americans.

9.   Henry Watkins, one of the African American victims, sued the parole Board for retaliation and discrimination.  His case is pending.

10.   As part of the practice of discriminatory hostility, intimidation, ridicule, and insult, at Jones' direction, defendant Solla consistently treated me differently than the White supervisors because of my race, as more fully set forth hereinafter, commencing in or about 1997 and continuing until I was constructively discharged in February 2001.

11.   The discriminatory and retaliatory acts and omissions include, but are not limited to the following:

## Unwarranted Discipline

12.  I was subjected to unwarranted discipline.  First, I was summoned to a pre-disciplinary conference by defendant Solla on July 18, 2000 based on my alleged failure to maintain arrest controls.

13.  In violation of Board policy, Solla conducted the pre-disciplinary conference without the next level supervisor, i.e. Jones.

14.  Based upon Solla's improper pre-disciplinary conference, I received an unwarranted written reprimanded dated August 7, 2000 for allegedly failing to follow a case involving parolee Carlos Ramos ("Ramos").

15.  The incident arose as a result of inadequate performance by Agent Alan Boyd ("Boyd"), who had been assigned the Ramos case, and was responsible for monitoring the status of the case.

16.  As Boyd's supervisor, I monitored the case by checking up on his arrest controls to ensure that deadlines were being met.  In addition, I continually updated my controls based on the information provided to me by Agent Boyd, whose responsibility it was to periodically check on the status of the case, and provide information regarding the status to me.

17.  A supervisor obtains the information needed complete

his arrest controls from the agent responsible for the case.

18.  I went on vacation in mid-April 2000.  Less than one week after I returned from my vacation, I reviewed the Ramos case with Agent Boyd.  Boyd informed me that the computers were down and he was not able to check the status of the case before our meeting.  I told Boyd to check the computer, then update his arrest controls, and update me regarding the status of the case.

19.  About one week later, when I had not heard from Boyd regarding his controls, I again requested that he update his controls, and advise me of the status.  Boyd informed me that he had still not checked the computer regarding the Ramos case.  I verbally instructed him to manage his caseload more effectively. He told me he would get back to me with an update.

20.  Approximately one week later, I went out on sick leave to have angioplasty surgery.  At that time, I had not heard back from Boyd regarding the Ramos case.

21.  In the first week in June 2000, I returned from sick leave.  I sent Boyd a memorandum requesting the status of the Ramos case.  He did not respond to the memorandum.

22.  Soon after my return back from sick leave, I learned (for the first time) from a clerical that Ramos had been convicted.  The warrant was then issued.  After the revocation hearing, Ramos was re-committed as a convicted parole violator.

23. Despite the fact that I was not at fault, a written reprimand was issued. The four week delay between Ramos' conviction and the warrant was the alleged reason for the written reprimand, i.e. the Board contended that I failed to follow the case. As discussed above, I clearly followed up with the agent responsible for the case. Yet, I was blamed for the delay, despite my diligence and the fact that I was out on vacation and then sick leave (as a result of my angioplasty surgery), and returned to work immediately after recovering from the surgery. Moreover, during the time between Ramos' conviction and revocation hearing, Ramos posed no harm to society, as he was detained that entire time.

24. I filed a grievance concerning the reprimand. A hearing, conducted by Thomas Marshall ("Marshall"), was held.

25. At the hearing, I was represented by two union representatives, Geraldine Jackson ("Jackson") and Barbara Kremp ("Kremp"), whose name I am not sure how to spell.

26. After the hearing, Jackson and Kremp, the union representatives, and Marshall informed me that the Board was considering reducing the written reprimand to training. Moreover, Marshall assured me that he had recommended training to Maria Marcinko, the Board's Personnel Director.

27. In fact, when I inquired about the status of the

grievance one month later, Jackson informed me that Marshall and Kremp informed her that the written reprimand would be reduced to training.

28.   Despite Marshall's, Jackson's, and Kremp's assurances that the Board agreed to reduce the disciplinary action to training, the Board never did so.  No reason was ever given.  Thus, a written reprimand remained in my file.

29.   A written reprimand, as an adverse action, prevents a promotion or transfer.

30.   In fact, Jones informed me that my transfer request of August 8, 2000 could not be granted because of the August 2000 written reprimand that had been placed in my file.

### Solla's Derogatory Racial References

31.   On two to three occasions, Solla referred to me as "Jim Bo", a term used in reference to African American male slaves, thus humiliating me in front of my co-workers.

32.   Although I never told Solla that the term "Jim Bo" is racially derogatory, it is common knowledge that the phrase is derogatory.

33.   Solla received a lot of support from his superiors, including and especially Jones.  For fear of retaliation, I, therefore, never complained to anybody at the Board about my supervisor's derogatory statements.

<u>Defendants' Failure to Address My Complaint About Racially
Derogatory T-Shirts Worn By Board Agents</u>

34.  As part of the hostile and discriminatory environment
at the Board, Solla refused to respond to my concern and the
concern of several of my subordinates regarding a t-shirt worn by
several White board agents, and also displayed in their offices.

