01/01/1996  00:00   215-364-6939           FORENSIC INSTITUTE        ... ....       PAGE  07

23.  I was humiliated by the treatment I received. Furthermore, I suffered a substantial loss of income, loss of opportunity for promotion, and other damages, including the humiliation of having to leave the Agency with a poor reputation and fear of a negative job reference.

24.  I used to work for the Crime Prevention Association.  I now work for Foundation Behavioral Health and the Archdiocese of Philadelphia.  I also do some private consulting.  Although I enjoy the work, I am now forced to work three jobs in order to match the income I was earning at the Parole Board.  I often work from 9:00 a.m. until 10:30 p.m., seven days per week.

25.  The long work hours and financial constraints suffered by my family has had a terrible toll on my marriage.

26.  I have been informed that the Auditor General of Pennsylvania is currently investigating the discrimination and retaliation instituted against me and other employees who were forced to resign or retire early from the Philadelphia District office.

Executed this 20th day of May, 2002, subject to the penalties for unsworn perjury, I state the foregoing is true and correct.

RONALD ZAPPAN

## AFFIDAVIT

I, Henry Williams, pursuant to 28 U.S.C. § 1746, state as follows:

1. I was an African American employed by the Pennsylvania Board of Probation and Parole for approximately fifteen years until I was constructively discharged in May 1998.

2. I currently work for the Marriott Corporation as a security officer.

3. Other African American employees and I settled a racial discrimination case in or about May, 1995.

4. From on or about 1993 to the date of my resignation, Ronald Zappan was the Deputy District Director in the Philadelphia District Office.

5. In retaliation for the settlement I reached with the Parole Board in 1995, the Board, through the actions directed by Willie Edward Jones, repeatedly and continually discriminated and retaliated against me, as part of a continuing pattern and practice of discrimination and retaliation.

6. For example, I was assigned more cases than other White Board agents. I was assigned in excess of 260 cases. I was unfairly transferred from my position as Parole Agent II to the position of Warrant officer (transferring prisoners). The Board unfairly removed my weapon for approximately 6 months while I continued the performance of my duties as a parole agent. I was



refused participation in weapon requalification with other parole agents. Instead, I was required to requalify at night, alone, with two White Board firearms officers.

7. As further discrimination and retaliation, Ernest Holmes and myself African American agents who were parties to the settlement reached with the Board, were also assigned a disproportionately high caseload. We were assigned to the absconder unit, pursuant to the Settlement Agreement. In that unit, we alone were made to handle hundreds of cases. Ernest Holmes no longer works for the Board. I recently learned that there are currently five agents and one supervisor in the absconder unit, which we used to handle by ourselves, and know of no increase in the caseload.

8. As further discrimination and retaliation, the agents who were parties to the settlement, and other African American board agents, were more frequently and harshly disciplined than White agents. I received verbal notice that I would be disciplined for an unidentified problem. There was no evidence concerning the purpose of a disciplinary conference. The conference did not go forward. This as one of many notices of disciplinary conferences that I was told I had to attend, but the conferences never happened. Two White agents were indicted by the Federal government for drug possession and distribution and were allowed to retire. A White Parole Supervisor was arrested

and convicted for theft and only given a written reprimand.

9. Through numerous memoranda and meetings with Harold Shalon (District Director), Willie Edward Jones (District Director, Veronica Thomas (Regional Director), Alan Castor, Chairman of the Parole Board, I complained about the discriminatory and retaliatory treatment by White supervisors and White agents against the African American Agents who had settled the racial discrimination suit against the Board. White agents, if disciplined, were not disciplined as severely as Black agents, whereas Black agents were disciplined harshly for minor violations.

10. The pattern and practice of discrimination and retaliation, as described above, eventually led to my forced resignation.

Executed this 16th day of December, 2002, subject to the penalties for unsworn perjury, I state the foregoing is true and correct.

HENRY WILLIAMS

## AFFIDAVIT

I, Howrhu Self, pursuant to 28 U.S.C. § 1746, state as follows:

1. I was an African American employed by the Pennsylvania Board of Probation and Parole for approximately twenty-seven years until I was constructively discharged in or about 1999.

2. I currently work for the City of Philadelphia Court of Common Pleas in the First Judicial District as a bail interviewer.

3. Other African American employees and I settled a racial discrimination case in or about May, 1995.

4. From on or about 1993 to the date of my constructive discharge, I reported to Hugh Young, a Unit Supervisor. Ronald Zappan was the Deputy District Director of the Division in which I worked.

5. In retaliation for the settlement I reached with the Parole Board in 1995, the Board, through the actions directed by Edward Jones, repeatedly and continually discriminated and retaliated against me, as part of a continuing pattern and practice of discrimination and retaliation.

6. For example, I was assigned many more cases than other Board agents. At one point, I was responsible for at least 400 cases.

F:\Zappan\Pleadings\affidavit.self

1


EXHIBIT
Q

7.  As further discrimination and retaliation, Ernest Holmes and Henry Williams, African American agents who were parties to the settlement reached with the Board, were also assigned a disproportionately high caseload.  They were assigned to the absconder unit, pursuant to the Settlement Agreement.  In that unit, they alone were made to handle hundreds of cases.  Holmes and Williams no longer work for the Board.  I recently learned that there are currently five agents and one supervisor in the absconder unit, which Holmes and Williams used to handle by themselves, and know of no increase in the caseload.

8.  As further discrimination and retaliation, the agents who were parties to the settlement, and other African American board agents, were more frequently and harshly disciplined than White agents.  There was one instance in which I was late for a hearing.  I received a written reprimand, despite the fact that the hearing was held and there were no repercussions.  On the other hand, a White agent was late for a hearing around that same time.  He received no disciplinary action.

9.  As further discrimination and retaliation, I was forced to work overtime (as a result of the workload), but I was always denied overtime pay.  On the other hand, White agents' requests for overtime compensation were approved.

10.  As further discrimination and retaliation, Board

resources were disproportionately allocated.  I was forced to share a state car with another African American board agent, while White agents were each provided with their own state car. This made it difficult for me to perform my job duties.

11.  During a pre-disciplinary conference meeting, which was held in 1998 or 1999, among Jones, Veronica Thomas (Regional Director), a union representative (whose name I have since forgotten), and me, I complained about the discriminatory and retaliatory treatment.  I complained to Jones that African American board agents, particularly the agents who had settled the racial discrimination suit, were being treated differently than White agents.  Jones did not react to my concerns.  He did not say anything at all regarding the issue.

12.  The pattern and practice of discrimination and retaliation, as described above, eventually led to my forced resignation.

Executed this 16th day of December, 2002, subject to the penalties for unsworn perjury, I state the foregoing is true and correct.

_____
HOWRHU SELF

## AFFIDAVIT

I, James Burton, pursuant to 28 U.S.C. § 1746, state as follows:

1.  I was employed at the Pennsylvania Board of Probation and Parole for over eleven years from December 1990 until February 2001, when I was forced to retire by constructive discharge.

2.  My initial position was parole agent.

3.  I had a highly successful record at the Board.  As a result, I was promoted to the position of Parole Supervisor in January 1997.

4.  Until 1993, I successfully reported to James Heisman, who served as a Supervisor in the Philadelphia District.

5.  From 1993 until I was forced to retire, I reported to Daniel Solla ("Solla"), who served as the Deputy District Director of the Philadelphia District.

6.  Defendant Willie E. Jones a/k/a Edward Jones ("Jones") was installed as the District Director in the Philadelphia District in April 1997.  Thereafter, Solla reported directly to Jones.

7.  Allen Castor, an African American male, was replaced as Chairman of the Parole Board in 1996, after settling a prior


EXHIBIT

racial discrimination case.

8.   Sometime soon after, defendant Jones was installed as the District Director, he implemented the new Board policy of discrimination, retaliation, and harassment against African American supervisors and agents, based on race.  This was a Board practice instituted as a result of a successful settlement of a court case brought by several African American board agents who had challenged previous discrimination and retaliation, to resume that prior discrimination, retaliation, and harassment, and in retaliation for Castor's positive actions toward African Americans.

9.   Henry Watkins, one of the African American victims, sued the parole Board for retaliation and discrimination.  His case is pending.

10.   As part of the practice of discriminatory hostility, intimidation, ridicule, and insult, at Jones' direction, defendant Solla consistently treated me differently than the White supervisors because of my race, as more fully set forth hereinafter, commencing in or about 1997 and continuing until I was constructively discharged in February 2001.

11.   The discriminatory and retaliatory acts and omissions include, but are not limited to the following:

## Unwarranted Discipline

12.  I was subjected to unwarranted discipline.  First, I was summoned to a pre-disciplinary conference by defendant Solla on July 18, 2000 based on my alleged failure to maintain arrest controls.

13.  In violation of Board policy, Solla conducted the pre-disciplinary conference without the next level supervisor, i.e. Jones.

14.  Based upon Solla's improper pre-disciplinary conference, I received an unwarranted written reprimanded dated August 7, 2000 for allegedly failing to follow a case involving parolee Carlos Ramos ("Ramos").

15.  The incident arose as a result of inadequate performance by Agent Alan Boyd ("Boyd"), who had been assigned the Ramos case, and was responsible for monitoring the status of the case.

16.  As Boyd's supervisor, I monitored the case by checking up on his arrest controls to ensure that deadlines were being met.  In addition, I continually updated my controls based on the information provided to me by Agent Boyd, whose responsibility it was to periodically check on the status of the case, and provide information regarding the status to me.

17.  A supervisor obtains the information needed complete

his arrest controls from the agent responsible for the case.

18.  I went on vacation in mid-April 2000.  Less than one week after I returned from my vacation, I reviewed the Ramos case with Agent Boyd.  Boyd informed me that the computers were down and he was not able to check the status of the case before our meeting.  I told Boyd to check the computer, then update his arrest controls, and update me regarding the status of the case.

19.  About one week later, when I had not heard from Boyd regarding his controls, I again requested that he update his controls, and advise me of the status.  Boyd informed me that he had still not checked the computer regarding the Ramos case.  I verbally instructed him to manage his caseload more effectively. He told me he would get back to me with an update.

20.  Approximately one week later, I went out on sick leave to have angioplasty surgery.  At that time, I had not heard back from Boyd regarding the Ramos case.

21.  In the first week in June 2000, I returned from sick leave.  I sent Boyd a memorandum requesting the status of the Ramos case.  He did not respond to the memorandum.

22.  Soon after my return back from sick leave, I learned (for the first time) from a clerical that Ramos had been convicted.  The warrant was then issued.  After the revocation hearing, Ramos was re-committed as a convicted parole violator.

23. Despite the fact that I was not at fault, a written reprimand was issued. The four week delay between Ramos' conviction and the warrant was the alleged reason for the written reprimand, i.e. the Board contended that I failed to follow the case. As discussed above, I clearly followed up with the agent responsible for the case. Yet, I was blamed for the delay, despite my diligence and the fact that I was out on vacation and then sick leave (as a result of my angioplasty surgery), and returned to work immediately after recovering from the surgery. Moreover, during the time between Ramos' conviction and revocation hearing, Ramos posed no harm to society, as he was detained that entire time.

24. I filed a grievance concerning the reprimand. A hearing, conducted by Thomas Marshall ("Marshall"), was held.

25. At the hearing, I was represented by two union representatives, Geraldine Jackson ("Jackson") and Barbara Kremp ("Kremp"), whose name I am not sure how to spell.

26. After the hearing, Jackson and Kremp, the union representatives, and Marshall informed me that the Board was considering reducing the written reprimand to training. Moreover, Marshall assured me that he had recommended training to Maria Marcinko, the Board's Personnel Director.

27. In fact, when I inquired about the status of the

grievance one month later, Jackson informed me that Marshall and Kremp informed her that the written reprimand would be reduced to training.

28. Despite Marshall's, Jackson's, and Kremp's assurances that the Board agreed to reduce the disciplinary action to training, the Board never did so. No reason was ever given. Thus, a written reprimand remained in my file.

29. A written reprimand, as an adverse action, prevents a promotion or transfer.

30. In fact, Jones informed me that my transfer request of August 8, 2000 could not be granted because of the August 2000 written reprimand that had been placed in my file.

<u>Solla's Derogatory Racial References</u>

31. On two to three occasions, Solla referred to me as "Jim Bo", a term used in reference to African American male slaves, thus humiliating me in front of my co-workers.

32. Although I never told Solla that the term "Jim Bo" is racially derogatory, it is common knowledge that the phrase is derogatory.

33. Solla received a lot of support from his superiors, including and especially Jones. For fear of retaliation, I, therefore, never complained to anybody at the Board about my supervisor's derogatory statements.

<u>Defendants' Failure to Address My Complaint About Racially
Derogatory T-Shirts Worn By Board Agents</u>

34.  As part of the hostile and discriminatory environment
at the Board, Solla refused to respond to my concern and the
concern of several of my subordinates regarding a t-shirt worn by
several White board agents, and also displayed in their offices.

35.  The t-shirt concerned the racially divisive issue of
"Mumia Abu-Jamal", an African American male whose conviction for
murder was controversial.

36.  The t-shirt took the "White" side, calling for Jamal's
execution.  The t-shirt read as follows: "Officer Danny Faulkner
was murdered by Mumia Abu-Jamal who shouldn't be in an 8 x 10
foot cell.  He should be 6 feet closer to hell."

37.  In February 2000, I arranged a meeting with Solla, who
I believed was the appropriate person to talk to, as my immediate
supervisor and Deputy District Director.  In or about February
2000 Solla and I met to address the objections my African
American subordinates and I had to the t-shirt.

