IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
_____
                                    :
HENRY WATKINS,                      :
                                    :   NO.  02-CV-2881
          Plaintiff,                :
                                    :
     v.                             :
                                    :
PENNSYLVANIA BOARD OF               :
PROBATION & PAROLE,                 :
EDWARD JONES, and MICHAEL BUKATA,   :
                                    :
          Defendants.               :
_____ :
```

**DEFENDANTS' REPLY BRIEF TO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION**

Defendants, the Pennsylvania Board of Probation and Parole (the "Board"), Willie E. Jones (improperly pled as Edward Jones) ("Mr. Jones") and Michael Bukata ("Mr. Bukata") (collectively the "Defendants"), by their counsel, Miller, Alfano & Raspanti, P.C., respectfully submit this Memorandum of Law in further support of their Summary Judgment Motion.

**I.    PRELIMINARY STATEMENT**

Mr. Watkins points out the obvious - there are disparities in the workplace.  Not every employee has the same working conditions.  This is not a symptom of an "illness," but a reality of _every_ workplace.  Differences among working conditions are not illegal unless they are motived by an illegal purpose.  Here, Mr. Watkins has patched together a tale that either cites to no evidence, mischaracterizes the evidence or contradicts his own testimony.  He does not, as he must, create a genuine issue of material fact.

Accordingly, summary judgment should be entered.

## II.  <u>MR. WATKINS' SO-CALLED DISPUTED MATERIAL FACTS</u>

Mr. Watkins' motive is clear: prevent summary judgment by creating a lengthy, disjointed and self-contradicting record to dissuade this Court and Defendants from separating reality from fantasy.  These tactics must be rejected because, when the smoke clears, there are no material factual disputes that preclude summary judgment.

Mr. Watkins relies on several "facts" to support his many arguments.  These "facts" are not facts at all, but rather, are mischaracterizations or outright fabrications.  Set forth below are several (but not all) examples of Mr. Watkins' tactics.

### A.  <u>Case Overload</u>

Mr. Watkins swears that his caseload was disproportionate to white supervisors' case loads.  (Pb. at Exhibit A, ¶ 10-11)  Mr. Watkins conveniently ignores the testimony of caucasian witnesses who have testified that their case loads were excessive.  <u>See, e.g.,</u> Exhibit A (Deposition transcript of Robin Taylor, Caucasian, Supervisor, who testified that her unit had over 900 cases) and Exhibit B (Deposition of Dana Roth, Caucasian, Agent, who testified that her case load was, at times, between 300 and 400 parolees).

In fact, Mr. Watkins' average case load from November 2000 until August 2001 was 491, while Stuart Greenberg's unit averaged

404 and Donna Henry's unit averaged 438.[1]  Mr. Watkins supervised six agents during this time, while Mr. Greenberg supervised four, and Ms. Henry supervised six.  Therefore, Mr. Watkins' agents had an average of 81 parolees, while Mr. Greenberg's unit had 101 and Ms. Henry's unit had 73.  See Exhibit C.  Thus, caseloads were not uneven due to race.

    **B.**   **Lack Of Secretary**

Mr. Watkins secretary went out on sick leave. (Pb. 4) She could not be replaced until her employment ended.  See Exhibit C. In the interim, the Board gave Mr. Watkins the assistance of Mr. Bukata's own secretary, Ramona Sterling, nee Alexander.  See Exhibit 3 of Defendants' moving papers at 62:8-16.  Mr. Watkins contends that this was a sham offer of assistance.  He cannot, however, dispute the log that Ms. Sterling prepared that reflects all of the work that she completed for Mr. Watkins' unit.  See Defendants' moving papers at Exhibit 9.  In fact, Mr. Watkins testified that maintaining that log was a good idea and that he had no reason to doubt its accuracy.  See Exhibit D at 76:25-78:12.

Moreover, Mr. Watkins admits that Stuart Greenberg, a white supervisor also was without a secretary for six months.[2]

---

[1]    Mr. Watkins alleges that Stuart Greenberg (caucasian supervisor) and Donna Henry (caucasian supervisor) are comparators.

