

*A Performance Audit of the Pennsylvania Board of*

# PROBATION AND PAROLE

**April 2003**



EXHIBIT

# Auditor General Robert P. Casey, Jr.

April 8, 2003

The Honorable Edward G. Rendell
Governor
Commonwealth of Pennsylvania
225 Main Capitol Building
Harrisburg, Pennsylvania  17120

Dear Governor Rendell:

This report contains the results of the Department of the Auditor General's performance audit of the Pennsylvania Board of Probation and Parole for the period July 1, 1999, through June 30, 2001.  The audit was conducted pursuant to Section 402 of The Fiscal Code and in accordance with *Government Auditing Standards* as issued by the Comptroller General of the United States.

Chapters One and Two of the report present the most disturbing conclusions, including how the Board did not document parolee investigations, insufficiently supervised paroled prisoners, lost track of nearly 1,600 offenders, did a poor job of collecting supervisory fees, inadequately monitored parolee and probationer court-ordered payments for victim restitution, and did little to increase employment opportunities for parolees.

Chapters Three through Five show that the Board did not analyze recidivism data effectively, was at times deficient in providing training and assistance to parole agents, and was ineffective in monitoring its field operations and county parole offices.  Chapter Six discusses a positive finding—the Board's commendable participation in interagency and external monitoring efforts of its substance abuse programs.

Aside from the audit findings themselves, another important issue surfaced that raises questions about the Board's actions.  Throughout this audit engagement, the Board continually invoked various state and federal laws containing confidentiality provisions that prohibit public disclosure of certain information (for example, drug and alcohol treatment information).  The Board made it clear that even the Department of the Auditor General could not have access to this privileged information.  However, the Board failed to keep such information confidential.  In fact, the Board's failure to comply with its own

The Honorable Edward G. Rendell
Page 2
April 8, 2003

confidentiality provisions compelled us to report such noncompliance to the Board in a letter dated March 14, 2003. Specifically, the Board repeatedly provided our auditors with papers and files containing information that—based on the Board's own determination—should have been redacted, and it continued to do so *even when we returned such information for additional redactions.*

This problem continued when the Board initially responded to this audit report by including—in its appendix to the response—information previously deemed confidential. That action is significant for two reasons. First, in trying to rebut our audit findings, the Board chose to disclose information that it would not make available to our auditors. Second, because we had told the Board that its response would appear *in its entirety* in this publicly disseminated audit report, the Board was also disclosing the confidential information to the general public. Only after we intervened once again did the Board provide a revised appendix with the confidential information deleted.

In summary, throughout this audit the Board failed to fulfill its stated duty to protect certain information. Perhaps the Board's failure to redact information during our field work was inadvertent, and it is possible that the Board simply did a poor job of crossing out confidential information; but to include the previously withheld information in its official response is outrageous.

The audit findings presented in this report—losing track of 1,600 offenders, failing to recommit violent offenders, missing required supervisory visits, not enforcing conditions and sanctions—demonstrate a lack of action that threatens the safety of our communities. I hope that you will vigorously encourage the Board to implement the nearly 50 recommendations we have offered to improve the Board's accountability and protect the public.

The Board's response and its revised appendix are included in their entirety at the end of this report. In addition, portions of the response, along with our comments, appear throughout the report with the related findings.

Sincerely,

/s/ **Robert P. Casey, Jr.**

Robert P. Casey, Jr.
Auditor General

A Performance Audit of the                                    Page i
Pennsylvania Board of Probation and Parole

                                                        Table of Contents

Pennsylvania Department of the Auditor General

# Table of Contents

| | | |
|---|---|---|
| **Executive Summary** | | iv |
| **Introduction and Background** | | 1 |
| **Objectives and Methodology** | | 6 |
| **Chapter One:** **Supervising parolees and other offenders** | | 7 |
| Conclusion 1: The Parole Board inadequately documented some investigations of parolee home and work plans, and also took questionable actions beyond the inadequate documentation. | | 11 |
| Conclusion 2: The Parole Board did little to increase employment opportunities for parolees. | | 22 |
| Conclusion 3: The Parole Board was deficient in supervising paroled prisoners in our sample. | | 30 |
| Conclusion 4: The Parole Board sanctioned parolees ineffectively by sending mixed messages—sanctioning inconsistently or threatening violators with punishment but then not following through. | | 45 |
| Conclusion 5: The Parole Board did a poor job collecting $25-a-month supervisory fees from parolees and probationers, taking in only $1.2 million of nearly $15 million owed. | | 56 |

