A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

training during a single year. Why, then, were there 11 agents who did not meet the requirements?

While it may be possible that the agents themselves did not take responsibility to ensure they met the annual training requirements, the final responsibility rests with the Board. Indeed, we traced the training deficiencies and inconsistencies to the Board's failure to adequately record and monitor the training activities of its parole agents. The Board's procedures require the training division to maintain an up-to-date training record for each employee; the procedures also say that regional directors, office directors, and bureau directors will receive a report identifying employees who do not meet the minimum number of annual training hours.[56] Unfortunately, even though the Board was technologically able to maintain the records and did actually forward the reports to the applicable directors who could have taken action to correct the training deficiencies, there was little, if any, such action taken.

Aside from not ensuring that agents met the annual 40-hour requirement, the Board also allowed 20 of the 50 agents in our sample to count meetings (as opposed to courses or other formal training activities) toward the required training hours—meetings that should have been deemed unacceptable for a variety of reasons. Specifically, our testing showed the following:

- In some instances, the Board allowed meetings about deferred compensation or retirement to count toward the required training, in spite of the Board's written policy that unacceptable training activities are those that disseminate routine information or review/update existing policy.[57]

---

[56] *Pennsylvania Board of Probation and Parole Procedures*, "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2(E)(4), Effective January 16, 2001.

[57] *Pennsylvania Board of Probation and Parole Procedures*, "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2(C)(1), Effective January 16, 2001. This procedure also deems unacceptable training activities to include planning or problem-solving meetings or activities concerning case staffing.

EXHIBIT
1-E

A Performance Audit of the                                   Page 93
Pennsylvania Board of Probation and Parole

                                                         Chapter Four

Pennsylvania Department of the Auditor General

- In other instances, the Board allowed entire meetings to count toward the required hours even when only a portion of the meetings included training-related subjects. The Board told us it has since altered this practice by allowing only relevant portions of meetings to count toward the required hours, but we note that this altered practice is also unacceptable unless the training is "formal training" for which "supporting documentation clearly shows those portions of the meeting to be training."[58] Without the documentation, and without "measurable, performance-based learning objectives" as required by the American Correctional Association's accreditation standards,[59] the Board should not permit these hours to count toward the required training.

Our finding that the Board allowed unacceptable meetings to count as training is most significant when applied to 4 of the 20 agents. These 4 agents would not have met their 40-hour training requirement if the Board had not counted the unacceptable meetings.[60] Moreover, these 4 agents are *different from* and *in addition to* the 11 agents discussed at the beginning of this conclusion who did not meet the 40-hour training requirement. Therefore, if we add the 4 agents to the 11, that means there were 15 agents altogether in our sample that did not complete the required 40 hours of training.

Board officials disagreed with our numbers, maintaining that two of the 11 agents we initially identified had actually received all the required training but had simply not had their total hours

---

[58] *Pennsylvania Board of Probation and Parole Procedures*, "Management Services -- Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2(B)(2)(d), Effective January 16, 2001. The procedure goes on to note that training provided by an agency employee would have to include a training outline or lesson plan.

[59] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3073, August 1998, p. 22.

[60] The other 16 agents had completed enough acceptable hours of training to meet their requirements without counting these unacceptable meetings. Still, that point does not change the fact that the Board was deficient in allowing the meetings to count toward training hours.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Four

Pennsylvania Department of the Auditor General

recorded.  However, we were unable to verify the Board's
assertions, even after speaking with the applicable agents or their
supervisors.

While Board officials may dispute the results of our testing, they
have only to look to their own records to find that their staff did
not meet the ACA requirements.  We base this assertion on
information provided by the Board following the testing
described in the preceding narrative.  Using Board-provided lists
of all staff members required to obtain 40 hours of annual
training, we found that, during the fiscal year ended June 30,
2001, approximately 34 percent of the Board's staff failed to
obtain the necessary training.  Moreover, using the Board-
provided list for the previous fiscal year, we found that
approximately 24 percent of the staff failed to obtain the 40
hours of training.  Altogether for the two fiscal years, more than
350 members of the Board's staff did not receive all their
required training.

