The DAG criticized the Board auditors for not providing evidence of supporting documentation when conducting county audits. There is simply not enough storage space to keep secondary documentation on 227 standards from 65 counties. The Board auditors use the same auditing procedures as the ACA uses to determine if an agency should be accredited. Those techniques include reviewing primary and secondary documentation on site and making a determination at that time of compliance, non-compliance or non-applicability.

The DAG recommended that "…the Board needs to review case files and other secondary documentation to determine compliance with American Correctional Association standards." In the Board's *Manual of Operations and Procedures*, Volume III, Chapter VI, Procedure 6.16 addresses the subject entitled "County Adult Probation and Parole Program Audit." This Procedure became effective on March 11, 2002. (See Appendix, Item 17)

### Department of the Auditor General Comments

The Board has failed to rebut our basic finding, instead deflecting attention by focusing on a few details and making criticisms that are themselves without foundation. For example, although it is correct that our auditors did not accompany the Board's auditor on a return visit to Philadelphia County on January 31, 2002, *we were absent only because the Board failed to tell us when it was making the return visit—despite our request to be notified*. Moreover, when we subsequently asked for a copy of the Board's completed checklist and work papers documenting the return visit, the Board told us it did not retain its documentation.

The Board must take measures to address its issue of document retention. With current technology, it is simply


EXHIBIT
1-F

Page 118                    A Performance Audit of the
                            Pennsylvania Board of Probation and Parole

Chapter Five


                            Pennsylvania Department of the Auditor General

---

not reasonable for the Board to suggest that only a lack of
storage space prevents it from saving documents that
could support its claims about county performance.

---

# Chapter Six

# Evaluating special treatment programs

The Parole Board participates in several special programs, including two major programs that provide substance abuse treatment and intensive supervision, and other programs that address, for example, parenting skills and various other parolee reentry issues.

In the discussion that follows, we limit our focus to the two substance abuse treatment programs because these are the programs in which significant efforts are being made to measure and evaluate results. These programs are for drug- and alcohol-abusing technical parole violators and serve as alternatives to re-incarceration.

### The SAVE Program (Substance Abuse Violators Effort)

SAVE, or Substance Abuse Violators Effort, is a joint program of the Pennsylvania Department of Corrections and the Board. Parolees with significant addiction problems are placed into the SAVE program instead of being re-incarcerated. The parolees spend three months as an inpatient in the intensive substance abuse program at Eagleville Hospital, Montgomery County. Subsequently, the parolees are reintroduced—initially with enhanced supervision—into the community and participate in months of outpatient group and counseling sessions.

Parolees who experience difficulty in the SAVE program can (1) be required to repeat an earlier phase of the program, (2) be re-incarcerated, or (3) be placed into the Residential Substance Abuse Treatment program, or RSAT, described next.

### The RSAT Program (Residential Substance Abuse Treatment)

Begun in early 1998, RSAT is similar to SAVE and is a program of the Department of Corrections, the Pennsylvania Commission on Crime and Delinquency, and the Board. Unlike with the SAVE

program, however, participants in RSAT spend the first six months actually incarcerated in a state prison, albeit in a "therapeutic community" there. Following that initial six-month incarceration, the offender then resides in a community corrections center and undergoes intensive outpatient treatment focusing on relapse prevention and aftercare planning. The offender must also obtain a sponsor willing to be a support person, including attending group meetings such as Alcoholics Anonymous. RSAT participants may earn privileges—such as furloughs and curfew raises—by actively participating in and completing RSAT requirements. In the final months of the program, offenders are re-paroled with an intensive case plan and subject to enhanced supervision, including at least one face-to-face meeting a week, electronic monitoring, and frequent urinalysis testing for drugs. According to Board officials, offenders who fail a phase of RSAT are re-incarcerated.

RSAT was initially offered in just the Graterford and Huntingdon state correctional institutions but was expanded in 2000 to the state correctional institutions at Albion, Cambridge Springs, Camp Hill, and Somerset.

### Objectives and Methodology

Our objectives for this portion of the audit were to determine whether the Board's special programs were effective in helping offenders to overcome substance abuse problems and in reducing recidivism; and to determine whether the Board's existing programs were providing effective alternatives to incarceration.

To accomplish these objectives, we employed the following methodology:

- Interviewed Board officials concerning the special treatment programs used for its parolees

A Performance Audit of the                                                Page 121
Pennsylvania Board of Probation and Parole

                                                                         Chapter Six


Pennsylvania Department of the Auditor General

---

■ Reviewed Board policies, procedures, and program descriptions,
  as well as applicable American Correctional Association
  accreditation standards.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

---

**Conclusion 1:**

**The Parole Board participated in interagency and external monitoring efforts of its substance abuse programs.**

Because the Board is bound by confidentiality requirements that keep such information from the public eye, we were unable to review SAVE and RSAT treatment program outcomes and the program costs. However, several independent studies of SAVE and RSAT have already been or were being conducted at the time of our audit.

