The Board acknowledges the DAG's recommendation to create and utilize an electronic tracking system to monitor the amounts owed by offenders for fines, costs and restitution, and the history of payments while under the Board's supervision. The Board will discuss opportunities to work with DOC, AOPC and JNET to create an improved monitoring system.

## Chapter Two: Absconders

**Chapter Two, DAG Conclusion 1:  The DAG concludes that "The Parole Board lost track of nearly 1,600 offenders and did not aggressively search for them."**

Specific criteria are used to determine when an offender becomes an absconder.  The Board's procedures require the supervision staff to conduct a diligent search for the offender before requesting that Parole Violation Wanted Notices be issued with state and national law enforcement databases.  The Board's issuance of Parole Violation Wanted Notices significantly assists the Board and the criminal justice agencies to locate absconders.

The DAG claimed that, of the 50 offender files reviewed, there were seven absconders, "only one [of whom] was found as a result of the Board's efforts."  In addition, the DAG contends that, as of June 2001, the Board "lost track of 1,560 parolees and probationers, or more than 6.5% of the offenders it was supposed to be supervising."

The Board takes exception to the conclusion that the Agency "lost track of" any offender. An offender's success while under supervision may be successful or unsuccessful; there are some offenders who are not amenable to supervision. If they abscond, they are declared delinquent and are subject to diligent searches for their apprehension.    In fact, the national average for parole absconders on any given day is between 10% and 15%.  *Pennsylvania's absconder rate of 6.5% is significantly less than the national average.*

The DAG's report states "The Board should have been much more aggressive at finding absconders." The Board enlists the assistance of the entire law enforcement community in locating parole absconders, as evidenced by the two absconders in the sample who were apprehended in other states within two weeks of the Board declaring them to be absconders.  (see Appendix, Items 9 – 15)

Since 1999, the Board has posted all of its parole absconders on the Commonwealth's Justice Network ("JNET"). In 2000, the Board's entire parolee and probationer caseload was posted in the JNET system.  Additionally, the Board established a 24-hours/day, seven-days/week Operations Monitoring Center ("24/7 Unit") within its Central Office headquarters that receives inquiries



EXHIBIT

I-G

14

about the offender population from the law enforcement community.  Once a Wanted Notice is posted within the Commonwealth Law Enforcement Assistance Network (CLEAN) and the National Crime Information Center (NCIC), the 24/7 Unit receives an electronic message if an absconder is arrested or in police custody, or if information is being requested about a subject who is wanted as a parole violator by the Board.  These "CLEAN hits" allowed the Agency to communicate with the arresting authority, confirm the subject's identity, confirm the offender's "wanted" status, forward a warrant immediately, and prevent the absconder from being released on bail (if arrested for new criminal charges).

The DAG suggested that the Board should utilize a special task force to pursue absconders more aggressively. The Board agrees that in certain instances (e.g., urban areas) a special task force is practical.  An agent's knowledge of the offender, as well as his/her interactions with the local law enforcement community will achieve the best results for locating absconders.

It is important to note that the Board initiated the development and implementation of a *Fugitive Apprehension Search Team* ("FAST") unit in early 2002 in the Philadelphia District. This district had 50% of the statewide absconder population.  Once the assigned parole agent concludes his/her diligent search efforts to locate the offender, the case can be transferred to the FAST Unit.

In the three months since the FAST's activation, it has been responsible for the successful arrest of 35 absconders. Notably, the unit made 17 absconder arrests in 17 working days during the month of November 2002.

In addition to this new unit, the Board posts photos and demographic information regarding over 1,000 absconders on its web page.  The web page is updated regularly, adding new absconders and noting those who were captured and returned to custody.  Individuals viewing the Board's Parole Absconder Website, (See Appendix, Item #16) are referred to the appropriate office to report absconder information.

## Chapter Three: Recidivism Data

**Chapter Three, DAG Conclusion 1:  The DAG concludes that "The Parole Board did not analyze recidivism data to see the effect of certain practices or characteristics."**

Although the Board does not currently publish statewide recidivism rate data to the general public, there is ongoing analysis of recidivism data and evaluation of what works.  Recidivism data are used in the Board's internal program evaluations and in program performance monitoring despite the fact that a detailed breakdown of recidivism rates is not being routinely published.

The Board produces monthly documentation of recidivism counts and recidivism percentages to monitor and evaluate program performance. The Board analyzes performance in specific programs using recidivism rates.

- The Board produces monthly data on recidivism by counting and comparing time trends of offenders returned to prison for technical parole violations and new criminal convictions. These data are essential in the monitoring the management of community risk and the reduction of crime. While reducing recidivism is important, the reduction of crime is more important. **Among the total number of parolees returned to prison, the number with new criminal convictions** *declined* **from 43% in 1995 to 25% in 2001, despite the fact that the total number of returned cases decreased.** *See* the graph and chart below.



Returned to Correctional Institutions/County

| Fiscal Year End | 1995 | 1996 | 1997 | 1999 | 1998 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|
| Parole Recommitment to Prison | 4,279 | 3,501 | 3,965 | 3,577 | 3,041 | 3,622 | 3,838 |
| *Percent New Convictions* | 43% | 36% | 39% | 26% | 33% | 25% | 25% |
| *Percent Technical Parole Violations* | 57% | 64% | 61% | 74% | 67% | 75% | 75% |

- The Board uses recidivism rates on a regular basis to evaluate specific programs. Examples include diversion programs such as the Substance Abuse Violators Effort ("SAVE") program and the Residential Substance Abuse Treatment ("RSAT") program.

