<u>Item #6.</u>

---

**Case File #45**
  The DAG audit team again quotes special conditions that inform the offender that any violation of certain conditions of parole would make the offender "… subject to arrest and revocation …" The agent accomplished this by informing the offender that his freedom was at stake, and that his parole might be violated. The parole agent continued to work with the offender, proceeding through the sanctioning levels of a Conference Level 1 (with the unit supervisor) and Conference Level 2 (with the district director), and finally another Conference Level 2, which was necessary require the offender to undergo appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above. Every effort was made to sanction the offender while still in the community. However, while the above-mentioned corrective measures were in effect, the offender continued the use of illegal substances. The decision was then made to incarcerate the offender for his non-compliance.

---

### Department of the Auditor General Comments (to the Board's Item #6)

Altogether, this parolee (Case File #45) accrued nearly a dozen positive drug tests before he was finally returned to jail.  The Board's actions, as well as its response now, are unacceptable: Informing an offender that his freedom is at stake is *not* an accomplishment if such warnings are empty ones, and zero tolerance is not zero tolerance if it is not enforced.  Moreover, in view of the empty warnings *and* the fact that this parolee began using drugs two days after his release and continued using them regularly over the next eight-month period, it seems unreasonable for the Board to suggest that a series of progressive sanctions was appropriate before this parolee could be re-incarcerated.  In short, while saying one thing and doing another, the Board allowed errant behavior to continue.



EXHIBIT

Item #7.

---

**Case File # 20**

    The offender was paroled from SCI Houtzdale on 3/7/00 for the convictions of Aggravated Assault and Corruption of Minors.  The offender was given the mandatory special condition "Upon your release, you shall be evaluated to determine your need for sex offender treatment" and "You shall not contact or associate with minor female, and/or the codefendant(s) for any reason."  The offender was paroled to a Community Corrections Center and was required to undergo appropriate and  strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above.  At the time of his successful discharge, the offender was employed through a temporary employment service.

    According to the *Progress and Conduct Report*, dated 9/15/00, the offender maintained employment.  He was given a District Director Conference (Administrative Conference Level 2) due to having contact with a minor female. The offender claimed that the minor female was his daughter. The offender was ordered to undergo an intensive evaluation, the exact nature of which is confidential and the disclosure of which would violate one or more of the provisions of law listed above.  He was further required to undergo appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above. The offender was arrested because his girlfriend reported that he had punched her in the mouth; however, she later recanted her statement.  Without her testimony, the Board could not prosecute the offender for that particular parole violation.  On 10/31/00, the offender was given a special condition not to have contact with his current girlfriend for any reason.  Upon release from the Board detainer, the offender was placed on curfew and electronic monitoring. Employment during this time was intermittent.   The offender was granted a supervision fee waiver, and it is reported that all of his fines, costs, and restitution were paid in full.  On 4/9/01, the offender was given a written warning for having contact with his girlfriend, and was warned that further contact would result in his arrest.  At this time, reports concerning the offender's adherence to the corrective measures referred to above indicated that he may not have been in full compliance.  The Board's agents and local police arrested the offender on 7/10/01 for technical violations.  He was found in violation of his parole, and was ordered to serve his un-expired term of approximately 14 months.

    The Board made 19 collateral contacts with six different law enforcement agencies.  Although the DAG made reference to an incident where the police intervened for a "dispute involving a gun," the allegation regarding a gun was not substantiated or corroborated.  Accordingly, there was no arrest of the offender by law enforcement authorities for this incident.

### Department of the Auditor General Comments (to the Board's Item #7)

Again, our review of Case File #20 is not changed by the Board's explanation. Based on the extensive chronology kept by the parole agent, who documented the regularity of this parolee's violent and errant behavior, there was enough information to let the Board know that this sexual offender and substance abuser posed a huge risk. The Board's response does not explain effectively why 17 months elapsed before this offender's recommitment.