35.  The t-shirt concerned the racially divisive issue of
"Mumia Abu-Jamal", an African American male whose conviction for
murder was controversial.

36.  The t-shirt took the "White" side, calling for Jamal's
execution.  The t-shirt read as follows: "Officer Danny Faulkner
was murdered by Mumia Abu-Jamal who shouldn't be in an 8 x 10
foot cell.  He should be 6 feet closer to hell."

37.  In February 2000, I arranged a meeting with Solla, who
I believed was the appropriate person to talk to, as my immediate
supervisor and Deputy District Director.  In or about February
2000 Solla and I met to address the objections my African
American subordinates and I had to the t-shirt.

38.  Solla informed me that this issue fell within a "gray
area", and dismissed the issue.

39.  Solla's inaction incensed my subordinates, who blamed
me for Solla's inaction.

40.  I spoke to Solla at least one more time in passing

about the t-shirt.

41.  I also complained to LaDelle Ingram ("Ingram"), a Board employee, about the t-shirt.

42.  Despite my complaints to Solla and Ingram, they refused to take any action regarding the issue, and the board agents continued to wear and display the t-shirt from in or about February 2000 through my constructive discharge in February 2001.

### Defendants' Attempt to Demean and Informally Reprimand Me Regarding False Charges of Tardiness

43.  As part of the hostile and discriminatory environment at the Board, on at least three different occasions in or about June 1998, Solla placed post-it notes marked "late" on my office door.  I was never late to work.

44.  My duties as a parole supervisor required that I leave my office to conduct interviews in the "interview room", meet with warrant officers at the transport station, meet with board agents in their offices, attend meetings at other agencies, run errands at the State Office Building, and drop off warrants.

45.  Solla did not ask me if I was working outside of my office at the time he placed the notes on my door.  In fact, he did not even attempt to contact me or to discuss the situation before placing the post-it notes marked "late" on my office door.

46.  White employees, such as Michael Barone, often arrived

to work more than thirty minutes late, but were not embarrassed in this way.

47. In or about June 1998, I verbally complained to Solla about the post-it notes.

48. This discriminatory action and gesture was humiliating to me, in that it conveyed to all employees, including the parole agents under my supervision, that I was being demeaned and reprimanded. I, therefore, lost the respect of my superiors and subordinates.

## Defendants' Discriminatory Supervision

49. As part of the hostile and discriminatory environment against me, Solla had business lunches with several White supervisors, at which Board policy and procedures were discussed. I was excluded from those meetings, but often overheard the conversation when I walked into the meetings to tell Solla about an emergency or provide an individual with an urgent telephone message.

50. Carol Schultz, Nicholas Cinquanto, and James Hines, White supervisors, and several White board agents (whose names I cannot recall at this time) were often in attendance. There were never any African American supervisors or board agents in attendance at the lunch meetings.

51. I was denied access to important information discussed

at these meetings, thereby providing White supervisors and agents with a greater opportunity to improve their skills.

52.  Solla refused to address concerns he had about my work performance informally, but would immediately impose formal disciplinary action, such as a pre-disciplinary conference or written reprimand.  As a result, I could never address any concerns or questions to Solla, for fear of receiving disciplinary action for poor performance.

53.  White supervisors were able to discuss concerns and questions with Solla without the fear of receiving disciplinary action.  These discussions often took place during the business lunch meetings, from which I was excluded.

<u>Discriminatory Caseload</u>

54.  In 1997, as part of the hostile and discriminatory environment at the Board, my unit was assigned a significantly higher number of cases than the units of White supervisors.

55.  When on several occasions, from 1997 through 2001, in person and in writing, I complained to defendant Solla about the larger number of cases that Solla had assigned to my unit as compared to the units of my White colleagues, Solla refused and/or intentionally continued the practice and perpetuated the discrimination.

56.  I also complained about the excessive caseload to

Thomas Costa and defendant Jones.   They refused to ameliorate the excessive caseload situation.

57.   Solla refused to take any action to resolve the problem, despite the fact that he acknowledged that my caseload was larger.   For example, in his December 27, 1999 memorandum to the Northeast Division supervisors, Solla acknowledged the following breakdown of cases:

> My unit: **532** cases (89 cases per agent)
>
> Supervisor Barone's unit: 384 cases (64 cases per agent)
>
> Supervisor Hines' unit: 281 cases (70 cases per agent)
>
> Supervisor Schultz's unit: 322 cases (54 cases per agent)
>
> Supervisor Weinstein's unit: 288 cases (58 cases per agent)

58.   Supervisors Barone, Hines, Schultz, and Weinstein are Caucasian.

59.   On or about August 28, 2000, I received a memorandum from Solla identifying 64 cases under my supervision that he claimed I could transfer to Supervisor Hines' unit.   However, transferring those 64 cases still would not have equalized my caseload with that of the other supervisors, as demonstrated by the numbers above.   Moreover, my unit always received the highest number of incoming cases.