38.  Solla informed me that this issue fell within a "gray
area", and dismissed the issue.

39.  Solla's inaction incensed my subordinates, who blamed
me for Solla's inaction.

40.  I spoke to Solla at least one more time in passing

about the t-shirt.

41.    I also complained to LaDelle Ingram ("Ingram"), a Board employee, about the t-shirt.

42.    Despite my complaints to Solla and Ingram, they refused to take any action regarding the issue, and the board agents continued to wear and display the t-shirt from in or about February 2000 through my constructive discharge in February 2001.

### Defendants' Attempt to Demean and Informally Reprimand Me Regarding False Charges of Tardiness

43.    As part of the hostile and discriminatory environment at the Board, on at least three different occasions in or about June 1998, Solla placed post-it notes marked "late" on my office door. I was never late to work.

44.    My duties as a parole supervisor required that I leave my office to conduct interviews in the "interview room", meet with warrant officers at the transport station, meet with board agents in their offices, attend meetings at other agencies, run errands at the State Office Building, and drop off warrants.

45.    Solla did not ask me if I was working outside of my office at the time he placed the notes on my door. In fact, he did not even attempt to contact me or to discuss the situation before placing the post-it notes marked "late" on my office door.

46.    White employees, such as Michael Barone, often arrived

to work more than thirty minutes late, but were not embarrassed in this way.

47. In or about June 1998, I verbally complained to Solla about the post-it notes.

48. This discriminatory action and gesture was humiliating to me, in that it conveyed to all employees, including the parole agents under my supervision, that I was being demeaned and reprimanded. I, therefore, lost the respect of my superiors and subordinates.

### Defendants' Discriminatory Supervision

49. As part of the hostile and discriminatory environment against me, Solla had business lunches with several White supervisors, at which Board policy and procedures were discussed. I was excluded from those meetings, but often overheard the conversation when I walked into the meetings to tell Solla about an emergency or provide an individual with an urgent telephone message.

50. Carol Schultz, Nicholas Cinquanto, and James Hines, White supervisors, and several White board agents (whose names I cannot recall at this time) were often in attendance. There were never any African American supervisors or board agents in attendance at the lunch meetings.

51. I was denied access to important information discussed

at these meetings, thereby providing White supervisors and agents
with a greater opportunity to improve their skills.

52.  Solla refused to address concerns he had about my work
performance informally, but would immediately impose formal
disciplinary action, such as a pre-disciplinary conference or
written reprimand.  As a result, I could never address any
concerns or questions to Solla, for fear of receiving
disciplinary action for poor performance.

53.  White supervisors were able to discuss concerns and
questions with Solla without the fear of receiving disciplinary
action.  These discussions often took place during the business
lunch meetings, from which I was excluded.

### Discriminatory Caseload

54.  In 1997, as part of the hostile and discriminatory
environment at the Board, my unit was assigned a significantly
higher number of cases than the units of White supervisors.

55.  When on several occasions, from 1997 through 2001, in
person and in writing, I complained to defendant Solla about the
larger number of cases that Solla had assigned to my unit as
compared to the units of my White colleagues, Solla refused
and/or intentionally continued the practice and perpetuated the
discrimination.

56.  I also complained about the excessive caseload to

Thomas Costa and defendant Jones.   They refused to ameliorate the excessive caseload situation.

57.   Solla refused to take any action to resolve the problem, despite the fact that he acknowledged that my caseload was larger.   For example, in his December 27, 1999 memorandum to the Northeast Division supervisors, Solla acknowledged the following breakdown of cases:

My unit:  **532** cases (89 cases per agent)

Supervisor Barone's unit: 384 cases (64 cases per agent)

Supervisor Hines' unit: 281 cases (70 cases per agent)

Supervisor Schultz's unit: 322 cases (54 cases per agent)

Supervisor Weinstein's unit: 288 cases (58 cases per agent)

58.   Supervisors Barone, Hines, Schultz, and Weinstein are Caucasian.

59.   On or about August 28, 2000, I received a memorandum from Solla identifying 64 cases under my supervision that he claimed I could transfer to Supervisor Hines' unit.   However, transferring those 64 cases still would not have equalized my caseload with that of the other supervisors, as demonstrated by the numbers above.   Moreover, my unit always received the highest number of incoming cases.

60.   On or about August 28, 2000, Solla informed me that he was removing ten census tracts from my unit, census tracts

representing geographical areas. In a memorandum dated August 30, 2000, I expressed appreciation to Solla for his apparent stated decision to reorganize the division's case assignments. However, the removal of those census tracts consisted of the removal of the 64 cases discussed in ¶ 53. As set forth above, the removal of those cases did not decrease my caseload because I had such a dramatically higher caseload to begin with, and I always received the highest number of incoming cases. Moreover, I later learned that redistricting occurred only after I left the Board.

61. As a result of Solla's, Jones', and Costa's inaction, I was unable to respond to my subordinates' complaints about their caseload, and was unable to provide them with an explanation or any hope for improvement.

### Defendants' Intentional Assignment of Problem Employees To My Unit

62. As part of the hostile and discriminatory environment at the Board, defendants began to assign the most problem employees to my unit, which exacerbated an already unfair workload situation and caused further resentment among my subordinates, who resented me for my inability to remedy the unfair situation, and thus made the work environment even more hostile. These problem employees included: Agent Alan Boyd,

Agent Ralph Harris, Agent Chantal-list Mirman, Agent Stuart Greenburg, clerical Sandy Loschiavo ("Loschiavo"), and clerical Dolores Tillery ("Tillery").

63. Defendant Solla and I interviewed Loschiavo for the clerical position. Solla suggested that we hire her. Although I opposed her hiring, I did not expressly do so, in order to avoid a confrontation with Solla.

64. Loschiavo was, therefore, hired as a clerical in my unit.

65. Before Tillery was transferred to my unit, I was told by Tillery's former supervisor, whose name I cannot remember, that Tillery was having problems in her former unit. As I was not involved in the hiring process, and in order to avoid a confrontation with Solla, I did not share this information with him.

## Discriminatory Lack of Clerical Support

66. As part of the hostile and discriminatory environment at the Board, I was forced to perform menial clerical tasks, which the White supervisors were not forced to perform.

67. These menial tasks included data input and taking out the mail.

68. The situation was perpetuated by the fact that Solla refused to assign clerical staff to my unit, until Loschiavo was

hired.

## Summary

69.  Solla's retaliation against me and defendants'
creation of a hostile work environment became so intolerable that
I was forced to retire in February 2001, thereby constituting a
constructive discharge, after working at the Board for over
eleven years.

70.  I was humiliated by the treatment I received at the
Board.  Furthermore, I suffered a continuing substantial loss of
income, loss of opportunity for promotion, and other damages,
including the humiliation of having to leave the Agency with a
poor reputation and fear of a negative job reference.

71.  Currently I work at the University of Delaware as an
Adjunct Faculty Member, where I teach Psychology and Study
Skills.  I also act as a Student Advisor.

72.  I am hired by the University on a semester-by-semester
basis.  Therefore, although I enjoy the work, I have been denied
the stability of the Parole Board work and the benefits that
accompany employment at the Board.

Executed this 17th day of March, 2003, subject to the

penalties for unsworn perjury, I state the foregoing is true and correct.

JAMES BURTON



## AFFIDAVIT

I, Darryl Rankin, pursuant to 28 U.S.C. § 1746, state as follows:

1.  I was an African American employed by the Pennsylvania Board of Probation and Parole for twenty-five years, until I was constructively discharged in 1999.

2.  I currently work for the Jewish Employment Vocational Services as an instructor.

3.  Other African American employees and I settled a racial discrimination case in or about May, 1995.

4.  Pursuant to the Settlement Agreement, I was promoted to supervisor of a newly created unit, the PREP Unit, a unit responsible for helping parolees find employment.

5.  As the supervisor of the PREP Unit, I reported to Ronald Zappan, the Deputy District Director of the Division in which I worked.  Harold Shalon, a White male, was the District Director.

6.  In retaliation for the settlement I reached with the Parole Board in 1995, through the actions of Shalon and Edward Jones, the Board repeatedly and continually discriminated and retaliated against me, as part of a continuing pattern and practice of discrimination and retaliation.

7.  For example, when I first became a supervisor, I was provided with a small office, with no equipment.  Eventually I

1



was relocated to an office in West Philadelphia.  Once again, my
unit was provided with no equipment.  In order to improve the
quality of the workplace and improve my unit's morale, I implored
a friend to donate refurbished desks, and I fixed some broken
phones.  When Shalon and Zappan made a visit to the office, they
were surprised and impressed by the condition.  Zappan also
remarked that he was impressed with the strong agent morale,
despite the conditions provided by the Board.

8.  The PREP Unit was functioning effectively and
efficiently until my secretary was relocated and not replaced.
As a result, the agents and I were now responsible for the
clerical duties and opening new cases, in addition to our own job
duties.

9.  Almost on a daily basis, I complained to Edward Jones,
who replaced Shalon, and Zappan about the lack of clerical
support.  A new secretary was never assigned.

10.  As a result of the failure of the Board to reassign a
secretary, the unit fell behind, as the Board intended, in
retaliation for my settlement of the racial discrimination suit.

11.  Approximately eighteen months after I was promoted to
supervisor, Zappan informed me that his supervisors were not
happy with the PREP Unit's performance.  Consequently, I was to
be transferred.

12.  As further discrimination and retaliation, I was transferred to Daniel Solla's Division.  Daniel Solla, a White Deputy District Director, was one of the individual defendants in the racial discrimination suit we had brought against the Board, and the Board was aware of this.  Despite this fact, I was forced to once again report to him.

13.  Solla had daily lunch meetings with the White supervisors, but excluded the other African American supervisor and me.  At these business lunch meetings, the workings of the Board were discussed.  Consequently, I was denied access to important information, which could help me advance at the Board. Moreover, these meetings sent a strong message that the African American supervisors were not part of the club.

14.  As further discrimination and retaliation, each time I met with Solla regarding a concern I had or merely to seek advice, he put everything in writing.  On the other hand, White supervisors were able to raise concerns, without the fear that each such instance would be documented in their personnel file.

15.  As further discrimination and retaliation, the Board started to do mass transfers of cases.  These mass transfers entailed the transferring of a whole caseload from a White supervisor to an African American supervisor.  Often, the White supervisor would not even be required to update his cases before

the transfer.  Coincidentally, these transfers were done before a
Central Office audit, in order to make African American
supervisors and agents look bad.  At one point, a caseload was
transferred in mass to my unit.

16.  The pattern and practice of discrimination, as
described above, eventually led to my forced resignation in
January, 1999.

Executed this 17th day of December, 2002, subject to the
penalties for unsworn perjury, I state the foregoing is true and
correct.

DARRYL RANKIN

## AFFIDAVIT

I, Victoria Roadcloud, pursuant to 28 U.S.C. Section 1746, declare under penalty of perjury that the following is true and correct:

1. I am an African-American woman.

2. I worked for the parole board for approximately ten years. I was classified as a parole agent II.

3. I received positive performance evaluations.

4. On December 14, 1998, I got into a car accident, while in the course and scope of my employment. As a result of which, I suffered serious injuries to my knee, including a torn meniscus, and injuries to my head and back.

5. As a result of the accident, I was out of work on disability for a while.

6. In approximately June, 1999 I went back to work on a limited hourly basis, pursuant to my doctors' instructions.

7. A few months later, at Edward Jones' request I was involuntarily transferred to the CCC Unit, in which I also worked as a parole agent.

8. The CCC unit was in shambles. It was understaffed and the caseload was unmanageable.

9. I protested my transfer and explained to Mr. Jones that I shouldn't be moved to the CCC unit because of my work hour

1

EXHIBIT

restrictions, and restrictions on my ability to travel
extensively, drive, or climb stairs. I was transferred anyway.

10   Jones said that he knew she was at work on a restricted
basis, but he did not care because he wanted a woman in that
position.

11. I believe this transfer was discriminatory.

12. Despite the tremendous caseload, Mr. Jones approved of a
white agent's transfer out of the CCC unit, just prior to my
transfer into that unit.  That agent was Ms. Dana Roth.

13.  Before transferring me into the CCC unit, Mr. Jones had
tried to transfer Parole Agent Rosalind Russ-Tobias into the Unit
against her will.  After receiving a letter that she had been
transferred into the CCC unit, Ms. Russ-Tobias challenged the
transfer which she believed was discriminatory.  Her transfer was
then rescinded.

14.  Despite difficulty doing so, and my modified duty
status, I performed administrative work, attended hearings, went
to the CCC to meet with parolees, and completed ISRs and initial
assessments from the office, while part of the CCC unit.

15.  While in the CCC unit, I was continually harassed on
the basis of my race and because of my disability, including the
imposition of frequent unwarranted discipline, requiring me to
work excessive hours despite my disability (and in fact agreeing

2

that I was granted leave, but then disciplining me for not
showing up at work), and assigning me an excessively high
caseload.

16. On June 13, 2002, I tripped on a hole in the floor in
the office. As a result of the fall, I exacerbated the injuries
I suffered as a result of the car accident, and suffered injuries
to my neck, wrist and knee. I also suffered from dizziness.

17. I was then out of work on disability. My doctor
concluded that I was unable to return to work as I was on
medication and unable to drive to half-way houses and meet with
parolees as required to perform my function as a parole agent II.

18. On January 13, 2003, while still on disability leave, I
received a termination letter dated January 9, 2003 which claimed
that the reason I was terminated was for falsifying records and
inadequately supervising my caseload.

19. The parole board apparently conducted an OPR
investigation. During the investigation they apparently
interviewed parolees that were part of my caseload. The
resulting report concluded that I was falsifying records and
providing inadequate supervision of parolees.