[2]    First, Mr. Watkins states that Mr. Greenberg had no secretary for six months.  (Pb. 5) He later contends that Mr. Greenberg was without a secretary for eight months.  (Pb. 6)

Recognizing that this undisputed evidence destroys his theory, he complains that he endured the lack of a secretary for four months more than Mr. Greenberg. (Pb. 6) This hardly amounts to a violation of law. First, Mr. Watkins ignores Ms. Sterling's efforts for his unit. Second, Mr. Watkins ignores the reality of the situation. Mr. Greenberg's secretary left the employ of the Board. Her position was available to be filled. See Exhibit C. Mr. Watkins' secretary was on medical leave, and thus, her position was not available to be filled. Id.

Thus, Mr. Watkins' hollow complaint about lacking secretarial support cannot defeat summary judgment.

### C. Ronald Zappan

Mr. Watkins argues that Mr. Zappan testified that Mr. Jones told him to "target" former (African-American) plaintiffs for retaliation. Mr. Zappan, however, made the same contentions in his own retaliation lawsuit, which this Court dismissed on summary judgment. Zappan v. Pa. Bd of Prob. and Parole, No. CIV. A. 00-1409, 2002 WL 32174230, (E.D. Pa. Nov. 25,2002). The Court of Appeals affirmed that dismissal. Zappan v. Pa. Bd. of Prob. and Parole, 152 Fed. Appx. 211 (2005). Significantly, Mr. Zappan testified during his deposition that the demands Mr. Jones made were directed generally at any (white or black) non-performing employees as follows:

> It was a general statement of the individuals that were not doing their jobs. His intent was he was sick and

4

> tired of poor work performance and he was – his plan was
> to terminate them.

<u>See</u> Exhibit E (emphasis added).  Mr. Jones mentioned "individuals"
who were not doing their jobs, not African American plaintiffs.

Further, Mr. Zappan admitted that Mr. Watkins deserved to be
disciplined.  <u>See</u> Exhibit F.  Moreover, prior to Mr. Jones' alleged
demands, Mr. Zappan disciplined, counseled or criticized the
performance of the very same African American employees that he
contended Mr. Jones demanded that he target.  <u>See</u> Exhibit G.  Thus,
it utterly defies logic for Mr. Zappan to state that African
American employees, including Mr. Watkins, were "targeted" by Mr.
Jones for discipline.  Accordingly, Mr. Watkins cannot rely on the
testimony of Mr. Zappan because it either supports the Defendants'
claims or contradicts itself.[3]

### D.    <u>LeDelle Ingram</u>

Mr. Watkins claims that Ms. Ingram testified that the Board
"never actually complied with any of the terms of the ADR
agreement."  (Pb. 10) Mr. Watkins cites to numerous pages of Ms.
Ingram's deposition transcript in another matter to support this

---

[3] <u>See, e.g.</u>, <u>Hackman v. Valley Fair</u>, 932 F.2d 239, 241 (3d
Cir. 1991)(allowing contradictory affidavits to be disregarded);
<u>Goff v. Bayada Nurses, Inc.</u>, No. Civ. A. 04-5226, 2006 WL 782170,
at *3 (E.D. Pa. Mar. 24, 2006)(same).  The objectives of summary
judgment "would be seriously impaired if the district court were
not free to disregard the conflicting affidavit."  <u>Martin v.</u>
<u>Merrell Dow Pharm., Inc.</u>, 851 F.2d 703, 706 (3d Cir. 1988)(internal
citations omitted)(prohibiting the use of affidavits that
contradict prior testimony).

proposition.  When all this testimony is reviewed, however, it shows that Ms. Ingram <u>never</u> testified to this "fact".  Therefore, any reliance upon this "fact" by Mr. Watkins should be disregarded.

### E.   <u>Hugh Young</u>

Mr. Watkins argues that Mr. Young testified that "it was known that the Board was 'out to get' the original plaintiffs".  (Pb. 11) Mr. Watkins relies on Mr. Young's testimony from the <u>Russ-Tobias</u> trial.  In reality, Mr. Young never testified as to anything even remotely close to this alleged "fact".  (Pb. at Exhibit L) In fact, Mr. Young testified as follows about Howrhu Self, one of the "original plaintiffs":

> I had been working with Howrhu for about 20 years and <u>he was messing up</u>, and I kept saying, look, you're putting me in the middle.  I don't want to be put there.  You know, we can get this squared away.  But <u>he just didn't seem to want to care</u> . . .

<u>Id.</u> (emphasis added).  Indeed, Mr. Young also testified that his "out to get" them statement is based on no more than hearsay and general gossip.  <u>See</u> Exhibit H at 39:11-40:13.  Thus, Mr. Watkins' characterization of Mr. Young's testimony must be disregarded.