Page ii

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Table of Contents

Pennsylvania Department of the Auditor General

# Table of Contents, *continued*

Conclusion 6: The Parole Board did not adequately enforce or track parolee and probationer court-ordered payments that should have been made to victims and others. ..... 64

## Chapter Two: Pursuing absconders ..... 70

Conclusion 1: The Parole Board lost track of nearly 1,600 offenders and did not aggressively search for them. ..... 72

## Chapter Three: Reducing recidivism ..... 80

Conclusion 1: The Parole Board did not analyze recidivism data to see the effect of certain practices or characteristics. ..... 82

## Chapter Four: Providing training and assistance to parole agents ..... 88

Conclusion 1: The Parole Board did not ensure that all agents in our sample received the 40 hours of training required annually, nor did the Board ensure that all training was "acceptable." ..... 91

Conclusion 2: The Parole Board ensured that all the agents in our sample were qualified to carry guns but did not ensure that all the agents met annual training requirements. ..... 99

A Performance Audit of the                                      Page iii
Pennsylvania Board of Probation and Parole

                                                         Table of Contents

Pennsylvania Department of the Auditor General

---

**Table of
Contents,**
*continued*

**Chapter Five:**                                              106
**Supervising district field operations and
county offices**

    Conclusion 1: The Parole Board did not effectively     108
    monitor the performance of its field operations.

    Conclusion 2: The Parole Board did not effectively     113
    audit the 65 county probation and parole offices.

**Chapter Six:**                                               119
**Evaluating special treatment programs**

    Conclusion 1: The Parole Board participated in         122
    interagency and external monitoring efforts of its
    substance abuse programs.

**Appendix A:**                                                126
**Response from the Board of Probation and
Parole**

**Appendix B:**                                                181
**Additional comments from the Department of
the Auditor General**

**Appendix C:**                                                185
**Audit report distribution list**

Page iv                      A Performance Audit of the
                             Pennsylvania Board of Probation and Parole

Executive Summary

                             Pennsylvania Department of the Auditor General

# Executive Summary

For the two-year audit period from July 1, 1999, through June 30, 2001, the Pennsylvania Board of Probation and Parole (also referred to in this report as "Parole Board" or "Board") failed to meet its own supervisory requirements in 45 of the 50 cases sampled, lost track of nearly 1,600 parolees and probationers, and allowed violent offenders to remain free while imposing meaningless sanctions. Those findings, among others, are presented in this report by the Pennsylvania Department of the Auditor General following its performance audit of the Parole Board.

Pennsylvania spent nearly $29,000 a year to keep each of its 37,500 inmates in state prison, or about $79 a day, during the state fiscal year ended June 30, 2001. By contrast, the state spent about $3,000 a year—less than $8.25 a day—to supervise each of the 19,500 parolees living throughout the state.

That cost differential should have been good news for Pennsylvania taxpayers who, under normal conditions, might appreciate the state's ability to save $26,000 annually for each inmate released on parole. Unfortunately, the savings came at significant risk to the community. Specifically, community residents were exposed to or victimized by criminal acts or other violations that the parolees committed.

The risk to public safety is best illustrated by the sheer number of parolees—at least 8,500 during the two-year period ended June 30, 2001—who were returned to prison for various offenses committed while living among their neighbors. Moreover, many other parolees were cited but not re-incarcerated for violating parole conditions, thereby exposing communities to the risks associated with such wrongdoing and the behaviors that caused it. Worst of all, these risks were compounded by the state's perilous lack of required supervision.