Overall, we could find no explanation to minimize the
significance of all components of this finding—the lack of
required hours or the counting of unacceptable hours.

### Recommendations

- The Board should ensure that its agents receive the required
  40 hours of annual training.

- The Board should ensure that general meetings are not used
  as a substitute for acceptable training activities, and that other
  meetings substituted for training activities are legitimately
  training-related and have the requisite lesson plans and
  objectives.

- The Board should ensure that agents know their training
  requirements and how to meet them.

- The Board should ensure that supervisors monitor training records and take action to resolve training deficiencies or inconsistencies.

- The Board should utilize technology to track training and to generate reports that identify training deficiencies.

### Board of Probation and Parole Response

The Board disagrees with the DAG's statement that "the Board did not ensure that its parole agents and other field employees were adequately trained." Although we reached the same finding as the DAG in that 11 agents did not receive 40.00 hours of required annual training (NOTE: 3 of these 11 agents had, however, received between 39.00 and 39.50 hours of training), the PBPP does not support the conclusion that PBPP employees are not "adequately trained."

Parole agents are fully trained professionals. The Board's training requirement of 40 hours per year is designed to keep them informed of current probation, parole and related issues and to update them on professional issues. *In fact, the DAG report recognized that new employees received in excess of 300 hours of training their first year on the job.* During the 18-month period prior to 7/1/02, the Board's parole agents (excluding first year agents) received an average of 55.3 hours of training annually.

In fiscal year 1999-2000, the Agency provided *43,725 hours of training* with a diversified curriculum to state and county employees. The Board also sent 409 PBPP staff to attend out-service training sessions of one or more days each. In fiscal year 2000-2001, the Agency provided *45,375 hours of training* with a diversified curriculum to state and county employees. The Board also sent 491 PBPP staff to attend out-service training sessions of one day or more each. The DAG report also states: "In some

instances, the Board allowed meetings about deferred
compensation or retirement to count toward the required
training." The Board believes that this is valid training time.
SEAP, Workers' Compensation, retirement, and other benefits-
related topics provide relevant information more efficiently in a
group setting.

In addition, to ensure better monitoring, the Board instituted a
new electronic training records system, which went on-line in
October 2002. This application allows all staff to review their
training records on-line. It also gives management and
supervisory staff the ability to review the records of
subordinates. Employees no longer need to wait for a hardcopy
report of their training hours. The new application also gives the
training staff the ability to view the training history of all
employees when assigning class participants. This aids in a more
equitable distribution of training opportunities.


### Department of the Auditor General Comments

It is clear from our numerous interviews and meetings with
Board officials that the Board does indeed take great pride in the
training of its employees and, moreover, in the carrying out of *all*
its responsibilities. Such pride is laudable. Nevertheless, the
deficiency here is not a lack of pride; rather, the deficiency is the
Board's failure to follow its own requirements.

The Board notes that 3 of the 11 agents we tested received nearly
all of their required hours of training. That statement is true—
but the Board also counted non-acceptable hours in 2 of those 3
cases. Even if we factored out those 3 agents, however, there
were still 8 of 50 agents, or 16 percent, who were more than just
one or two hours short. The violation of its own training
requirements—plus the Board's attempt to minimize the
violation by suggesting that it's okay for some agents to fall short

A Performance Audit of the                                    Page 97
Pennsylvania Board of Probation and Parole

Chapter Four

Pennsylvania Department of the Auditor General

as long as it's only by a few hours—is not acceptable and, once
again, sends the wrong message.

Of particular significance is that, notwithstanding *our* testing, the
Board's own training records document that *more than 350
agents failed to obtain their required training hours during the
fiscal years ended June 30, 2000, and June 30, 2001.* Worse,
given the Board's practice of counting training hours that do not
constitute acceptable training, that number would undoubtedly be
even higher. In its response to this audit, however, the Board
does not really address its deficient compliance with
requirements but instead presents statistics about other hours of
training—not the subject of this conclusion—provided to state
and county employees.