The single study available to us was a May 1999 report by the Vera Institute of Justice. *A Collaborative Evaluation of Pennsylvania's Program for Drug-Involved Parole Violators* notes that "the RSAT programs benefit from steady monitoring by a management group that includes all involved agencies, public and private."[68] That group includes the Board, the Department of Corrections, the Pennsylvania Commission on Crime and Delinquency, and the service providers that operate the RSAT programs.

The Vera report notes that RSAT was established in 1998 in the Graterford and Huntingdon state correctional institutions, that the programs expanded from 50 to 60 beds within a few months of opening, and that they were nearly always at capacity. As of December 31, 1998, 237 technical parole violators had entered the two programs. Although there was little dropout in the first six months of RSAT when the participants were actually inside the prison, the failure rate increased significantly when the participants resided outside prison in community corrections centers. The Vera report noted that the interagency working group was concerned with the higher failure rates and, accordingly, initiatives were undertaken to increase RSAT retention among community corrections center participants.

Information from the Department of Corrections' Web site indicates that Vera is continuing its research of the RSAT program, but newer studies were not available to us as of September 2002.

---

[68] Douglas Young and Rachel Porter, *A Collaborative Evaluation of Pennsylvania's Program for Drug-Involved Parole Violators*, Vera Institute of Justice, prepared for the National Institute of Justice, grant #98-RT-VX-K002, May 1999.

A Performance Audit of the                                    Page 123
Pennsylvania Board of Probation and Parole

                                                             Chapter Six

Pennsylvania Department of the Auditor General

---

Information from the Corrections' Web site also indicates that a study was undertaken involving the SAVE program, but that study too was unavailable.

For the time being, and with the little information available to us, we will have to rely on the Board and the Department of Corrections to analyze and evaluate the RSAT and SAVE programs. Whether the analyses and evaluations are done internally or externally is not important—what *is* important is that the programs are indeed evaluated, modified as necessary to achieve maximum effectiveness, and provided to the parolees who need them.

Experts in the field of corrections have drawn a direct correlation between rehabilitation and treatment programs and reduction in recidivism. According to these experts, treatment and rehabilitation, rather than mere surveillance and enforcement, directly affect recidivism.[69] "The empirical evidence regarding intermediate sanctions is decisive: Without a rehabilitation component, reductions in recidivism are elusive."[70] Furthermore, a body of research, consisting of hundreds of studies, often referred to as "what works" literature, has concluded that official punishment for parole violations without treatment does not act as a specific deterrent to future criminality.[71]

Nearly 24,000 offenders under the Board's supervision are serving the remainder of their prison sentence in Pennsylvania neighborhoods. As discussed previously, many of these offenders—in addition to their numerous other background barriers—have substance abuse problems. Yet they often reenter communities that provide few social services. It is essential that treatment programs be utilized, that performance measures be developed, that results be monitored and communicated, and that effective programs be expanded so that all who need the treatment can be served.

---

[69] Madeline M. Carter (ed.), *Responding to Parole and Probation Violations: A Handbook to Guide Local Policy Development*, Center for Effective Public Policy, Silver Spring, Md., April 2001, p. 7.
[70] Carter, p. 7.
[71] Carter, p. 8.

Page 124

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Six

Pennsylvania Department of the Auditor General

## Recommendations

- The Board should continue its participation in the SAVE and RSAT programs and, at the same time, utilize all available research to determine the programs' effectiveness as well as changes that must be implemented.

- The Board should develop and implement performance measures and ensure that results are documented—whether through its own research or that of independent entities.

- The Board should report the results of analytical reviews regarding success and failure rates for each of its special treatment programs.

## Board of Probation and Parole Response

While it is encouraging that this statement was included in the DAG's report, the DAG mentioned only the nationally recognized RSAT and SAVE programs. The PBPP maintains other special treatment programs that were not discussed in the DAG report.

The DAG's recommendations regarding the SAVE and RSAT programs are acknowledged and can be reviewed for appropriate action when research results are available. It should be noted that independent evaluations of each program are in the final stages of preparation. Similar recommendations would also be applicable for the programs not listed in the DAG report.

Listed below are programs target to offender re-entry. Detailed program information is available.

RSAT, SAVE and County SAVE Programs
Quehanna Boot Camp Aftercare Program
Fatherhood Program
Pre-parole Planning
Parole Re-entry Program
Sex Offender Treatment and Supervision
Drug Offenders Work Program

### Department of the Auditor General Comments

As we note in the introduction to Chapter Six, we limited our focus to just the two substance abuse programs because these are the programs for which the Board has made significant efforts to measure and evaluate results. However, we encourage the Board to make every effort to publicize much more information about the additional programs in which it participates, and to disseminate detailed program results widely.