- The Pennsylvania Commission on Sentencing's annual evaluation report to the General Assembly regarding Pennsylvania's Motivational Boot Camp is based largely upon recidivism data supplied by the Board

- The Board, in conjunction with George Washington University, has conducted ongoing research regarding the validation of risk assessment instruments, namely, the *Level of Service Inventory-Revised* ("LSI-R") and the *Static-99*. These studies utilize recidivism data supplied by the Board.

To the extent that there is a perceived need to have general descriptive recidivism statistics available, the Board will respond and attempt to meet that need.

### Chapter Four: Training

**Chapter Four, DAG Conclusion 1:  The DAG concludes that "The Parole Board did not ensure that all agents in our sample received the 40 hours of training required annually, nor did the Board ensure that all training was 'acceptable'."**

The Board disagrees with the DAG's statement that  "the Board did not ensure that its parole agents and other field employees were adequately trained." Although we reached the same finding as the DAG in that 11 agents did not receive 40.00 hours of required annual training (NOTE: 3 of these 11 agents had, however, received between 39.00 and 39.50 hours of training), the PBPP does not support the conclusion that PBPP employees are not "adequately trained."

Parole agents are fully trained professionals.  The Board's training requirement of 40 hours per year is designed to keep them informed of current probation, parole and related issues and to update them on professional issues. *In fact, the DAG report recognized that new employees received in excess of 300 hours of training their first year on the job.*  During the 18-month period prior to 7/1/02, the Board's parole agents (excluding first year agents) received an average of 55.3 hours of training annually.

In fiscal year 1999-2000, the Agency provided *43,725 hours of training* with a diversified curriculum to state and county employees. The Board also sent 409 PBPP staff to attend out-service training sessions of one or more days each. In fiscal year 2000-2001, the Agency provided *45,375 hours of training* with a diversified curriculum to state and county employees. The Board also sent 491 PBPP staff to attend out-service training sessions of one day or more each.  The DAG report also states: "In some instances, the Board allowed meetings about deferred compensation or retirement to count toward the required training."  The Board believes that this is valid training time. SEAP, Workers' Compensation,

17

retirement, and other benefits-related topics provide relevant information more efficiently in a group setting.

In addition, to ensure better monitoring, the Board instituted a new electronic training records system, which went on-line in October 2002. This application allows all staff to review their training records on-line. It also gives management and supervisory staff the ability to review the records of subordinates. Employees no longer need to wait for a hardcopy report of their training hours. The new application also gives the training staff the ability to view the training history of all employees when assigning class participants. This aids in a more equitable distribution of training opportunities.

**Chapter Four, DAG Conclusion 2: The DAG concludes that "The Parole Board ensured that all the agents in our sample were qualified to carry guns but did not ensure that all the agents met the annual training requirements."**

The auditors reviewed the training records of 50 parole agents. Of that sample, 42 agents were authorized to carry the PBPP-issued firearm. (The Board does not require parole agents to carry firearms.) The DAG found that "7 of the 42 agents did not complete annual tactical firearms training" and that "4 of the 42 agents did not complete annual dim light/night fire training."

The Board requires that all parole agents who are authorized to carry a PBPP-issued firearm complete the initial firearms training. Phase 1 of this training includes weapon familiarization, shooting fundamentals, weapon safety, policy and procedure review, weapon retention, a written exam, and qualification. Those staff members who successfully complete Phase 1 are then permitted to attend Phase 2 of the firearms training. Those agents who fail to complete Phase 1, for any reason, are not permitted to attend Phase 2, and are re-scheduled for Phase 1.

Phase 2 of the initial firearms training includes dim light/night fire courses and tactical training. The dim light/night fire training provides the staff instruction regarding the use of available light and the proper use of the flashlight in concert with the firearm. The tactical portion of Phase 2 instructs the staff on the use of cover and concealment deadly force decision-making, "move and shoot" techniques, and target identification. The entire Initial Firearms Training requires 60 hours of instruction, which includes classroom and firing range instruction.

Upon completion of the Initial Firearms Training and after all other training requirements have been met, agents may request permission to carry a PBPP-issued firearm. Upon issuance of the firearm, the agents attend the required firearms training as scheduled within their district. This will place the agents into an annual training cycle.

The Board's "Use-of-Force" procedure requires that all staff who are authorized to carry an Agency-issued firearm complete re-qualification no later then 90 days beyond the anniversary date of the employees' last re-qualification date. Dim light/night fire and tactical training must be completed *annually*. At the time of the audit, the procedure in place allowed for the training to be completed **within the calendar year**. A recently revised procedure (effective 3/11/02) requires the dim light/night fire and tactical training to be completed within the training year, July through June.