In addition, it is completely unacceptable for the Board to defend its performance based on the fact that, on numerous occasions, the girlfriend of the offender refused to take an active role in helping to recommit him. Indeed, it is not uncommon for abused women to report abuse and then recant it or, for that matter, to refrain from reporting abuse at all. It is inexcusable that the Board's tolerance of this offender extended to the point where he remained free after breaking his girlfriend's jaw. We adamantly disagree that "[w]ithout her testimony, the Board could not prosecute the offender for that particular parole violation." The fact that the parolee had *contact* with his girlfriend was a violation in itself, whether or not he broke her jaw. Moreover, the Board could have recommitted him—either before or after that incident and with or without her testimony—for numerous *other* violations and therefore prevented him from attempting to incinerate the girlfriend later. Specifically, the agent's notes showed that the parolee contacted a minor female (his daughter, with whom contact was prohibited), consumed alcohol, and—perhaps most glaring of all—*admitted* to unallowable contact with the same girlfriend whom he continued to abuse and attack. In short, this offender should not have remained free for 17 months regardless of whether his girlfriend/victim substantiated or corroborated his actions, and regardless of whether other law enforcement authorities arrested him.

Item #8.

---

### Case File #38

The offender was paroled on 1/10/00 from SCI-Houtzdale to a Community Corrections Center on condition that he undergo and successfully comply with appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above. He successfully complied with these additional corrective measures. He started working through temporary employment agencies. On 6/5/00 the offender submitted a urine sample that tested positive for cocaine. An Administrative Conference Level 1 was held on 6/13/00 where the offender was required to undergo and successfully complete further appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above. The offender planned to move to New York after successfully completing these further corrective measurers and did not have a residence in the local area pending the transfer. On 7/11/00, after successfully completing these further corrective measures, the offender was required to undergo and successfully complete yet another instance of such corrective measures. On 8/25/00, the offender successfully completed this corrective program and moved to a local boarding home. He began working in September 2000. The offender submitted a urine positive for cocaine on 1/31/01 and was detained on technical charge on 2/13/01 and recommitted the offender to serve 10 months back time.

The offender was able to successfully complete three separate corrective programs; however, he was finally returned to prison for continuing to use drugs despite all of the Board's efforts.

The audit team also mentions in their report that a charge for drunk driving was discovered during an independent search of local court records. The Board conducted several criminal history records checks (one as recently as 12/6/02) and found no indication of the offender's arrest, Accelerated Rehabilitative Disposition ("ARD") or conviction for a charge of driving under the influence while the offender was under PBPP supervision.

---

### Department of the Auditor General Comments (to the Board's Item #8)

In our original report that went to the Board for its response (audit reports are provided to the audited entity for comments before being released to the general public), we reported incorrectly that this parolee was arrested for a drunk driving violation. The Board pointed out the error, and we removed the drunk driving reference from the report. The rest of the information in our case file narrative remains as we originally wrote it: specifically, the Board allowed this man to stay free—with few apparent sanctions—after repeated violations.

<u>Items #9 - 15</u>

The Board has located an impressive percentage of absconders as evidenced by the Case Files below.

<u>Item #9</u>

| |
|---|
| **Case File #6**<br>    The offender was arrested within 13 days of being declared delinquent by the Board.  He was stopped by the police in Hagerstown, MD, for a motor vehicle violation.  The police determined he was wanted in Pennsylvania for a *parole violation*.  After his arrest on the Board's warrant, the offender admitted to the officer that he had a small amount of marijuana in the car.  The DAG analysis suggests that the offender was arrested first for possession of the marijuana and then charged later with the parole violation. |

**<u>Department of the Auditor General Comments (to the Board's Item #9)</u>**

The Board provides neither an acknowledgement nor a response to the fact that—beyond the routine issuance of a warrant—it made absolutely *no* attempts to find this absconder.  Indeed, as the Board notes, it is the police in Hagerstown, Maryland, who were responsible for this parolee's apprehension.

Item #10.

---

**Case File #16**

    This female parolee was arrested on 11/8/00 for robbery and receiving stolen property by the local city police department. She posted bail the next day. On 11/16/00, the supervising parole agent read a newspaper account of the arrest. He immediately began a diligent search of her residence, last known employer, and acquaintances. Failing to locate her, a *Delinquency Notice* was filed and *Wanted Notices* were posted on the same day. In conducting his diligent search, the agent received information from community sources about her location. He and another parole agent went to that location on 12/8/00 and were informed by neighbors that she was seen getting into a taxicab. Parole agents contacted the cab company and were told of the intersection where the absconder was dropped off by the cab driver. The agents proceeded to this location and were able to follow footsteps in the snow to a particular house. They called the police to provide backup assistance. When the police arrived, the agents approached the home and the absconder was apprehended at 12:30 a.m.