60.   On or about August 28, 2000, Solla informed me that he was removing ten census tracts from my unit, census tracts

representing geographical areas.  In a memorandum dated August 30, 2000, I expressed appreciation to Solla for his apparent stated decision to reorganize the division's case assignments. However, the removal of those census tracts consisted of the removal of the 64 cases discussed in ¶ 53.  As set forth above, the removal of those cases did not decrease my caseload because I had such a dramatically higher caseload to begin with, and I always received the highest number of incoming cases.  Moreover, I later learned that redistricting occurred only after I left the Board.

61.  As a result of Solla's, Jones', and Costa's inaction, I was unable to respond to my subordinates' complaints about their caseload, and was unable to provide them with an explanation or any hope for improvement.

Defendants' Intentional Assignment of Problem Employees
To My Unit

62.  As part of the hostile and discriminatory environment at the Board, defendants began to assign the most problem employees to my unit, which exacerbated an already unfair workload situation and caused further resentment among my subordinates, who resented me for my inability to remedy the unfair situation, and thus made the work environment even more hostile.  These problem employees included: Agent Alan Boyd,

Agent Ralph Harris, Agent Chantal-list Mirman, Agent Stuart Greenburg, clerical Sandy Loschiavo ("Loschiavo"), and clerical Dolores Tillery ("Tillery").

63.  Defendant Solla and I interviewed Loschiavo for the clerical position.  Solla suggested that we hire her.  Although I opposed her hiring, I did not expressly do so, in order to avoid a confrontation with Solla.

64.  Loschiavo was, therefore, hired as a clerical in my unit.

65.  Before Tillery was transferred to my unit, I was told by Tillery's former supervisor, whose name I cannot remember, that Tillery was having problems in her former unit.  As I was not involved in the hiring process, and in order to avoid a confrontation with Solla, I did not share this information with him.

## Discriminatory Lack of Clerical Support

66.  As part of the hostile and discriminatory environment at the Board, I was forced to perform menial clerical tasks, which the White supervisors were not forced to perform.

67.  These menial tasks included data input and taking out the mail.

68.  The situation was perpetuated by the fact that Solla refused to assign clerical staff to my unit, until Loschiavo was

hired.

## Summary

69.  Solla's retaliation against me and defendants' creation of a hostile work environment became so intolerable that I was forced to retire in February 2001, thereby constituting a constructive discharge, after working at the Board for over eleven years.

70.  I was humiliated by the treatment I received at the Board.  Furthermore, I suffered a continuing substantial loss of income, loss of opportunity for promotion, and other damages, including the humiliation of having to leave the Agency with a poor reputation and fear of a negative job reference.

71.  Currently I work at the University of Delaware as an Adjunct Faculty Member, where I teach Psychology and Study Skills.  I also act as a Student Advisor.

72.  I am hired by the University on a semester-by-semester basis.  Therefore, although I enjoy the work, I have been denied the stability of the Parole Board work and the benefits that accompany employment at the Board.

Executed this 17th day of March, 2003, subject to the penalties for unsworn perjury, I state the foregoing is true and correct.

_____

JAMES  BURTON

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

ROSALIND RUSS-TOBIAS,                    .    CIVIL ACTION
                                         .
          Plaintiff,                     .
                                         .    No. 04-CV-270
     vs.                                 .
                                         .    TRIAL
PENNSYLVANIA BOARD OF PROBATION,.
and PAROLE, ET AL.                       .    May 13, 2005
                                         .
          Defendants.                    .
     .   .   .   .   .   .   .   .   .   .   .

                    Philadelphia, Pennsylvania

                         -  -  -  -  -

          BEFORE THE HONORABLE THOMAS N. O'NEILL, JR.
               UNITED STATES DISTRICT JUDGE
                         and JURY

APPEARANCES:

For the Plaintiff:              ROBERT J. SUGARMAN, ESQUIRE
ROSALIND RUSS-TOBIAS            Robert Morris Building
                                100 N. 17th Street
                                Philadelphia, PA. 19103


For the Defendants:             CLAUDIA M. TESORO, ESQUIRE
PA. BOARD OF PROBATION          21 South 12th Street, 3rd Floor
AND PAROLE                      Philadelphia, PA. 19107

Audio Operator:                 Charles E. ???

Transcriber:                    DIANA DOMAN TRANSCRIBING
                                P. O. Box 129
                                Gibbsboro, NJ    08026-0129
                                Telephone: (609) 435-7172
                                Fax:       (609) 435-7124


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.



H. Young - Direct                                          75

A.    That's basically it."

"Q.    Oh.  And what happened as a result of that?

A.    Well I was holding Pre-Disciplinary Conferences right and
left."

"Q.    Were you ever pressured to be more serious, to impose more
serious discipline?

A.    Yes."

"Q.    By whom?

A.    Mr. Jones."

"Q.    And as to anybody in particular?

A.    Yes."

"Q.    Who?

A.    I'm trying to remember the name."

"Q.    Was it Howrhu Self?

A.    Yes."

"Q.    Can you tell us what happened with respect to Howrhu Self.

A.    Well I had been working with Howrhu -- "

              READER:    Is that the correct pronunciation?

              MR. SUGARMAN:    Yeah.