20. I never received a copy of the investigation report and
was denied the opportunity to review the findings at my grievance
hearing.

3

21. The conclusions of the OPR investigation are false.

22. The reasons for my termination as cited by the termination letter are false. I never falsified any documents. And I supervised my caseload to the extent possible, given its size and my injuries.

23. My firing was really part of a pattern and practice of discrimination and retaliation against African-Americans.

I swear the foregoing is true and correct to the best of my knowledge, information, and belief, subject to the penalties of unsworn perjury. Executed on this date, September _28_, 2004.

Victoria Roadcloud

DATED: September _28_, 2004

4

## AFFIDAVIT

I, Rosalind Russ-Tobias, pursuant to 28 U.S.C. Section 1746, declare under penalty of perjury that the following is true and correct:

1.  I am an African-American woman.

2.  I have a Bachelor of Arts from Temple University. My major was Communications with an emphasis on advertising. I minored in Criminal Justice.

3.  I was hired to work for the Parole Board in June of 1996.

4.  When I started at the Parole Board I was shown a copy of the Equal Employment Opportunity policy, but I am unaware of the details of the policy, and do not believe the policy is followed generally. It certainly was not followed in my case.

5.  Upon completion of my training period, I was promoted to parole agent II. This occurred on December 31, 1996.

6.  The job is difficult and takes time to get used to. After about three years I felt comfortable with the job. An agent's comfort and effectiveness depends on numerous factors, including experience, the size of her caseload, the quality of her supervisor, and other variables, such as the degree of administrative support.

7.  Every performance evaluation I received was positive

1



during the course of my employment at the Parole Board, reflecting my actual performance on the job.

8.  Over the six years of my employment at the Board I had three immediate supervisors.  When I first arrived my supervisor was Mr. Daryl Rankin. After Mr. Rankin retired my immediate supervisor was named Hugh.  My final immediate supervisor was Ms. Bonnie Ferguson.

9.  I consistently expressed concern to Ms. Ferguson about the size of my caseload.

10.  I did not have any problems at the Board until October 10 2001, when Edward Jones, District Director for the Philadelphia District involuntarily transferred me from my current unit to CCC-3. CC-3 was a unit  that had a caseload in shambles. The transfer was effective October 20, 2001 according to the letter

11.  Just prior to issuing the order to involuntarily transfer me into the CCC-3 unit, Mr. Jones transferred Agent Dana Roth, a white agent, out of the CCC-3, despite his knowledge that the unit was severely overloaded.

12. The job opening created by Ms. Roth's transfer out of CCC-3 was never posted.

13. I spoke to my supervisor, Bonnie Ferguson, about the transfer.  I objected to the transfer because I felt it was

2

unfair to me and was an example of African-Americans being given disproportionate difficult, unpleasant work to favor whites. I told her that the vacancy should have been posted so that any agents who wanted the position could ask for it. I also told Ms. Ferguson that the acting Supervisor of CCC-3 was often combative and critical of the parolees.

14.   I considered it discriminatory to let a white agent out of a difficult job and then transfer me, a black agent, into the unit without prior notice or consultation. I asked for permission to talk to Mr. Jones about my objection to the transfer. Ms. Ferguson granted me that permission.

15.   I voiced my objections to the transfer to Mr. Jones. He was adamant. He told me that he needed a female in the CCC-3 unit, and that I was a seasoned agent. He insisted that his decision was final.

16.   I went back to Ms. Ferguson. She decided to talk to Mr. Jones about the transfer.

17.   When Ms. Ferguson objected to the transfer Mr. Jones remained unmoved.

18.   Ms. Ferguson decided to go to Mr. Thomas Costa, Regional Director of the Parole Board, to object to the transfer.

19.   At the suggestion of a co-worker I also contacted LeDelle Ingram, the Board's Equal Employment Opportunity

3

specialist, about the discriminatory treatment I was receiving. She was non responsive.

20.   On October 24, 2001, I received a letter rescinding my transfer.

21.   After my transfer was rescinded, Mr. Jones involuntarily transferred another African-American agent, Ms. Vicotria Roadcloud, into the CCC-3 unit.  Ms. Roadcloud was later terminated for nonperformance.

22. On October 30, 2001, Mr. Jones requested an OPR investigation of me.  I understand he claimed that he received a complaint from Mr. Umberger of the Diagnostic and Rehabilitation Center (hereby "DRC"), where most of my parolees lived, that I was not adequately supervising offenders at the center.

23.   Mr. Umberger denies any such complaint.  Mr. Jones' claim is false.  I was providing adequate supervision to the parolees in my caseload, based on Board practice.  My evaluations reflected this.

24.   Agents whose parolees live at a CCC had the same responsibilities as general agents.  A CCC agent was to supervise her parolees, investigate home plans for her offenders, attend hearings, and maintain paperwork. we were no longer required to investigate home plans after March or April of 2002.

25.   The CCC's are unlocked facilities.  Residents, mostly

4

parolees, are not always at the CCC simply because they live there. Parolees have jobs, school, have drug and alcohol rehabilitation, and counseling appointments, just like general parolees. It is thus impossible to catch all of the parolees at the DRC at the same time.

26. Security at the Center was not that tight. I felt uncomfortable when I met with parolees there at night.

26. The DRC is a big building several stories high. It was home to nearly 200 people a vast majority of whom were parolees. The DRC had a large staff of nearly 50 people.

27. The DRC did not require people the staff knew sign in and out. I rarely signed in. If an agent signed in it was usually for an arrest.

28. It was not uncommon for DRC staff to be unaware of my presence at the DRC when I was in fact there. Ms. Ferguson would sometimes call me on my cell phone to inform me that someone from the DRC was looking for me, when I was already in the building.

29. No one at the DRC ever expressed concerns to me that I was not there enough.

30. Parolees and DRC staff should not have had a problem reaching me. Most of the DRC staff was given my cellular telephone number. When I was in my office, parolees could call me there. If a parole called the main swithboard, I would be

paged. I did not have my own direct telephone line, so if a parolee called they would speak to Ms. Ferguson first. If I was not in, the parolees would leave a message on my voice-mail box.

31. When a parolee absconded or was returned to jail, a new parolee would quickly take his place at the DRC. When this happened an agent's workload would increase because the agent still had responsibility regarding the absconder, or the offender in jail, but also has responsibility for the new parolee at the DRC.

32. My caseload was always very demanding. It was usually somewhere between 100 and 150 parolees. When I was terminated I had approximately 75 physical bodies in my caseload.

33. The contact frequency requirements regarding parolees was constantly changing due to the practical implications of the caseloads.

34. In an attempt to stabilize the contacts requirements the parole board issued the "Continuum" in January, 1998.

35. The Continuum broke down the contact requirements for parolees into categories of supervision. All parolees at the DRC were under the category of maximum supervision. This meant that under the Continuum, a parole agent should have two face-to-face contacts with the individual offender each month and make two collateral contacts each month as well. Collateral contacts were

6

contacts with people the parolee interacted with, eg. employers or rehabilitation counselors.

36. The Continuum was more of a utopian wish than a requirement. No agents were meeting the wish, as they were unattainable and too demanding to meet, given the excessive caseloads. To meet the wishes of the Continuum, an agent with 75 parolees in her caseload would have to make 35 face-to-face contacts, 35 collateral contacts, attend any hearings, deal with absconders, investigate home plans, and keep up on her paperwork.

37. Nevertheless, I always gave my best effort to supervise the parolees in my caseload as closely as I could, given the circumstances, and succeeded in accordance with Board norms.

38. In November of 2000, I went on maternity leave. I returned to work on March 12, 2001.

39. When I returned from maternity leave I was assigned exclusively to the DRC, but also had responsibility regarding absconders. I was still required to attend hearings, investigate home plans, and keep up on paperwork.

40. After the investigation into the charge that I was not providing adequate supervision to parolees in my caseload was launched, the scope of the investigation expanded. Although unaware of it at the time, I was being accused of falsifying documents, misusing my commonwealth vehicle, and maintaining two

7

valid drivers licenses.

41. When white Agent, Dana Roth, was investigated for failing to provide adequate supervision to the parolees in her caseload. Charges against her were sustained, but she was not disciplined.

42. Minority agents are held to different standards of conduct than white agents at the Parole Board, such as Ms. Roth, Mr. Greenberg and many other whites.

43. In regard to the charge that I had two active drivers licenses, the fact is I got a New Jersey drivers license when I moved to that state, but I was unaware that the New Jersey DMV did not notify the Pennsylvania DMV to cancel my drivers license. I did not know that the Pennsylvania Drivers license was still valid. I had no information this has to do with my employment, or why this would matter to the Parole Board.

44. As for the charge that I misused my Commonwealth vehicle by stopping at a store once on my way back from work, and by dropping my children off on the way to work a couple times, these actions were not violations of the automobile policy as I understood it. I knew that the automobiles were not to be used for personal use, but I understood that to mean that I was not to make personal trips in the vehicles or treat the vehicle as if it were my own. My children's school was on the way to the office,

8

and it did not even cause me to divert from my route to work. I only took my children to work in the Commonwealth vehicle when they missed the bus.  This only happened a couple times.

45.  I never falsified any documents.

46.  I never recorded any action which I did not take.

47.  Any discrepancies in my paperwork were caused by the fact that some forms are filled out immediately while an activity is occurring and other forms are filled out at the office, after the fact.

48.  Prior to the OPR investigation the Board never provided clear guidelines explaining how to fill out forms.  No policy explained the level of detail required to fill out each form.

49.  My unit has been audited several times.  Each time random files from my caseload were studied.  I was never told by my supervisors or any one else that my forms were being filled out improperly.

50.  If my paperwork had any faults at all it was that I sometimes understated my work by failing to record actions that I had taken.  These omissions would occur because sometimes the day would become so busy I would forget to record everything that had happened.

51.  The OPR investigation investigated by Jones as racial discrimination and to retaliate against me for opposing the

9

discriminatory transfer.  Because the investigation itself was designed to be punitive, it was a given that I would be disciplined.

52.  The investigation was stressful.  The investigation followed me like a cloud of suspicion and impacted the terms and conditions of my employment.  Because my parolees were interviewed and operations at the DRC were interrupted as a result of the investigation, the parolees, DRC staff, and my colleagues perceived me differently.

53.  I felt intimidated by the conduct of two investigators, Mr. Moyer and Mr. Margerum, during my interviews.  They entered the interview with preconceived notions of what had happened and did not seem impartial.  They were asking me questions about events that were well into the past, and I felt pressured into giving answers that fit their preconceived agenda.

54.  The OPR investigation falsely sustained all of the charges against me.  My termination letter cited the results of the OPR report as the reason I was fired.

55.  The conclusions of the OPR investigation are false.

56.  The reasons for my termination as cited by the termination letter are false.

57.  My firing was really discriminatory and retaliatory against me as an African-American at the Parole Board.

10

58. In addition to this lawsuit. I filed a union grievance, and complaints with the EEOC and PHRC.

59. My union arbitration has been put on hold pending the outcome of this case.

I swear the foregoing is true and correct to the best of my knowledge, information, and belief, subject to the penalties of unsworn perjury. Executed on this date, September 28, 2004.

Rosalind Russ-Tobias

DATED: September 28, 2004

11



*A Performance Audit of the Pennsylvania Board of*

# PROBATION AND PAROLE

**April 2003**

( EXCERPTS )



EXHIBIT

## Auditor General Robert P. Casey, Jr.

April 8, 2003

The Honorable Edward G. Rendell
Governor
Commonwealth of Pennsylvania
225 Main Capitol Building
Harrisburg, Pennsylvania 17120

Dear Governor Rendell:

This report contains the results of the Department of the Auditor General's performance audit of the Pennsylvania Board of Probation and Parole for the period July 1, 1999, through June 30, 2001. The audit was conducted pursuant to Section 402 of The Fiscal Code and in accordance with *Government Auditing Standards* as issued by the Comptroller General of the United States.

Chapters One and Two of the report present the most disturbing conclusions, including how the Board did not document parolee investigations, insufficiently supervised paroled prisoners, lost track of nearly 1,600 offenders, did a poor job of collecting supervisory fees, inadequately monitored parolee and probationer court-ordered payments for victim restitution, and did little to increase employment opportunities for parolees.

Chapters Three through Five show that the Board did not analyze recidivism data effectively, was at times deficient in providing training and assistance to parole agents, and was ineffective in monitoring its field operations and county parole offices. Chapter Six discusses a positive finding—the Board's commendable participation in interagency and external monitoring efforts of its substance abuse programs.

Aside from the audit findings themselves, another important issue surfaced that raises questions about the Board's actions. Throughout this audit engagement, the Board continually invoked various state and federal laws containing confidentiality provisions that prohibit public disclosure of certain information (for example, drug and alcohol treatment information). The Board made it clear that even the Department of the Auditor General could not have access to this privileged information. However, the Board failed to keep such information confidential. In fact, the Board's failure to comply with its own

The Honorable Edward G. Rendell
Page 2
April 8, 2003

confidentiality provisions compelled us to report such noncompliance to the Board in a letter dated March 14, 2003. Specifically, the Board repeatedly provided our auditors with papers and files containing information that—based on the Board's own determination—should have been redacted, and it continued to do so *even when we returned such information for additional redactions.*

This problem continued when the Board initially responded to this audit report by including—in its appendix to the response—information previously deemed confidential. That action is significant for two reasons. First, in trying to rebut our audit findings, the Board chose to disclose information that it would not make available to our auditors. Second, because we had told the Board that its response would appear *in its entirety* in this publicly disseminated audit report, the Board was also disclosing the confidential information to the general public. Only after we intervened once again did the Board provide a revised appendix with the confidential information deleted.