### F.   <u>James Burton</u>

Mr. Watkins offers the testimony of James Burton in the form of an unsigned affidavit.  Mr. Burton is an African American male who was also a supervisor employed by the Board.  Mr. Burton, however, was supervised by Daniel Solla, not Mr. Bukata. Mr. Burton relied on many of the same ambiguous complaints of discrimination as Mr. Watkins, such as a large caseload and lack of training.

This Court found that those allegations did not support Mr. Burton's hostile work environment and retaliation claims.[4]

Mr. Burton also claimed that Mr. Solla made racially derogatory remarks to him.  For good reason, Mr. Watkins does not highlight those remarks in his opposition.

First, Mr. Burton alleged that Mr. Solla referred to him as "Jim Bo" on two unspecified dates, once in 1995 or 1996 and once in 1998.  See Exhibit I at 8:23 to 9:16; 39:18 to 42:8.  Despite the alleged offensiveness of this comment, Mr. Burton never told Mr. Solla, Mr. Jones or the Board that he believed the name "Jim Bo" to be racially derogatory.  See id. at 13:8 to 14:5; 43:9-43:12; 44:11-44:14.  Moreover, Mr. Burton testified that he does not know whether Mr. Solla believed the name "Jim Bo" to be racially derogatory.  See id. at 44:15-44:24.

Second, Mr. Burton alleged in his lawsuit that in February or March 2000, he observed Board employees either wearing or displaying t-shirts that Mr. Burton considered racially offensive.[5]

---

[4]    This Court, however, entered summary judgment dismissing Mr. Burton's hostile work environment and retaliation claims.  See Burton v. Pa. Bd. of Prob. and Parole, No. Civ. A. 02-2573, 2004 WL 2943725, at *5, 7 (E.D. Pa. Dec. 20, 2004).  The Court denied the Board's summary judgment motion on Mr. Burton's disparate treatment claim.  See Burton v. Pa. Bd. of Prob. and Parole, No. 04-3866, 2005 WL 2761594 (3d Cir. Oct. 26, 2005).

[5]    The t-shirts about which Mr. Burton allegedly expressed his concern read as follows: "Officer Danny Faulkner was murdered by Mumia Abu-Jamal who shouldn't be in an 8 x 10 foot cell.  He should be 6 feet closer to hell."  See Exhibit C.

See id. at 104:9 to 105:8; 110:1-110:7; 111:15-111:19.  Mr. Burton
expressed his concerns about the t-shirts to Mr. Solla on one
occasion after he first saw it.  See id. at 106:18 to 107:13.  Mr.
Solla is the only individual Mr. Burton complained to about the t-
shirts.  See id. at 111:8-111:10.

Even when viewed in the light most favorable to Mr. Watkins,
Mr. Burton's "testimony" in the form of an unsigned affidavit, does
not create any material factual disputes.

**G.    Henry Williams & Howrhu Self**

Mr. Watkins relies on the testimony of Mr. Williams and Mr.
Self.  Their testimony, however, must be disregarded because both
stopped working for the Board in 1998.  They were not present
during any of the time periods applicable to Mr. Watkins' claims.
See Exhibits Q & R.

**H.    Jury Verdict In Russ-Tobias**

Mr. Watkins relies on the jury verdict entered against the
Board and Mr. Jones in the Russ-Tobias matter to support his
discrimination claims.  The Honorable Thomas O'Neil, however, in an
Order dated March 2, 2006 set aside the Russ-Tobias verdict.  See
Exhibit J.

**I.    2003 AG Report**

Mr. Watkins relies on a 2003 report issued by the Pennsylvania
Department of the Auditor General (the "Report") to support his
claims. The Report concerns the Board's general practices and

8

procedures across the entire Commonwealth of Pennsylvania. The Report does <u>not</u> address whether the Board treats its employees differently based on their race. From this report, Mr. Watkins argues that many Board supervisors were underperforming yet he was the only one disciplined. Mr. Watkins' strained conclusion does not create any issue to preclude summary judgment. First, the report does not conclude that any particular supervisor was underperforming. Further, the report examined 50 case files from across the Commonwealth of Pennsylvania and made certain conclusions about those cases from that review.[6]

Second, many Philadelphia based employees were disciplined for performance failures. In fact, from 1998 until 2002, approximately 46 caucasian employees were counseled or disciplined as compared to approximately 21 African American employees. <u>See</u> Defendants' moving papers at Exhibit 11. Moreover, the Board issued a written reprimand to Mr. Greenberg, a white supervisor, for the same performance failure for which Mr. Watkins was disciplined.[7] Thus, the report offers no support for Mr. Watkins' claims.[8]

---

[6]    The Board, in fact, supervised over 23,735 parolees across the Commonwealth, such that the reliability of this report is called into question. <u>See</u> Exhibit C.