Supervising parolees should be a critical part of the parole system. Parolees, after all, have not been "freed" from serving their sentences; rather, parolees serve only the first part of their sentences in prison and are released to serve the remaining time in the community.

Supervising probationers, too, is part of the Board's responsibility, although the 4,300 probationers (also supervised at the cost of $3,000 a year each) make up much less of the Board's caseload than do the parolees. Overall, the Board releases or supervises the following:

- **Parolees.** The Board releases and then supervises offenders who are sentenced in Pennsylvania state courts to a *maximum* sentence of two or more years. Parolees can be released only on or after the *minimum* sentence date.

- **Probationers.** The Board supervises offenders serving sentences of probation in Mercer and Venango counties, where there are no county probation offices.

- **Other offenders.** The Board supervises offenders serving sentences of less than two years in any Pennsylvania county when the sentencing court so requests; the Board also supervises offenders sentenced by other states in cases where a request is made pursuant to the Interstate Compact for Adult Offender Supervision.

An important note: Although we intentionally structured our audit to examine the Parole Board's *supervision* of parolees and probationers rather than the Board's *granting* of parole in the first place, we came away from our audit recommending that future study be done to audit the initial parole decisions. We base this recommendation on three conditions identified during our audit:

Page vi                    A Performance Audit of the
                           Pennsylvania Board of Probation and Parole

Executive Summary

                           Pennsylvania Department of the Auditor General

1. The Parole Board's uneven performance in its
   supervision of parolees who were often violent
   offenders.

2. The Parole Board's repeated leniency toward errant
   parolees, as illustrated by its lack of enforcement of
   conditions and its lack of follow-through with
   sanctions. Whether this leniency occurred by conscious
   policy or by default based on failure to follow
   requirements is unclear.

3. The Parole Board's inability or unwillingness—again
   unclear—to track and analyze the work for which it is
   responsible.

In short, if the Board could not supervise its charges, it is
fair to ask if it should have released them.

Regarding our specific findings related to the Board's weak
supervisory performance, we identified numerous
significant deficiencies for the two-year audit period.
These deficiencies, which our audit report describes in
detail, include the following:

- The Parole Board missed required visitations of
  parolees in 45 of the 50 cases we sampled, or 90
  percent. Moreover, it was typical of the Board to keep
  parolees in the community even after they committed
  offenses that should have been sanctioned harshly or
  resulted in the revocation of parole. Indeed, it was
  troubling to see the Board allowing parolees to ignore
  the terms of their release two, three, four, or more
  times.

- The Board lost track of nearly 1,600 offenders and did
  not aggressively search for them.

- The Board did not analyze recidivism—parolees returned to prison—in ways that allowed evaluation of the overall parole program.  For example, the Board did not analyze re-incarcerated inmates by the types of crimes they committed (either the original crime for which they were sentenced or new crimes committed during parole), the treatment programs they attended, or the sanctions that were in effect at the time of re-incarceration (for example, electronic monitoring, curfews, travel restrictions, required attendance at drug and alcohol treatment programs).  Without looking at such data, the Board could not possibly have made an accurate evaluation about what worked, what didn't, and what changes were needed.

- The Board did not ensure that offenders paid court-imposed fines and made restitution to victims as required.

- The Board did not actively pursue the collection of monthly supervision fees that parolees and probationers were required to pay.

- The Board imposed sanctions ineffectively by sending mixed messages to parolees—threatening them with action but then not following through with that action.

- The Board did not effectively audit its district offices.

- The Board did not ensure that its parole agents and other field employees were adequately trained.

As of August 31, 2002, there were nearly 39,300 inmates in Pennsylvania's state prisons.[1]  According to the

---

[1] *Monthly Population Report as of August 31, 2002*, Pennsylvania Department of Corrections.  As of February 28, 2003, the population was 40,556, according to the monthly report on the Web site at http://www.cor.state.pa.us.