Regarding the Board's contention that information about
deferred compensation or retirement or other benefits-related
topics are presented more efficiently in a group setting, we agree.
However, we disagree that those benefits-related group meetings
should be allowed to count toward the 40 hours of required
annual training as they were. The Board's own written policy
deems training activities "unacceptable" when they disseminate
routine information or review/update existing policy. Once
again, we used the Board's own measurement tool to draw our
training conclusion and, once again, the Board now attempts to
change the tool when the measured results come up short.

Finally, the Board's use of very specific and precise numbers in
its response portrays an image that the Board maintained detailed
and accurate training records. We note, however, that the Board
was much less precise when we identified training deficiencies
during our field work. In two particular cases involving the
training of parole agents, for example, we asked for evidence and
the Board responded in writing as follows:

> The agent's former supervisor related that in his
> recollection the agent had all of her hours
> completed, but some did not get recorded on her

training record.  He stated that some training hours he submitted on the Training Input and Documentation form were included in the agent's training record and some were not.  He is not able to remember, at this time, what those particular training were.

Another example:

The agent recalls completing all of his training hours for the time in question, but claims that he did not receive credit for all the training he attended. Again, at this point and time, he cannot recall specifically which trainings those were. His current supervisor has checked supervisory files for the time in question and can find no reference to this situation.

The imprecision and guesswork illustrated in the two examples will likely be addressed with the Board's new electronic training records system that, according to the Board's response, went on-line in October 2002 (following completion of our field work). Such a system should significantly improve the Board's ability to keep track of its employees' training.

A Performance Audit of the                                                      Page 99
Pennsylvania Board of Probation and Parole

Chapter Four

Pennsylvania Department of the Auditor General

| **Conclusion 2:** | Of the 50 parole agents in our sample, 42 were authorized to carry a firearm while on duty.  Agents who carry firearms must take and pass a shooting test every year to retain their qualification, and we found that all 42 agents took this re-qualification test as required. |
| --- | --- |
| **The Parole Board ensured that all the agents in our sample were qualified to carry guns but did not ensure that all the agents met annual training requirements.** | Unfortunately, we also found that 7 of the 42 agents did not complete annual tactical firearms training as required and that 4 of the 42 agents did not complete annual dim light/night fire training.  These agents were permitted to carry their guns nonetheless. |

In addition to the obvious risk of danger, allowing unqualified or inadequately trained parole agents to carry guns is a violation of both state law and Board procedures:

- Under the Board's regulations, "parole agents shall be authorized to carry firearms in accordance with established standards and procedures of the Board."[61]

- The Board's policy is clear: All staff members authorized to carry guns must successfully complete initial training and then must re-qualify annually thereafter.

- The Board's written procedures also dictate that—in addition to the re-qualification—all mandatory annual firearms training must be completed, including tactical training and dim light/night fire training.

If the firearms re-qualification—along with the training—is not completed by 90 days past the agent's re-qualification date, the Board policy sets forth consequences:  "Upon the expiration of the 90-day period, the Board-owned weapon must be retrieved from the individual."[62]  We found no evidence that this retrieval

---

[61] 37 Pa. Code section 69.1.
[62] *Pennsylvania Board of Probation and Parole Procedures*, "Firearms Procedures (As Revised)," Chapter V(I), Effective September 1, 2000.

was either attempted or carried out.  Accordingly, the Board
continued to allow untrained agents to carry guns, thereby
putting both themselves and the public at risk.

### Recommendations

- The Board should monitor the firearms training of its agents
  and report on that training to supervisors.

- The Board should ensure that its agents complete all annually
  required firearms training, including tactical training and dim
  light/night fire training.

- The Board should retrieve firearms from agents who do not
  take the annual re-qualification test on time or who do not
  complete the annual training.