Page 126

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Appendix A

Pennsylvania Department of the Auditor General

---

## Appendix A

## Response from the Board of Probation and Parole

The response from the Board of Probation and Parole—with its own appendix—appears in its entirety on the following pages.

Please note the following:

- The Board's Chapter One through Chapter Six responses in the subsequent pages are also included in the body of our audit report after the applicable conclusions, along with our comments to each of those responses.

- In the Board's appendix, which consists of Board-identified Items #1-#17, we have inserted our comments directly after each item.

- Our comments related to the Board's (1) Introduction and Background and (2) Methodology responses appear in Appendix B.

# COMMONWEALTH OF PENNSYLVANIA

## BOARD OF PROBATION AND PAROLE



## Response of the
## Board of Probation and Parole
## to the Performance Audit conducted by the
## Pennsylvania Department of the Auditor General

December 9, 2002

# Response of the Pennsylvania Board of Probation and Parole to the Performance Audit conducted by the Pennsylvania Department of the Auditor General

## TABLE OF CONTENTS

Executive Summary                                             1 - 5

Introduction and Background                                   5, 6

Methodology                                                   6, 7

Chapter One:  Supervision of Offenders
        Response to Conclusion 1                              7, 8
        Response to Conclusion 2                              8, 9
        Response to Conclusion 3                              10, 11
        Response to Conclusion 4                              11, 12
        Response to Conclusion 5                              12, 13
        Response to Conclusion 6                              13, 14

Chapter Two:  Absconders
        Response to Conclusion 1                              14, 15

Chapter Three:  Recidivism Data
        Response to Conclusion 1                              15 - 17

Chapter Four:  Training
        Response to Conclusion 1                              17, 18
        Response to Conclusion 2                              18 - 20

Chapter Five:  Monitoring District Field Operations and
        Auditing County Probation Offices
        Response to Conclusion 1                              20
        Response to Conclusion 2                              21

Chapter Six:  Special Programs
        Response to Conclusion 1                              21, 22

Attachments:
        1.  Report of Mario Paparozzi, Ph.D. (with biographical information)
        2.  Appendix

**Response of the Pennsylvania Board of Probation and Parole
to the Performance Audit conducted by the
Pennsylvania Department of the Auditor General**

### EXECUTIVE SUMMARY

Throughout an eight-month process beginning in July 2001, the Pennsylvania Board of Probation and Parole (PBPP) cooperated with the Pennsylvania Department of the Auditor General (DAG) to conduct a performance audit of the Commonwealth's oversight of probation and parole in Pennsylvania.    Although the Board supports some suggestions by the DAG, there are still many areas of significant disagreement regarding certain findings, conclusions and recommendations.    As such, the following report is a comprehensive response to those disputed areas in the DAG's audit.

*Historical Reference.*    Although the Board understands that the DAG only provided as much historical overview of the probation and parole process as necessary to understand the Commonwealth's system, nevertheless, it failed to adequately note the major changes that have occurred in this system over the past sixty years.

*Methodology.*    In connection with this audit, the Department of the Auditor General ("DAG") requested a list of offenders who became subject to the Board's jurisdiction in the first quarter of 2000.  From the list of 2,975 offenders, the DAG selected 50 cases to review and audit.  It is important to note that *50 cases only represents **0.2%** of the Board's total caseload*. This is not a representative sample of the Board's total caseload. Simply put, the DAG's findings and conclusions from 50 cases cannot and should not be extrapolated to apply to the nearly 24,000 offenders currently under the Board's supervision.

In addition, the audit approach used by the DAG is highly subjective.  In fact, when these 50 cases were reviewed at the request of the Board by Dr. Mario Paparozzi, an expert in the field of criminal justice issues, he concluded that the Board's "…parole agents seem to firmly grasp the agency's public safety mission within the context of sound parole supervision practices.  In short, actual supervision reflects thoughtful case planning, attempts to manage offenders in community settings whenever possible, and appropriate decisions to incarcerate parolees and probationers who threaten public safety." Dr. Paparozzi's complete report is attached at the conclusion of this response.

The DAG also calculated the number of contacts required to be made by the field agents for each of the 50 offenders.  Thereafter, they counted the number of documented contacts that were made each month for the 18 months of the audit period.  If an agent, regardless of the reason, missed (or failed to document) *a*

1

*single contact* of the required contacts for an offender case in any given month over 18 months, the DAG concluded that supervision of the case was "deficient" or "weak." The Board disagrees with that conclusion. Preliminarily, it is clear that the DAG's review of the number of contacts made in a 50-case sample is not representative of the quality of supervision provided by the Board.

***Quantity v. Quality.*** The Board disagrees with the DAG's findings and conclusions regarding the Board's supervision of offenders. The DAG's view of the Board's operations, as seen through the prism of "quantity instead of quality," places too great an emphasis upon the number of contacts instead of the fluid and dynamic relationship between the agent and offender. Nonetheless, for 47 of the 50 cases in the sample, the Board made 1,171 (102.9%) of the required offender contacts, an amount exceeding the 1,138 required offender contacts.