The DAG has incorrectly interpreted the Board's procedure. The DAG found that 7 of the 42 agents did not complete the annual tactical firearms training. Contrary to the DAG finding, a review of each agent's training record indicates **all 42 of the agents did complete the required tactical firearms training within each calendar year included in the audit as outlined by Board procedure.**

The DAG's report also indicated that 4 of the 42 agents authorized to carry firearms did not complete the annual dim light/night fire training. Contrary to the DAG finding, a review of each agent's training record indicates *3 of the 4 agents did complete the required dim light/night fire training within each of the calendar years of the audit.* (One parole agent failed to complete the dim light/night fire training as required. The agent was on extended sick leave for bypass surgery during the time that the dim light/night fire training was held in his district. This parole agent has since retired.)

The 42 agents in this sample were required to participate in 252 firearms trainings within the time frame of the performance audit. Of the required 252 firearms trainings, *only one agent did not complete one training course*. This compliance indicates a **99.6% completion rate**.

The dim light/night fire and tactical training was implemented by the Agency as a response to various court rulings which require staff to receive "realistic" training as may be encountered within the scope and duties required on the job. See *City of Canton, OH v. Harris*, 489 U.S. 378 (1989) and *Popow v. City of Margate, NJ*, 476 F.Supp. 1237 (D.N.J., 1979). The use of an anniversary date as the cut off for the tactical and dim light/night fire training, as interpreted by the DAG, would not allow for realistic training to occur. For example: If an agent is required to receive the tactical training in July of every year, then that agent will never learn how to respond to the limitations imposed by the heavy clothing that may be worn during the colder months.

The PBPP has always been proactive in the development and improvement of all levels of the use of force training. In the Fall of 2001, the PBPP developed a *Defensive Tactics Staff Safety Training Unit* ("DTSSTU") that is responsible for all "use-of-force" training provided to staff throughout the Agency. (Prior to the development of this unit, the training was provided entirely

by parole agents who were required to carry a full caseload as well as developing, setting up, and delivering the firearms training.)  The DTSSTU includes a parole manager and three parole agents dedicated to training parole staff in all levels of the use-of-force.  The DTSSTU also centralizes all of the Agency use-of-force training records.  The centralization of the use of force training records provides a means for reporting and recording the status of employee training.  The DTSSTU is required to notify the Board's Firearms Coordinator of any individual who has not successfully completed the required use of force training so that appropriate action can be taken. The new DTSSTU and reengineered training record database has provided a means to detect discrepancies and act on them immediately.   This action includes the removal of the Agency-issued firearm, when necessary.

**The PBPP recently achieved a 99.6% compliance rating on an American Correctional Association (ACA) audit, having been found in compliance with 217 of 218 non-mandatory supervision standards.  The ACA audit includes mandatory compliance standards relating to firearms policy, procedure and practice.  This Agency received a 100% compliance rating on all mandatory standards.**

### Chapter Five: Monitoring District Field Operations and Auditing County Probation Offices

**Chapter Five, DAG Conclusion 1:   The DAG concludes that "The Parole Board did not effectively monitor the performance of its field operations."**

The Board conducts annual inspection audits of the field supervision units in ten districts. These audits are conducted by the Board's Special Projects Division.  The objective of the audits is to determine whether supervision staff is complying with the Board's policies and procedures and with the supervision standards established by the American Correctional Association (ACA).

The Board's auditors examine approximately 10% of the supervision units' case records to determine whether appropriate Agency and ACA procedures are being followed.  When the PBPP auditor completes his/her inspection of the unit files for compliance with Agency procedures and ACA Standards, the PBPP auditor then meets with the unit supervisor and District Director and reviews the findings.  Upon return to Central Office, the auditor files a comprehensive report of his findings with the Special Projects Director.  This report is forwarded through the chain of command to the Director, Office of Probation and Parole Services, who reviews the issues with the Regional Directors.  The Board will intensify its efforts to institute corrective action plans, where necessary, and to ensure that district directors implement action plan recommendations.

**Chapter Five, DAG Conclusion 2:  The DAG concludes that "The Parole Board did not effectively audit the 65 county probation and parole offices."**

The DAG recommended that the Board "conduct more in-depth and comprehensive analyses of each county probation and parole office before awarding the grant-in-aid funding.  To accomplish this recommendation, the Board needs to review case files and other secondary documentation to determine compliance with [ACA] standards."

Members of the DAG's audit team accompanied the Board auditors on two "technical reviews" (Cambria County and Clearfield County on October 31, 2001) and one partial county audit (Philadelphia County on October 15-18, 2001).  In the case of the "technical reviews," audit checklists were used during the audits as well as review of case files.  In the case of the Philadelphia audit, there was insufficient time to do a standards audit during the October 2001 field visit.  The Board's auditor secured a copy of the Philadelphia County Adult Probation Department's manual and conducted an audit of primary documentation (policy and procedure) and used a checklist to record findings.  The DAG auditor did not accompany the Board's auditor on the return visit to Philadelphia County on January 31, 2002, in order to discuss these findings and to review supporting documentation.

The DAG criticized the Board auditors for not providing evidence of supporting documentation when conducting county audits.  There is simply not enough storage space to keep secondary documentation on 227 standards from 65 counties.  The Board auditors use the same auditing procedures as the ACA uses to determine if an agency should be accredited.  Those techniques include reviewing primary and secondary documentation on site and making a determination at that time of compliance, non-compliance or non-applicability.