---

### Department of the Auditor General Comments (to the Board's Item #10)

In our conclusion, we took no issue with the Board's action related to the absconder in Case File #16. Indeed, we noted in the chart on page 74 that the Board was successful in locating this offender. The Board's deficient performance in pursuing absconders was related to Case Files #5, #6, and #46, for which the Board made no attempts to locate the offenders once they had been verified missing.

Item #11.

---

**Case File #33**

This offender absconded from a residential facility in Central Pennsylvania on 8/8/00.  The case file was returned to the District Office where the offender had originally resided.  (Agency Procedure requires this transfer because it is likely that the offender will return to his/her home area.)  The offender was immediately declared delinquent and wanted notices were filed. The District Office receiving the case file generated letters advising numerous law enforcement agencies in the vicinity of the offender's absconder status and provided each agency with a copy of *"Warrant for Paroled Prisoner."*  The District in which the offender's mother resided was notified as well, so they could be aware of the offender's status if the offender appeared there.  Information was received that the absconder had been issued a citation at a local department store in late August 2002 for shoplifting.  Additional efforts were made by providing notification to the two local State Police barracks of this absconder's possible presence in their jurisdiction. The absconder was arrested within two weeks at another department store for shoplifting.  A PBPP warrant was immediately provided and the offender was placed in jail.

---

### Department of the Auditor General Comments (to the Board's Item #11)

The Board's actions related to the Case File #33 absconder were not an issue in this conclusion.  As noted in the chart on page 74, the Board pursued various leads and made phone calls and visits to locate this offender.  The Board's deficient performance in pursuing absconders was related to Case Files #5, #6, and #46, for which the Board made no attempts to locate the offenders once they had been verified missing.

Item #12.

> **Case File #35**
> The offender was declared delinquent on 11/30/00 after the offender's employer notified the parole agent that he was fired for absenteeism. The parole agent immediately went to the offender's home and could not locate him. The home was locked and there was no response to the agent's efforts to gain entrance. The parole agent contacted the offender's mother, who advised that she had not seen him in recent weeks. A *Delinquency Notice* was filed and *Wanted Notices* posted. Within one week the absconder was arrested in Brighton, NY, when his uncle contacted the local police and told them that his nephew was wanted for a parole violation in Pennsylvania. The parole agent's communication with the offender's mother was instrumental in this offender's apprehension.

### Department of the Auditor General Comments (to the Board's Item #12)

The Board's actions related to the Case File #35 absconder were not an issue in this conclusion. As noted in the chart on page 74, the Board did indeed make phone calls in an attempt to locate this absconder. The Board's deficient performance in pursuing absconders was related to Case Files #5, #6, and #46, for which the Board made no attempts to locate the offenders once they had been verified missing.

Item #13 .

---

**Case File #36**

    The PBPP declared this offender delinquent on 8/22/01.  Case notes indicate that the supervising agent had contact with a local police officer on 10/22/01.  Within two days, the absconder phoned the parole agent and advised him that he would report to the office that day to clear up his delinquent status.  The offender's supervision was continued without him being incarcerated but he was required to successfully complete a strict rehabilitative regimen, the exact nature of which is confidential and the disclosure of which would violate one or more of the provisions of law listed above.

---

### Department of the Auditor General Comments (to the Board's Item #13)

The Board's actions related to the Case File #36 absconder were not an issue in this conclusion.  We noted in our report that a visit to police was made to locate this absconder and that he surrendered and was returned to parole. The Board's deficient performance in pursuing absconders was related to Case Files #5, #6, and #46, for which the Board made no attempts to locate the offenders once they had been verified missing.

Item #14.