"A.    ... I had been working with Howrhu for about 20 years and
he was messing up, and I kept saying, look, you're putting me
in the middle.  I don't want to be put there.  You know, we can
get this squared away.  But he just didn't seem to want to
care.  And every time I did something wrong --

              MS. TESORO:    He did something.

ntinels in Criminal Just e    v.    PA Board of Probation & Parole
Philadelp  District Office    P-2

## SENTINELS IN CRIMINAL JUSTICE DISCRIMINATION COMPLAINT

On February 8, 1988, the Sentinels in Criminal Justice filed a complaint with the Bureau of Affirmative Action/Contract Compliance. The Sentinels in Criminal Justice are seeking to address what they perceive as discrimination in the promotional process within the Pennsylvania Board of Probation and Parole's Philadelphia State Office based on race, class and sex. The group most affected by the discrimination are the Black and Hispanic Parole Agents.

The investigation was conducted by Patricia Williamson and Eugene Smith from the Bureau of Affirmative Action/Contract Compliance, Office of Administration.

Fifteen employes were interviewed at the Philadelphia District Office. The 15 employes included the Deputy District Director, District Director, Parole Supervisors, and Parole Agents. All of the Parole Agents interviewed were members of the Sentinels in Criminal Justice. The Personnel Officer and the Affirmative Action Officer were also interviewed during the investigation.

The Sentinels in Criminal Justice is an organization comprised of individuals employed by the criminal justice system. Their purpose is to educate the public and to educate them about Parole Agents' duties and responsibilities. The organization is open to anyone who is employed within the criminal justice system. There is no distinction of race or classification. Organization dues are $15.00 per year.

The major issue of concern to the Parole Agents is meeting the eligibility requirements for the 501 Promotion Without Examination and becoming eligible for the interview process.

### 501 Promotion Without Examination Findings

Most of the agents have very little knowledge of the mechanics of the 501 Promotion Without Examination process. None of the agents have ever received or reviewed copies of Management Directive 580.19, Promotion in the Classified Service Without Examination, dated April 1, 1985. However, they feel it is a tool used by supervisors to manipulate the system and to selectively choose the candidates of their personal choice.



EXHIBIT
M

The 501 Promotion Without Examination process is devised by a formula governed by the Civil Service Commission. The formula includes merit, seniority, and overall performance ratings. The weight the formula is calculated on a ratio of 60/40 (60 merit/40 seniority). All of the minority agents that have applied for Promotion Without Examination and were deemed ineligible, received a standard form letter stating that they did not meet the qualifications or were ineligible. When Parole Agents asked the Personnel Officer why they did not meet the eligibility requirement they did not receive a satisfactory response.

In order for an employe to be qualified for a Parole Agent supervisory position, they must be an employe of the Pennsylvania Board of Probation and Parole. They cannot have any suspensions or written reprimands within the last three years, and they must meet the next lower classification requirements. The next lower class positions include Parole Agent 2, Institutional Parole Representative, and Institutional Parole Supervisor, and Staff Development Specialist. The Parole Agent 3 classification was recently merged with the Parole Agent 2 classification.

Listed below is a breakdown by race, sex, and job classification in the next lower classification as of May 31, 1988, in the Philadelphia District Office:

| | |
|---|---|
| Institutional Parole Supervisors | 2 White Males |
| Institutional Parole Representatives | 4 White Males |
| Staff Development Specialists | 1 White Male |
| Parole Agent 2's | 43 White Males |
| | 6 White Females |
| | 6 Black Females |
| | 22 Black Males |
| | 2 Hispanic Males |

The above statistics include Chester, the State Correctional Institution at Graterford and the Philadelphia County Prison, as it relates to the next lower class positions that are eligible to bid on the Parole Supervisor 1 vacant positions.

role Agents expressed gre   concerns about   ution System as it presently exists. Several agents inch   ints under led that "one male supervisor has jeopardized black supervision from being promoted to Parole Supervisors". This use bjective criteria in rating performance evaluations hindered the agents' ability to advance.

Also, in another instance it was revealed that "a Parole rvisor rated three of his agents extremely high in order to keep happy". This subjective approval to performance evaluations s against minorities trying to compete for promotions.

Agents stressed their belief that the current rating system procedure ows managers to consistently form a pattern of discrimination against orities. Thus, eliminating minorities from becoming eligible for con-   eration within the interview process. Agents interviewed stated that ite supervisors, over a period of years, consistently give white agents   er their supervision higher evaluations". This impacts on the selec- on of individuals eligible for interviews and promotions. The rapport h supervisors or raters has more weight than the actual work being per- rmed.

Several agents interviewed also stated that "many white agents who ve performed their duties and responsibilities well, were also being cluded from the interview process". It appears to the agents that ne current system reflects that cliques and office politics play a ajor role in the Promotion Without Examination Process. This system as a greater negative effect on minorities according to minority gents.

Two Parole Agent Supervisors (a black female and a white male) described the current MSPT System as discriminatory. They stated that the same employes apply or become eligible for the vacant positions, because they receive the higher ratings from their supervisor.

One supervisor complained about the MSPT training given by the Personnel Office. He felt that the training was inadequate and further training was needed in order to properly rate their employes and understand the system. A supervisor stated that "it is not the process that is discriminatory, it is the people or management that rates the agent that is discriminatory".