In summary, throughout this audit the Board failed to fulfill its stated duty to protect certain information. Perhaps the Board's failure to redact information during our field work was inadvertent, and it is possible that the Board simply did a poor job of crossing out confidential information; but to include the previously withheld information in its official response is outrageous.

The audit findings presented in this report—losing track of 1,600 offenders, failing to recommit violent offenders, missing required supervisory visits, not enforcing conditions and sanctions—demonstrate a lack of action that threatens the safety of our communities. I hope that you will vigorously encourage the Board to implement the nearly 50 recommendations we have offered to improve the Board's accountability and protect the public.

The Board's response and its revised appendix are included in their entirety at the end of this report. In addition, portions of the response, along with our comments, appear throughout the report with the related findings.

Sincerely,

/s/ **Robert P. Casey, Jr.**

Robert P. Casey, Jr.
Auditor General

# Table of Contents

| | |
|---|---:|
| **Executive Summary** | iv |
| **Introduction and Background** | 1 |
| **Objectives and Methodology** | 6 |
| **Chapter One:**<br>**Supervising parolees and other offenders** | 7 |
| Conclusion 1: The Parole Board inadequately documented some investigations of parolee home and work plans, and also took questionable actions beyond the inadequate documentation. | 11 |
| Conclusion 2: The Parole Board did little to increase employment opportunities for parolees. | 22 |
| Conclusion 3: The Parole Board was deficient in supervising paroled prisoners in our sample. | 30 |
| Conclusion 4: The Parole Board sanctioned parolees ineffectively by sending mixed messages—sanctioning inconsistently or threatening violators with punishment but then not following through. | 45 |
| Conclusion 5: The Parole Board did a poor job collecting $25-a-month supervisory fees from parolees and probationers, taking in only $1.2 million of nearly $15 million owed. | 56 |

# Table of Contents, *continued*

Conclusion 6: The Parole Board did not adequately enforce or track parolee and probationer court-ordered payments that should have been made to victims and others. — 64

**Chapter Two: Pursuing absconders** — 70

Conclusion 1: The Parole Board lost track of nearly 1,600 offenders and did not aggressively search for them. — 72

**Chapter Three: Reducing recidivism** — 80

Conclusion 1: The Parole Board did not analyze recidivism data to see the effect of certain practices or characteristics. — 82

**Chapter Four: Providing training and assistance to parole agents** — 88

Conclusion 1: The Parole Board did not ensure that all agents in our sample received the 40 hours of training required annually, nor did the Board ensure that all training was "acceptable." — 91

Conclusion 2: The Parole Board ensured that all the agents in our sample were qualified to carry guns but did not ensure that all the agents met annual training requirements. — 99

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

**Table of Contents,**
*continued*

**Chapter Five:**
**Supervising district field operations and county offices** ... 106

Conclusion 1: The Parole Board did not effectively monitor the performance of its field operations. ... 108

Conclusion 2: The Parole Board did not effectively audit the 65 county probation and parole offices. ... 113

**Chapter Six:**
**Evaluating special treatment programs** ... 119

Conclusion 1: The Parole Board participated in interagency and external monitoring efforts of its substance abuse programs. ... 122

**Appendix A:**
**Response from the Board of Probation and Parole** ... 126

**Appendix B:**
**Additional comments from the Department of the Auditor General** ... 181

**Appendix C:**
**Audit report distribution list** ... 185

# Executive Summary

For the two-year audit period from July 1, 1999, through June 30, 2001, the Pennsylvania Board of Probation and Parole (also referred to in this report as "Parole Board" or "Board") failed to meet its own supervisory requirements in 45 of the 50 cases sampled, lost track of nearly 1,600 parolees and probationers, and allowed violent offenders to remain free while imposing meaningless sanctions. Those findings, among others, are presented in this report by the Pennsylvania Department of the Auditor General following its performance audit of the Parole Board.

Pennsylvania spent nearly $29,000 a year to keep each of its 37,500 inmates in state prison, or about $79 a day, during the state fiscal year ended June 30, 2001. By contrast, the state spent about $3,000 a year—less than $8.25 a day—to supervise each of the 19,500 parolees living throughout the state.

That cost differential should have been good news for Pennsylvania taxpayers who, under normal conditions, might appreciate the state's ability to save $26,000 annually for each inmate released on parole. Unfortunately, the savings came at significant risk to the community. Specifically, community residents were exposed to or victimized by criminal acts or other violations that the parolees committed.

The risk to public safety is best illustrated by the sheer number of parolees—at least 8,500 during the two-year period ended June 30, 2001—who were returned to prison for various offenses committed while living among their neighbors. Moreover, many other parolees were cited but not re-incarcerated for violating parole conditions, thereby exposing communities to the risks associated with such wrongdoing and the behaviors that caused it. Worst of all, these risks were compounded by the state's perilous lack of required supervision.

Supervising parolees should be a critical part of the parole system. Parolees, after all, have not been "freed" from serving their sentences; rather, parolees serve only the first part of their sentences in prison and are released to serve the remaining time in the community.

Supervising probationers, too, is part of the Board's responsibility, although the 4,300 probationers (also supervised at the cost of $3,000 a year each) make up much less of the Board's caseload than do the parolees. Overall, the Board releases or supervises the following:

- **Parolees.** The Board releases and then supervises offenders who are sentenced in Pennsylvania state courts to a *maximum* sentence of two or more years. Parolees can be released only on or after the *minimum* sentence date.

- **Probationers.** The Board supervises offenders serving sentences of probation in Mercer and Venango counties, where there are no county probation offices.

- **Other offenders.** The Board supervises offenders serving sentences of less than two years in any Pennsylvania county when the sentencing court so requests; the Board also supervises offenders sentenced by other states in cases where a request is made pursuant to the Interstate Compact for Adult Offender Supervision.

An important note: Although we intentionally structured our audit to examine the Parole Board's *supervision* of parolees and probationers rather than the Board's *granting* of parole in the first place, we came away from our audit recommending that future study be done to audit the initial parole decisions. We base this recommendation on three conditions identified during our audit:

1. The Parole Board's uneven performance in its supervision of parolees who were often violent offenders.

2. The Parole Board's repeated leniency toward errant parolees, as illustrated by its lack of enforcement of conditions and its lack of follow-through with sanctions. Whether this leniency occurred by conscious policy or by default based on failure to follow requirements is unclear.

3. The Parole Board's inability or unwillingness—again unclear—to track and analyze the work for which it is responsible.

In short, if the Board could not supervise its charges, it is fair to ask if it should have released them.

Regarding our specific findings related to the Board's weak supervisory performance, we identified numerous significant deficiencies for the two-year audit period. These deficiencies, which our audit report describes in detail, include the following:

- The Parole Board missed required visitations of parolees in 45 of the 50 cases we sampled, or 90 percent. Moreover, it was typical of the Board to keep parolees in the community even after they committed offenses that should have been sanctioned harshly or resulted in the revocation of parole. Indeed, it was troubling to see the Board allowing parolees to ignore the terms of their release two, three, four, or more times.

- The Board lost track of nearly 1,600 offenders and did not aggressively search for them.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Page vii

Executive Summary

Pennsylvania Department of the Auditor General

- The Board did not analyze recidivism—parolees returned to prison—in ways that allowed evaluation of the overall parole program. For example, the Board did not analyze re-incarcerated inmates by the types of crimes they committed (either the original crime for which they were sentenced or new crimes committed during parole), the treatment programs they attended, or the sanctions that were in effect at the time of re-incarceration (for example, electronic monitoring, curfews, travel restrictions, required attendance at drug and alcohol treatment programs). Without looking at such data, the Board could not possibly have made an accurate evaluation about what worked, what didn't, and what changes were needed.

- The Board did not ensure that offenders paid court-imposed fines and made restitution to victims as required.

- The Board did not actively pursue the collection of monthly supervision fees that parolees and probationers were required to pay.

- The Board imposed sanctions ineffectively by sending mixed messages to parolees—threatening them with action but then not following through with that action.

- The Board did not effectively audit its district offices.

- The Board did not ensure that its parole agents and other field employees were adequately trained.

As of August 31, 2002, there were nearly 39,300 inmates in Pennsylvania's state prisons.[1] According to the

---

[1] *Monthly Population Report as of August 31, 2002*, Pennsylvania Department of Corrections. As of February 28, 2003, the population was 40,556, according to the monthly report on the Web site at http://www.cor.state.pa.us.

Department of Corrections, the state prison population increased significantly in 2001 after having remained stable in 1999-2000; now, new violent offender admissions are expected to increase, as are the number of parole violators.[2] Accordingly, with its weak performance in the past, it is reasonable to question whether the Board of Probation and Parole is capable of supervising offenders in a way that protects Pennsylvania communities in the future.

A final note: Despite the negative findings, it was evident throughout our audit work that, particularly among the Board's field staff, Board employees took pride in performing their jobs, in conducting themselves with professionalism, and in knowing that their responsibilities are critical to the Commonwealth of Pennsylvania. It is our hope that the Board will view our findings and recommendations as opportunities to make constructive changes as it carries on its important work.

---

[2] Jeffrey A. Beard, Ph.D., *Budget Presentation,* Pennsylvania Department of Corrections, February 2002.

Page 6

Objectives and
Methodology

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

# Objectives and Methodology

The Department of the Auditor General conducted this performance audit to provide an independent assessment of the Pennsylvania Board of Probation and Parole's oversight of criminal offenders assigned to its authority. Our expectation is that the conclusions and recommendations presented in this report will improve the Parole Board's accountability to the public and facilitate corrective action where necessary.

We began our audit with the overall objective of determining whether the Parole Board performed its supervisory duties effectively, including how it implemented sanctions when offenders violated their parole conditions, how the Board utilized special programs such as those related to drug and alcohol treatment, what the Board did to ensure that fines and restitution were paid, how the Board tracked and monitored recidivism, and how the Board ensured that it met training requirements.

Our methodology included comprehensive and detailed testing of a sample of 50 offenders—41 parolees and 9 probationers—drawn from a first quarter 2000 population totaling 2,975 parolees and probationers. We also interviewed Board management and staff and reviewed documents and background material as necessary. The data and conclusions we present are based on objective and systematic examination of the evidence gathered during our field work.

We conducted this audit in accordance with *Government Auditing Standards* as issued by the Comptroller General of the United States. Unless otherwise indicated in the body of this report, our audit covered the period of July 1, 1999, through June 30, 2001.

*Comments*
*See Appendix A, beginning on page 126, for related methodology comments from the Parole Board (pages 1-2 and 6-7 in the Board's response). See Appendix B, beginning on page 181, for our response to those comments.*

- mental health treatment

- not having contact with listed persons such as the victim of the crime

In theory, parolees follow all the general and special conditions and, accordingly, pose little risk to the public. In practice, however, parolees violate their conditions routinely and expose the public to risks associated with errant behavior. It is for that reason that parolee supervision is so important.

## Objectives and Methodology

Our objective for this section of the audit was to determine if the Board performed well in supervising parolees and probationers, enforcing parole conditions, and, accordingly, protecting the public from risk.

Our methodology included a comprehensive analysis of case files for 50 offenders—41 parolees and 9 probationers—whose Board supervision began during the first quarter of 2000. We examined the applicable documents in the offenders' files, reviewed Board policies and procedures as well as the accreditation standards of the American Correctional Association,[10] conducted background research using various publications and reports related to parole supervision, and interviewed Board staff.

Specific tests included the following:

---

[10] According to the American Correctional Association's Web site at http://www.aca.org/standards/faq.htm, accreditation "is a system of verification that correctional agencies/facilities comply with national standards promulgated by the American Correctional Association. Accreditation is achieved through a series of reviews, evaluations, audits and hearings."

- General case file test – We examined case records to gather general information such as release date, supervision level, and conditions set by the Board.

- Parole plan investigation test – We tested parole plan investigation reports to ensure they contained necessary information including, for example, date of completion, home and work plans, and proper approval.

- Supervision level test – We determined if the offenders selected for testing were supervised in accordance with the requirements for the assessed or imposed level.

- Sanctions test – We examined whether sanctions were imposed for various violations and, if so, the types and frequency of sanctions used.

- Supervision fee test – We determined whether supervision fees were collected and, if not, whether they were waived appropriately.

- Fines/costs/restitution tests – We determined whether fines, costs, and restitution were collected on a regular basis.

Our conclusions are presented in the following pages and show how the Board could have performed much better in carrying out its supervisory responsibilities.

| | |
|---|---|
| **Conclusion 1:**<br><br>**The Parole Board inadequately documented some investigations of parolee home and work plans, and also took questionable actions beyond the inadequate documentation.** | Prison inmates considered for parole must plan for their release—where they will live and how they will support themselves or, in some cases, be supported. The Parole Board is required, by its own procedures and by the American Correctional Association's standards, to conduct a parole plan investigation.[11]<br><br>Board-approved arrangements for both living and working are critical to a parolee's transition to the community. For example, living in an acceptable home establishes a day-to-day foundation for the parolee. In addition, working at a job has been shown to be a good stabilizer as well as a competitor for time that could otherwise be spent on illegal activity.[12] |

In spite of the importance of verifying and approving home and job arrangements prior to releasing parolees into the community, we found that the Board fell short in 61 percent of the cases in our sample. Specifically, of the 41 parolee case files we sampled, we found just 16 in which the Board had clearly and adequately proven it had investigated and approved the parolees' home and work arrangements. The remaining 25 parolee case files contained inadequate documentation for us to determine if the Board had indeed investigated, verified, and approved home and/or job arrangements prior to the parolees' release into the community.