[7]    Specifically, Mr. Greenberg received a written reprimand for failing to properly monitor and supervise a case. <u>See</u> Defendants' Statement of Uncontested Facts at ¶ 75.

[8]    Moreover, the Report is an out of court statement offered for the truth of the matter asserted, and is therefore, (continued...)

**J.    Discipline**

Mr. Watkins argues that he received more discipline than other employees.    (Pb. 55) When the record is reviewed, it becomes abundantly clear that Mr. Watkins admits to virtually all of the material allegations against him that lead to discipline.

    1.    April 2000 - Counseling Session - No Discipline[9]

On April 18, 2000, Mr. Bukata conducted a pre-disciplinary conference (PDC) with Mr. Watkins because of his failure to complete an Employee Performance Review (EPR) for an agent, and his failure to order the requisite equipment for an agent.    Documents were generated as a result of the PDC from which the testimony and findings were recorded.    Mr. Watkins admitted that the material statements in those PDC documents were true.    See Exhibit D at 147:24-148:23.    See also Exhibit K.

    2.    May 2000 - Written Reprimand[10]

Conveniently, Mr. Watkins now denies making statements during a May 31, 2000 PDC stemming from his failure to properly monitor a case.    In his deposition, however, he admitted to these very statements.    Namely, he admitted that "he failed to do as directed

---

[8](...continued)
impermissible hearsay evidence.    Such evidence cannot defeat summary judgment.    See Williams v. Borough of West Chester, 891 F.2d 458, 460, 465 n.12 (3d Cir.1989).

[9]    See Defendants' Statement of Facts, ¶ 78-86.

[10]    See Defendants' Statement of Facts, ¶ 87-94.

on 5/18/00 because he just had not gotten to it; he was busy with other priority matters." <u>See</u> Exhibit D at 153:10-25.  <u>See also</u> Exhibit L.

### 3.  <u>June 2000 - One Day Suspension</u>[11]

Despite his new assertions to the contrary, Mr. Watkins admitted that he never wrote the counseling memorandum that he was instructed to write, which resulted in his discipline. <u>See</u> Exhibit D at 159:20-164:8.

### 4.  <u>October 2000 - Three Day Suspension</u>[12]

A PDC was held on October 5, 2000 because Mr. Watkins failed to timely request a revocation hearing.  <u>See</u> Defendants moving papers at Exhibit 15.  Mr. Watkins testified during his deposition that he "failed to establish an arrest/hearing control on the case and that this was the reason that he was not monitoring the court activity." <u>See</u> Exhibit D at 169:2-171:19.  <u>See also</u> Exhibit M.

### 5.  <u>November 2000 - Five Day Suspension</u>[13]

A PDC was held on November 16, 2000 because Mr. Watkins failed to submit leave slips for agents in his unit.  <u>See</u> Defendants' moving papers at Exhibit 16.  Mr. Watkins admitted that the actions alleged concerning the November 2000 discipline were correct.  <u>See</u> Exhibit D at 194:8-195:19.

---

[11]    <u>See</u> Defendants' Statement of Facts, ¶ 95-102.

[12]    <u>See</u> Defendants' Statement of Facts, ¶ 103-114.

[13]    <u>See</u> Defendants' Statement of Facts, ¶ 115-127.

6.    July 2001 - Termination[14]

A PDC was held on July 5, 2001 because Mr. Watkins failed to properly monitor a case, failed to properly handle a parking citation, and failed to follow directives. Documents were generated as a result of the PDC from which the testimony and findings were recorded. Mr. Watkins admitted that the material statements in those PDC documents were true. See Exhibit D at 206:1-207:21. See also Exhibit S.

Thus, for each discipline event, Mr. Watkins admits that he actually engaged in the conduct for which the discipline was imposed. Contrary to Mr. Watkins' protestations, the Board did not fabricate Mr. Watkins' performance failures. They actually happened.