Page viii

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Executive Summary

Pennsylvania Department of the Auditor General

Department of Corrections, the state prison population increased significantly in 2001 after having remained stable in 1999-2000; now, new violent offender admissions are expected to increase, as are the number of parole violators.[2] Accordingly, with its weak performance in the past, it is reasonable to question whether the Board of Probation and Parole is capable of supervising offenders in a way that protects Pennsylvania communities in the future.

A final note: Despite the negative findings, it was evident throughout our audit work that, particularly among the Board's field staff, Board employees took pride in performing their jobs, in conducting themselves with professionalism, and in knowing that their responsibilities are critical to the Commonwealth of Pennsylvania. It is our hope that the Board will view our findings and recommendations as opportunities to make constructive changes as it carries on its important work.

---

[2] Jeffrey A. Beard, Ph.D., *Budget Presentation,* Pennsylvania Department of Corrections, February 2002.

Pennsylvania Department of the Auditor General

# Introduction and Background

As of June 30, 2001, there were nearly 19,500 parolees living in Pennsylvania neighborhoods under the supervision of the Pennsylvania Board of Probation and Parole (also referred to in this report as "Parole Board" or "Board"). Parolees are not "free"; rather, they have been released from actual incarceration and are serving the ends of their sentences in the community.

Also as of June 30, 2001, there were nearly 4,300 Board-supervised probationers living in Pennsylvania. Typically, most criminals serving sentences of probation rather than imprisonment are supervised by county-run probation offices rather than by the Board. However, two of the state's 67 counties—Mercer and Venango—have no county probation offices, so it is the Board's responsibility to supervise probationers there. In addition, judges in other counties sometimes assign their probationers to Board supervision, although that number is relatively small. Finally, probationers from other states fall under Board supervision when they live in Pennsylvania. In total, however, the 4,300 probationers represent less than one-fifth of the Board's caseload. It is for that reason that much of this report centers on parolees rather than probationers.

Before we begin our discussion about the background of parole, a discussion of sentencing is in order since the two are entwined. The following background was provided by the Pennsylvania Commission on Sentencing:

> During the past fifty years, jurisdictions through-out the United States have struggled in attempts to balance judicial discretion and individualized sentencing with broader goals of uniformity, proportionality and public safety. The trend throughout this period has been toward a more determinate sentencing model.

Page 2

Introduction and
Background

A Performance Audit of the
Pennsylvania Board of Probation and Parole


Pennsylvania Department of the Auditor General

The 1960s and 70s represented a high point in the use of indeterminate sentencing, with heavy reliance on and support of rehabilitation as the primary goal of sentencing.  However, as research at the time brought into question the efficacy of existing treatment programs, a shift toward a more retributive and determinate sentencing model began. By the 1980s, incapacitation and deterrence were the primary goals of many jurisdictions.  To some degree, the past decade has represented a move to the center: public safety demands the incapacitation of serious and violent offenders, while correctional overcrowding and improved community-based programs support the expanded use of treatment alternatives.

The shift described nationally was evident in Pennsylvania.  Beginning in the late 1970s, the General Assembly enacted legislation that imposed some limits on the discretion of the courts. Mandatory minimum sentencing provisions and establishment of sentencing guidelines promoted a more uniform and retributive sentencing system. However, in the 1990s, both the Legislature and the Sentencing Commission implemented policies similar to other jurisdictions that better targeted the use of incarceration and treatment.[3]

Currently, Pennsylvania has a sentencing system with both indeterminate and determinate characteristics; the system uses recommended sentences within set ranges as established by prescribed guidelines adopted in the 1980s.  Judges who choose to depart from these guidelines are required to record why.

Once a state sentence is imposed, the court loses authority over the case, and the decision regarding parole lies solely with the

---

[3] Mark H. Bergstrom, Executive Director, Pennsylvania Commission on Sentencing, September 13, 2002.