### Board of Probation and Parole Response

The auditors reviewed the training records of 50 parole agents.
Of that sample, 42 agents were authorized to carry the PBPP-
issued firearm.  (The Board does not require parole agents to
carry firearms.)  The DAG found that "7 of the 42 agents did not
complete annual tactical firearms training" and that "4 of the 42
agents did not complete annual dim light/night fire training."

The Board requires that all parole agents who are authorized to
carry a PBPP-issued firearm complete the initial firearms
training.  Phase 1 of this training includes weapon
familiarization, shooting fundamentals, weapon safety, policy
and procedure review, weapon retention, a written exam, and
qualification. Those staff members who successfully complete
Phase 1 are then permitted to attend Phase 2 of the firearms
training.  Those agents who fail to complete Phase 1, for any

reason, are not permitted to attend Phase 2, and are re-scheduled for Phase 1.

Phase 2 of the initial firearms training includes dim light/night fire courses and tactical training. The dim light/night fire training provides the staff instruction regarding the use of available light and the proper use of the flashlight in concert with the firearm. The tactical portion of Phase 2 instructs the staff on the use of cover and concealment deadly force decision-making, "move and shoot" techniques, and target identification. The entire Initial Firearms Training requires 60 hours of instruction, which includes classroom and firing range instruction.

Upon completion of the Initial Firearms Training and after all other training requirements have been met, agents may request permission to carry a PBPP-issued firearm. Upon issuance of the firearm, the agents attend the required firearms training as scheduled within their district. This will place the agents into an annual training cycle.

The Board's "Use-of-Force" procedure requires that all staff who are authorized to carry an Agency-issued firearm complete re-qualification no later then 90 days beyond the anniversary date of the employees' last re-qualification date. Dim light/night fire and tactical training must be completed *annually*. At the time of the audit, the procedure in place allowed for the training to be completed **within the calendar year**. A recently revised procedure (effective 3/11/02) requires the dim light/night fire and tactical training to be completed within the training year, July through June.

The DAG has incorrectly interpreted the Board's procedure. The DAG found that 7 of the 42 agents did not complete the annual tactical firearms training. Contrary to the DAG finding, a review of each agent's training record indicates **all 42 of the agents did complete the required tactical firearms training within each calendar year included in the audit as outlined by Board procedure.**

The DAG's report also indicated that 4 of the 42 agents authorized to carry firearms did not complete the annual dim light/night fire training.  Contrary to the DAG finding, a review of each agent's training record indicates *3 of the 4 agents did complete the required dim light/night fire training within each of the calendar years of the audit.*  (One parole agent failed to complete the dim light/night fire training as required.  The agent was on extended sick leave for bypass surgery during the time that the dim light/night fire training was held in his district.  This parole agent has since retired.)

The 42 agents in this sample were required to participate in 252 firearms trainings within the time frame of the performance audit.  Of the required 252 firearms trainings, *only one agent did not complete one training course.*  This compliance indicates a **99.6% completion rate**.

The dim light/night fire and tactical training was implemented by the Agency as a response to various court rulings which require staff to receive "realistic" training as may be encountered within the scope and duties required on the job.  See *City of Canton, OH v. Harris*, 489 U.S. 378 (1989) and *Popow v. City of Margate, NJ*, 476 F.Supp. 1237 (D.N.J., 1979).  The use of an anniversary date as the cut off for the tactical and dim light/night fire training, as interpreted by the DAG, would not allow for realistic training to occur.  For example: If an agent is required to receive the tactical training in July of every year, then that agent will never learn how to respond to the limitations imposed by the heavy clothing that may be worn during the colder months.