The supervision of offenders is a complex process that cannot be reduced to counting contacts. In the daily supervision of offenders, an agent may have to reschedule an appointment for other priorities, such as to remove a parole violator from the street or to testify at a parole violation hearing.

***Absconders.*** The DAG concludes that the Board "lost track" of 1,560 parolees and probationers, or more than 6.5% of the 24,000 offenders under the Board's jurisdiction. ***The national average for parole absconders on any given day is between 10% and 15%; thus, Pennsylvania's absconder rate of 6.5% is significantly less than the national average.***

Further, the Board has not "lost track" of any offender. If an offender is not amenable to supervision and absconds, the Board immediately places wanted notices into national and state criminal justice databases, including the Commonwealth's Justice Network ("JNET") system, so that the entire criminal justice community can assist the Board in the location and apprehension of these offenders. Based upon the review of the cases sampled by the DAG, it is unreasonable to suggest that the Board did not take immediate action to apprehend those offenders; likewise, it is unreasonable to conclude that the Board's procedures, described at length in the attached report, are inadequate.

During the DAG's fieldwork, the Board had already developed and implemented the *Fugitive Apprehension Search Team*, a unit in the Philadelphia District dedicated to the apprehension of absconders. In the first three months of the unit's operation, the Board's agents arrested 35 absconders. Notably, the unit made 17 absconder arrests in 17 working days during November 2002. The Board will continue to apprehend absconders through the operations of the *Fugitive Apprehension Search Team*, continued cooperation with other law enforcement agencies, continued participation with JNET agencies, and by use of the Board's web page listing absconders and their digital photographs.

2

***Training of Parole Agents.***  The Board takes great pride in the training of more than 1,000 employees.  In that regard, the Board has established required annual training of 40 hours for its professional staff.  In fact, new parole agents at the Board receive in excess of 300 hours of training during their first year on the job.

During the 18-month period prior to 7/1/02, the Board's parole agents received an average of 55.3 hours of training annually (excluding the first year agents described above).  In fiscal year 1999-2000, the Board provided 43,725 hours of training to state and county employees.  Likewise, in fiscal year 2000-2001, the Board provided 45,375 hours of training to such employees.  The Board's commitment to training is outstanding.

The PBPP does not require parole agents to carry firearms.  For those who do carry, the Board has a rigorous firearms training program.  During its audit, the DAG reviewed the training records of 50 parole agents.  Of that sample, 42 agents were authorized to carry Board-issued firearms.  The DAG audit found that all of the agents were qualified to carry firearms.

However, the DAG concluded that the Board "..did not ensure that all the agents met the annual training requirements."  The Board disagrees with the conclusion.  It appears that the Board and the DAG disagree on the meaning of the word "annual."  To the Board, the requirement is plain that the agents must obtain their annual required firearms training during each calendar year. To the DAG, the training must occur within a 12-month period with an anniversary date.  Accordingly, the DAG concluded that 7 of the 42 agents did not complete the tactical firearms training within 12 months.
Deference should be given to the Board's interpretation of its own procedures.  Using the calendar-year definition of "annual," all 42 agents did complete the required tactical firearms training within each calendar year included in the audit.  Further, 41 of the 42 agents completed the annual dim light/night fire training within each calendar year of the audit.  (The one agent who did not do so was on extended sick leave for bypass surgery when the training was held in his district; he has since retired.)

The 42 agents in this sample were required to participate in 252 firearms trainings within the time frame of the audit.  Of the 252 trainings, only one agent (described above) did not complete one training course.   This compliance indicates a *99.6% completion rate.*

Finally, the Board recently achieved a **99.6% compliance rating** from the American Correction Association ("ACA") during the Board's reaccreditation audit.  (The Board complied with 217 of 218 non-mandatory standards, missing only one standard because of the applicability of Pennsylvania law.)  The ACA also requires compliance with mandatory standards relating to firearms policy, procedure and practice.  The Board received a 100% compliance rating on all mandatory standards.

***Recidivism Data.*** The Board conducts ongoing analysis of recidivism data and evaluation of what works. Recidivism data are being used in the Board's internal program evaluations and in monitoring program performance. The Board produces monthly data on recidivism by counting and comparing time trends of offenders returned to prison for technical parole violations and new criminal convictions. These data are essential in monitoring the management of community risk and the reduction of crime.

**Among the total number of parolees returned to prison, the number with new criminal convictions *declined* from 43% in 1995 to 25% in 2001, despite the fact that the total number of returned cases decreased.** This reduction in the rate of new criminal convictions demonstrates that the Board's parole agents are effectively supervising parolees and returning them to prison as technical parole violators *before new crimes are committed.*

Conclusion

The supervision of parolees and probationers is challenging work. The Board believes that its agents have achieved a reasonable balance among the two primary work orientations of parole agents: social casework and law enforcement. As Dr. Paparozzi observed: "Like any other profession, parole principles and practices are administered with the reality that there is a margin of error regarding the relationship between principles and desired outcomes. There can be no expectation for 100% success with regard to agency mission."