The DAG recommended that "…the Board needs to review case files and other secondary documentation to determine compliance with American Correctional Association standards."  In the Board's *Manual of Operations and Procedures*, Volume III, Chapter VI, Procedure 6.16 addresses the subject entitled "County Adult Probation and Parole Program Audit."  This Procedure became effective on March 11, 2002.  (See Appendix, Item 17)

### Chapter Six: Special Programs

**Chapter Six, DAG Conclusion 1:  The DAG concludes that "The Parole Board participated in interagency and external monitoring efforts of its substance abuse programs."**

While it is encouraging that this statement was included in the DAG's report, the DAG mentioned only the nationally recognized RSAT and SAVE

programs. The PBPP maintains other special treatment programs that were not discussed in the DAG report.

The DAG's recommendations regarding the SAVE and RSAT programs are acknowledged and can be reviewed for appropriate action when research results are available. It should be noted that independent evaluations of each program are in the final stages of preparation. Similar recommendations would also be applicable for the programs not listed in the DAG report.

Listed below are programs target to offender re-entry. Detailed program information is available.

RSAT, SAVE and County SAVE Programs
Quehanna Boot Camp Aftercare Program
Fatherhood Program
Pre-parole Planning
Parole Re-entry Program
Sex Offender Treatment and Supervision
Drug Offenders Work Program

Findings
From a Review of
Fifty Offender Case Files
Under the Jurisdiction of
The Pennsylvania Board of Probation and Parole

By: Mario A. Paparozzi, Ph.D.
609.771.2288 (Daytime Phone)
Email: paparozzi@sprynet.com

*Background*

This report is the result of a fifty-case analysis that was
conducted for, and at the request of, the Pennsylvania Board
of Probation and Parole ("the Board"). The Board's Office of
Probation and Parole Services handled logistics regarding
time and place for the case file reviews as well as
materials to be analyzed.

No *a priori* assumptions were made regarding cases to be
analyzed, the purpose of the analysis, or how the results
would be used by the contracting agency. The only
information provided prior to and during the analysis
pertained to the need for an analysis of the quality of case
supervision from an independent expert.

The assigned tasks included:

   a.  Reviewing agency supervision standards for fifty
       parolee and probationer case files that were selected in
       advance of the assessment by the agency;
   b.  Developing an impression of the quality of supervision
       in the context of state and national norms regarding
       same; and
   c.  Producing a report of the findings.

The results of the case assessments is deemed to be an
expert opinion based upon the assessor's 30 years of
extensive national and international involvement and
academic credentials in criminal justice - specifically,
corrections, probation, and parole. A biographical sketch
is attached to this report.

**Parole: National Perspective**

Like any other profession, parole principles and practices are administered with the reality that there is a margin of error regarding the relationship between principles and practices and desired outcomes. There can be no expectation for 100% success with regard to agency mission. It is essential to approach any evaluation of a parole program against the backdrop of the foregoing fact.

The reality of a margin of error notwithstanding, there is a legitimate public expectation that parole agencies conduct their day-to-day business practices in accordance with the state-of-the-art. The public's expectation in this regard is valid, but it must be tempered by the realities of resource allocations to agencies charged with the supervision of parolees and probationers.

The desired outcomes of parole release, supervision, and revocation functions are best conceptualized as dependent variables; and the principles and practices underpinning the quest to achieve these outcomes as independent variables. A review of the national trends for parole functions reveals that there are two primary desired outcomes (dependent variables) that provide the conceptual framework for:

- The organizational structure of parole agencies (for example, the agency's relationship to other agencies in the criminal justice system, the executive, legislative, and judicial branches of government, etc.).
- The development of policies and practices that efficiently and effectively (in other words, "best professional practices") achieve the outcome (meaning that they are positively correlated to the dependent variable).

The two desired outcomes that are consistently articulated for parole release, supervision, and revocation functions across the nation are:

1. Public safety (in the short-term and long-term).
2. Justice (generally defined as parolee and probationer accountability for their compliance with conditions of parole and probation).

The parole release, supervision, and revocation processes in Pennsylvania are underpinned by offender assessments, case plans, Board Member, and agent activities that are intended to accomplish three purposes:

      a. Short-term risk management of the offender;
      b. Long-term behavioral reform of the offender; and
      c. Offender accountability.

*Fifty-Case Analysis*

Three parole functions are the primary foci of the case file review:

- Parole release decision making
- Parole supervision practices
- Parole revocation

*Release Process:*

With regard to parole release decision making, the practices of the Board are consistent with, or better than, national norms for best practices. The Board engages in structured release decision making as opposed to undocumented subjective opinions of the decision-maker.

In general, the special conditions of parole that are established prior to an inmate's release on parole form the basis of a mandatory case supervision plan. It is noteworthy, and commendable, that the Board generally allows the supervising district parole office the flexibility to recommend modifications of parole conditions as case needs dictate during the course of supervision.

The Board, in a very limited manner, makes use of "zero tolerance" conditions of parole for substance abusing parolees and probationers. It is recommended that the Board review the use and utility of imposing "zero tolerance" release contingencies. In fact, while most parole boards across the nation make use, albeit limitedly, of such "zero tolerance" policies, the state-of-the art (based upon research evidence) is to allow for supervision discretion with regard to substance abuse relapse.