---

**Case File #46**

Within three months of this offender's release on parole, he relapsed into substance abuse and was required to undergo and successfully complete further appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above. The offender relapsed again and was required to undergo and successfully complete further appropriate and strict additional corrective measures, the exact nature of which are confidential and the disclosure of which would violate one or more of the provisions of law listed above. During this period the offender absconded. This case was returned to the District Office that had originally referred him. He was arrested five months later in another city for drug possession.

The DAG's report indicates that supervision staff "missed 9 of 28 required visits." The Board's analysis of this same case indicates 25 offender contacts made and 17 collateral contacts were made while the offender was under active supervision. Further, the DAG's report did not take into account the number of daily interactions the supervision staff and other rehabilitative professionals made with the offender while he was in a residential setting.

---

**Department of the Auditor General Comments (to the Board's Item #14)**

We stand by our finding that no documented efforts were made to locate this absconder. Furthermore, regarding this parolee's supervision before he absconded, the Board's staff itself corroborated our test results showing that the Board missed 9 of the required 28 visits.

Item #15.

---

**Case File #5**
     A criminal complaint was filed by a large metropolitan police department alleging that this offender shot another individual within two weeks of his release from a Community Corrections Center.  The supervising agent was not made aware of this incident (or failed to document it properly).   The offender was declared delinquent two and one half months later and remained at large until his arrest five months later.  The parole agent did not document his efforts to locate this offender and no case notes were retrievable.  The supervisor was terminated for reasons of negligent performance and the parole agent resigned his employment with the Board shortly thereafter.

---

### Department of the Auditor General Comments (to the Board's Item #15)

It is unacceptable for the Board to say that the agent "was not made aware of this incident (or failed to document it properly)."  The agent should have made regular contacts with the police.  Had such contacts been made, the Board could have been aware of the violence that occurred on July 30, 2000, just two weeks after the parolee was released from the community corrections center.  On that date, according to police documents, the following occurred:

> On 7/30/2000 around 11:30PM…[parolee] approached [victim] with a gun in his hand.  [Parolee] put the gun to [victim's] temple and shot as [victim] pulled his head away striking him in the side of the face.  After [victim]was shot, [parolee and others with him] ran.  [Victim]…was treated for a gunshot wound [to] the cheek. (The bullet entered through the side of [victim's] face and exited near his lip.)

Item #16.

## Parole Absconder Website



# Pennsylvania Parole System Absconders

THESE ARE INDIVIDUALS WHO ARE NOT REPORTING FOR SUPERVISION AS REQUIRED BY CONDITIONS OF PAROLE. WE ARE SEEKING INFORMATION AS TO THEIR WHEREABOUTS. ANYONE HAVING INFORMATION SHOULD CALL THE PHONE NUMBER LISTED WITH THE PHOTO, BETWEEN 8:30 AM AND 5:00 PM. OR SEE OUR ADDITIONAL CONTACT INFORMATION.

Page 1 of 6    Home Next

| WILLIAM GLADDIN | JOHN BONYAN | PATRICIA TAYLOR |
|---|---|---|
| PAROLE NO: 079AN | PAROLE NO: 013AJ | PAROLE NO: 970AN |
| HT: 6'1"  WT: 232 | HT: 66"  WT: 140 | HT: 5'1"  WT: 120 |
| EYES: HAZEL | EYES: BROWN | EYES: HAZEL |
| HAIR: BLACK | HAIR: BLACK | HAIR: BLOND |
| RACE: B  SEX: M | RACE: B  SEX: M | RACE: W  SEX: F |
| RELEASED: 07/24/00 | RELEASED: 10/04/00 | RELEASED: 06/26/00 |
| Contact: | Contact: | Contact: |
| (215)560-2454 | (215)560-2454 | (570)327-3575 |





| TRACEY OSBORNE | FRED GREENBERG | MIGUEL RIVERA |
|---|---|---|
| PAROLE NO: 9716I | PAROLE NO: 1591I | PAROLE NO: 179AF |
| HT: 6'2"  WT: 315 | HT: 5'9"  WT: 220 | HT: 5'7"  WT: 166 |
| EYES: BROWN | EYES: BROWN | EYES: BROWN |
| HAIR: BLACK | HAIR: BROWN | HAIR: BLACK |
| RACE: B  SEX: M | RACE: W  SEX: M | RACE: H  SEX: M |
| RELEASED: 08/11/99 | RELEASED: 10/04/00 | RELEASED: 05/08/00 |
| Contact: | Contact: | Contact: |
| (215)560-2454 | (215)560-2454 | (610)791-6157 |