Although all supervisors and managers are trained uniformly in the Management Performance Evaluation System, there exists disparity in this application.

One of the supervisors commented that after receiving the MSPT training, he felt that he must follow the rules and regulations stipulated in the training. After rating the agents under his supervision, many of the agents complained that they were underrated. The supervisor found out that other managers were giving excellent ratings even when agents did no exceed all of their objectives. The supervisor then felt that the rating that were given were unfair after reviewing other performance ratings fr other managers.

arol's Agents commented on    the weight that is placed on accuracy
completeness of the "Field Book Log". The log is ma  ained by
agent and agents are required to document all caseloads and
-date activities. Supervisors review the log prior to rating
ts' Performance Evaluations. Also, periodically logs are selected
andom and audits are performed by a Case Specialist from
quarters.

The majority of the agents interviewed handled 85 cases or more.
 agents interviewed felt they were covering more than their 50 case
irement per year. Even though significant emphasis is placed on
ts' record keeping as a standard, they feel more emphasis should be
ed on the client/agent relationship.

### Interview Process Findings

In the Philadelphia District Office the Deputy District Director
ack male) and the District Director (white male) were the Interview
.  These managers jointly interview all candidates for appoint-
ts and promotions and make a recommendation for selection to the
irman of the Board.

After both managers receive the Certified List of Eligible
didates from the State Civil Service Commission, they review the
es of candidates and develop the questions to be used for that par-
ular vacancy or interview. There are no standard questions estab-
hed. The questions are made up for each vacancy. However, the same
stions are given to all candidates that apply for the same vacancy.

After candidates are interviewed, both managers rate the candidates
their answers and submit their recommended selection to Headquarters
r review by the Personnel Office, Bureau Director, Affirmative Action
icer, and the Chairman. The Personnel Officer was not aware that the
terview Team reviewed the Certified List of Eligibles first, and then
veloped the interview questions. He informed us this process will
t continue. Listed below is a sample of the questions used during
e interview.

1. Why do you want this job?
2. What is the importance of performance evaluations?
3. If you are promoted to the position of supervisor, how
   would you approach your subordinates in your unit?
4. Do you consider the human relations aspect of a supervisor
   important? If so, why? If not, why not?

The Personnel Director completes a technical review of the Deputy
istrict Director's and the District Director's recommendations in
ccordance with the Rules and Regulations of the State Civil Service
ommission upon receiving the interview package from the District
irector.

he Division ... Office to make sure ... a vacant position were omi... ed and then the package is sent to the native Action Officer.

he Affirmative Action Officer reviews the interview package which des the entire applicant pool. If there are questions regard- he recommended selection, the Affirmative Action Officer will ct the Interview Team and Personnel Office. She will either ve or disapprove the recommended selection after a thorough ation of the personnel action and submit her decision to the Chair- f the Board.

he Philadelphia District Office filled three Parole Supervisory ions between August 1987 and February 1988. All of the positions filled by Promotion Without Examination. The interview package he three vacancies consisted of the following:

## Vacancy #1

There were six persons interviewed. Four white males and two black males. A white male was selected for the position. The top three candidates for the position were white males. As a result of these interviews, two positions were vacant at the same time.

## Vacancy #2

The same six persons, plus one additional white male, applied for Vacancy #1 and Vacancy #2. The top three candidates were white males. A white male was selected.

## Vacancy #3

There were five persons interviewed. Two of the five candidates applied for the first three vacancies. Four minorities were interviewed, three black males and one Hispanic male. A black male was selected.

After evaluating the interview process and discussing it with management, it was confirmed that a minority was not selected for Vacancy #2 because the top two candidates (a white male/black male) were both deemed equal and the next Vacancy #3 was committed for a minority employe.

### SUMMARY OF FINDINGS AND RECOMMENDATIONS

#### Summary of Findings

1. Some supervisors subjectively gave higher ratings to those agents they have known for long periods of time. Through our interviews we learned that uniform standards are not always being applied objectively to minority agents.

In some cases the extended periods of ... never seem to
served difficult because of t ... change.

2. A pattern of high ratings by one supervisor was discovered after
reviewing performance evaluations of candidates that were inter-
viewed for Parole Supervisor positions while other supervisors
never rate employes at the Consistently Exceed level.

3. The current application of the performance evaluation process
used by Parole Supervisors has resulted in minorities not
receiving promotions as rapidly as nonminorities.

4. Statistics show that blacks are promoted to the Parole
Supervisory positions at a lower rate than nonminorities.
Currently, there are 31 Parole Supervisors (25 white males, 4
black males, 2 black females) within the agency. The
Philadelphia District Office currently has 11 Parole Supervisors
(8 white males, 2 black males, 1 black female).

5. The Personnel Director stated that "managers are trained uni-
formly on the MSPT System", however, the criteria in ratings
are not applied uniformly.

6. Supervisors are not clear on the proper procedure to rate
their employes under the MSPT System. The lack of uniformity
in MSPT ratings has a negative impact on all employes and has
greater impact on minorities.

7. Parole Agents do not have any knowledge about the mechanics of
the 501 Promotion Without Examination process or the State
Civil Service Commissions's formula used to govern its
administration.