It is important to note that, in cases where the Board released parolees directly to community corrections centers (sometimes referred to as halfway houses), we accepted the Board's policy that an investigation of home and job arrangements was *not* required for entry to the centers. That Board policy appears

---

[11] *Pennsylvania Board of Probation and Parole Procedures*, "Release Procedures – The Paroling Process/The Parole Plan," Chapter II(C)(4), Revision 17, July 20, 1981, and "Institutional Parole Processing – Investigation Request/Report," Volume III, Chapter III, Section IV, Procedure 3.4, Effective February 26, 2002. Also, *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3193, August 1998, p. 58.
[12] Shelley Albright and Furjen Deng, "Employer Attitudes Toward Hiring Ex-Offenders," *Prison Journal*, Vol. 76, No. 2, June 1996, p. 118.

Page 12

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

reasonable because community corrections centers are "known" entities with rules and on-premises supervision. Accordingly, we included the community corrections center parolees in our testing only when they *left* the community corrections center at the end of their stay.

| Did the Board show it had properly investigated and approved home and employment arrangements for parolees before releasing them into communities? | | |
|---|---|---|
| *Number of parolee case files in sample = 41* | | |
| Yes | 16 case files | Both home and employment investigations were documented adequately. |
| No | 8 case files | Neither home nor employment investigations were documented adequately. |
| No | 10 case files | Home investigations were not documented adequately. |
| No | 7 case files | Employment investigations were not documented adequately. |

**Home plan investigations**

The Board's investigation of proposed living arrangements for parolees before releasing them into the community requires the Board to verify, among other things, the following:

- location of the residence
- type of neighborhood
- proximity to employment
- available living and sleeping space
- any sources of potential conflict (e.g., conditions existing that may have led to initial arrest)

- readiness of home provider, if applicable, to provide living arrangements
- willingness of home provider, if applicable, to agree to certain conditions including, for example, a prohibition of weapons and illegal drugs

The Board's policy and procedures manual in effect at the time of our audit noted that parole agents must visit the proposed home and prepare a narrative summary, along with a statement that the parolee would be accepted into the home. In addition, the manual noted that the agent/investigator should include a subjective statement about the suitability of the proposed residence. In March 1999, the Board also implemented a procedure whereby an agreement signed by the home provider was also required as part of the home investigation. The agreement documents that the home provider has been advised of the conditions of parole and understands the responsibilities of housing the parolee.

In order to determine whether the Board properly investigated proposed home arrangements, we looked first in the case files for a specific form (typically, the *Investigation Request/Report* "PBPP-30" form was used), as well as for the agreement, mentioned above, from the home provider. However, we allowed the Board considerable latitude by also accepting other reasonable forms of evidence in the files such as other forms, records, or notations. Still, based on all the documentation available, we found 18 cases (8 +10, chart on page 12) for which there was inadequate evidence—or in some cases no evidence at all—that the Board had investigated, verified, and approved parolees' proposed residential arrangements. In short, it appears that the Board did not perform its job as well as it should have in this critical area.

Page 14

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

### Work plan investigations

The Board's policy requires that parolees released into the community must either be employed or have an alternative means of subsistence. The latter category may include, for example, financial assistance from family or friends, public assistance, social security or pension income, or educational assistance.

According to the Board, "Statistics have continually shown that employment is one of the biggest factors in successes on parole."[13]  Similarly, *Corrections Today* notes, "Recidivism studies continue to show that offenders are more likely to recommit within the first year after their release...[and] it follows that employment is a necessary ingredient for success."[14]

The reason that employment is critical for parolee success is clear. "Work is a self motivator," according to James A. Gondles, Jr., Executive Director of the American Correctional Association (ACA). "People in prison or jail, or on probation or parole can empower themselves with self-worth if they have jobs."[15]

Despite employment's importance and the policy requiring alternative means of subsistence in the absence of employment, the Parole Board released 15 parolees (8 + 7, chart on page 12) into the community without adequately documenting—or in some cases without providing any evidence at all—that the parolees had jobs or other financial support. Either situation put parolees at a distinct disadvantage by imperiling their chances for success while, at the same time, providing them with idle time that could easily be misspent.  Releasing prisoners without employment or alternative means of subsistence clearly runs

---

[13] *Pennsylvania Board of Probation and Parole Procedures*, "Release Procedures – The Paroling Process/The Parole Plan," Chapter II(C)(4)(b)(2), Revision 16, March 18, 1981.
[14] Timothy Mann, "In the Name of Jobs," *Corrections Today*, October 1999, p. 131.
[15] James A. Gondles, Jr., CAE, "Programs and Jobs Help Offenders," *Corrections Today*, April 2002, <www.corrections.com>.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

counter to both the Board's own policy and the American
Correctional Association's accreditation standards.

It is important to note that, as with our testing of home plan
investigations, we allowed the Board considerable latitude in
what we considered as documentation or evidence of
employment or financial support. Again, however, the Board
came up short.

### Questionable Board actions

Among the cases in which we found inadequate documentation
of home or work plan investigations, there were two cases that
had troubling issues *beyond* those already discussed.

In one of the two cases [Case file #20 – also see page 50], the
Board had initially rejected the proposed home arrangements
because the offender wanted to live near two of his victims—that
is, within a mile of a victim he had violently assaulted, and
*across the street* from an earlier victim against whom he had
committed a sex crime. The Board paroled the offender to a
community corrections center rather than deny him parole
altogether, a questionable action in itself.

An equally questionable action arose when the parolee
completed his time at the community corrections center.
Inadequately documented residential arrangements aside, there
was enough evidence to show that the Board approved a home
location which was within 1.04 miles of the previously rejected
address. In fact, there were indications in the file that even the
*new* address had been rejected previously. (Both addresses are in
the same very small town.) From that point on, the parolee
committed numerous Board-chronicled violations until finally he
was returned to prison.

In the second case of questionable Board action [Case file #5 – also see pages 72 and 74], a parolee was permitted to leave a community corrections center and enter the community with no job, no other financial support, and with Board-documented misgivings about how he would fare overall. The misgivings were evident in a notation found in this parolee's initial supervision report. In that report, the agent documented a meeting with the parolee within days after his release from prison to the center: "[This parolee] has at least 4 prior probation failures. I do not harbor any illusions that this time will prove to be successful."

Not only would the Board have known about the prior probation failures when it made its decision to grant parole to this offender initially, but the agent proved to be correct in his subsequent assessment. Six months later, the parolee was permitted to leave the community corrections center and move in with his mother. From that point on, he lived in the community virtually unsupervised—*shooting a man in the face within the first two weeks*—until his arrest eight months later.

Our review of these two cases reveals that the Board had reason for serious doubt about whether parole should have been granted in the first place. However, because our audit objectives did not include an analysis of initial decisions to grant parole, we can recommend only that such parole decisions be studied independently of this audit.

## Recommendations

- The Board should request an independent study of its decisions to grant parole to determine whether such decisions are appropriate.

- The Board should follow its policies and procedures when making decisions after the granting of parole, or it should

Pennsylvania Department of the Auditor General

explain and document its reasons when it departs from those policies and procedures.

- The Board should refuse parole to offenders who have not yet obtained employment, not proven they are employable, or have no alternative means of subsistence.

- The Parole Board should adequately document investigations of parolee home and work plans before releasing parolees into the community—whether the parolees are released directly from prison or from community corrections centers.

- The Board should evaluate how its staff can best carry out parole plan investigations effectively and efficiently, perhaps considering the creation of a specialized unit within each district office to complete parole plan investigations.

### Board of Probation and Parole Response

The Board's procedures define the process for investigating parole plans for offenders. The parole agent must visit the proposed place of residence and verify the proposed employment during the investigation of the home and work plans. This process begins while the inmate is incarcerated; the inmate cannot be released from prison until a plan is approved. In some instances, and with increasing frequency since September 1997, the Board has taken action to parole offenders only to Community Corrections Centers operated by, or under contract with, the Pennsylvania Department of Corrections ("DOC"), where the offenders must reside and are assisted in obtaining employment and aftercare services within the community.

In the 50 cases reviewed, the DAG reached conclusions not supported by the facts provided within the case files. (See Appendix, Items 2 and 3)

For example, in ten of the 50 cases that the DAG reviewed, the Board decided to parole the offender directly to a Community Corrections Center or a contract facility for a specified time period (usually between 90 to 180 days). This was done so that the offenders could benefit from a structured reentry program in which they were under daily supervision and could develop a strong community plan, including residence and employment, with case management assistance provided by the Center and parole supervision staff.

Five of the 50 cases were ordered by the Board to be "Paroled to an approved plan;" however, either the offender could not provide a plan for the field staff to investigate, or the plan that they did submit had been rejected by the field staff. When this occurred, institutional parole staff referred the cases for placement in Community Corrections Centers. After these parolees obtained jobs and were able to establish residence in the community, agents investigated and approved their releases from the Community Corrections Centers. In such instances, no formal investigation report is required.

The DAG did not clarify that two of the sampled cases were serving *county* jail sentences, which placed their release decisions under the jurisdiction of the county judges who sentenced them. The PBPP had no opportunity to review and investigate the proposed release plans prior to these offenders being paroled by the judges.

Two additional offenders, while serving state sentences, did not achieve parole release during the time of the DAG's review, and were required to remain in prison until their maximum sentences were served. When they were released from incarceration, they were under Board supervision for *consecutive probation* sentences that were imposed by the county judges to commence after their prison sentences expired. The Board's supervision staff had no opportunity to investigate their release plans when they turned over to probation sentences. Another case identified in this sample could not develop a parole plan in the community

Pennsylvania Department of the Auditor General

and was released to a residential plan offered by the Salvation Army that deals with ex-offenders. The approval of this plan was clearly documented.

### Department of the Auditor General Comments

First, the Board is wrong to say that we reached conclusions not supported by the facts provided in the case files. The Board specifically cites two cases (Case Files #20 and #5) and references them in Items 2 and 3 of the appendix to its response. We stand by our conclusions and provide additional supporting narrative directly following the Board's appendix items (See Appendix A). In Case File #20, for example, the Board's idle threats allowed a violent offender to remain on parole for 18 months—even after he broke his girlfriend's jaw, threatened her with a gun, and attempted to set her afire. In Case File #5, the Board lost track of a parolee who, within two weeks of his release from a community corrections center and before he absconded, shot a man in the face.

Second, our report clearly states that 25 case files—all parolees and no probationers—had inadequate or unclear documentation related to the Board's investigative actions when offenders were ultimately released into the community (as opposed to a community corrections center). Yet the Board in its response sheds no light on these deficiencies in these 25 files. Instead, it focuses on extraneous information, to which we nonetheless respond as follows:

- We do not dispute the Board's assertion that it decided to parole offenders directly to community corrections centers in 10 of the 50 cases reviewed. The deficiencies we found were not related to the Board's release of offenders directly to a community corrections center; rather, deficiencies occurred in some cases when offenders were released *from* a community corrections center into the community.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

- We also do not dispute that 5 of the 50 cases were ordered by the Board to be paroled to "an approved plan," nor was this ever an issue with us. Again, the fact that these 5 offenders were paroled to "an approved plan" has no bearing on the deficiencies related to an ultimate release *into the community* with an inadequately documented investigation. Moreover, it is not an acceptable response that the Board does not *require* a formal investigation report before releasing a parolee into the community from a community corrections center. Such a report *should* be required (as we have recommended), and the practice of not requiring a report is itself a questionable action.

- As far as our not clarifying that two of the sampled cases were serving county jail sentences, again these cases were never an issue in our findings. Indeed, these cases had nothing to do with the deficiencies we found regarding inadequately documented investigations.

- Regarding the two additional offenders who were under Board supervision for probation, these two probationers also had nothing to do with the deficiencies we found regarding inadequately documented investigations (all of which related only to parolees, not probationers).

- Also not at issue was the offender released to a residential plan offered by the Salvation Army. In fact, we agree with the Board that approval of this plan was clearly documented. A deficient investigation became the issue when the offender was released *from* the Salvation Army plan into the community.

In summary, the Board's response does not address the deficiencies we found of inadequately documented investigations in 25 cases. Our conclusion stands: The Parole Board inadequately documented some investigations of parolee home and work plans, and it took questionable actions beyond the inadequate documentation.

**AN IMPORTANT NOTE:**  At the end of our audit, the Board hired a consultant to audit the same 50 files that were in our sample. The consultant's report, which appears in Appendix A as part of the Board's response, provides an evaluation conducted over four days: one day of preparation, two days on site, and one day for report preparation.  The report, however, does not address the preceding finding about inadequately documented investigations.  In fact, the report is general in nature and—except for one item—does not contradict the very specific exceptions or the particular case file details that we reference in *any* of our findings.  Regarding the single item that the consultant specifically contradicts (i.e., our finding that supervision levels were lowered incorrectly by the Board or its agents), we have a Board-written memorandum to us that clearly validates our finding.  We discuss that issue further on page 44 in our comments following Conclusion 3 of this chapter.

| | |
|---|---|
| **Conclusion 3:**<br><br>**The Parole Board was deficient in supervising paroled prisoners in our sample.** | We found the Board was deficient in performing some of the most basic elements related to supervising parolees and probationers. Primarily, the Board's agents did not make—or did not document—the required visits and contacts to keep track of 45 of the 50 offenders in our sample, or 90 percent. In addition, in a limited number of cases the agents did not classify offenders according to the correct supervision level. |

Supervision levels—minimum, medium, maximum, or enhanced—are generally set in one of two ways:

1. Least typical are the cases in which the Board imposes a supervision level at the same time it makes a parole decision. There were 4 parolee cases in our sample for which the Board imposed an enhanced level of supervision as a special condition of parole.