III. **LEGAL ARGUMENT**

A.    **Mr. Watkins' § 1983 Claims Against the Board, Mr. Jones and Mr. Bukata, In Their Official Capacities, Should Be Dismissed As A Matter of Law**

Mr. Watkins concedes that there can be no cause of action against the Board and/or Mr. Jones and Mr. Bukata, in their official capacities for retrospective damages. Mr. Watkins argues, without merit, that there is a cognizable claim against the Board for prospective damages. Mr. Watkins, however, cites to no authority for this proposition, and it is clear that a state is not

---

[14]    See Defendants' Statement of Facts, ¶ 128-136.

12

a "person" within the meaning of § 1983.  See Will v. Mich. Dep't. of State Police, 491 U.S. 58, 61 n.1 (1989).

Defendants agree that an official capacity suit under 42 U.S.C. § 1983 is permissible to the extent that only prospective injunctive relief is sought.  See Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002).  Although Mr. Watkins argues that "prospective relief, i.e., reinstatement, is not precluded," (Pb. 46) Mr. Watkins has not asserted a claim for prospective injunctive relief.  Even if Mr. Watkins was able to sustain a claim against the office of the Deputy District Director and District Director[15] for the prospective relief of reinstatement, this is a hollow claim.  Neither of those positions possesses the power or ability to reinstate a terminated employee.  Only the Board has that power, and the Board is a state agency to which § 1983 does not apply.

Thus, this Court should enter an order limiting the relief available under 42 U.S.C. § 1983 to be against the individual defendants, in their individual capacities, or in the alternative, against the individuals in their official capacities for prospective relief only.  Under no circumstances, can there be a 42 U.S.C. § 1983 claim against the Board.

_____

[15]   See id. at 64, 71 ("[an] official capacity [suit] is not a suit against the official but rather is a suit against the official's office").

13

Likewise, to the extent that this Court has not already resolved the issue of whether or not a 42 U.S.C. § 1981 can be brought without a § 1983 claim, Defendants ask that the § 1981 claims be limited in the same manner as the § 1983 claims.

**B.    Mr. Watkins' Claims Of Retaliation Should Be Dismissed Because He Did Not Engage In Protected Conduct Or Fails To Establish A Connection Between His Protected Activity And Any Adverse Employment Action**

1.    Protected Conduct

Mr. Watkins cites to two cases in support of his proposition that the settlement of his 1993 lawsuit is a "protected activity." First, Mr. Watkins cites to an unpublished Western District of Pennsylvania decision that is not on point. In Westerman v. Gen'l Nutrition Corp., No. Civ. A. 05-999, 2005 WL 3454325, at *2 (W.D. Pa. Dec. 16, 2005), the court did not find that the settlement of a claim was protected conduct. Rather, the court found that the plaintiff alleged that the filing of her complaint was based on the protected conduct of filing a complaint with the EEOC, not on the settlement of that complaint. Id. In fact, the court refused to find that a settlement can constitute "protected activity." Id. at *2, N. 14 (taking no position on whether a settlement of a dispute is protected conduct). Here, unlike Westerman, Mr. Watkins alleges that his protected activity was a settlement.

Second, Mr. Watkins relies on an unpublished opinion from the Northern District of Georgia, Wise v. Overhead Door Corp., No. 1:04-CV-2972-RWS, 2006 WL 648776 (N.D. Ga. Mar. 15, 2006). In

14

<u>Wise</u>, the court found that there was temporal proximity between the adverse action and <u>both</u> the filing and settlement of the plaintiff's complaint.  <u>Id.</u>  Therefore, the court did not reach the question of whether a settlement is protected conduct.  Thus, Mr. Watkins' reliance on <u>Wise</u> for that proposition is misplaced. Further, here, unlike <u>Wise</u>, the complaint was filed two years before the settlement, and the first adverse action, admittedly, occurred two years after the settlement.  (Pb. 63)  Therefore, the facts of <u>Wise</u> do not apply to this case.

Mr. Watkins has failed to address Defendants' argument relating to F.R.Evid. 408.  His silence on this issue speaks volumes.  As set forth in Defendants' moving papers, any evidence concerning a settlement is inadmissable.  <u>See</u> F.R.Evid. 408.  Thus, elevating a settlement to protected conduct status contradicts F.R.Evid. 408 by discouraging parties from settling civil rights cases if they can later be used as a basis for retaliation.