A Performance Audit of the                                      Page 3
Pennsylvania Board of Probation and Parole

                                                    Introduction and
                                                    Background

Pennsylvania Department of the Auditor General

---

Board of Probation and Parole. The Board may consider a prisoner for parole only when the prisoner has served the court-imposed minimum sentence.[4]

Parole, like sentencing, has undergone periods of change and, in fact, continues to do so. Criticism in the 1930s and 40s was leveled at the release of prisoners based on their good conduct rather than on evidence that parolees had reformed. Sometime around the 1970s, a nationwide poll showed that half of those surveyed were satisfied with the way parole was granted.[5] But in the early 1990s, more than 80 percent of surveyed Americans supported the idea of making parole more difficult.[6]

In Pennsylvania, the Parole Board was created by the legislature in 1941 in accordance with a 1938 recommendation made by the Governor's Commission to Study the Probation and Parole Systems of Pennsylvania. In its report to then Governor George H. Earle, the Commission posited that a single statewide and coordinated parole administration would repair the defects of the state's parole administration at that time. According to the Commission, those defects included too many independent and non-cooperating parole agencies, all with too few funds and personnel, an inadequate supply of information needed to exercise parole decisions, and too many other duties.

The Commission's report also contained substantial discussion about inequalities in sentencing, the origin and nature of parole, and the value of parole as a method to rehabilitate criminals and reduce crime. In taking on the question of whether parole should be abandoned altogether, the Commission said this:

---

[4] Pennsylvania does not permit "good time" or "earned time" to count as a credit toward the court-imposed minimum sentences.

[5] J. V. Roberts & L. J. Stalans, "Sentencing and Parole," *Public Opinion, Crime, and Criminal Justice,* Westview Press, Boulder, Co., 2000, p. 217.

[6] Roberts & Stalans, p. 217.

Page 4

Introduction and
Background

A Performance Audit of the
Pennsylvania Board of Probation and Parole


Pennsylvania Department of the Auditor General

It can be asserted with certainty . . . that the value of
parole as a weapon in the fight against crime is
manifestly great, that it is inherently sound, and that
its defects lie in faulty administration of the process,
rather than in the fundamental nature of the process
itself."[7]

Today, the Parole Board consists of eight board members plus a
chairman, all full time. Members are appointed by the
Governor—with the consent of a Senate majority—to serve
staggered, renewable six-year terms.

The Parole Board also comprises a staff of 1,000 to supervise its
nearly 24,000 offenders. Altogether, the Board used more than
$71 million for its general operations during the fiscal year ended
June 30, 2001.

The Board has the difficult job of carrying out objectives that
may sometimes compete—protecting the public while
encouraging and motivating parolees. However, because parolees
are still serving prison sentences, protecting the public is the
Board's dominant mission.[8] Striking the right balance is
difficult, and words from the Governor's Commission in 1938
ring true today:

The efforts of the ex-convict to reestablish himself
in life are obstructed at every turn.... The hand of
society is ever raised against him; few are willing to
employ him; none can altogether conceal their
distrust of him. He cannot bury his past if he
would, and thus the stigma of his transgression
hangs like a millstone around his neck dragging him
back to the ranks of the underworld.... Parole's

[7] *Report of the Governor's Commission to Study the Probation and Parole Systems of Pennsylvania,*
(submitted to His Excellency George H. Earle, Governor of the Commonwealth), December 1938, p. 9.
[8] Illustrating public risk is the fact that, according to the state Department of Corrections (in "Recidivism in
Pennsylvania State Correctional Institutions 1994-1999," June 2001, p. 5), nearly one-fourth of the parolees
returned to prison in 1999 had committed new crimes.

A Performance Audit of the                                              Page 5
Pennsylvania Board of Probation and Parole

                                                                    Introduction and
                                                                    Background


Pennsylvania Department of the Auditor General

---

influence upon character is steadying and
encouraging, and the threat of re-imprisonment for
its violation is a forceful incentive to good behavior
for all.  It is weakened only by lax methods of
enforcement...."[9]

Unfortunately, this audit report shows that the state parole
system suffered from exactly what the 1938 Commission
cautioned against—lax methods of enforcement.  By not
performing as strongly as it could have, the Parole Board did not
provide the necessary incentive for parolees to become
productive, law-abiding citizens.  Nor did the Board fulfill its
most important obligation to protect the public.