The PBPP has always been proactive in the development and improvement of all levels of the use of force training.  In the Fall of 2001, the PBPP developed a *Defensive Tactics Staff Safety Training Unit* ("DTSSTU") that is responsible for all "use-of-force" training provided to staff throughout the Agency.  (Prior to the development of this unit, the training was provided entirely by parole agents who were required to carry a full caseload as well as developing, setting up, and delivering the firearms

training.) The DTSSTU includes a parole manager and three
parole agents dedicated to training parole staff in all levels of the
use-of-force. The DTSSTU also centralizes all of the Agency
use-of-force training records. The centralization of the use of
force training records provides a means for reporting and
recording the status of employee training. The DTSSTU is
required to notify the Board's Firearms Coordinator of any
individual who has not successfully completed the required use
of force training so that appropriate action can be taken. The new
DTSSTU and reengineered training record database has provided
a means to detect discrepancies and act on them immediately.
This action includes the removal of the Agency-issued firearm,
when necessary.

**The PBPP recently achieved a 99.6% compliance rating on
an American Correctional Association (ACA) audit, having
been found in compliance with 217 of 218 non-mandatory
supervision standards. The ACA audit includes mandatory
compliance standards relating to firearms policy, procedure
and practice. This Agency received a 100% compliance
rating on all mandatory standards.**


### Department of the Auditor General Comments

It is absolutely incorrect for the Board to state here and in its
Executive Summary response that we measured training based
on employees' anniversary dates (we did not) and that we and the
Board disagree about the definition of "annual" (we used the
Board's own written definition). The Board invokes these same
arguments in its response immediately preceding this rebuttal by
saying, "At the time of the audit, the procedure in place allowed
for the training to be completed **within the calendar year.**"
(Emphasis in original.) In reality, Procedure 9.4.4.2.(A)(3),
effective January 16, 2001, said something quite different:

A.  Minimum Annual Training Hours

3.  The yearly time period for which
training hours are required begins
July 1 and ends June 30 of each
year.

Accordingly, based on the Board's policy in effect at the time of
the audit, we looked at July 1 through June 30 as the yearly time
period for which training hours are required.  During our field
work, the Board acknowledged our use of that same period in
written correspondence concerning various cases we tested.  In
short, we did not use calendar year dates, we did not use
anniversary dates, and the Board *knew* what dates we used and
took no exception to them.  The Board once again is attempting
to change prescribed measuring tools when the measured results
come up short.

In addition, the Board is being inconsistent by definitively
claiming now that a particular parole agent "was on extended
sick leave for bypass surgery during the time that the dim
light/night fire training was held in his district."  In fact, the
Board was much less definite in its response to us during the
course of our field work:

> After checking with his previous supervisors and
> firearms instructors and searching records, there is
> no evidence that his training was done.  The *best
> guess* is that he was off for by-pass surgery when
> the training was held and when he returned, this fact
> was overlooked.  (Emphasis added.)

Finally, the Board's statement that it achieved a 99.6
percent compliance rating from the American
Correctional Association for non-mandatory supervision
standards—as well as a 100 percent rating for all
mandatory standards related to firearms policy,
procedure, and practice—is undermined by the Board's
own internal audits of its districts.  Our review of those

audits revealed that the Board is not as close to ACA
compliance as indicated.

Our conclusion stands as written: The Parole Board
ensured that all the agents in our sample were qualified to
carry guns but did not ensure that all the agents met
annual training requirements.

## Chapter Five

## Supervising district field operations and county offices

The American Correctional Association's accreditation standards require that the Board of Probation have—in policy, procedure, and practice—a "system to monitor operations and programs through [annual] inspections and reviews" that will "reveal the degree of compliance with policies and procedures."[63]

In keeping with the ACA standard, the Board's Division of Special Projects completes annual audits of the Board's 10 district and 12 sub-offices.[64]

In addition, the Board's Bureau of Probation Services provides funds to county probation and parole departments through a state-funded "grant-in-aid" program. As part of the funding process, the Bureau of Probation Services establishes standards that the county departments must follow in order to receive the grant monies. Accordingly, the Board completes an ACA standards audit of each of the state's 65 county probation and parole departments (Mercer and Venango counties have no such county departments) at least once every three years. During intervening years, the Bureau completes more limited technical reviews of a select group of standards.