In view of legitimate and reasonable public expectations, the Board's parole agents will continue to use best business practices in their daily business of supervising offenders under the jurisdiction of the Board.

4

# Response of the Pennsylvania Board of Probation and Parole to the Performance Audit conducted by the Pennsylvania Department of the Auditor General

By letter dated June 1, 2001, the Pennsylvania Department of the Auditor General ("DAG") advised the Pennsylvania Board of Probation and Parole ("the Board," "the Agency" or "PBPP") that the DAG had "…commenced a performance audit of the Commonwealth of Pennsylvania's oversight of probation and parole in Pennsylvania through the Board of Probation and Parole." *(See Appendix, Item #1)*

In July 2001, the DAG began its field work on the premises of the Board's Central Office in Harrisburg; thereafter, the DAG also visited District Offices of the Board throughout the state.   The DAG's field work for the audit was conducted for eight months (until April 2002).

The DAG audit team and the Board's staff, including the Office of Chief Counsel, provided full cooperation.   Nonetheless, despite the close working relationship between the two agencies, the Board found many areas of significant disagreement regarding the DAG's findings, conclusions and recommendations. The Board appreciates the opportunity to set forth its Agency Response to the primary areas of dispute in the Performance Audit.

## Introduction and Background Section: Historical Reference

The "Introduction and Background" section of the DAG report briefly describes the background of parole, including Governor Earle's 1938 Commission to study the probation and parole system in Pennsylvania. Although PBPP recognizes  that a detailed analysis of the history since 1941 of parole or our agency was not the DAG's primary focus, the DAG report nonetheless lacks the requisite historical perspective to demonstrate the ***many positive changes*** that have occurred over the years, and particularly under the Ridge-Schweiker Administrations.

In 1995, Governor Tom Ridge convened the Special Session on Crime to address many of the problems in the criminal justice system in Pennsylvania.  In that regard, the General Assembly of Pennsylvania revisited the public policy as to parole and amended the Parole Act of 1941 by stating:

> The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.  In providing these benefits to

5

the criminal justice system, the Board shall first and foremost seek to protect the safety of the public.  In addition to this goal, the Board shall address input by crime victims and assist in the fair administration of justice by ensuring the custody, control and treatment of parole offenders.  *61 Pa.C.S. §331.1, Act of August 6, 1941, as amended, December 18, 1996.*

The Pennsylvania Board of Probation and Parole ("the Board") has derived its Mission Statement and subsequent policies as a result of this legislative change.

For example, in 1997, consistent with the legislative mandate and the Board's emphasis to protect the safety of the public, the Board carefully reviewed the existing procedures regarding the supervision of offenders.  Certain policies of previous administrations, namely the *"Administrative Level"* of supervision (which required no contacts) and the *"Minimum Supervision Requirements Contingency Plan,"* were abolished in favor of policies that actually **increased** the number of contacts that parole agents were expected to make with offenders.  In addition, the 1997 *Parole Supervision Continuum Plan's* contacts include face-to-face meetings with offenders as well as collateral contacts, such as communications with the offender's family, employer or other individuals in the community.

Stated simply, the Board under the Ridge Administration "raised the bar" regarding public safety so that all offenders under the Board's supervision would be adequately supervised.  It provided a mission and direction that is embraced proudly by over 1,000 employees of the Board, and is one that reflects the outstanding work of parole agents in their supervision of nearly 24,000 parolees and probationers.

## Methodology

More than two dozen times in its report, the DAG cited sample results and illustrative cases that were a product of its sampling methodology.  The DAG then used those results to draw conclusions about the Board's performance in specific areas.  The DAG, in the "Objectives and Methodology" section of its report, stated that their "…methodology included a comprehensive analysis of case files for 50 offenders -- 41 parolees and 9 probationers -- whose Board supervision began during the first quarter of 2000."  Despite an opportunity to provide the reader with a better understanding of its sampling process in the "Objectives and Methodology" section of its report, the DAG did not do so.  For example, the report mentioned only twice, and then not until page [83], that the DAG's sample was drawn from a first quarter of 2000 population totaling 2,975 parolees and probationers.  However, the DAG did state -- more than a dozen times -- that the Board is responsible for supervising approximately 19,500

6

parolees and 4,300 probationers.  Information about the sample population, early in the report, would have provided much needed clarity.