Note:       The Board's use of "zero tolerance" appears to be less than is the case in other jurisdictions. The Board should consider evaluating the efficacy of "zero tolerance" conditions of parole versus parole agent discretion.  Such an evaluation would be unique, have significant benefit to the state and the nation by analyzing sound policy and practice, and would serve to assure the maintenance of cost-effective supervision practices regarding addicted offenders under supervision.

There were no instances where the Board assigned an offender to an inappropriate supervision status (for example: enhanced versus maximum, medium versus minimum, etc.).

*Parole Supervision Practices:*

With only a few exceptions of the 50 cases reviewed, parolees and probationers under the Board's supervision received/were subject to an appropriate amount of:
a.   Services;
b.   Monitoring; and
c.   Law enforcement responses.

As was the case with the release decision making process, no cases were found to be incorrectly assigned to a supervision status by parole agents. Several cases were found to have been subject to a supervision status override. The overrides, however, always increased the level of supervision rather than decreased it (e.g. medium to maximum, minimum to medium - not the reverse).

It appears that Pennsylvania parole agents are ahead of the national curve with regard to having struck a reasonable balance among the two primary work orientations of parole agents: social casework and law enforcement.

The social casework and law enforcement orientations are polarized ideal types. From a national perspective, it is common to find parole agents, and even entire districts, who/that possess one or the other work orientation. In fact, the success of any parole program turns on the extent to which it integrates these two critical public safety functions.

With few exceptions, the supervision notes contained in the 50 case files revealed that the overwhelming majority of agents properly identified an offender's individual, economic, and social problem areas that, if addressed, would likely reduce recidivism. In professional terms, agents targeted the correct criminogenic need factors. Parole agents, with few exceptions, developed appropriate case plans around the problems identified, and they appropriately "worked" their case plans.
Pennsylvania parole agents were generally aggressive in their pursuit of parole absconders. Historically, the national average for parole absconders on any given day is between 10% and 15%. The rate of absconders is a fluid number; as some absconders are apprehended, others abscond. The rate of parole absconders in Pennsylvania appears to be below the national average. It appears that about 7% to 8% (n = 4) of the fifty files reviewed contained absconder issues. It is significant that almost all of the absconders were apprehended relatively quickly. With regard to responding to absconders assigned to general parole

supervision caseloads, Pennsylvania appears to be above average.

Note: When the realities of day-to-day workload interfered with a parole agent's ability to make the exact type and quantity of contact, the agents were flexible and creative; their objectives for case supervision, again with only few exceptions, were not diminished.

Overall, parole agents did an average to above average job in assuring that parolees in need of drug treatment were referred to treatment. Pennsylvania's corrections and parole programs appear to have established more community-based drug treatment options than most other jurisdictions.

Consistent with national professional norms, adequate housing for parolees is problematic. Due to the paucity of housing resources available to service parolee and probationer populations, parolees and probationers must reside in areas where they lived prior to their current commitment offense. Therefore, they must often live with family and friends who themselves are living on the edge of pro-social life.

The unfortunate circumstances regarding parolee and probationer housing is a problem whose resolution is beyond the scope of any one agency, especially a parole/probation agency. It is recommended that a multi-agency task force be convened in order to examine what can be done to pool resources, or develop additional resources, in order respond to the housing needs of parolees and probationers.

It must be noted that public safety will be enhanced if the housing needs issue is resolved; conversely, there is greater risk to the public when the problem exists across time.

Parolees under supervision were generally referred for vocational training and employment as appropriate.  It is noted that the rate of employment of the 50 cases reviewed was less than half of the sample. The rate of parolee employment is only illuminating if considered in the context of the number of parolees and probationers available for employment.  In this regard, it appeared that approximately 33% of the cases reviewed were in some phase of dealing with a substance abuse issue; therefore, those offenders were not available for employment. There were also probationers and parolees dealing with unstable housing problems; until housing is stabilized it is more often than not difficult to situate a parolee or probationer in gainful employment.

Overall, in the few instances where case files reflected less than satisfactory field coverage of a parolee or probationer, the problems were indicative of isolated

occurrences of errors attributable to a small number of specific individuals. The instances of inadequate field coverage of a case were significantly less than what can be expected in similar reviews conducted in other jurisdictions.

Overall, the 50 case file review reveals that the Board has worked aggressively with parole agents to instill a sense of balance between their treatment and law enforcement responsibilities. In this regard, the Board has established protocols for graduated sanctions to be deployed by parole agents during the course of parole supervision. Specifically, parole agents and local area supervisors thoroughly assessed parolee and probationer risk, marshaled appropriate community resources to respond to case problems, and collaborated in meaningful ways with local social service providers and law enforcement agencies.

**Parole Revocation:**

The parole revocation process was implemented appropriately. There were very few examples of cases that should have been violated and were not, or the reverse. Consistent with national norms, parole agents, with very few exceptions, appropriately exhausted all community-based treatment and control options before recommending violation of parole or probation.

Consistent with national norms, the agency has developed a continuum of supervision statuses, and graduated responses to technical violations of parole and probation. In the overwhelming majority of cases reviewed, parole agents, through their actions, seemed to embrace the concepts of a continuum of supervision and graduated responses to technical violations (reflecting the balanced work orientation discussed earlier). Moreover, the aggressive and generally successful pursuit of parole absconders by the Board's parole agents is a fairly unique practice among parole agencies nationwide.