| JAMES ALDERMAN | DAVID REITHMAYER | RAYFORD ODOM |
|---|---|---|
| PAROLE NO: 2437J | PAROLE NO: 2441P | PAROLE NO: 253AN |
| HT: 72"  WT: 165 | HT: 68"  WT: 165 | HT: 5'-5"  WT: 145 |
| EYES: BROWN | EYES: BROWN | EYES: BROWN |
| HAIR: BLACK | HAIR: GRAY | HAIR: BLACK |
| RACE: B  SEX: M | RACE: W  SEX: M | RACE: B  SEX: M |
| RELEASED: 02/17/98 | RELEASED: 04/03/00 | RELEASED: 05/25/00 |
| Contact: | Contact: | |
| (215)560-2454 | (215)560-2454 | |





 

PENNSYLVANIA BOARD OF PROBATION AND PAROLE
1101 S. FRONT ST., SUITE 5600 HARRISBURG, PENNSYLVANIA 17104-2522
PHONE: (717) 787-5699    FAX: (717) 787-4197
© Copyright 2002, Commonwealth of PA

Browse  Search  Absconder Home  Back  Printable Version  Text-Only  Full-Screen  Ask  Previous  Next

### Department of the Auditor General Comments (to the Board's Item #16)

The Web site provides valuable information to the public and, at the same time, provides a means for the public to assist the Board in locating absconders. The Board should use news releases and other media contact opportunities to publicize the site widely.

<u>Item #17.</u>

The *Policies and Procedures for Improvement Grants* document was furnished to the DAG's staff during their audit of the Board. It has been the practice of the Board's auditors to follow these procedures, which are outlined below:

All standards requiring policy and procedure shall be supported by primary and secondary documentation. Primary documentation includes written policy and procedure; secondary documentation includes written records supporting the policy and procedure.

- Verbal documentation alone may be insufficient to confirm "compliance." Written or sight confirmation, as appropriate, may be needed to support verbal documentation.
- The auditor shall request documentation, as necessary, to reach a conclusion of "compliance," "non-compliance," or "non-applicability."
- Board staff shall determine "compliance," "non-compliance," or "non-applicability" with required standards:
  a. through interviews with the court, chief adult probation officer, and other appropriate county personnel;
  b. by examining policies, procedures and practices, case records, and other appropriate files and documents.

### Department of the Auditor General Comments (to the Board's Item #17)

These procedures, which indeed were provided to us during our field work, do not address the deficiencies we noted in Chapter 5, Conclusion 2, namely the cursory audits which the Board conducted of the 65 county and probation offices. Although the Board states that it has been its practice to follow these procedures, little or no documentation was provided to us during the course of our audit to indicate that such practices were actually completed. Again, the Board should comply with our recommendation to conduct more in-depth and comprehensive analyses of each county probation and parole office before awarding grant-in-aid funding.

A Performance Audit of the                          Page 181
Pennsylvania Board of Probation and Parole

                                                   Appendix B

Pennsylvania Department of the Auditor General

---

## Appendix B

## Additional comments from the Department of the Auditor General

Following are our comments to the Board's responses about our introductory background narrative and our methodology.

### Department of the Auditor General Comments (to the Board's Introduction and Background response)

The information about the 1995 Special Session on Crime is a helpful addition to our discussion, and we appreciate the Board's perspective on that issue.

Regarding the Board's perspective on its 1997 review of policies and the subsequent changes that purportedly "raised the bar" concerning public safety, we agree in part and disagree in part. Specifically, the changes may have resulted in *policy* revisions to increase the number of required contacts, but—as our audit report shows—the changes did not result in the actual *practice* of adequate supervision.