8. The interview questions are developed after the Interview Team
reviews the List of Certified Eligibles submitted by the State
Civil Service Commission.

9. Of the last three vacancies for a Parole Supervisor in the
Philadelphia District Office, one black male was hired. The
other positions were filled by white males.

10. The agency has targeted 18 positions (12 white females, 4 black
females, and 2 black males) in the Professional EEO category and
Parole Supervisory positions are within this category.

## Recommendations

1. The Personnel Director/Affirmative Action Officer should pro-
vide MSPT training to all Parole Supervisors in the
Philadelphia District Office. Subsequent to training, the MSPT
evaluation documents should be approved by the Personnel
Director/Affirmative Action Officer prior to implementation.

2. A un... ...eries ... evaluation ... ...
Exceeded Objective, ...erally me... ...
Objective, should be ...veloped and applied cons... ...tently
throughout the agency.

3. The Personnel Officer and the Affirmative Action Officer
should develop a one-day or more training package to be pre-
sented to the Agents and Supervisors. The training should
include Grievance Procedures; 501 Promotion Without
Examination; Performance Evaluations; Upward Mobility, and
Civil Service Rules and Regulations as part of the re-
quirements for a minimum of 40 hours of training annually
for Probation and Parole employees.

4. Agents should be given copies of Management Directive 580.19,
Promotion in the Classified Service Without Examination,
dated April 1, 1985.

5. Supervisors should be encouraged to promote employes through
upward mobility within their own division or units, and con-
same employes consistently bid on vacant positions, and con-
tinually get rejected, the opportunity for the perception of
discrimination may occur.

6. Questions should be developed before the Interview Team re-
views the Certified List of Eligible candidates and submitted
to the Personnel Director for approval prior to implementation.

7. The Affirmative Action Officer should be more visible in
all of the Regional Offices by scheduling on-site visits.

The Bureau of Affirmative Action/Contract Compliance has found that
the PA Board of Probation and Parole did not intentionally discriminate
against minorities in the Parole Supervisory category, however, the
current use of the performance evaluation review tool by supervisors
has presented a barrier for minorities in receiving promotions, there-
fore, disparate impact against minorities does exist in promotion in
the PA Board of Probation and Parole. The PA Board of Probation and
Parole should develop a plan of action to respond to these recommen-
dations and submit it to the Bureau of Affirmative Action/Contract
Compliance within 30 days.

The Bureau of Affirmative Action/Contract Compliance is closing its
file on this subject. We intend to monitor the progress of the PA
Board of Probation and Parole in the implementation of the above
recommendation. We would like to express our complete faith in the
Board's Affirmative Action Officer and her ability to carry out these
recommendations. The Bureau of Affirmative Action/Contract Compliance
will offer assistance when needed. If you have any questions regard-
ing this investigation report, please feel free to contact me at
783-1130.

7-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HENRY WILLIAMS, et al.              :          CIVIL ACTION
                   v.               :
                                    :    FILED  OCT 1 2 1994
PENNSYLVANIA BOARD OF               :
PROBATION AND PAROLE et al.         :          No.  93-5696


MEMORANDUM

O'Neill, J.                              October 12, 1994


On June 27, 1994, United States Magistrate Judge M. Faith Angell issued a Report and Recommendation in the above-captioned case recommending that plaintiffs' Motion for a Preliminary Injunction pursuant to Fed.R.Civ.P. Rule 65(a) be denied.

Both parties have filed objections to the Report and Recommendation. After reviewing these objections, I adopt Judge Angell's findings of fact with the exception of findings number 24 and 26 as to which I express no opinion.[1]  I adopt both Judge

---

1.  Finding of fact number 24 states:
        The Office of Administration based its finding of retaliation, in part, on the fact that ten (10) black agents and zero (0) white agents were suspended between 1988 and 1992.
Finding of fact number 26 states:
        The Office of Administration's 1993 finding that the Board retaliated against black agents may have been different if the investigators had been aware of the discipline and suspension of white agents during the same time period.

- 1

EXHIBIT

Angell's determinations in regard to the factual sufficiency of the retaliation claims made by plaintiffs Self and Rich and her conclusion that plaintiff Williams failed to present sufficient proof to allow the Court to find that his temporary reassignment was in fact a disciplinary action.  See Magistrate's Report and Recommendation, at 20 n.7.  I also concur with Judge Angell that, though plaintiffs have demonstrated that they will probably prevail at trial in regard to at least some of their non-First Amendment based discrimination claims, plaintiffs have not met their burden of showing that they will suffer irreparable harm as a result of defendants' allegedly retaliatory acts if relief is not granted prior to a resolution of those claims at trial.  See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989); Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.), cert. denied, 493 U.S. 848 (1989).  I will, however, write separately to address the First Amendment claims of plaintiffs Rankin, Holmes, Williams and Watkins.

As Judge Angell noted, the Court of Appeals has held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." Hohe, 868 F.2d at 72; see Magistrate's Report and Recommendation, at 21.  The Hohe Court continued:

> the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. Rather, the plaintiffs must show a chilling effect upon free expression.  It is purposeful unconstitutional government suppression of speech which constitutes irreparable harm for preliminary injunction purposes.