2. More typical, however, are the cases in which a parole agent sets the supervision level. The agent establishes this level when the agent and the offender first meet (for parolees, the meeting takes place during the first 24 hours after release). At that time, the offender undergoes an in-depth interview that includes a risk and needs assessment. As its name denotes, the risk and needs assessment determines (1) areas in which the offender is at risk, such as substance abuse or domestic violence, and (2) areas in which the offender has needs, such as drug and alcohol treatment or anger management. The parole agent also takes information about the offender's prior criminal history and other matters.

For parolees, the parole agent is required at this time to review all conditions imposed by the Board, as well as the consequences for violating them. It is here where the agent should note whether a parolee has already had a supervision level imposed by the Board. But in 3 of the 4 cases in our sample for which the Board did impose a special condition of enhanced supervision, the parole agents wrongly assigned the next *lower* level of supervision to the parolee instead.

Each supervision level—whether for parolees or probationers—carries with it specific standards dictating how the Board's agents should conduct their day-to-day supervision of every offender. The supervision not only protects the public by keeping track of the offender, but it also helps to reintegrate the offender into the community as a responsible and productive citizen.

The following table illustrates the minimum requirements for each level of supervision:

| Supervision requirements | | |
| --- | --- | --- |
| Level of supervision | Minimum number of face-to-face visits required* | Minimum number of collateral visits required* |
| Minimum | 2 each quarter | 1 each quarter** |
| Medium | 1 each month | 1 each month |
| Maximum | 2 each month | 2 each month |
| Enhanced | 4 each month | 2 each month |
| *Collateral visits are visits between the parole agent and someone other than the offender, e.g., an employer. **This collateral visit cannot occur in the same month as a face-to-face visit. | | |

It is important to emphasize that these requirements are *minimum* requirements for each level. Indeed, Board procedures specifically state that the requirements "must not be construed as necessarily sufficient to properly supervise the offender. The Parole Agent is expected to make whatever additional contacts are necessary beyond the minimum requirements...."[26]

It was troubling to find that the Board either did not meet or could not prove that it met the above requirements for 45 of the 50 parolees and probationers in our sample, including the 3 parolees whose "enhanced" supervision levels had been wrongly lowered by the Board's agents. Specifically, either the Board's agents (1) failed to conduct the required minimum number of visits, (2) could not

---

[26] *Pennsylvania Board of Probation and Parole Procedures*, "Supervision Practices – Levels of Supervision," Volume III, Chapter IV, Procedure 4.5, Effective June 1, 2001.

provide records of supervision, or (3) provided records that were illegible and, accordingly, un-reviewable.

The chart of our test results, below, shows that the Board made the required number of visits to only 5 offenders (10 percent of our sample). For the remaining 90 percent of the sample, the Board did not meet its supervisory requirements. Specifically, the Board did not document whether *any* supervisory visits were made for 6 offenders (12 percent of our sample) and missed more than one-third of the required supervisory visits for the remaining 39 offenders (78 percent of our sample).

| Poor Board performance: Which offenders received their required visits, and did the Board record its visits?* | | | | |
| --- | --- | --- | --- | --- |
| *Sample = 50 offenders (41 parolees and 9 probationers) placed under the Board's supervision beginning in the first quarter of 2000 Term of testing = January 1, 2000, through June 30, 2001* | | | | |
| **Offenders** | **Visits required** | **Visits made** | **Visits missed** | **Percent missed** |
| 39 did not receive their required visits | 1,675 | 1,090 | 585 | 35% |
| 5 received *all* their required visits | 99 | 99 | 0 | 0% |
| 6 may or may not have been visited: the Board had no record of *any* visits | 333 | unknown | unknown | unknown |

*Visits include both face-to-face and collateral visits*

More detailed narratives of three cases of poor supervision are presented on the following pages.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Page 33

Chapter One

Pennsylvania Department of the Auditor General

---

### Case File #4

#### Violent offender was wrongly assigned
#### and poorly supervised

After shooting and killing a 22-year-old man in 1990, this offender was imprisoned for voluntary manslaughter. In January 2000, he was paroled with numerous conditions, including a condition of "enhanced supervision." Yet, upon this offender's release, the Board's agent assigned him incorrectly to the lower level of maximum.

Worse, Board records indicate that the agent did not have enough contacts with this parolee to meet even the requirements for *medium* supervision.

Six months later when this violent offender was again assessed as required, his agent correctly noted that the Board had stipulated enhanced supervision. Even so, case file information indicates that *this parolee was seen by his agent only two times over the next nine months.*

Translating this data into missed visits, we found that the Board missed 48 of 56 required face-to-face visits and nearly *all* (27 of 28) of its required collateral visits. Accordingly, the parolee continued to live in the community virtually unsupervised.

The Board had almost 350 agents to monitor nearly 24,000 offenders; plus, there were 80 supervisors and managers in the Board's 10 district offices to manage the agents' work. Some Board staff whom we interviewed said that the hiring of agents had not kept pace with their duties. And no matter what the duties—conducting parole plan investigations, visiting offenders, reviewing offenders' supervision fees and other payments, pursuing absconders, attending trials and revocation hearings, ensuring that parolees received drug and alcohol treatment—there were paperwork requirements for every case. It is therefore reasonable to ask if caseload numbers were a factor in the Board's poor performance and, if not, whether the Board might perform better by working more efficiently. One such way might be to create specialized units to which certain duties—for example, investigations or absconder searches—could be delegated.

Although the analysis of caseload was not an objective of this audit, we can relay that, as of December 31, 2000, the Board reported that its average agent was responsible for 66 offenders.[27] However, the Board claimed that, because some offenders require more attention and supervisory time than others, an agent's actual workload might be much greater than the caseload of 66 implies.[28]

For comparative purposes, the audit team reviewed caseload data compiled by SEARCH, the National Consortium for Justice Information and Statistics.[29] Of the seven states with state probation and parole agencies similar in size (number of agents and offenders) to Pennsylvania, only Florida (46 per agent) and

---

[27] This caseload number is a simple division of the total caseload at that time (23,071) by the number of agents (347). Accordingly, 23,071 divided by 347 is 66.49.
[28] During the same time period, Pennsylvania's county-run probation offices had an average caseload of 165 offenders per agent.
[29]SEARCH, the National Consortium for Justice Information and Statistics, operates the automated index database through funding received from the Bureau of Justice Statistics, U.S. Department of Justice. The database (available online at www.search.org/Aindex/default.asp) is created from a national survey of justice agencies. The criminal justice agency profiles contained in the database describe each agency in terms of type, size, and jurisdiction.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

# Chapter Four

## Providing training and assistance to parole agents

During our audit period, the Parole Board had nearly 350 agents to supervise 23,800 offenders—19,500 on parole and 4,300 on probation. Effective supervision of parolees and probationers is necessary to ensure public safety; accordingly, parole agents have a critical job.

The Board is responsible for training its parole agents and for making sure they maintain their skills, including skills in the use of firearms. Unfortunately, as we will show in this chapter, the Board came up short in overseeing the training of its agents.

Before we proceed to the results of our testing, it is necessary to explain the parole agent's work. We can describe the nature of this work in the words of the State Civil Service Commission as it announced testing and sought applications for entry-level agents in February 2002:

> This is entry-level professional work managing a caseload of probationers and parolees in the state probation and parole system, and/or pre-parole counseling of inmates of correctional institutions. Employees attend and complete various training programs. They maintain contacts with offenders' families, friends, social service agencies, employers and clergy to assist in the transition to community life. The work includes developing parole plans. The work is physically demanding and there is an element of danger in working with offenders.

> Some positions are at field sites. Employees in these positions investigate offenders to determine if they are complying with conditions of their release, and arrest violators. Employees are required to make decisions directly affecting public safety and the personal liberties of offenders. Parole Agents have arrest powers and the option of carrying firearms.

Other positions are in correctional facilities throughout the state. Employees in these positions develop pre-parole plans and assist inmates in preparing for the transition to community life.[52]

The Civil Service Commission also noted that, in addition to passing a 2½-hour test covering individual and group behavior (including aberrant and criminal behavior), applicants were expected to meet the following requirements:

- Must be willing to travel (travel expenses paid)

- Must have a Pennsylvania driver's license

- Must be a state resident of good moral character and able to perform the essential functions of the job

- Must (for some positions) be willing to work nights and weekends when necessary, and to occasionally be on 24-hour call

- Must pass a background investigation, a medical examination, a psychological evaluation, and urinalysis screening

- Must have a bachelor's degree in Criminal Justice; or a bachelor's degree that includes six credits in certain social sciences; or an equivalent combination of experience and training

Finally, the Civil Service Commission listed the annual salary for a Parole Agent 1 as $33,716. A salary increase and promotion (to Parole Agent 2) were promised upon the agent's successful completion of a training period, the length of which was not defined.

---

[52] "Examination for Parole Agent 1," State Civil Service Commission, Commonwealth of Pennsylvania, Test Announcement Number 1997-772, amended and reissued February 22, 2002.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

The oversight and monitoring of employee training should be a high priority for the Board. To that end, the American Correctional Association says this about training: "Training and its delivery and implementation is one of the major forces that affect employee performance. Its consistency, relevance, and impact should be of major concern to an agency."[53]

### Objectives and Methodology

The overall objective for this chapter was to determine whether the Board ensured that its parole agents had access to and completed the required training.

To complete this objective, we did the following:

- Reviewed the applicable training requirements and plans, including the Board's policies and procedures and the accreditation standards of the American Correctional Association

- Interviewed Board officials and staff

- Examined and analyzed the training records for a sample of 50 Board-employed agents and supervisors for the period of July 1, 1999, to June 30, 2001

---

[53] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, August 1998, p. 22.

| **Conclusion 1:** | Our testing of 50 agents and other field staff—both new and existing—disclosed that 11 did not receive the entire 40 hours of required annual training during at least one of the two years we reviewed. Two of the 11 were deficient in *each* of the two years, and one of the two agents received only 9.5 hours in the two years combined, meaning the agent in the latter case completed less than 12 percent of his training requirement over the two-year period. The Board noted that this particular case represented an exception based on serious personal circumstances. |
|---|---|
| **The Parole Board did not ensure that all agents in our sample received the 40 hours of training required annually, nor did the Board ensure that all training was "acceptable."** | In addition, the Board permitted 20 additional agents to count undocumented meetings toward the required training hours. The deficiencies in these instances mean that parolees and probationers were supervised by agents with incomplete—and at times unacceptable—training. |

The Board's practice violated not only its own policies and procedures but also the accreditation standards of the American Correctional Association. Specifically, the Board's policy requires its professional and technical employees to complete a minimum of 40 hours of acceptable annual training.[54] The American Correctional Association also requires that probation and parole officers receive 40 hours of training each year; in addition, the ACA requires another 40 hours of first-year orientation.[55]

The Board was capable of ensuring that the 40-hour requirement was met, as evidenced by the facts that training opportunities were ample and that other agents in our sample received *more* than the minimum amount of required training. For example, most of the new employees in our sample received more than 300 hours of training during the first year alone. In addition, five existing agents in our sample completed more than 100 hours of

[54] *Pennsylvania Board of Probation and Parole Procedures,* "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2, Effective January 16, 2001.
[55] *Standards for Adult Probation and Parole Field Services,* 3rd ed., American Correctional Association, Standard 3-3085, August 1998, p. 26.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

training during a single year. Why, then, were there 11 agents who did not meet the requirements?

While it may be possible that the agents themselves did not take responsibility to ensure they met the annual training requirements, the final responsibility rests with the Board. Indeed, we traced the training deficiencies and inconsistencies to the Board's failure to adequately record and monitor the training activities of its parole agents. The Board's procedures require the training division to maintain an up-to-date training record for each employee; the procedures also say that regional directors, office directors, and bureau directors will receive a report identifying employees who do not meet the minimum number of annual training hours.[56] Unfortunately, even though the Board was technologically able to maintain the records and did actually forward the reports to the applicable directors who could have taken action to correct the training deficiencies, there was little, if any, such action taken.

Aside from not ensuring that agents met the annual 40-hour requirement, the Board also allowed 20 of the 50 agents in our sample to count meetings (as opposed to courses or other formal training activities) toward the required training hours—meetings that should have been deemed unacceptable for a variety of reasons. Specifically, our testing showed the following:

- In some instances, the Board allowed meetings about deferred compensation or retirement to count toward the required training, in spite of the Board's written policy that unacceptable training activities are those that disseminate routine information or review/update existing policy.[57]

---

[56] *Pennsylvania Board of Probation and Parole Procedures*, "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2(E)(4), Effective January 16, 2001.
[57] *Pennsylvania Board of Probation and Parole Procedures*, "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2(C)(1), Effective January 16, 2001. This procedure also deems unacceptable training activities to include planning or problem-solving meetings or activities concerning case staffing.

- In other instances, the Board allowed entire meetings to count toward the required hours even when only a portion of the meetings included training-related subjects. The Board told us it has since altered this practice by allowing only relevant portions of meetings to count toward the required hours, but we note that this altered practice is also unacceptable unless the training is "formal training" for which "supporting documentation clearly shows those portions of the meeting to be training."[58] Without the documentation, and without "measurable, performance-based learning objectives" as required by the American Correctional Association's accreditation standards,[59] the Board should not permit these hours to count toward the required training.