  2. <u>Adverse Employment Action</u>

Mr. Watkins argues that a large case load, lack of a secretary and having counseling sessions amounts to adverse employment actions.  Mr. Watkins relies on the recent Supreme Court decision of <u>Burlington N. & Santa Fe Railway Co. v. White</u>, 126 S. Ct. 2405 (2006) in support of his position.  Mr. Watkins, however, fails to realize that the "anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from

retaliation that produces an injury or harm [and] a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." <u>Id.</u> at 2414-15.  The Supreme Court defined "materially adverse" with an objective test: dissuading a "reasonable worker from making or supporting a charge of discrimination." <u>Id.</u>

Mr. Watkins attempts to liken his alleged shortage of clerical support, alleged disproportionately large caseload and counseling sessions to the facts in <u>Burlington</u> where the plaintiff was suspended and transferred to a less desirable position.  The two are inapposite.

Counseling sessions did not cause Mr. Watkins harm.  Further, a large case load was not assigned only to Mr. Watkins, but also to many other units.  For example, Robin Taylor (caucasion) testified that her unit has over 900 parolees, while Mr. Watkins complained of a large caseload of between 400-500.  It is not objectively reasonable that a large case load (assigned based on where parolees live) is a materially adverse action.  <u>See</u> <u>Burlington</u>, 126 S. Ct. at 2415-16.  Last, lack of clerical support is also not objectionably materially adverse.  Mr. Watkins secretary went out on sick leave.  She could not be replaced until her employment was terminated by either party.  In the interim, Mr. Watkins was given the assistance of Mr. Bukata's own secretary.  No reasonable jury

can find that these circumstances rise to the level of a materially adverse condition.

      3.  <u>Causation</u>

Mr. Watkins argues that there was an "ongoing pattern of antagonism." (Pb. 54). Mr. Watkins admits that there was no discrimination from the time his lawsuit settled in 1995 until Mr. Jones became his indirect supervisor in 1997. (Pb. 63). Mr. Watkins admits no discrimination in 1995 and 1996, but yet, he asks this court to find a causal link between protected activity in 1993 and actions taken in 1997 and later. Four years is much longer than eight months, which the Third Circuit has already determined is too long to find a causal connection. <u>See</u> <u>Van Houten</u> <u>v. Principi</u>, 106 Fed. Appx. 134, 138 (3d Cir. 2004).

The next "protected activity" that Mr. Watkins allegedly engaged in was a verbal complaint during a November 2000 grievance hearing, which was <u>after</u> all of his suspensions. Assuming Mr. Watkins did complain in November of 2000, his next "adverse action" was not until his termination in August 2001, nine months after the alleged protected activity.

Mr. Watkins claims ongoing antagonism, but his argument must fail for two reasons: 1) there was admittedly no discrimination, and thus no antagonism, during 1995 and 1996; 2) accordingly, in order for antagonism to be present between protected activities, there must be a first "protected activity", which did not occur

until (allegedly) November 2000.  At most, Mr. Watkins may argue that there was antagonism between November 2000 and his termination in August 2001.  Mr. Watkins complains that the antagonism was: 1) lack of clerical staff; 2) e-mails pointing out his performance deficiencies; 3) disciplinary proceedings; 4) large case loads; 5) negative performance reviews. These arguments are without merit.

First, Mr. Watkins' unit had a secretary during the relevant time period.  See Exhibit C.

Second, Mr. Watkins argument that e-mails pointing out his work deficiencies are "antagonistic" flies in the face of his argument that he was never "informally" told of his problem areas so that they could be corrected before receiving a negative evaluation.  Mr. Watkins cannot have his cake and eat it too. Either he was advised of his problem areas or he was not.  He cannot complain of lack of communication and then use evidence of communication to argue that the communication is an act of antagonism.

Third, there were no disciplinary actions taken after the protected conduct except for Mr. Watkins' termination in August of 2001.

Fourth, for the reasons set forth above, Mr. Watkins' reliance on his argument of a "large case load" is not persuasive, nor does it raise a genuine issue of material fact.