*Comments*
*See Appendix A, beginning on page 126, for related background*
*comments from the Parole Board (pages 1 and 5-6 in the*
*Board's response).  See Appendix B, page 181, for our response*
*to those comments.*

---

[9] *Report of the Governor's Commission*, p. 9.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

# Objectives and Methodology

The Department of the Auditor General conducted this performance audit to provide an independent assessment of the Pennsylvania Board of Probation and Parole's oversight of criminal offenders assigned to its authority. Our expectation is that the conclusions and recommendations presented in this report will improve the Parole Board's accountability to the public and facilitate corrective action where necessary.

We began our audit with the overall objective of determining whether the Parole Board performed its supervisory duties effectively, including how it implemented sanctions when offenders violated their parole conditions, how the Board utilized special programs such as those related to drug and alcohol treatment, what the Board did to ensure that fines and restitution were paid, how the Board tracked and monitored recidivism, and how the Board ensured that it met training requirements.

Our methodology included comprehensive and detailed testing of a sample of 50 offenders—41 parolees and 9 probationers—drawn from a first quarter 2000 population totaling 2,975 parolees and probationers. We also interviewed Board management and staff and reviewed documents and background material as necessary. The data and conclusions we present are based on objective and systematic examination of the evidence gathered during our field work.

We conducted this audit in accordance with *Government Auditing Standards* as issued by the Comptroller General of the United States. Unless otherwise indicated in the body of this report, our audit covered the period of July 1, 1999, through June 30, 2001.

*Comments*
*See Appendix A, beginning on page 126, for related methodology comments from the Parole Board (pages 1-2 and 6-7 in the Board's response). See Appendix B, beginning on page 181, for our response to those comments.*

## Chapter One

## Supervising parolees and other offenders

It is the primary duty of the Board of Probation and Parole to protect the safety of the public and to address the needs of crime victims. Yet all too often we found that the Board failed to supervise offenders according to requirements and, in so doing, compromised the safety of the public and the needs of crime victims.

Before moving on to our specific findings, we offer this explanation—much of it from the Board of Probation and Parole's own description on its Web site—of how the parole process works:

After prisoners incarcerated in state prisons serve the minimum part of their sentence, they become eligible for parole consideration. Parole is neither automatic nor a right, however, and the Board considers various factors when making its decision whether or not to release an inmate on parole:

- the nature and circumstances of the crime

- the behavior of the inmate while in prison

- injury to the victim

- input from the sentencing court, the district attorney, the Department of Corrections, and the victim

- prior criminal history

- prior parole failures

- any other relevant information

Offenders under the Board's supervision are subject to general conditions of parole, or in some cases special conditions of parole, all of which the parolee agrees to in writing. If conditions are violated, the Board can impose sanctions that can

Page 8

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

be heightened as violations continue. The most serious sanction is revocation of parole and the return to prison.

The Board's Web site lists the following general conditions of parole:

- must be under the supervision of a district office or sub-office and not leave that district without prior written permission of the parole supervision staff

- must obtain prior written permission of parole supervision staff in order to change residence

- must maintain regular contact with the parole supervision staff by (1) reporting regularly as instructed and following written instructions of supervising staff and (2) notifying supervision staff within 72 hours of an arrest, receipt of summons, citation, or offenses punishable by imprisonment

- must comply with state, county, local, and federal criminal laws, the vehicle code, and the liquor code

- must abstain from the unlawful possession or sale of narcotics/drugs and from the use of controlled substances without a valid prescription

- must refrain from owning/possessing firearms or other weapons

- must refrain from assaultive behavior

- must pay fines, costs, and restitution imposed by the sentencing court

The Board's Web site also lists the following examples of special conditions of parole:

- inpatient or outpatient drug and alcohol treatment

A Performance Audit of the                                              Page 9
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

---

- mental health treatment

- not having contact with listed persons such as the victim of
  the crime

In theory, parolees follow all the general and special conditions
and, accordingly, pose little risk to the public.  In practice,
however, parolees violate their conditions routinely and expose
the public to risks associated with errant behavior.  It is for that
reason that parolee supervision is so important.