### Objectives and Methodology

The objective for this portion of the audit was to determine if the Board established adequate procedures to monitor the performance of its field offices that oversee the day-to-day supervision of offenders. To accomplish this objective, the auditors completed the following tasks:

- Reviewed the ACA Standards regarding probation and parole supervision requirements

---

[63] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3023, August 1998, p. 7.
[64] The Board's organizational chart divides field operations into 10 separate district offices throughout the state. Each of these offices is further divided into smaller sub-offices, of which there are 12 in total.

- Examined applicable Board policy and procedures regarding annual audits of district field offices

- Interviewed applicable Board staff

- Accompanied the Board's Division of Special Projects auditors on their annual audit reviews of two district offices

- Accompanied the Board's Bureau of Probation Services auditors on one annual audit and two technical reviews of county probation and parole offices

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

| | |
|---|---|
| **Conclusion 1:**<br><br>**The Parole Board did not effectively monitor the performance of its field operations.** | The Parole Board conducted annual compliance audits of its 10 district offices and 12 sub-offices, but these audits were ineffective. While the audits did identify instances of noncompliance with American Correctional Association standards and other problems relating to offender supervision, the Board did not ensure that corrective action plans were implemented to remedy identified deficiencies. As a result, field staff was permitted to continue its poor work habits that contributed, in turn, to inadequate offender supervision and increased risk to public safety. |

As noted in the introduction to this chapter, American Correctional Association accreditation standards require that annual inspections and reviews are conducted to reveal compliance with policies and procedures. The Board, in compliance with the ACA standards, has issued several procedure statements that are part of its written policy manual. It is in these written policies and procedures that the Board's Division of Special Projects is assigned the annual audit responsibility.

These 10 district offices and their 12 sub-offices carry out the day-to-day operations of the Board by supervising offenders, conducting urinalysis testing, and collecting supervision fees. During the Board's annual audits, staff from the special project division review approximately 10 percent of the offender case files in the audited offices, using ACA standards and Board policies and procedures as benchmarks.

The purpose of the file reviews is to determine if field staff is (1) properly supervising offenders and (2) documenting the results of their supervision efforts. To accomplish this task, the Board's auditors complete a checklist of basic elements that should be present in each offender's file. The elements on the checklist cover a variety of topics. For example, one element on the checklist addresses whether the number of contacts is appropriate for the level of supervision. Another element on the checklist

A Performance Audit of the                                    Page 109
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

addresses if initial supervision reports for offenders were
completed in a timely manner.

Based on our review of the Board's district office audit reports
for the fiscal year ended June 30, 2002, we found the process to
be ineffective. Although the audits uncovered deficiencies, the
Board did not take steps to ensure that identified problems were
corrected.

Examples of district audit findings that were contained in more
than one audit report include the following, many of which
mirror our own findings of the Board:

- Case files did not contain completed supervision plans. In one
  case, the offender was listed as being an absconder since 1978.

- Cases (offenders) were not properly supervised because they
  did not have the appropriate number of contacts for the grade
  of supervision or the auditor could not determine compliance.

- Cases did not have documentation supporting why offenders
  were not paying supervision fees.

- Supervisors kept records manually and did not use the
  "Supervisor Controls" program.

- Case files contained loose papers (including travel
  permissions, progress and conduct reports, public letters,
  changes of address, and criminal complaints).

- Case files did not contain client supervision plans and
  criminal history logs; in one case, the offender was classified
  at enhanced supervision but contacts were made only once a
  month.

- Case files had pre-release material fastened to post-release
  material.

- At least three audits indicated that, generally, the files would not meet either American Correctional Association or Board standards because of the untimeliness of initial supervision reviews, incomplete client supervision plans, and unacceptable assessments and progress and conduct reports.