Sampling is a powerful audit tool.  However, sampling can be  complicated and often misunderstood, and can be frequently associated with extending sample results to a much larger population.  The DAG, given the brevity of the sampling discussion in the "Objectives and Methodology" section of its report and the frequency with which its sample results and illustrative cases were cited without clearly distinguishing the total population of parolees and probationers from the sample population, did little to ensure its results were not misunderstood.  Accordingly, the Board believes the DAG fell short of the spirit and intent of Section 7.18 of the Government Auditing Standards which states "In reporting findings, auditors should include sufficient, competent and relevant information to promote adequate understanding of the matters reported and to provide convincing but fair presentations in proper perspective."

Stated simply, readers of the DAG report should not link sample results derived from the 50 cases to the Board's total population of parolees and probationers frequently mentioned throughout the report.  *The DAG's findings and conclusions from 50 cases cannot and should not be extrapolated to apply to the nearly 24,000 offenders currently under the Board's supervision.*

### Chapter One: Supervision of Offenders

**Chapter One, DAG Conclusion 1:  The DAG concludes that "The Parole Board inadequately documented some investigations of parolee home and work plans, and also took questionable actions beyond the inadequate documentation."**

The Board's procedures define the process for investigating parole plans for offenders.  The parole agent must visit the proposed place of residence and verify the proposed employment during the investigation of the home and work plans.  This process begins while the inmate is incarcerated; the inmate cannot be released from prison until a plan is approved.  In some instances, and with increasing frequency since September 1997, the Board has taken action to parole offenders only to Community Corrections Centers operated by, or under contract with, the Pennsylvania Department of Corrections ("DOC"), where the offenders must reside and are assisted in obtaining employment and aftercare services within the community.

In the 50 cases reviewed, the DAG reached conclusions not supported by the facts provided within the case files. (See Appendix, Items 2 and 3)

7

For example, in ten of the 50 cases that the DAG reviewed, the Board decided to parole the offender directly to a Community Corrections Center or a contract facility for a specified time period (usually between 90 to 180 days). This was done so that the offenders could benefit from a structured reentry program in which they were under daily supervision and could develop a strong community plan, including residence and employment, with case management assistance provided by the Center and parole supervision staff.

Five of the 50 cases were ordered by the Board to be "Paroled to an approved plan;" however, either the offender could not provide a plan for the field staff to investigate, or the plan that they did submit had been rejected by the field staff. When this occurred, institutional parole staff referred the cases for placement in Community Corrections Centers. After these parolees obtained jobs and were able to establish residence in the community, agents investigated and approved their releases from the Community Corrections Centers. In such instances, no formal investigation report is required.

The DAG did not clarify that two of the sampled cases were serving *county* jail sentences, which placed their release decisions under the jurisdiction of the county judges who sentenced them. The PBPP had no opportunity to review and investigate the proposed release plans prior to these offenders being paroled by the judges.

Two additional offenders, while serving state sentences, did not achieve parole release during the time of the DAG's review, and were required to remain in prison until their maximum sentences were served. When they were released from incarceration, they were under Board supervision for *consecutive probation* sentences that were imposed by the county judges to commence after their prison sentences expired. The Board's supervision staff had no opportunity to investigate their release plans when they turned over to probation sentences. Another case identified in this sample could not develop a parole plan in the community and was released to a residential plan offered by the Salvation Army that deals with ex-offenders. The approval of this plan was clearly documented.

**Chapter One, DAG Conclusion 2: The DAG concludes that "The Parole Board did little to increase employment opportunities for parolees."**

The auditors noted the importance of obtaining employment in relation to recidivism rates and acknowledged the immense barriers parolees face when released from prison. In the Fall 2002 issue of the DOC's "*Newsfront,*" it was noted that, at the time of receipt into DOC, the 10,486 inmates released in 2001 had the following profile:

40% read below the eighth grade level;
77% had no or very limited skilled vocational training or experience;
9% of males and 27% of females had mental health needs;
81% were unemployed at the time of offense;

The Board agrees with the DAG's conclusion that "it is unlikely that employers are eager to hire employees with such a profile."

The DAG found that Pennsylvania has several DOC-funded programs that can help parolees prepare for employment. Although the DOC pays for the programs, the Board's institutional and field agents work in close collaboration with the DOC to deliver these programs. For example, the PBPP is working daily with the DOC regarding Phase 2 of the referenced "Community Orientation and Reintegration" program.

In view of the fact that 81% of inmates released in 2001 were unemployed at the time of their offense, the criticism leveled by the DAG concerning the unemployment rate of 32% for the parolee and probationer labor force in June 2001 is unreasonable. The DAG's report lacks a clear explanation of the relationship between parole agents and offenders regarding efforts undertaken to secure employment. The needs of each offender are assessed by supervision staff during the initial interview and reassessed every six months, or more frequently if deemed appropriate. The *PBPP Manual of Operations and Procedures* recognizes the importance of employment for offenders, and directs supervision staff to make concerted efforts to assist offenders in securing employment and upgrading their employment based upon each offender's capabilities. **The initial offender assessment leads to an individually tailored Supervision Plan for each parolee/probationer, jointly developed by the parole agent and the offender.** The supervision plan is modified, as needed, in accordance with the offender's adjustment in the community. Obtaining and/or maintaining employment, for those offenders who are capable of working, have always been important goals of the supervision staff.