This review reveals that the Board conducts its release, supervision, and revocation functions in a manner that places it in the top 25% of parole agencies in the nation. The Board, for example, has adopted state-of-the-art practices for risk assessment, case planning, and execution of its law enforcement function with regard to violators – especially absconders. It is important to note that parole agents seem to firmly grasp the agency's public safety mission within the context of sound parole supervision practices. In short, actual supervision reflects thoughtful case planning, attempts to manage offenders in community settings whenever possible, and appropriate decisions to incarcerate parolees and probationers who threaten public safety.

Submitted by:


\_\_/s/ Mario A. Paparozzi\_\_\_\_\_          Date:\_\_\_\_12/3/02_____
Mario A. Paparozzi, Ph.D.

**Mario Paparozzi**

Dr. Mario Paparozzi began his career in criminal justice in 1972. From 1972 to 1998, he worked at the New Jersey Department of Corrections. During that time he worked his way up the career ladder from parole officer trainee through a variety of supervisory and management titles, including Assistant Commissioner and Deputy Interstate Compact Administrator.

In 1998, Dr. Paparozzi retired from the New Jersey Department of Corrections to accept a faculty appointment at The College of New Jersey in their Department of Law and Justice. At The College of New Jersey, Dr. Paparozzi also was appointed as The Associate Director of The Criminal Justice Center - the research and technical assistance arm of the Department of Law and Justice.

After two years at his faculty position, Dr. Paparozzi took a leave of absence from the College of New Jersey to serve as the Chairman of the New Jersey State Parole Board. After serving as Chairman for approximately two years, Dr. Paparozzi decided that he could do more for the professional advancement of community corrections profession by cutting short his six-year gubernatorial and legislative appointment and returning to the College of New Jersey.

Dr. Paparozzi has published extensively on a variety of topics related to criminal justice.

Dr. Paparozzi holds a Ph.D. in Criminology from Rutgers University. He is a certified public manager, and has completed numerous training courses related to corrections, criminal justice, and public administration.

From 1992-1994, Dr. Paparozzi served as an elected county legislator in Union County, New Jersey. As well, he has been active on local social service advisory boards and the Coalition for Crime Victims Rights.

Over the years, Dr. Paparozzi has provided numerous keynote addresses, seminars, and professional staff training in 46 states, the District of Columbia, Canada, and The Council of Europe in Strasbourg, France. He has appeared on several television and radio shows and has been interviewed by numerous representatives of the print media on topics related to criminal justice.

Dr. Paparozzi is Immediate Past-President of the American Probation and Parole Association, a member or the Manhattan Institute's council to reinvent probation, and a member of the Board of Trustees of the Crime Victims' Legal Center. He founded and is President Emeritus of the New Jersey Parole Officers' Benevolent Association - PBA #326.

## Appendix *[to the Board of Probation and Parole's response]*

With concurrence of Chief Counsel for the Board of Probation and Parole and Counsel for the Department of Auditor General, certain information contained in the files requested by the Department of Auditor General for purposes of the performance audit has not been disclosed and will not be publicly disseminated, because such disclosure or dissemination would violate one or more of the following provisions of law:

| | |
|---|---|
| 18 P.S. §11.211 | Responsibilities of victims of crime under basic bill of rights |
| 18 P.S. §11.214 | Responsibilities of department, local correctional facilities and board |
| 18 P.S. §11.502 | Crime Victims Act—Petitions to deny parole upon expiration of minimum sentence |
| 18 P.S. §11.709 | Confidentiality of records – Crime Victims Act |
| 35 P.S. §7603 | Definitions – Confidentiality of HIV-Related Information Act |
| 35 P.S. §7607 | Confidentiality of Records – HIV-Related Information Act |
| 35 P.S. §7608 | Court Order – Confidentiality of HIV-Related Information Act |
| 50 P.S. §7111 | Confidentiality of Records – Mental Health Procedures |
| 61 P.S. §331.22a | Right of victim or relative to present statement for parole report or to testify |
| 71 P.S. §1690.108 | Confidentiality of records – The Administrative Code and Related Provisions |
| 18 Pa.C.S. §9102 | Definitions – Criminal History Record Information Act |
| 18 Pa.C.S. §9106 | Information in central repository or automated systems |
| 18 Pa.C.S. §9121 | General Regulations – Criminal History Record Information Act |
| 18 Pa.C.S. §9141 | Audits |
| 23 Pa.C.S. §4304.1 | Cooperation of Government and Non-Government Agencies |
| 23 Pa.C.S. §6102 | Definitions – Domestic Abuse |
| 23 Pa.C.S. §6116 | Confidentiality – Domestic Relations |
| 23 Pa.C.S. §6339 | Confidentiality of Reports – Domestic Relations |

| | |
|---|---|
| 23 Pa.C.S. §6340 | Release of information in confidential reports – Domestic Relations |
| 42 Pa.C.S. §5945.1 | Confidential Communications to Sexual Assault Counselors |
| 42 Pa.C.S. §6352.1 | Treatment records – Juvenile Matters |
| Pa.R. Crim.P. 703 | Disclosure of Pre-sentence Reports |
| 42 USC §290dd-2 | Confidentiality of records – The Public Health Service |
| 42 USC §14011 | Payment of Cost of Testing Sexually Transmitted Diseases |
| 42 CFR §2.2 | Confidentiality of Alcohol and Drug Abuse Patient Records |