### Department of the Auditor General Comments (to the Board's Methodology response)

At no point did we extend our sample results to the entire population of parolees and probationers or to any portion of that population. Indeed, there are at least 41 references throughout the report to clarify that our results are from a sample population rather than from the entire parolee and probationer population. The earliest references include the following:

---

- On the first page of our audit report—the Table of Contents on page i—we qualify our results with the words "some" and "in our sample."[72]

- In the first sentence of our Executive Summary beginning on page iv of this report, we refer to the sample size by using the words "in 45 of the 50 cases sampled."

- In our Objectives and Methodology section on page 6, we make reference specifically to our sample size.

As for the Board's notation that we did not until later in the audit report note that the sample of 50 was drawn from a total population of 2,975 (offenders the Board began supervising in the first quarter of 2000) and not from the total population of 19,500, we have two replies:

1. First, we have amended our report to include that information on page 6, thereby negating the Board's contention that readers have to wait for this information.

2. Second, since a sample of 50 out of 2,975 is proportionately larger than a sample of 50 out of 19,500, it would benefit the Board, not us, if readers had initially thought that our sample of 50 came from the larger population. But we again note that nowhere in this report do we attempt to extend results to the entire population—whether that population is 2,975 or 19,500.

---

[72] For example, we state "The Parole Board inadequately documented *some* investigations of parolee work plans…" and "The Parole Board was deficient in supervising paroled prisoners *in our sample*" in conclusions 1 and 3, respectively, on the first Table of Contents page. (Emphasis added.)

A Performance Audit of the                          Page 183
Pennsylvania Board of Probation and Parole

                                                    Appendix B

Pennsylvania Department of the Auditor General

In summary, the examples we cite stand on their own to illustrate inadequate supervision in the instances we discuss.  The very fact that we labeled and numbered our illustrative cases individually signifies to the reader that they are indeed case file examples.

Regarding the Board's contention that the sampling process was highly selective on our part, it was not.  The Board knew from the beginning of our audit that we would be reviewing 50 offenders—preferably 5 cases from each of 10 districts—whom the Board began supervising in the first quarter of 2000.  Using district lists provided by the Board, we used a very common method of systematic sampling by choosing every $n^{th}$ offender.  We asked the Board to provide us with files for the $n^{th}$ offenders, which the Board did for six of the districts.  In the other four districts, however, the Board said it did not have all the $n^{th}$ files conveniently accessible.  Accordingly, the Board provided us with only the $n^{th}$ files that it—not we—deemed accessible. In other words, for those four districts, the Board itself was selective by providing us with the files it wished to provide from our sample list.

Regarding the Board's inference that we did not provide readers with sufficient information to understand our sampling process, we assert that such is not the case.  However, the sampling process should be even *more* clear to readers with the added details in the above paragraph.

Regarding the Board's contention that we fell short of the spirit and intent of Section 7.18 of *Government Auditing Standards*, we first provide the full text of Section 7.18 here:

    Auditors should report the significant findings developed in response to each audit objective.  In

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

reporting the findings, auditors should include
sufficient, competent, and relevant information to
promote adequate understanding of the matters
reported and to provide convincing but fair
presentations in proper perspective.  Auditors
should also report appropriate background
information that readers need to understand the
findings.

There is no question that we followed the Section 7.18 standard
in full.  We reported our significant findings in detail; we
included sufficient, competent, and relevant information; and we
provided a convincing and fair presentation.

Whether or not the Board *likes* the audit report findings and
presentation is another story.  Unfortunately, when we find
deficiencies, it is not uncommon for an audited entity to attack
the audit team's methodology.  But our methodology stands on
its own as we have just discussed, as do the results of our work.
The audit team spent 16 months examining the 50 sampled files
in detail, interviewing Board staff, conducting extensive testing
and analysis, reviewing publications and research, developing
findings, and preparing the report.  In short, this entire audit is
supported by solid, comprehensive, in-depth review work that
has been conducted and reported by educated and experienced
staff.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Page 185

Appendix C

Pennsylvania Department of the Auditor General

---

## Appendix C

## Audit report distribution list

This report was initially distributed to the following:

The Honorable Edward G. Rendell
Governor
Commonwealth of Pennsylvania

Benjamin A. Martinez
Acting Chairman
Pennsylvania Board of Probation and Parole

William F. Ward[73]
Former Chairman
Pennsylvania Board of Probation and Parole

Ross E. Starner
Comptroller
Pennsylvania Board of Probation and Parole

The Honorable Joe Conti
Chair
Law and Justice Committee
Senate of Pennsylvania

The Honorable Sean Logan
Minority Chair
Law and Justice Committee
Senate of Pennsylvania

The Honorable Robert J. Thompson
Chair
Appropriations Committee
Senate of Pennsylvania

---

[73] Mr. Ward was the Board's chairman during the period of this audit.  He resigned as chairman in February 2003 at the expiration of his term.