2

> Accordingly, it is the direct penalization, as opposed
> to incidental inhibition, of First Amendment rights
> which constitutes irreparable injury."

Id. at 73(quotations and citations omitted); see Magistrate's

Report and Recommendation, at 22.

　　　To the extent, if any, that the Report and

Recommendation may be construed to hold that plaintiffs must

prove the existence of an explicit Parole Board policy or rule

intended to directly limit plaintiffs' First Amendment rights, I

do not adopt it.　Rather, I conclude that plaintiffs may prevail

under the test articulated in Holder v. City of Allentown, 987

F.2d 188 (3d Cir. 1993), in the absence of a specific rule

intended to chill plaintiffs' speech.　To prevail on a First

Amendment claim under Holder:

> First, plaintiff must show that the activity
> in question was protected.　Plaintiff must
> then show that the protected activity was a
> substantial factor in the alleged retaliatory
> action.　Finally, defendant may defeat
> plaintiff's claim by demonstrating that the
> same action would have taken place even in
> the absence of the protected conduct.

987 F.2d, at 194 (citations and quotations omitted).

　　　Plaintiffs assert that defendants retaliated against

them because plaintiffs are members of the Sentinels -- a

professional organization committed to improving the criminal

justice system.　Based upon my independent review of the record,

I conclude that the stated purpose of the Sentinels implicates

speech protected by the First Amendment and that membership in

the organization implicates association rights protected by the

First Amendment.

　　　　　　　− 3

In determining whether injunctive relief should issue,
however, I must determine whether plaintiffs are likely to
prevail at trial on their claim that defendants discriminated
against them due to their exercise of First Amendment rights.[2]
See Holder, 987 F.2d at 194.  At the onset, I conclude that the
statistical evidence which tends to establish that the Parol
Board discriminates or has discriminated against black agents and
which Judge Angell reviews in her general findings of fact is not
germane to plaintiffs' First Amendment claims.[3]  See
Magistrate's Report and Recommendation, at 4-8.  Based upon my
review of the general findings of fact contained in the
Magistrate's Report and Recommendation I conclude that findings
number one, two and thirty-one are relevant to my inquiry here.
Specifically, I find it relevant that plaintiffs are members of
the Sentinels professional organization and that black parol
agents who are known to be members of the Sentinels received
lower performance ratings than black agents who were not members
of the Sentinels.

On December 21, 1993 plaintiffs met with District
Director Shalon and Deputy Director Zappan to discuss the Parol

---

2.  I note that the allegations here differ from those made in
Hohe where the possibility of incidental infringement of First
Amendments rights existed.  Plaintiffs here allege that they have
been directly penalized for engaging in First Amendment protected
activity.  Plaintiffs' motion here will therefore succeed if this
Court determines that plaintiffs have a reasonable probability of
prevailing on their First Amendment based claims at trial.

3.  By general findings I refer to findings number 1-35.

Board's hiring and promotion practices and with regard to race.[4]
Each plaintiff was the object of a disciplinary inquiry within
two months of this meeting.  Two plaintiffs -- Mr. Rankin and Mr.
Watkins -- were disciplined after these inquiries.[5]

It is uncontroverted that each of the plaintiffs
disciplined had committed the procedural violation of Parol Board
policy upon which defendants assert the disciplinary action was
taken.  It is also uncontroverted that Parole Board supervisors
similarly scrutinized the work of other agents when plaintiffs'
work was reviewed.  The record does not disclose whether other
agents were actually disciplined.  The record does disclose that
plaintiffs Holmes, Williams and Watkins had been disciplined for
failing to comply with Parole Board policies prior to the
December 21 meeting.  It is also uncontroverted that Joseph Scott
-- the supervisor who initiated disciplinary proceedings against
plaintiff Watkins -- is a black male and a founding member of the
Sentinels.

---

4.  For the purpose of this motion, I adopt Judge Angell's
determination that statements made by District Director Shalon
during the December 21 meeting and in a private conversation with
plaintiff Rankin that followed, did not have a discriminatory
intent.


5.  According to defendants, plaintiff Rankin was given a written
reprimand for failing to declare a client delinquent in a timely
manner and plaintiff Holmes received a one day suspension for
failing to prepare timely arrest reports.  A disciplinary
conference for plaintiff Williams was scheduled for January 4,
1994 but never occurred.  A disciplinary conference for plaintiff
Watkins occurred on March 2, 1994.  The conference revealed that
plaintiff Watkins had not committed the alleged violation of
Parole Board policy.  No disciplinary action was taken against
him.

This is a close case and I am guided by the recognition that "the grant of injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." Instant Air Freight, 882 F.2d, at 800 (citations omitted). The record contains circumstantial evidence to support the contention that known members of the Sentinels may have been subject to retaliation. The record also contains circumstantial evidence that might permit a reasonable jury to determine that defendants purposely subjected plaintiffs to disciplinary inquiry and disciplined plaintiffs Rankin and Watkins for speaking out on issues of race and Parol Board hiring and promotion practices. At this juncture -- based upon the findings of Judge Angell which I have adopted -- I cannot say that a reasonable probability exists that a jury will so find.[6]  I will therefore affirm the result reached by Judge Angell.