Our finding that the Board allowed unacceptable meetings to count as training is most significant when applied to 4 of the 20 agents. These 4 agents would not have met their 40-hour training requirement if the Board had not counted the unacceptable meetings.[60] Moreover, these 4 agents are *different from* and *in addition to* the 11 agents discussed at the beginning of this conclusion who did not meet the 40-hour training requirement. Therefore, if we add the 4 agents to the 11, that means there were 15 agents altogether in our sample that did not complete the required 40 hours of training.

Board officials disagreed with our numbers, maintaining that two of the 11 agents we initially identified had actually received all the required training but had simply not had their total hours

---

[58] *Pennsylvania Board of Probation and Parole Procedures*, "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2(B)(2)(d), Effective January 16, 2001. The procedure goes on to note that training provided by an agency employee would have to include a training outline or lesson plan.

[59] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3073, August 1998, p. 22.

[60] The other 16 agents had completed enough acceptable hours of training to meet their requirements without counting these unacceptable meetings. Still, that point does not change the fact that the Board was deficient in allowing the meetings to count toward training hours.

recorded. However, we were unable to verify the Board's
assertions, even after speaking with the applicable agents or their
supervisors.

While Board officials may dispute the results of our testing, they
have only to look to their own records to find that their staff did
not meet the ACA requirements. We base this assertion on
information provided by the Board following the testing
described in the preceding narrative. Using Board-provided lists
of all staff members required to obtain 40 hours of annual
training, we found that, during the fiscal year ended June 30,
2001, approximately 34 percent of the Board's staff failed to
obtain the necessary training. Moreover, using the Board-
provided list for the previous fiscal year, we found that
approximately 24 percent of the staff failed to obtain the 40
hours of training. Altogether for the two fiscal years, more than
350 members of the Board's staff did not receive all their
required training.

Overall, we could find no explanation to minimize the
significance of all components of this finding—the lack of
required hours or the counting of unacceptable hours.

## Recommendations

- The Board should ensure that its agents receive the required
  40 hours of annual training.

- The Board should ensure that general meetings are not used
  as a substitute for acceptable training activities, and that other
  meetings substituted for training activities are legitimately
  training-related and have the requisite lesson plans and
  objectives.

- The Board should ensure that agents know their training
  requirements and how to meet them.

- The Board should ensure that supervisors monitor training records and take action to resolve training deficiencies or inconsistencies.

- The Board should utilize technology to track training and to generate reports that identify training deficiencies.

## Board of Probation and Parole Response

The Board disagrees with the DAG's statement that "the Board did not ensure that its parole agents and other field employees were adequately trained." Although we reached the same finding as the DAG in that 11 agents did not receive 40.00 hours of required annual training (NOTE: 3 of these 11 agents had, however, received between 39.00 and 39.50 hours of training), the PBPP does not support the conclusion that PBPP employees are not "adequately trained."

Parole agents are fully trained professionals. The Board's training requirement of 40 hours per year is designed to keep them informed of current probation, parole and related issues and to update them on professional issues. *In fact, the DAG report recognized that new employees received in excess of 300 hours of training their first year on the job.* During the 18-month period prior to 7/1/02, the Board's parole agents (excluding first year agents) received an average of 55.3 hours of training annually.

In fiscal year 1999-2000, the Agency provided *43,725 hours of training* with a diversified curriculum to state and county employees. The Board also sent 409 PBPP staff to attend out-service training sessions of one or more days each. In fiscal year 2000-2001, the Agency provided *45,375 hours of training* with a diversified curriculum to state and county employees. The Board also sent 491 PBPP staff to attend out-service training sessions of one day or more each. The DAG report also states: "In some

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

instances, the Board allowed meetings about deferred
compensation or retirement to count toward the required
training." The Board believes that this is valid training time.
SEAP, Workers' Compensation, retirement, and other benefits-
related topics provide relevant information more efficiently in a
group setting.

In addition, to ensure better monitoring, the Board instituted a
new electronic training records system, which went on-line in
October 2002. This application allows all staff to review their
training records on-line. It also gives management and
supervisory staff the ability to review the records of
subordinates. Employees no longer need to wait for a hardcopy
report of their training hours. The new application also gives the
training staff the ability to view the training history of all
employees when assigning class participants. This aids in a more
equitable distribution of training opportunities.

### Department of the Auditor General Comments

It is clear from our numerous interviews and meetings with
Board officials that the Board does indeed take great pride in the
training of its employees and, moreover, in the carrying out of *all*
its responsibilities. Such pride is laudable. Nevertheless, the
deficiency here is not a lack of pride; rather, the deficiency is the
Board's failure to follow its own requirements.

The Board notes that 3 of the 11 agents we tested received nearly
all of their required hours of training. That statement is true—
but the Board also counted non-acceptable hours in 2 of those 3
cases. Even if we factored out those 3 agents, however, there
were still 8 of 50 agents, or 16 percent, who were more than just
one or two hours short. The violation of its own training
requirements—plus the Board's attempt to minimize the
violation by suggesting that it's okay for some agents to fall short

as long as it's only by a few hours—is not acceptable and, once again, sends the wrong message.

Of particular significance is that, notwithstanding *our* testing, the Board's own training records document that *more than 350 agents failed to obtain their required training hours during the fiscal years ended June 30, 2000, and June 30, 2001.* Worse, given the Board's practice of counting training hours that do not constitute acceptable training, that number would undoubtedly be even higher. In its response to this audit, however, the Board does not really address its deficient compliance with requirements but instead presents statistics about other hours of training—not the subject of this conclusion—provided to state and county employees.

Regarding the Board's contention that information about deferred compensation or retirement or other benefits-related topics are presented more efficiently in a group setting, we agree. However, we disagree that those benefits-related group meetings should be allowed to count toward the 40 hours of required annual training as they were. The Board's own written policy deems training activities "unacceptable" when they disseminate routine information or review/update existing policy. Once again, we used the Board's own measurement tool to draw our training conclusion and, once again, the Board now attempts to change the tool when the measured results come up short.

Finally, the Board's use of very specific and precise numbers in its response portrays an image that the Board maintained detailed and accurate training records. We note, however, that the Board was much less precise when we identified training deficiencies during our field work. In two particular cases involving the training of parole agents, for example, we asked for evidence and the Board responded in writing as follows:

> The agent's former supervisor related that in his recollection the agent had all of her hours completed, but some did not get recorded on her

training record.  He stated that some training hours
he submitted on the Training Input and
Documentation form were included in the agent's
training record and some were not.  He is not able to
remember, at this time, what those particular
training were.

Another example:

The agent recalls completing all of his training
hours for the time in question, but claims that he did
not receive credit for all the training he attended.
Again, at this point and time, he cannot recall
specifically which trainings those were. His current
supervisor has checked supervisory files for the
time in question and can find no reference to this
situation.

The imprecision and guesswork illustrated in the two examples
will likely be addressed with the Board's new electronic training
records system that, according to the Board's response, went on-
line in October 2002 (following completion of our field work).
Such a system should significantly improve the Board's ability to
keep track of its employees' training.

# Chapter Five

## Supervising district field operations and county offices

The American Correctional Association's accreditation standards require that the Board of Probation have—in policy, procedure, and practice—a "system to monitor operations and programs through [annual] inspections and reviews" that will "reveal the degree of compliance with policies and procedures."[63]

In keeping with the ACA standard, the Board's Division of Special Projects completes annual audits of the Board's 10 district and 12 sub-offices.[64]

In addition, the Board's Bureau of Probation Services provides funds to county probation and parole departments through a state-funded "grant-in-aid" program. As part of the funding process, the Bureau of Probation Services establishes standards that the county departments must follow in order to receive the grant monies. Accordingly, the Board completes an ACA standards audit of each of the state's 65 county probation and parole departments (Mercer and Venango counties have no such county departments) at least once every three years. During intervening years, the Bureau completes more limited technical reviews of a select group of standards.

### Objectives and Methodology

The objective for this portion of the audit was to determine if the Board established adequate procedures to monitor the performance of its field offices that oversee the day-to-day supervision of offenders. To accomplish this objective, the auditors completed the following tasks:

- Reviewed the ACA Standards regarding probation and parole supervision requirements

---

[63] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3023, August 1998, p. 7.
[64] The Board's organizational chart divides field operations into 10 separate district offices throughout the state. Each of these offices is further divided into smaller sub-offices, of which there are 12 in total.

A Performance Audit of the                                          Page 107
Pennsylvania Board of Probation and Parole

                                                                   Chapter Five

Pennsylvania Department of the Auditor General

- Examined applicable Board policy and procedures regarding annual audits of district field offices

- Interviewed applicable Board staff

- Accompanied the Board's Division of Special Projects auditors on their annual audit reviews of two district offices

- Accompanied the Board's Bureau of Probation Services auditors on one annual audit and two technical reviews of county probation and parole offices

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

| Conclusion 1: | The Parole Board conducted annual compliance audits of its 10 district offices and 12 sub-offices, but these audits were ineffective. While the audits did identify instances of noncompliance with American Correctional Association standards and other problems relating to offender supervision, the Board did not ensure that corrective action plans were implemented to remedy identified deficiencies. As a result, field staff was permitted to continue its poor work habits that contributed, in turn, to inadequate offender supervision and increased risk to public safety. |
|---|---|
| **The Parole Board did not effectively monitor the performance of its field operations.** | |

As noted in the introduction to this chapter, American Correctional Association accreditation standards require that annual inspections and reviews are conducted to reveal compliance with policies and procedures. The Board, in compliance with the ACA standards, has issued several procedure statements that are part of its written policy manual. It is in these written policies and procedures that the Board's Division of Special Projects is assigned the annual audit responsibility.

These 10 district offices and their 12 sub-offices carry out the day-to-day operations of the Board by supervising offenders, conducting urinalysis testing, and collecting supervision fees. During the Board's annual audits, staff from the special project division review approximately 10 percent of the offender case files in the audited offices, using ACA standards and Board policies and procedures as benchmarks.

The purpose of the file reviews is to determine if field staff is (1) properly supervising offenders and (2) documenting the results of their supervision efforts. To accomplish this task, the Board's auditors complete a checklist of basic elements that should be present in each offender's file. The elements on the checklist cover a variety of topics. For example, one element on the checklist addresses whether the number of contacts is appropriate for the level of supervision. Another element on the checklist

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Page 109

Chapter Five

Pennsylvania Department of the Auditor General

addresses if initial supervision reports for offenders were completed in a timely manner.

Based on our review of the Board's district office audit reports for the fiscal year ended June 30, 2002, we found the process to be ineffective. Although the audits uncovered deficiencies, the Board did not take steps to ensure that identified problems were corrected.

Examples of district audit findings that were contained in more than one audit report include the following, many of which mirror our own findings of the Board:

- Case files did not contain completed supervision plans. In one case, the offender was listed as being an absconder since 1978.

- Cases (offenders) were not properly supervised because they did not have the appropriate number of contacts for the grade of supervision or the auditor could not determine compliance.

- Cases did not have documentation supporting why offenders were not paying supervision fees.

- Supervisors kept records manually and did not use the "Supervisor Controls" program.

- Case files contained loose papers (including travel permissions, progress and conduct reports, public letters, changes of address, and criminal complaints).

- Case files did not contain client supervision plans and criminal history logs; in one case, the offender was classified at enhanced supervision but contacts were made only once a month.

- Case files had pre-release material fastened to post-release material.

Page 110

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

- At least three audits indicated that, generally, the files would not meet either American Correctional Association or Board standards because of the untimeliness of initial supervision reviews, incomplete client supervision plans, and unacceptable assessments and progress and conduct reports.

When we discussed this entire issue with the applicable Board management official, he relayed to us that the Board's audits are conducted specifically for the 10 district directors to use as management tools solely at their discretion. Stated another way, it is not the practice of the Board to follow up to see if directors actually resolve problems that are identified by the audits.

The establishment of monitoring procedures as a management tool to evaluate offender supervision efforts is of little use if reports are not taken seriously. Based on both our observation and on Board comments, the Board appeared to be interested primarily in complying with the ACA standard only in the sense of *conducting* the audits—not in resolving the problems that the audits identified.

### Recommendations

- The Board should institute a corrective action plan as necessary for district audits to ensure that identified deficiencies are addressed.

- The Board should ensure that district office directors are held responsible for implementing action plan recommendations.

- The Board should consider having its special projects division expand its annual audit process to include a review of these corrective action plans to ensure that identified deficiencies have been corrected.

A Performance Audit of the                                            Page 111
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

## Board of Probation and Parole Response

The Board conducts annual inspection audits of the field supervision units in ten districts. These audits are conducted by the Board's Special Projects Division. The objective of the audits is to determine whether supervision staff is complying with the Board's policies and procedures and with the supervision standards established by the American Correctional Association (ACA).

The Board's auditors examine approximately 10% of the supervision units' case records to determine whether appropriate Agency and ACA procedures are being followed. When the PBPP auditor completes his/her inspection of the unit files for compliance with Agency procedures and ACA Standards, the PBPP auditor then meets with the unit supervisor and District Director and reviews the findings. Upon return to Central Office, the auditor files a comprehensive report of his findings with the Special Projects Director. This report is forwarded through the chain of command to the Director, Office of Probation and Parole Services, who reviews the issues with the Regional Directors. The Board will intensify its efforts to institute corrective action plans, where necessary, and to ensure that district directors implement action plan recommendations.

## Department of the Auditor General Comments

In its response, the Board summarizes its internal process but does not sufficiently address whether the identified deficiencies were corrected or what the Board will do if the deficiencies were not corrected. Furthermore, although the Board says that it will intensify its efforts to institute corrective action plans, it is not clear whether such plans will be instituted for past deficiencies or only for future ones, nor is it clear how such efforts will be implemented.