Last, only two employee performance reviews (EPR) were completed after Mr. Watkins' alleged verbal complaint in November of 2000. One was completed at the end of July 2001, which was eight months after the alleged protected conduct. As set forth above, there is no causal connection. The second EPR was signed by Mr. Bukata on December 14, 2000 and by Mr. Jones on December 18, 2000. Mr. Watkins does not argue that he was the only employee to receive a performance review, nor does he allege to be the only employee with a less than satisfactory review. Rather, Mr. Watkins argues that the rating he received was unfair because, as he alleges, it was based on his race, and or in retaliation for protected conduct. The record is clear. The December 2000 EPR provided a detailed explanation as to why each rating was given, and the explanation coincides with the conduct that resulted in discipline. See Exhibit N. As set forth above, Mr. Watkins has admitted to the conduct. Moreover, this EPR cannot be seen as "antagonism" because one EPR is not an "ongoing pattern." It is one isolated event, which does not rise to the level of antagonism. See Weston v. Commonwealth of Pa., 251 F.3d 420, 432 (3d Cir. 2001).[16]

---

[16] Likewise, Mr. Watkins cites to a laundry list of "evidence" in an effort to support his hostile work environment claims. For the reasons set forth above, his efforts fall short. First, Mr. Watkins cites to 1988 and 1993 reports, but as set forth above, he admits that there was no discrimination in 1995 and 1996, and thus, the reports are of no consequence. Second, for the
(continued...)

Mr. Watkins argues that he was set up to fail because the Board gave his unit too many cases, not enough clerical help, and that he, Mr. Watkins, did not receive proper training.  It has already been shown that Mr. Watkins' claims of a large caseload and lack of secretarial support are hollow and do not meet his burden to overcome summary judgment.  Equally unpersuasive is his argument that he was not trained.  Mr. Watkins received extensive training.  See Exhibit O. Furthermore, Dionne Drayton, an agent, testified that Mr. Watkins trained her and was very helpful and knowledgeable.  See Exhibit P.

### C.    **Mr. Watkins Failed to Produce Evidence of Disparate Treatment**

Mr. Watkins argues that Mr. Greenberg and Ms. Henry are proper comparators simply because they were supervisors under Mr. Bukata at the same time as Mr. Watkins.  Holding the same position is not the proper definition of a comparator.  Rather, Mr. Watkins must show that Mr. Greenberg and/or Ms. Henry "engaged in the same conduct without such differentiating or mitigating circumstances

---

[16](...continued)
reasons set forth above, the reliance on the allegations of Zappan, Burton, Self and Young should not persuade this Court.  Third, a large caseload and lack of secretarial support is not conduct that rises to the level of "severe and pervasive".  Fourth, illegal disparate treatment, even if it existed, which it did not, does not create a hostile work environment unless it was "pervasive and regular".  See King v. Sch. Dist. of Phila., No. 00-CV-2503, 2001 WL 856948, at *5 (E.D. Pa. Jul. 26, 2001).  There is no evidence to support such a claim.  Fifth, the jury verdict in Russ-Tobias was set aside, and it is of no consequence.

that would distinguish their conduct or the employer's treatment of them for it . . . [and] must be similarly situated in all 'material respects.'" <u>Dill v. Runyon</u>, Civil Action No. 96-3584, 1997 WL 164275, at *4 (E.D.Pa. Apr. 3, 1997) (quotations omitted) (emphasis added). Specifically, "comparators should have worked with the same supervisor, have been subjected to the same standards, and have <u>engaged in the same conduct</u>." <u>Jones v. Hosp. of Univ. of Pa.</u>, No.Civ.A. 03-CV-4938, 2004 WL 1773725, at *6 (E.D.Pa. Aug.5, 2004) (citations omitted) (emphasis added).

Mr. Watkins has failed to meet his burden. Yes, Ms. Henry had a secretary for her unit when Mr. Watkins did not. Ms. Henry's secretary remained healthy while Mr. Watkins' secretary did not. Yes, Mr. Greenberg's secretary was replaced before Mr. Watkins' secretary. Mr. Greenberg's secretary left the employ of the Board. Mr. Watkins' secretary was on sick leave.

More importantly, Ms. Henry and Mr. Greenberg never engaged in the <u>conduct</u> that Mr. Watkins engaged in, and therefore, they are not proper comparators. Mr. Watkins has brought forth no evidence to suggest that either comparator failed to do all of the various activities that Mr. Watkins failed to do. Mr. Watkins attempts to compare apples to oranges. He argues that there was disparate discipline. The conduct, however, causing the <u>discipline</u> is not substantially similar. Therefore, the discipline is not relevant.

21

Based on the foregoing, Mr. Watkins failed to offer a proper comparator, and as such, his discrimination claims must fail.