### Objectives and Methodology

Our objective for this section of the audit was to determine if the
Board performed well in supervising parolees and probationers,
enforcing parole conditions, and, accordingly, protecting the
public from risk.

Our methodology included a comprehensive analysis of case
files for 50 offenders—41 parolees and 9 probationers—whose
Board supervision began during the first quarter of 2000.  We
examined the applicable documents in the offenders' files,
reviewed Board policies and procedures as well as the
accreditation standards of the American Correctional
Association,[10] conducted background research using various
publications and reports related to parole supervision, and
interviewed Board staff.

Specific tests included the following:

---

[10]According to the American Correctional Association's Web site at http://www.aca.org/standards/faq.htm,
accreditation "is a system of verification that correctional agencies/facilities comply with national standards
promulgated by the American Correctional Association.  Accreditation is achieved through a series of
reviews, evaluations, audits and hearings."

Page 10                         A Performance Audit of the
                                Pennsylvania Board of Probation and Parole

Chapter One

                                Pennsylvania Department of the Auditor General

---

- General case file test – We examined case records to gather general information such as release date, supervision level, and conditions set by the Board.

- Parole plan investigation test – We tested parole plan investigation reports to ensure they contained necessary information including, for example, date of completion, home and work plans, and proper approval.

- Supervision level test – We determined if the offenders selected for testing were supervised in accordance with the requirements for the assessed or imposed level.

- Sanctions test – We examined whether sanctions were imposed for various violations and, if so, the types and frequency of sanctions used.

- Supervision fee test – We determined whether supervision fees were collected and, if not, whether they were waived appropriately.

- Fines/costs/restitution tests – We determined whether fines, costs, and restitution were collected on a regular basis.

Our conclusions are presented in the following pages and show how the Board could have performed much better in carrying out its supervisory responsibilities.

| Conclusion 1: | |
|---|---|
| **The Parole Board inadequately documented some investigations of parolee home and work plans, and also took questionable actions beyond the inadequate documentation.** | Prison inmates considered for parole must plan for their release—where they will live and how they will support themselves or, in some cases, be supported. The Parole Board is required, by its own procedures and by the American Correctional Association's standards, to conduct a parole plan investigation.[11] |

Board-approved arrangements for both living and working are critical to a parolee's transition to the community. For example, living in an acceptable home establishes a day-to-day foundation for the parolee. In addition, working at a job has been shown to be a good stabilizer as well as a competitor for time that could otherwise be spent on illegal activity.[12]

In spite of the importance of verifying and approving home and job arrangements prior to releasing parolees into the community, we found that the Board fell short in 61 percent of the cases in our sample. Specifically, of the 41 parolee case files we sampled, we found just 16 in which the Board had clearly and adequately proven it had investigated and approved the parolees' home and work arrangements. The remaining 25 parolee case files contained inadequate documentation for us to determine if the Board had indeed investigated, verified, and approved home and/or job arrangements prior to the parolees' release into the community.

It is important to note that, in cases where the Board released parolees directly to community corrections centers (sometimes referred to as halfway houses), we accepted the Board's policy that an investigation of home and job arrangements was *not* required for entry to the centers. That Board policy appears

---

[11] *Pennsylvania Board of Probation and Parole Procedures*, "Release Procedures – The Paroling Process/The Parole Plan," Chapter II(C)(4), Revision 17, July 20, 1981, and "Institutional Parole Processing – Investigation Request/Report," Volume III, Chapter III, Section IV, Procedure 3.4, Effective February 26, 2002. Also, *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3193, August 1998, p. 58.
[12] Shelley Albright and Furjen Denq, "Employer Attitudes Toward Hiring Ex-Offenders," *Prison Journal*, Vol. 76, No. 2, June 1996, p. 118.

reasonable because community corrections centers are "known" entities with rules and on-premises supervision.  Accordingly, we included the community corrections center parolees in our testing only when they *left* the community corrections center at the end of their stay.