When we discussed this entire issue with the applicable Board management official, he relayed to us that the Board's audits are conducted specifically for the 10 district directors to use as management tools solely at their discretion. Stated another way, it is not the practice of the Board to follow up to see if directors actually resolve problems that are identified by the audits.

The establishment of monitoring procedures as a management tool to evaluate offender supervision efforts is of little use if reports are not taken seriously. Based on both our observation and on Board comments, the Board appeared to be interested primarily in complying with the ACA standard only in the sense of *conducting* the audits—not in resolving the problems that the audits identified.


### Recommendations

- The Board should institute a corrective action plan as necessary for district audits to ensure that identified deficiencies are addressed.

- The Board should ensure that district office directors are held responsible for implementing action plan recommendations.

- The Board should consider having its special projects division expand its annual audit process to include a review of these corrective action plans to ensure that identified deficiencies have been corrected.

---

### Board of Probation and Parole Response

The Board conducts annual inspection audits of the field supervision units in ten districts. These audits are conducted by the Board's Special Projects Division. The objective of the audits is to determine whether supervision staff is complying with the Board's policies and procedures and with the supervision standards established by the American Correctional Association (ACA).

The Board's auditors examine approximately 10% of the supervision units' case records to determine whether appropriate Agency and ACA procedures are being followed. When the PBPP auditor completes his/her inspection of the unit files for compliance with Agency procedures and ACA Standards, the PBPP auditor then meets with the unit supervisor and District Director and reviews the findings. Upon return to Central Office, the auditor files a comprehensive report of his findings with the Special Projects Director. This report is forwarded through the chain of command to the Director, Office of Probation and Parole Services, who reviews the issues with the Regional Directors. The Board will intensify its efforts to institute corrective action plans, where necessary, and to ensure that district directors implement action plan recommendations.

### Department of the Auditor General Comments

In its response, the Board summarizes its internal process but does not sufficiently address whether the identified deficiencies were corrected or what the Board will do if the deficiencies were not corrected. Furthermore, although the Board says that it will intensify its efforts to institute corrective action plans, it is not clear whether such plans will be instituted for past deficiencies or only for future ones, nor is it clear how such efforts will be implemented.

Page 112

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Five

Pennsylvania Department of the Auditor General

---

It is important to note that the Board's own district audit findings—examples are bulleted on page 109—contradict both the Board's assertions (in responding to this audit) and its consultant's report (in Appendix A) suggesting that nearly all is well.

| | |
|---|---|
| **Conclusion 2:**<br><br>**The Parole Board did not effectively audit the 65 county probation and parole offices.** | The Parole Board did not effectively audit the 65 county probation and parole offices and, accordingly, did not fulfill the Board's oversight responsibility of these offices. In fact, the Board's lack of oversight allowed the counties to receive almost $20 million in state funding for the fiscal year ended June 30, 2002, through grant-in-aid appropriations—even though some counties may not have been eligible for the grants. |

The Pennsylvania Probation and Parole Act states the following:

> Any county which provides additional probation staff for pre-sentence investigations and for improved probation supervision and program, shall receive a grant-in-aid from the Commonwealth through the board for the additional cost incurred thereby but only to the extent that the additional staff and program meet the qualifications and standards established by the board.[65]

In accordance with this 1965 Act, the Board is required to oversee and monitor the distribution of the grant-in-aid appropriations. Since the inception of that grant program, the Board has allocated more than $303 million in state aid to county probation and parole offices.

As a benchmark for receiving the grant-in-aid appropriations, the Board requires that—as determined by audits every three years and more limited reviews in intervening years—each county must maintain a compliance level of 90 percent or greater with all applicable American Correctional Association standards.

In order to determine whether the Board carried out its audit responsibilities appropriately, we observed one audit and two technical reviews by the Board during the fiscal year ended June 30, 2002. Although the Board's auditors should have used Board-developed audit checklists for both the full audit

---

[65] 61 P.S. section 331.17a(c).

and the technical review visits, we found that Board auditors
did so only for the technical review visits.   We further noted
that the Board's auditors did not include a review of case files
and other information needed to support audit conclusions.
Instead, it appeared that the visits were merely a question-
and-answer session regarding applicability of ACA
standards.