The DAG's report notes that the Board "fell short by offering employment assistance in only one program and as just a component of a second program." **Each offender's** employment needs were being addressed *individually* **by supervision staff in the specific district of residence, and not necessarily by a "one-size-fits-all" statewide program. The referenced programs are valuable but are only a small part of a larger picture.**

The DAG recommends that the Board increase its efforts to create employment opportunities. The Board has linked appropriate offenders to the Commonwealth's Targeted Jobs Tax Credit Program and has referred parolees and probationers to the 84 Career Link sites in Pennsylvania. Other efforts such as the Board's ten Citizens Advisory Committees and the Board's working relationship with the Pennsylvania Prison Society continue to develop employment opportunities for parolees. The Board agrees that employment issues need ongoing attention and improvement.

**Chapter 1, DAG Conclusion 3: The DAG concludes that "The Parole Board was deficient in supervising paroled prisoners in our sample."**

The Board adamantly disagrees with the DAG's findings and conclusion. The DAG defined the alleged shortcomings as any one missed contact in any given calendar month over an 18-month period. The DAG audit team appears to have focused exclusively on the number of contacts; this view through the prism of "quantity instead of quality" has resulted in findings and conclusions that misjudge the effectiveness of the Agency's efforts.

In 1997, the Board's standards were raised to the present day using the new *Parole Supervision Continuum Plan*. (See Appendix, Item #4). The *Parole Supervision Continuum Plan* significantly raised the minimum number of required contacts for all levels of supervision. This change in supervision requirements resulted in a higher level of intervention and supervision of offenders.

The DAG audit team argues that, in 90% of the sampled cases, the minimum numbers of required contacts were not made during the 18-month audit period. This finding is accurate when a case in the sample was reviewed one month at a time; if a reviewed case were missing just one contact over 18 months, such as a collateral contact to talk with someone in the community who knows the offender, the DAG designated the case as "inappropriately supervised." However, if the number of required contacts for a certain month were surpassed by 100%, the DAG counted only the required contacts; all other contacts during that time period were discounted.

This audit approach does not reflect the quality of the work of this Agency. In the daily supervision of offenders, an agent may have to reschedule an appointment in lieu of more important responsibilities, such as removing a parole violator from the street or testifying at a parole revocation hearing being held at a state correctional institution.

Additional offender contacts beyond the minimum required amounts illustrate the professionalism and commitment of the Board's parole agents, and demonstrate the need for flexibility in the exercise of their duties. Clearly, parole agents who made extra contacts were working with parolees who needed further intervention. The Board recognizes that wording in existing PBPP procedures may need to be revisited to articulate the need for discretion and flexibility in supervising individual offenders.

It was noted that the Board utilizes some information systems that are outmoded. This concern was recognized by the Agency during the audit period. The Board has made significant progress to enhance and improve the efficiency of its information technology systems. Efforts have been made to develop new

10

programs and applications, such as the Board's *Institutional Case Management Automation* system. The Board will continue to modernize information systems as funding allows.

**Chapter One, DAG Conclusion 4: The DAG concludes that "The Parole Board sanctioned parolees ineffectively by sending mixed messages—sanctioning inconsistently or threatening violators with punishment but then not following through."**

The Board disagrees with the DAG's findings and conclusion. All offenders cannot be sanctioned in the same manner. An important part of the Board's mission is to assist offenders with their reintegration into society. This structured reintegration is accomplished on an individual level. While responses for certain behaviors have been established, there is no "cookie cutter" solution in the sanctioning process. Probation and parole agencies need to be able to mete out sanctions in response to the totality of the circumstances.

Certain sanctioning information, such as drug and alcohol treatment, is restricted from public dissemination by Pennsylvania's *Criminal History Records Information Act* ("CHRIA"). Accordingly, during the audit, the Office of Chief Counsel advised that CHRIA required the Board to redact confidential information that could not be lawfully disclosed to the DAG, a non-criminal justice agency. These redaction requirements imposed by CHRIA may have limited the DAG audit team from fully evaluating the total Agency efforts in response to violations committed by these offenders.

As stated previously, the supervision and sanctioning of offenders is tailored to the assessment of their specific risk and needs. Each offender's case is viewed in its totality and in accordance with the Board's policies and procedures.

The Board acknowledges the DAG's recommendations to follow through with imposed sanctioning, define and communicate standards and procedures for graduated sanctions, and ensure that violations are correctly recorded, tracked, and analyzed routinely. The Agency's procedures regarding the graduated sanctioning process allow for movement up or down the scale of sanctioning; alternatives for sanctioning depend upon the nature of the violations (*e.g.,* a lesser sanction for the non-payment of supervision fees versus illegal drug use). The Board's procedure provides that "supervision staff may determine that there is need for additional structure and/or treatment in lieu of arrest and recommitment." This approach provides guidelines for the field staff to use in an ever-evolving case history, enabling them to respond appropriately to the current case management issues.