### Department of the Auditor General Comments ( to Appendix Introduction)

Contrary to the Board's statement on the preceding page, we do *not* concur that "certain information contained in the files requested by the Department of Auditor General for purposes of the performance audit has not been disclosed and will not be publicly disseminated." First, confidential information *was* disclosed to us repeatedly over the course of this audit, as we explain in paragraphs four through six of the letter (to the Governor) that opens this audit report. Second, we have no way of knowing whether the Board will or will not publicly disseminate such information. Indeed, the Board opined during a meeting with our audit staff and management officials on April 23, 2002, that its parole release decision "green sheets"—which often contain drug and alcohol treatment conditions, for example—are a matter of public record.

<u>ITEM #1.</u>

The DAG stated that the audit was being conducted under the authority of Sections 402 and 403 of the Fiscal Code, 72 P.S. §§ 402-403, which provides, in pertinent part, that "special audits of the affairs of all departments, boards, commissions or officers, may be made whenever they may, in the judgment of the Auditor General, appear necessary, and shall be made whenever the Governor shall call upon the Auditor General to make them."

The DAG audit was planned to encompass the following areas, as well as "any additional areas which may be added at [the DAG's] discretion:"

➢ Determining how the Board tracks and monitors recidivism rates in Pennsylvania;
➢ Determining if the Board has initiated new and innovative programs as a condition of probation and parole or as an alternative to incarceration, e.g., mental health and substance abuse treatment programs and other educational programs, and if these programs are effective;
➢ Determining what the Board does to ensure that fines and restitution are collected and that payment is properly monitored;
➢ Determining how sanctions and penalties are implemented when it is determined that conditions of probation and parole are violated, and how these sanctions and penalties are monitored;
➢ Determining how the Board allocates funds internally and externally, and how these funds are monitored for adequacy and appropriateness of expenditure; and
Determining what type and form of technical assistance and training are provided by the Board to county probation staff, and evaluating the quality of the training.

**<u>Department of the Auditor General Comments (to the Board's Item #1)</u>**

No response to Item #1 is necessary.

Items #2 and #3 are examples of files DAG found to be questionable release plans. The narrative below in Case Files #20 and #5 provides clarifying information on these cases.

Item #2.

---

**Case File # 20**

The DAG asserts that the Board had initially rejected the proposed home arrangements because the offender "wanted to live near two of his victims." In fact, the PBPP's field staff investigating the proposed residence rejected the offender's plan in June 1999 due to the offer being made by an elderly aunt. The field's investigation revealed that the offender did not have employment and it was unclear whether the aunt could financially support him. The field staff suggested that the offender be released through a Community Corrections Center where he could reestablish himself within the community and be assisted in obtaining employment. This offender was released to a Community Corrections placement in March 2000 and he obtained employment within two weeks. He was released to reside with his aunt ten weeks after his placement in the facility. Even though this plan was investigated and approved by the parole agent shortly after his arrival to a Community Corrections Center, the offender remained there an additional six weeks until he was stabilized. The offender was released with a special condition "You shall not have contact with victims, or victims' families, including correspondence, telephone contact, or communication through third parties." When the offender was residing at his approved residence, there were no allegations that this offender had violated this specific condition. While the offender was returned to custody approximately 16 months after his date of release on parole, the technical parole violations had nothing to do with the victims of an earlier case.

---

### Department of the Auditor General Comments (to the Board's Item #2)

Our files contain no evidence of a June 1999 rejection. There was only a March 1999 rejection based indisputably on the parolee's plan to live with his mother in a small town "directly across the street" from one victim and "within a mile" of another. Even if we were to concede that the parolee's release to an alternate location—that is, to the community corrections center—was not conspicuously questionable (and we make no such concession), certainly the release *from* the center was questionable. Specifically, the parolee was released to live with his aunt 1.04 miles from the previously rejected address of his mother. (The aunt's address, too, was formerly rejected, according to a letter from the parolee to the Board asking why.) If the Board deemed the mother's address to be too close to the victims, it should not have approved an address that was barely over a mile away. In short, the Board took an unacceptable risk by allowing this violent offender to reside with his elderly aunt so near to his victims. The Board's sole defense, above, is to say *now*—only in hindsight—that the man's eventual return to prison was unrelated to crimes against the nearby victims. (Also see our response to the Board's Item #7, which discusses numerous prohibited post-release actions of this same parolee, including violent and abusive behavior directed to yet another victim.)

Item #3.

---

**Case File # 5**

The Board paroled the offender with a condition that he must reside in a Community Corrections Center for a *minimum* of three months; the offender remained at the Community Corrections Center for a period of six months. More than sufficient contact requirements were maintained and urine specimens taken from this offender indicated no substance abuse. The offender was reported as being employed. At the time of his release from the Community Corrections Center, the offender was adjusting well to supervision requirements and his plan to reside with his mother was approved. Unknown to the parole agent, the offender assaulted an individual within two weeks of his release from the Center. The police department did not notify the PBPP that the offender was a suspect in the incident. The parole agent reported a contact with the offender six weeks after the incident, and declared him delinquent the following month. The offender was subsequently arrested.