Page 186

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Appendix C

Pennsylvania Department of the Auditor General

---

**Audit report distribution list,** *continued*

The Honorable Vincent J. Fumo
Minority Chair
Appropriations Committee
Senate of Pennsylvania

The Honorable David Argall
Chair
Appropriations Committee
Pennsylvania House of Representatives

The Honorable Dwight Evans
Minority Chair
Appropriations Committee
Pennsylvania House of Representatives

Harvey C. Eckert
Deputy Secretary for Comptroller Operations
Office of the Budget

Mark H. Bergstrom
Executive Director
Pennsylvania Commission on Sentencing

James A. Gondles, Jr.
Executive Director
American Correctional Association

*This report is available at http://www.auditorgen.state.pa.us or by
calling or writing to the Pennsylvania Department of the Auditor
General, Office of Communications, 318 Finance Building,
Harrisburg, Pennsylvania, 17120.  Telephone:  717-787-1381.*

# ALARMING FINDINGS

### PA Board of Probation and Parole:

- lost track of 1,600 offenders

- inconsistently sanctioned parole violators

- issued idle threats; violent offenders remained free

- missed 90% of required visits in sample

- inadequately investigated home and work plans

- wrongly lowered supervision levels for violent offenders

- failed to collect millions in supervisory fees

- inadequately monitored restitution to victims

Source: Department of the Auditor General Performance Audit of the Pennsylvania Board of Probation and Parole, April 2003

# BOARD LOST TRACK OF MURDER SUSPECT

## Parolee supposed to be under "maximum supervision"

### CASE FILE #5

- Board ignored agent's misgivings and approved parole to a community corrections center, even though offender had no job and no financial support

- parolee attempted murder within two weeks of his release from the center; shot man in face

- agents missed required visits and were unaware of shooting

- parolee absconded from Board's supervision

- Board made no effort to locate absconder

- parolee finally arrested six months after Board's last contact

Source: Department of the Auditor General Performance Audit of the Pennsylvania Board of Probation and Parole, April 2003

# 18 MONTHS OF FREEDOM FOR VIOLENT SEXUAL OFFENDER

## History of violence, assault, and sexual contact with 12-year-old girl

## CASE FILE #20

- Board rejected offender's request to live within 1 mile of his victim; later approved home 1.4 miles from rejected address

- parolee exhibited violent behavior
  - broke girlfriend's jaw
  - threatened girlfriend with gun
  - tried to light girlfriend on fire
  - ignored order to stay away from minors

- sanctions not consistently imposed and warnings not enforced

- parolee bit girlfriend on her arm

- parolee arrested for terroristic threats, simple assault, stalking, harassment

- 18 months passed before parolee finally recommitted to prison

Source: Department of the Auditor General Performance Audit of the Pennsylvania Board of Probation and Parole, April 2003

# PROTECT COMMUNITIES AND IMPROVE ACCOUNTABILITY

## Casey offers nearly 50 recommendations, including:

- aggressively pursue absconders
- notify and involve public in search for absconders
- enforce sanctions against parole violators
- adopt policies for graduated sanctions based on type, severity and repetition of violation
- ensure conditions of parole and treatment program requirements are met
- improve efforts to monitor and collect fees owed by offenders
- impose sanctions for non-payment of restitution, fines or costs
- institute corrective action plans to address deficiencies noted in Board's own internal audits
- ensure adequate support for parole agents
- improve adequate monitoring of agents' job performance
- analyze caseload and workload data to help agents perform better

Source: Department of the Auditor General Performance Audit of the Pennsylvania Board of Probation and Parole, April 2003