I suggest that the parties exercise restraint in their necessary interactions pending a resolution of plaintiffs' claims at trial.

---

6.  Because I conclude that the record does not establish a reasonable probability that plaintiffs can show that their protected activity was a substantial factor in the allegedly retaliatory activity, the burden of proof does not shift to defendants to show that they would have taken the same actions toward plaintiffs without regard to plaintiffs' First Amendment activity. See Holder, 987 F.2d at 194. I note that had plaintiffs presented evidence sufficient to shift the burden of persuasion pursuant to Holder, I would not conclude -- on the present record -- that defendants have carried their burden of establishing that plaintiffs would have been subject to the same treatment notwithstanding their First Amendment activity.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HENRY WILLIAMS, et al.          :          CIVIL ACTION
                                :
              v.                :
                                :
PENNSYLVANIA BOARD OF           :
PROBATION AND PAROLE et al.     :          No.   93-5696

O R D E R

FILED   OCT 1 2 1994

AND NOW, this ⎧2⎫ day of October, 1994 upon consideration of plaintiffs' renewed Motion for Preliminary Injunction and defendants' Answer thereto and after review of the Report and Recommendation of United States Magistrate Judge M. Faith Angell, it is hereby ORDERED:

    1.   The Report and Recommendation is APPROVED and ADOPTED as provided in the accompanying memorandum.

    2.   Plaintiffs' Motion is DENIED.

_____
THOMAS N. O'NEILL, JR.,          J.

ENTERED: ___10-12-94_____

CLERK OF COURT



## AFFIDAVIT

Ronald Zappan, pursuant to 28 USC § 1746, states as follows:

1.    I was employed by the Pennsylvania Board of Probation and Parole for over 26 years from on or about January 30, 1972 until August 28, 1998, when I was forced to retire.

2.    My initial position was parole agent.

3.    I had a highly successful record at the Board. As a result, I was promoted to Senior Parole Agent III in 1975, to Parole Supervisor in 1985 and to Deputy District Director for the Philadelphia District in 1990.  I was very content with my job at that time.  I always received "satisfactory" or better performance evaluations.

4.    Until 1996 I reported to Harold Shalon, who served as the District Director for the Philadelphia District.

5.    From April, 1997 until I was forced to retire, I reported to defendant Willie Jones (Edward Jones), who served as the District Director of the Philadelphia District.

6.    Defendant Jones was installed as the District Director in the Philadelphia District in April, 1997.  I did not challenge his promotion at that time and have never challenged his promotion.  Some time after defendant Jones was installed as a



EXHIBIT

District Director, in April 1997, he implemented a policy of harassment against certain African American supervisors and agents who had been complaining of discrimination and White employees, such as myself, who were known to be concerned about the discrimination against them.  This was a Board practice instituted as a result of a successful settlement of a court case brought by them challenging previous discrimination and retaliation.

7.  Defendant Jones began to request that I assist in the pattern of discrimination by discriminating against my subordinates who are African American.  He instructed me to bring unwarranted charges against them.  Soon after Jones' probationary period ended, in late 1997, the requests escalated into demands, and in February 1998, he stated that if I did not impose the discipline, I would be disciplined.

8.  Mr. Watkins and Mr. Self had some performance issues.  However, proper training and adequate staff, including clerical support staff, would have alleviated them.

9.  Because it was not warranted, I refused to impose heavy discipline on Darryl Rankin, Henry Watkins, and Howhru Self, all African American, as defendant Jones demanded. Instead, I provided defendant Jones with truthful information regarding understaffing and lack of training,

P:\Zappan\Pleading\affidavit.zappan                    2

01/01/1996  00:00    215-364-6939                FORENSIC INSTITUTE                    PAGE  04
MAY.20. 2002  4:05PM    SOCHABAR & ASSOCIATES ATTORNEY...              ... ....

10.   In February, 1998, Jones made specific demands and
threatened me.  I informed Jones' supervisors, defendants Thomas,
Scicchitano, and Robinson about Jones demands for unwarranted
discipline against several African Americans in my District.
They did not help.  They told me to obey Jones in regard to the
discriminatory action, despite their knowledge of the
discrimination and involvement in several previous out of court
settlements regarding racial discrimination against African
American employees and other pending lawsuits.

11.   Defendant Thomas was the Eastern Regional Director.  In
February, 1998, in a telephone conversation with Thomas, I told
her about the unwarranted discipline of several African American
board agents.  She directed me to do what my supervisor (i.e.
Jones) tells me to do.

12.   Defendant Scicchitano is the Personnel Director of the
Board of Probation and Parole.  I contacted defendant Scicchitano
and told him about the unwarranted discipline of several African
American board agents.  I advised him that I thought African
American board agents were being singled out for selective
treatment.  He advised me to put my concerns in writing, but did
not advise me as to any further action to take, or take any
action.  As a result, I then telephoned defendant Robinson.

13.   Defendant Robinson was the Director of the Office of