Page 112

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

It is important to note that the Board's own district audit
findings—examples are bulleted on page 109—contradict
both the Board's assertions (in responding to this audit)
and its consultant's report (in Appendix A) suggesting
that nearly all is well.

| | |
|---|---|
| **Conclusion 2:**<br><br>**The Parole Board did not effectively audit the 65 county probation and parole offices.** | The Parole Board did not effectively audit the 65 county probation and parole offices and, accordingly, did not fulfill the Board's oversight responsibility of these offices.  In fact, the Board's lack of oversight allowed the counties to receive almost $20 million in state funding for the fiscal year ended June 30, 2002, through grant-in-aid appropriations—even though some counties may not have been eligible for the grants. |

The Pennsylvania Probation and Parole Act states the following:

> Any county which provides additional probation
> staff for pre-sentence investigations and for
> improved probation supervision and program, shall
> receive a grant-in-aid from the Commonwealth
> through the board for the additional cost incurred
> thereby but only to the extent that the additional
> staff and program meet the qualifications and
> standards established by the board.[65]

In accordance with this 1965 Act, the Board is required to oversee and monitor the distribution of the grant-in-aid appropriations.  Since the inception of that grant program, the Board has allocated more than $303 million in state aid to county probation and parole offices.

As a benchmark for receiving the grant-in-aid appropriations, the Board requires that—as determined by audits every three years and more limited reviews in intervening years—each county must maintain a compliance level of 90 percent or greater with all applicable American Correctional Association standards.

In order to determine whether the Board carried out its audit responsibilities appropriately, we observed one audit and two technical reviews by the Board during the fiscal year ended June 30, 2002.  Although the Board's auditors should have used Board-developed audit checklists for both the full audit

---

[65] 61 P.S. section 331.17a(c).

Page 114

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

and the technical review visits, we found that Board auditors did so only for the technical review visits. We further noted that the Board's auditors did not include a review of case files and other information needed to support audit conclusions. Instead, it appeared that the visits were merely a question-and-answer session regarding applicability of ACA standards.

As a follow-up to our observations, we asked the Board to provide its supporting documentation for 7 selected ACA standards.[66] It was our intent to substantiate the 100 percent compliance rating the Board had granted to five county probation and parole offices.

Rather than provide us with the evidence we requested, the Board responded in writing that it did not collect such supporting documentation when conducting the county audits. The Board wrote that, instead, "we review documentation provided by the counties and make a determination at that time as to compliance, non-compliance, or non-applicability."

Based on our observations to the contrary, we found the Board's response to be unacceptable. Specifically, during the audit and the 2 technical assistance sessions we observed, the Board auditors did not review any supporting documentation regarding the 7 standards we selected. Rather, the Board's auditors held meetings with county officials and reviewed written policy and procedures to determine whether procedures *existed*—but not whether they were actually *used*.

In view of what appeared to be only cursory audits and reviews, it was troubling to find that the Board reported extremely high levels of compliance. Specifically, of the 9 full audits and the 48 technical assistance reviews that we examined, the Board listed

---

[66] The 7 ACA standards addressed training, pre-parole, supervision, workload, absconders, recidivism, and cash management.

28 as 100 percent compliant and the other 29 to be 95 percent compliant or better.[67]

Merely reviewing whether a policy or procedure *exists* is not sufficient evidence to ensure the counties are actually *exercising* the prescribed standards, and the Board clearly should be determining the latter.  In fact, to determine whether counties are at least 90 percent compliant with ACA standards, the Board should be doing—at a minimum—the following:

- Reviewing offenders' case files to determine if parole agents are adequately supervising offenders

- Reviewing training documentation to verify whether parole agents are adequately qualified to perform their duties

To illustrate our concern even further, we note here that, in the most recent edition of the American Correctional Association standards, the words "and practice" were added to the ACA's requirements for various policies and procedures.  It seems apparent that "in practice" was added to ACA standards for the purpose of forcing probation and parole agencies across the country to have more than just the existence of policies and procedures and, instead, to put those policies and procedures into actual practice.

Grant-in-aid funding was established by the state legislature as a method to improve county probation and parole services.  The Board is obligated to measure individual county probation and parole office performance—and not superficially.  Instead, the Board should realistically evaluate the strengths and weaknesses of the Commonwealth's county probation and parole offices and verify that these agencies are entitled to the grant-in-aid funding they receive.

---

[67] We learned from Board management that such high compliance ratings are typical; the last time a county received less than a 90 percent compliance rating was in the mid-1980s.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

### Recommendation

- We recommend the Board conduct more in-depth and
  comprehensive analyses of each county probation and parole
  office before awarding the grant-in-aid funding.  To
  accomplish this recommendation, the Board needs to review
  case files and other secondary documentation to determine
  compliance with American Correctional Association
  standards.

### Board of Probation and Parole Response

The DAG recommended that the Board "conduct more in-depth
and comprehensive analyses of each county probation and parole
office before awarding the grant-in-aid funding.  To accomplish
this recommendation, the Board needs to review case files and
other secondary documentation to determine compliance with
[ACA] standards."

Members of the DAG's audit team accompanied the Board
auditors on two "technical reviews" (Cambria County and
Clearfield County on October 31, 2001) and one partial county
audit (Philadelphia County on October 15-18, 2001).  In the case
of the "technical reviews," audit checklists were used during the
audits as well as review of case files.  In the case of the
Philadelphia audit, there was insufficient time to do a standards
audit during the October 2001 field visit.  The Board's auditor
secured a copy of the Philadelphia County Adult Probation
Department's manual and conducted an audit of primary
documentation (policy and procedure) and used a checklist to
record findings.  The DAG auditor did not accompany the
Board's auditor on the return visit to Philadelphia County on
January 31, 2002, in order to discuss these findings and to review
supporting documentation.

The DAG criticized the Board auditors for not providing evidence of supporting documentation when conducting county audits. There is simply not enough storage space to keep secondary documentation on 227 standards from 65 counties. The Board auditors use the same auditing procedures as the ACA uses to determine if an agency should be accredited. Those techniques include reviewing primary and secondary documentation on site and making a determination at that time of compliance, non-compliance or non-applicability.

The DAG recommended that "…the Board needs to review case files and other secondary documentation to determine compliance with American Correctional Association standards." In the Board's *Manual of Operations and Procedures*, Volume III, Chapter VI, Procedure 6.16 addresses the subject entitled "County Adult Probation and Parole Program Audit." This Procedure became effective on March 11, 2002. (See Appendix, Item 17)

## Department of the Auditor General Comments

The Board has failed to rebut our basic finding, instead deflecting attention by focusing on a few details and making criticisms that are themselves without foundation. For example, although it is correct that our auditors did not accompany the Board's auditor on a return visit to Philadelphia County on January 31, 2002, *we were absent only because the Board failed to tell us when it was making the return visit—despite our request to be notified.* Moreover, when we subsequently asked for a copy of the Board's completed checklist and work papers documenting the return visit, the Board told us it did not retain its documentation.

The Board must take measures to address its issue of document retention. With current technology, it is simply

Page 118

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

not reasonable for the Board to suggest that only a lack of
storage space prevents it from saving documents that
could support its claims about county performance.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSALIND RUSS TOBIAS :

       v. :

PENNSYLVANIA BOARD OF :
PROBATION AND PAROLE, :
EDWARD JONES, FRANK :
MARGERUM, AND MICHAEL :
MOYER :

CIVIL ACTION

NO. 04-0270

## JURY VERDICT FORM FOR DEFENDANT PENNSYLVANIA BOARD OF PROBATION AND PAROLE

### A. Disparate Treatment

1.    Do you find that the plaintiff has proved by a preponderance of the evidence that defendant Pennsylvania Board of Probation and Parole subjected plaintiff to an adverse tangible employment action?

      YES _____✓_____    NO _____

*If you answered "YES" to Question 1, continue to Question 2. If you answered "NO" to Question 1, continue to Question 3 and do not answer Question 2.*

2.    Do you find that the plaintiff has proved by a preponderance of the evidence that race was the determinative factor motivating defendant's employment action?

      YES _____✓_____    NO _____

*Continue to Question 3.*

### B. Retaliation

3.    Do you find that the plaintiff has proved by a preponderance of the evidence that she opposed a racially discriminatory practice?

      YES _____✓_____    NO _____

EXHIBIT

3

*If you answered "YES" to Question 3, continue to Question 4. If you answered "NO" to Question 3, do not answer Questions 4 and 5. Continue to answer Questions 6-8 but only if you answered "YES" to Questions 1 and 2.*

4.  Do you find that the plaintiff has proved by a preponderance of the evidence that defendant Pennsylvania Board of Probation and Parole subjected plaintiff to an adverse employment action at the time, or after, she opposed a racially discriminatory practice?

    YES  _____✓_____    NO  _____

*If you answered "YES" to Question 4, continue to Question 5. If you answered "NO" to Question 4, continue to answer Questions 6-8 but only if you answered "YES" to Questions 1 and 2.*

5.  Do you find that the plaintiff has proved by a preponderance of the evidence that there is a causal connection between the tangible employment action and plaintiff's opposition to a racially discriminatory practice?

    YES  _____✓_____    NO  _____

*If you answered "YES" to Question 5, continue to answer the remaining questions. If you answered "NO" to Question 5, continue to answer the remaining questions only if you answered "YES" to Questions 1 and 2.*

### C. Damages

*Please answer the following questions only if you found in favor of plaintiff on her disparate treatment claim, retaliation claim, or both. In other words, you should only answer these questions if you answered "YES" to Questions 1 and 2 and/or Questions 3 and 4 and 5.*

6.  Do you find that the plaintiff has proved by a preponderance of the evidence that plaintiff should be awarded damages to compensate for emotional pain and mental anguish?

    YES  _____✓_____    NO  _____

*If your answer is "YES," insert the amount of compensatory damages that will reasonably compensate plaintiff for her emotional pain and mental anguish in the space provided below.*

    $  __300,000__

7.  Do you find that the plaintiff has proved by a preponderance of the evidence that plaintiff

-2-

should be awarded damages to compensate for a net loss of wages and benefits to the date of trial?

YES _____✓_____    NO _____

*If your answer is "YES," insert the amount of compensatory damages that will reasonably compensate plaintiff for a net loss of wages and benefits in the space provided below.*

$ _____77,000_____

*If your answers to Questions 6 and 7 are "NO," insert a $1.00 award of nominal damages below.*

$ _____

8.    Do you find that the plaintiff has proved by a preponderance of the evidence that plaintiff is entitled to recovery of future earnings from defendant?

YES _____✓_____    NO _____

*If your answer is "YES," insert the amount of future earnings that plaintiff is entitled to in the space provided below.*

$ _____100,000_____

Foreperson: _____

Dated: _____

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ROSALIND RUSS TOBIAS | : | CIVIL ACTION |
|  | : |  |
| v. | : |  |
|  | : |  |
| PENNSYLVANIA BOARD OF | : | NO. 04-0270 |
| PROBATION AND PAROLE, | : |  |
| EDWARD JONES, FRANK | : |  |
| MARGERUM, AND MICHAEL | : |  |
| MOYER | : |  |

JURY VERDICT FORM FOR DEFENDANT EDWARD JONES

### A. Disparate Treatment

1. Do you find that the plaintiff has proved by a preponderance of the evidence that defendant Edward Jones subjected plaintiff to an adverse tangible employment action?

    YES _____✓_____     NO _____

*If you answered "YES" to Question 1, continue to Question 2. If you answered "NO" to Question 1, continue to Question 3 and do not answer Question 2.*

2. Do you find that the plaintiff has proved by a preponderance of the evidence that race was the determinative factor motivating defendant's employment action?

    YES _____✓_____     NO _____

*Continue to Question 3.*

### B. Retaliation

3. Do you find that the plaintiff has proved by a preponderance of the evidence that she opposed a racially discriminatory practice?

    YES _____✓_____     NO _____

*If you answered "YES" to Question 3, continue to Question 4. If you answered "NO" to Question 3, do not answer Questions 4 and 5. Continue to answer Questions 6-9 but only if you answered "YES" to Questions 1 and 2.*

-1-

4.    Do you find that the plaintiff has proved by a preponderance of the evidence that defendant Edward Jones subjected plaintiff to an adverse employment action at the time, or after, she opposed a racially discriminatory practice?

YES    _____✓_____    NO    _____

*If you answered "YES" to Question 4, continue to Question 5. If you answered "NO" to Question 4, continue to answer Questions 6-9 but only if you answered "YES" to Questions 1 and 2.*

5.    Do you find that the plaintiff has proved by a preponderance of the evidence that there is a causal connection between the tangible employment action and plaintiff's opposition to a racially discriminatory practice?

YES    _____✓_____    NO    _____

*If you answered "YES" to Question 5, continue to answer the remaining questions. If you answered "NO" to Question 5, continue to answer the remaining questions only if you answered "YES" to Questions 1 and 2.*

## C. Damages

*Please answer the following questions only if you found in favor of plaintiff on her disparate treatment claim, retaliation claim, or both. In other words, you should only answer these questions if you answered "YES" to Questions 1 and 2 and/or Questions 3 and 4 and 5.*

6.    Do you find that the plaintiff has proved by a preponderance of the evidence that plaintiff should be awarded damages to compensate for emotional pain and mental anguish?

YES    _____✓_____    NO    _____

*If your answer is "YES," insert the amount of compensatory damages that will reasonably compensate plaintiff for her emotional pain and mental anguish in the space provided below.*

$    36,000

7.    Do you find that the plaintiff has proved by a preponderance of the evidence that plaintiff should be awarded damages to compensate for a net loss of wages and benefits to the date of trial?

YES    _____✓_____    NO    _____