### D. There Can Be No Conspiracy Amongst The Board And The Individual Defendants In Their Official Capacities

As an initial matter, the conspiracy claims against the Defendants should be dismissed under the doctrine of sovereign immunity. Mr. Watkins arguments to the contrary fail because Mr. Watkins asserts conspiracy claims based on state law. See Watkins v. Pa. Bd. of Prob. and Parole, No. 02cv2881, 2002 WL 32182088, at *9 (E.D. Pa. Nov. 25, 2002)("despite the federal nature of these [conspiracy] allegations, Watkins contends that the conspiracy claim is brought under state law"). All cases cited by Mr. Watkins construe federal statutory conspiracy claims, which are not present here. Therefore, the analysis is inapplicable to the claims before this Court. The only case cited that construes Pennsylvania common law conspiracy claims states that an entity and its agents cannot conspire amongst themselves. See Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198 (1979). Therefore, Plaintiff's claims for conspiracy against the Board and Mr. Jones and Mr. Bukata in their official capacities should be dismissed.

Moreover, Mr. Watkins argues that Mr. Jones and Mr. Bukata, in their individual capacities "are clearly liable for conspiracy under Section 1985 and 1986 of the Civil Rights Act." Sections 1985 and 1986 are not pled. Therefore, any reliance on these statutory provisions is without merit.

E.    __Mr. Watkins Failed To Mitigate His Damages__

Now, for the first time since being terminated over five years ago, Mr. Watkins claims to have applied for two positions.  He testified during his deposition that he had not applied for any positions.  He stated in his answers to interrogatories that he did not apply for any positions.  Likewise, when pressed for updated information less than 90 days before this motion was filed, Mr. Watkins amended his interrogatory answers to state that he had not applied for any positions.  Now, for the first time, after discovery closed, in opposition to summary judgment, Mr. Watkins provides an unsigned affidavit in which he states:

> Since I was terminated, I applied for at least two positions as a hearing examiner in Norristown and Philadelphia.

(Pb. At Exhibit A ¶ 13).  This new testimony is in direct conflict with his earlier testimony and should not be permitted.  See Hackman, 932 F.2d at 241.

Finally, Mr. Watkins argues that he is not qualified for many of the job listings offered by Defendants as evidence of available positions; however, he indicated that it was exactly these type of job advertisements that he perused in his "efforts" to obtain employment.  See Exhibit D at pp. 274-292.

## IV.  <u>CONCLUSION</u>

This  Court  relies  on  admissible  evidence  when  deciding  a
summary  judgment  motion.   Mr. Watkins  has  taken  extreme  liberties
with  the  Rules  of  Evidence.   He  has  contradicted  himself;  he  has
mischaracterized  the  testimony  of  others;  and  he  has  ignored  the
hard  evidence  that  defeats  his  claims  as  a  matter  of  law.   Summary
judgment  is  designed  to  prohibit  these  very  tactics  and  avoid  the
expense  of  a  trial  when  the  <u>material</u>  facts  are  not  <u>genuinely</u>
disputed.   The  record  is  clear,  despite  Mr.  Watkins'  efforts  to
muddy  it.   This  case  is  ripe  for  summary  judgment.   Accordingly,
Defendants  respectfully  request  that  their  summary  judgment  motion
be  granted.

Respectfully Submitted,

MILLER, ALFANO & RASPANTI, P.C.

By: _____
GINO J. BENEDETTI, ESQUIRE
LISA R. MARONE, ESQUIRE
Attorney  I.D.  Nos.  59584;  200305
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 972-6400
Attorney for Defendants,
Pennsylvania Board of Probation and
Parole, Willie E. Jones, and Michael
Bukata

Dated:

24

## CERTIFICATION OF SERVICE

I certify that a true and correct copy of the foregoing Notice of Motion for Leave to File a Reply Brief to Plaintiff's Opposition to Defendants' Summary Judgment Motion, and supporting documents on behalf of Defendants, Pennsylvania Board of Probation & Parole, Willie E. Jones and Michael Bukata has been served on this date on the individual and in the manner listed below:

**VIA HAND DELIVERY**
Robert J. Sugarman
11th Floor, 100 No. 17th Street
Robert Morris Building
Philadelphia, PA 19103

Attorney for Plaintiff

By:  _____
GINO J. BENEDETTI, ESQUIRE
LISA R. MARONE, ESQUIRE
Attorney I.D. Nos. 59584; 200305
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 972-6400
Attorney for Defendants,
Pennsylvania Board of Probation and
Parole, Willie E. Jones, and Michael
Bukata

Dated:

F:\PBL\pa.bd.of prob.watkins\Pleadings\reply to sj opp on merits - final version.wpd