| **Did the Board show it had properly investigated and approved home and employment arrangements for parolees before releasing them into communities?** *Number of parolee case files in sample = 41* | | |
|---|---|---|
| Yes | 16 case files | Both home and employment investigations were documented adequately. |
| No | 8 case files | Neither home nor employment investigations were documented adequately. |
| No | 10 case files | Home investigations were not documented adequately. |
| No | 7 case files | Employment investigations were not documented adequately. |

**Home plan investigations**

The Board's investigation of proposed living arrangements for parolees before releasing them into the community requires the Board to verify, among other things, the following:

- location of the residence
- type of neighborhood
- proximity to employment
- available living and sleeping space
- any sources of potential conflict (e.g., conditions existing that may have led to initial arrest)

A Performance Audit of the                                           Page 13
Pennsylvania Board of Probation and Parole

                                                                    Chapter One

Pennsylvania Department of the Auditor General

- readiness of home provider, if applicable, to provide living arrangements
- willingness of home provider, if applicable, to agree to certain conditions including, for example, a prohibition of weapons and illegal drugs

The Board's policy and procedures manual in effect at the time of our audit noted that parole agents must visit the proposed home and prepare a narrative summary, along with a statement that the parolee would be accepted into the home. In addition, the manual noted that the agent/investigator should include a subjective statement about the suitability of the proposed residence. In March 1999, the Board also implemented a procedure whereby an agreement signed by the home provider was also required as part of the home investigation. The agreement documents that the home provider has been advised of the conditions of parole and understands the responsibilities of housing the parolee.

In order to determine whether the Board properly investigated proposed home arrangements, we looked first in the case files for a specific form (typically, the *Investigation Request/Report* "PBPP-30" form was used), as well as for the agreement, mentioned above, from the home provider. However, we allowed the Board considerable latitude by also accepting other reasonable forms of evidence in the files such as other forms, records, or notations. Still, based on all the documentation available, we found 18 cases (8 +10, chart on page 12) for which there was inadequate evidence—or in some cases no evidence at all—that the Board had investigated, verified, and approved parolees' proposed residential arrangements. In short, it appears that the Board did not perform its job as well as it should have in this critical area.

Page 14                          A Performance Audit of the
                                 Pennsylvania Board of Probation and Parole

Chapter One

                                 Pennsylvania Department of the Auditor General

---

**Work plan investigations**

The Board's policy requires that parolees released into the
community must either be employed or have an alternative
means of subsistence.  The latter category may include, for
example, financial assistance from family or friends, public
assistance, social security or pension income, or educational
assistance.

According to the Board, "Statistics have continually shown that
employment is one of the biggest factors in successes on
parole."[13]  Similarly, *Corrections Today* notes, "Recidivism
studies continue to show that offenders are more likely to
recommit within the first year after their release…[and] it
follows that employment is a necessary ingredient for success."[14]

The reason that employment is critical for parolee success is
clear.  "Work is a self motivator," according to James A.
Gondles, Jr., Executive Director of the American Correctional
Association (ACA). "People in prison or jail, or on probation or
parole can empower themselves with self-worth if they have
jobs."[15]

Despite employment's importance and the policy requiring
alternative means of subsistence in the absence of employment,
the Parole Board released 15 parolees (8 + 7, chart on page 12)
into the community without adequately documenting—or in
some cases without providing any evidence at all—that the
parolees had jobs or other financial support. Either situation put
parolees at a distinct disadvantage by imperiling their chances for
success while, at the same time, providing them with idle time
that could easily be misspent.  Releasing prisoners without
employment or alternative means of subsistence clearly runs

---

[13] *Pennsylvania Board of Probation and Parole Procedures,* "Release Procedures – The Paroling
Process/The Parole Plan," Chapter II(C)(4)(b)(2), Revision 16, March 18, 1981.
[14] Timothy Mann, "In the Name of Jobs," *Corrections Today*, October 1999, p. 131.
[15] James A. Gondles, Jr., CAE, "Programs and Jobs Help Offenders," *Corrections Today*, April 2002,
<www.corrections.com>.