As a follow-up to our observations, we asked the Board to
provide its supporting documentation for 7 selected ACA
standards.[66]  It was our intent to substantiate the 100 percent
compliance rating the Board had granted to five county probation
and parole offices.

Rather than provide us with the evidence we requested, the
Board responded in writing that it did not collect such supporting
documentation when conducting the county audits.  The Board
wrote that, instead, "we review documentation provided by the
counties and make a determination at that time as to compliance,
non-compliance, or non-applicability."

Based on our observations to the contrary, we found the Board's
response to be unacceptable.  Specifically, during the audit and
the 2 technical assistance sessions we observed, the Board
auditors did not review any supporting documentation regarding
the 7 standards we selected.  Rather, the Board's auditors held
meetings with county officials and reviewed written policy and
procedures to determine whether procedures *existed*—but not
whether they were actually *used*.

In view of what appeared to be only cursory audits and reviews,
it was troubling to find that the Board reported extremely high
levels of compliance.  Specifically, of the 9 full audits and the 48
technical assistance reviews that we examined, the Board listed

---

[66] The 7 ACA standards addressed training, pre-parole, supervision, workload, absconders, recidivism, and
cash management.

28 as 100 percent compliant and the other 29 to be 95 percent compliant or better.[67]

Merely reviewing whether a policy or procedure *exists* is not sufficient evidence to ensure the counties are actually *exercising* the prescribed standards, and the Board clearly should be determining the latter. In fact, to determine whether counties are at least 90 percent compliant with ACA standards, the Board should be doing—at a minimum—the following:

- Reviewing offenders' case files to determine if parole agents are adequately supervising offenders

- Reviewing training documentation to verify whether parole agents are adequately qualified to perform their duties

To illustrate our concern even further, we note here that, in the most recent edition of the American Correctional Association standards, the words "and practice" were added to the ACA's requirements for various policies and procedures. It seems apparent that "in practice" was added to ACA standards for the purpose of forcing probation and parole agencies across the country to have more than just the existence of policies and procedures and, instead, to put those policies and procedures into actual practice.

Grant-in-aid funding was established by the state legislature as a method to improve county probation and parole services. The Board is obligated to measure individual county probation and parole office performance—and not superficially. Instead, the Board should realistically evaluate the strengths and weaknesses of the Commonwealth's county probation and parole offices and verify that these agencies are entitled to the grant-in-aid funding they receive.

---

[67] We learned from Board management that such high compliance ratings are typical; the last time a county received less than a 90 percent compliance rating was in the mid-1980s.

### Recommendation

- We recommend the Board conduct more in-depth and comprehensive analyses of each county probation and parole office before awarding the grant-in-aid funding. To accomplish this recommendation, the Board needs to review case files and other secondary documentation to determine compliance with American Correctional Association standards.

### Board of Probation and Parole Response

The DAG recommended that the Board "conduct more in-depth and comprehensive analyses of each county probation and parole office before awarding the grant-in-aid funding. To accomplish this recommendation, the Board needs to review case files and other secondary documentation to determine compliance with [ACA] standards."

Members of the DAG's audit team accompanied the Board auditors on two "technical reviews" (Cambria County and Clearfield County on October 31, 2001) and one partial county audit (Philadelphia County on October 15-18, 2001). In the case of the "technical reviews," audit checklists were used during the audits as well as review of case files. In the case of the Philadelphia audit, there was insufficient time to do a standards audit during the October 2001 field visit. The Board's auditor secured a copy of the Philadelphia County Adult Probation Department's manual and conducted an audit of primary documentation (policy and procedure) and used a checklist to record findings. The DAG auditor did not accompany the Board's auditor on the return visit to Philadelphia County on January 31, 2002, in order to discuss these findings and to review supporting documentation.