It is understandable that the DAG could look at a case file and determine, with hindsight, that different steps should have been taken in the supervision of

11

certain cases. (See Appendix, Items, 5-8).   However, the Board entrusts the parole agents to make decisions based upon the totality of the circumstances concerning the case that may not be evident in a review of the file.  The field agents balance the Board's mission and goals of protecting the safety of the public while assisting the offender to become a useful member of society.

**Chapter One, DAG Conclusion 5:   The DAG concludes that "The Parole Board did a poor job collecting $25-a-month supervisory fees from parolees and probationers, taking in only $1.2 million of nearly $15 million owed."**

The DAG report analyzed the collection of state supervision fees during the audit period in three categories: "collected," "uncollected" and "waived." The DAG acknowledged the statutory authorization that the Board may find "such fee should be reduced, waived or deferred based upon the *offender's present inability to pay.*" 18 P.S. § 11.1102(d).  This provision is particularly relevant in view of the problems offenders have trying to find and keep employment. Accordingly, the DAG calculated that the Board, pursuant to its statutory authority, *"waived"* 47% of the total amount.

Further, included in the *"uncollected"* category (45%) are offenders who were in absconder status (7%) and offenders who have been detained in prison (16%), from whom supervision fees cannot be collected.

When considering all of the non-collectable categories of offenders, it can be seen that the conclusion of "taking in only $1.2 million of nearly $15 million owed" should be reported less narrowly.  The Board's collections, together with those amounts that were waived or were otherwise non-collectable, should be reviewed more favorably.

The DAG's report did not discuss the proactive measures taken by the Agency during the audit period to improve the collection of supervision fees.  On 3/29/01, the Board issued updated procedures regarding the *Financial Obligations of Offenders*.   These procedures addressed supervision responsibilities, the granting of fee waivers, and sanctions to be utilized in cases of non-payment.  Further, the priority of payment is as follows: court-ordered obligations (such as fines, costs and restitution); urinalysis testing fees; and, supervision fees.

In 2001, the Agency worked closely with the Administration on a project to improve the process of supervision fees collection.  Two of the Administration's *"PRIME IT!"* assistants co-facilitated process improvement workshops for four days.  As a result of the *"PRIME IT!"* workshops and the increased monitoring of offender payment obligations by supervision staff, the total amount of supervision fees collected increased significantly from $683,609 in FY2000-01 to $1,127,520

in FY2001-02.  Projections for FY2002-03 are expected to exceed last year's collections.

As already noted, the DAG's recommendations were already practices of this Agency before the audit period concluded. The remaining recommendations were discussed during the *PRIME IT!* project and, if implemented, would require additional resources and procedural changes.

**Chapter One, DAG Conclusion 6:  The DAG concludes that "The Parole Board did not adequately enforce or track parolee and probationer court-ordered payments that should have been made to victims and others."**

The DOC documents the court-ordered financial obligations that are owed by state offenders and provides the information to the Board when offenders are released on parole.  However, such information is not always available from the DOC or the sentencing court.  In addition, Act 84 of 1998, which streamlined the collection process contained in  the Judicial Code, 42 Pa.C.S. § 9728, did not go into effect until October 1998.  As a result, many of the 50 files sampled by the DAG did not fall under the Act 84 requirements.  The DAG criticized the Board for "haphazard" payment information, without acknowledging that information concerning an offender's legal financial obligations was not always available to the Board.

The counties, and not the Board, are responsible for the collection of such fees.  However, the Board does impose the following condition on those paroled offenders under its jurisdiction: "You shall pay fines, costs, and restitution imposed on you by the sentencing court.  You shall establish with appropriate county authorities, within 30 days of your release from prison, a payment schedule for the fines, costs, and restitution owed for those cases for which you are now on state parole.   Thereafter, you shall: (a) pay these obligations according to the established payment schedule or as ordered by the court; (b) provide proof of payment to parole supervision staff; and, (c) keep the parole supervision staff and the court informed of any changes in your financial ability to pay fines, costs and restitution."

This condition is supported by the Board's revised procedure pertaining to *Financial Obligations of Offenders*, issued 3/29/01, which requires that "all inmates released on supervision shall make continuing payments on restitution and any other court-ordered financial obligations," pursuant to Act 84 of 1998. The procedure sets forth the priority of payment: court-ordered financial obligations (such as fines, costs and restitution); urinalysis testing fees; and, supervision fees ($25/month).  In addition, parole agents impose a special condition on each offender to set up a payment plan with the appropriate county collections       agency      within      72      hours      of      release.

13