---

### Department of the Auditor General Comments (to the Board's Item #3)

Contrary to the above response, the Board's records for Case File #5 indicate that agents did *not* conduct the 10 minimum contacts (5 face-to-face and 5 collateral) required within the 10 weeks prior to the offender's absconding. In addition, not only does the file show *no* verification of the "reported" employment, but the Board's own "Supervision History" form reads as follows: "SUBJECT WAS UNEMPLOYED THROUGHOUT THE ENTIRE TIME HE WAS RESIDING AT HIS APPROVED RESIDENCE."

We note further that, if the agent had contacted police regularly, as should have been done, the Board might have discovered the parolee's arrest warrant for attempted murder—*shooting a man in the face*—within two weeks of his release from a community corrections center. Had the Board made itself aware of the incident, the parolee might never have absconded.

Most important of all, however, is that the Board appears to have ignored the *initial* misgivings (noted earlier in our report) of its parole agent who said he did not expect this parolee's release to be successful. The Board does not address these misgivings, a silence particularly noteworthy based on the Board's continued references about entrusting parole agents to make individual assessments and decisions about their assigned parolees.

Item #4.

### 1997 Supervision Requirements (New Supervision Continuum)

*Such as visits between the parole agent and the offender's employer of family.*
**This collateral visit cannot occur in the same month as a face-to-face visit.*

| Level of Supervision | Minimum Number of Face-to-face visits Required | Minimum Number Of Collateral visits Required* |
|---|---|---|
| Enhanced | 4 each month | 2 each month |
| Maximum | 2 each month | 2 each month |
| Medium | 1 each month | 1 each month |
| Minimum | 2 each quarter | 1 each quarter** |

### Department of the Auditor General Comments (to the Board's Item #4)

We do not dispute the numbers in this table. We used the same numbers to conduct our testing and found that the Board came up short.

<u>Items #5 – 8.</u>

As a result of discussions and communications between Chief Counsel for the Board of Probation and Parole and Counsel for the Department of the Auditor General, redaction requirements imposed by one or more of the provisions of law listed above, have limited the audit team's accessibility to some case details. Clearly, the sanctioning process was addressed appropriately in light of the circumstances within each case.

### Department of the Auditor General Comments (to the Board's introductory comments to Items #5-8)

The Board's comments, above, might give the incorrect impression that the Board and we are speaking in unison regarding (1) the redaction issue and (2) the sanctioning process.

Regarding the redaction issue, the discussions and communications between the Board and us (including counsel for both parties) began early in our field work when we requested complete access to case files. At this early stage, the Board informed us of its legal requirement to redact certain information such as drug and alcohol treatment data. Based on our own research, we did concur that various laws would limit our accessibility to some case details. We did *not* concur—nor was there any suggestion from the Board in this regard—that it was we who should determine what should be redacted. Nor was it we who should have been the arbiter of whether any such redactions were done correctly. Indeed, according to the Board, we were prohibited from even *seeing* confidential information at any point. Repeatedly, however, the Board provided us with information of the type that we believed to be confidential, and repeatedly we returned that Board-provided information for further redaction. It eventually became apparent that the Board was not competently carrying out its stated obligation to redact confidential information. This problem culminated when the Board responded to our audit findings by using information that it had previously deemed confidential. Only after our intervention once again did the Board revise its response, resulting in the Board's narrative printed in this report. (It's important to note, as we do on page 55, that the deficiencies we found can stand on their own, unaffected by—and by all appearances unrelated to—the information deemed confidential).

Regarding the sanctioning process, we do not concur with the Board that sanctioning "was addressed appropriately in light of the circumstances within each case." We discussed this issue more fully in Chapter One, Conclusion 4.

Item #5.

---

**Case File #1**

    The offender was released to a Community Corrections Center for a minimum of three months.  The Board imposed a mandatory special condition: "Drug/alcohol abuse is a direct parole violation and will result in immediate arrest."  Although this special condition directs that the offender be detained for violating this condition, it does not require that the agent revoke his supervision on the initial use of illegal substances.  The offender was under supervision for 14 months before he submitted his first positive urine.  The offender was given instructions for increased reporting, increased urinalysis testing, and was required to undergo appropriate and strict additional corrective measures,  the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above.

    The Board also imposed another mandatory special condition that the offender must participate in Enhanced Supervision for a minimum of 6 months after the successful completion of other appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above.  The offender was not employed, but was attending the Orleans Technical Institute and eventually obtained a diploma from that organization in Residential and Commercial Electricity on 9/13/01.  In light of the Agency's mission of reintegration of offenders, it is admirable that extra efforts were made to keep the offender on the street while directing him toward help.

---

**Department of the Auditor General Comments (to the Board's Item #5)**

Our concern about Case File #1 remains as originally written: The Board imposed a special "mandatory" condition that the use of drugs or alcohol would result in immediate arrest but then did not follow through. Moreover, nowhere in the above response does the Board account for the six-month delay and three subsequent warnings between initial discovery of illegal drug use and the Board's taking of "appropriate" confidential measures.  Finally, the Board should *not* congratulate itself for its "extra efforts" that kept the offender on the streets and attending school while, at the same time, he was abusing drugs and receiving only half of his required supervisory visits.