The Board's antiquated information system also contributed to its deficient supervision of parolees and probationers. The system was inadequate at delivering standard information required to manage an agent's caseload, such as parole agent records of parolee interviews and daily itinerary log sheets. The system was also deficient at producing non-standard information on demand, such as the number of offenders completing a treatment program or the reasons why parolees were recommitted to prison.

Two other supervisory issues—poor sanctioning and inadequate training—additionally affected the Board's ability to supervise parolees and probationers. Those issues were significant enough to warrant separate detailed discussions and, therefore, are addressed elsewhere in this report.

Overall, there appears to be no single reason for the Board's weak supervision of its charges. Any one of the reasons we have discussed—caseload issues, inefficient workers, little supervision, inadequate technology—or a combination of these factors plus others not yet discussed might have contributed to the Board's weak performance.

### Recommendations

- The Board should ensure that parole agents receive adequate support and assistance in their supervision, tracking, assessment, and sanctioning of parolees and probationers.

- The Board should evaluate the role of parole agent supervisors to ensure they properly monitor their agents' job performance and take corrective actions as necessary.

- The Board should ensure that special conditions of parole and treatment program requirements are reviewed and appropriately utilized when offender supervision levels are assigned.



EXHIBIT
1-C

- The Board should analyze its caseload and workload data to determine if there are enough agents to carry out their responsibilities effectively and, if so, how those agents can perform better.

- The Board should require that parole agents' notes and records be automated—using laptop computers with appropriate software, for example—to save agents' time, increase productivity, ensure that records are legible, and allow for management's retrieval, review, and evaluation.

### Board of Probation and Parole Response

The Board adamantly disagrees with the DAG's findings and conclusion. The DAG defined the alleged shortcomings as any one missed contact in any given calendar month over an 18-month period. The DAG audit team appears to have focused exclusively on the number of contacts; this view through the prism of "quantity instead of quality" has resulted in findings and conclusions that misjudge the effectiveness of the Agency's efforts.

In 1997, the Board's standards were raised to the present day using the new *Parole Supervision Continuum Plan*. (See Appendix, Item #4). The *Parole Supervision Continuum Plan* significantly raised the minimum number of required contacts for all levels of supervision. This change in supervision requirements resulted in a higher level of intervention and supervision of offenders.

The DAG audit team argues that, in 90% of the sampled cases, the minimum numbers of required contacts were not made during the 18-month audit period. This finding is accurate when a case in the sample was reviewed one month at a time; if a reviewed case were missing just one contact over 18 months, such as a collateral contact to talk with someone in the community who

knows the offender, the DAG designated the case as
"inappropriately supervised." However, if the number of
required contacts for a certain month were surpassed by 100%,
the DAG counted only the required contacts; all other contacts
during that time period were discounted.

This audit approach does not reflect the quality of the work of
this Agency. In the daily supervision of offenders, an agent may
have to reschedule an appointment in lieu of more important
responsibilities, such as removing a parole violator from the
street or testifying at a parole revocation hearing being held at a
state correctional institution.

Additional offender contacts beyond the minimum required
amounts illustrate the professionalism and commitment of the
Board's parole agents, and demonstrate the need for flexibility in
the exercise of their duties. Clearly, parole agents who made
extra contacts were working with parolees who needed further
intervention. The Board recognizes that wording in existing
PBPP procedures may need to be revisited to articulate the need
for discretion and flexibility in supervising individual offenders.

It was noted that the Board utilizes some information systems
that are outmoded. This concern was recognized by the Agency
during the audit period. The Board has made significant progress
to enhance and improve the efficiency of its information
technology systems. Efforts have been made to develop new
programs and applications, such as the Board's *Institutional Case
Management Automation* system. The Board will continue to
modernize information systems as funding allows.


### Department of the Auditor General Comments

In spite of the Board's adamant disagreement, our conclusion
remains supportable, significant, and real: The Parole Board was
deficient in supervising paroled prisoners in our sample. Our

definition of "alleged shortcomings" was based on the Board's own requirements, not our own; the "quantity instead of quality" prism is the Board's measurement tool, not ours. According to even the most minimum of those requirements, the Board came up short.

The Board's reference to a case missing just one collateral contact over 18 months is hypothetical. Indeed, the sole case among our sample with just one missed collateral visit was a parolee who was supervised for only six weeks in total (and then recommitted). There were no extra visits or contacts made. Moreover, even if we were to factor out that particular case and six others in which only two to four contacts were missed, there were still 38 other offenders—76 percent of the sample—who did not receive the required number of visits or who had no record of *any* visits at all.

Not only did the Board come up short, but it also attempted to re-configure its required measurements when it responded to this audit. Specifically, in the Board's executive summary to its response (See Appendix A), the Board noted that it made 102.9 percent of the required visits for 47 of the 50 cases in our sample. However, the 102.9 percent is faulty—and highly inflated—for three reasons:

1.  To arrive at 102.9 percent, the Board counted only face-to-face visits, *excluding the required collateral contacts.*

2.  Also in its 102.9 percent figure, the Board counted *total* visits made even when they were not made in the required time period. For example, if parole agents made "extra" visits during one time period and no visits during another period, the Board incorrectly allowed the extra visits to make up for the missed visits. Extra contacts (which the Board did at times make) should never be substituted for missed ones; indeed, extra contacts are *supposed* to be made when circumstances warrant.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

3. Finally, the Board counted only 47 of the 50 files to come up
   with this percentage, ignoring 3 entire case files because it
   could find no record of *any* visits. (Our own testing
   identified 6 files, rather than only 3, with no documentation
   of visits.)

It is wrong for the Board to disregard its own measurement tool
when the measured results are unflattering. If the Board believes
that its own standards do not allow an accurate reflection of
quality, then the Board should revise those standards (although it
is doubtful that revising quantifiable standards downward would
be acceptable to the public).

Regarding the Board's sweeping statement suggesting that
required visits were missed because agents were removing other
parole violators from the streets or testifying at parole revocation
hearings, never was there evidence provided to us—either now
or during our audit period—of such exceptions.

Finally, regarding the Board's agreement that it utilizes some
outmoded information systems, we are encouraged that the
Board has noted it will "continue to modernize information
systems as funding allows."

**An important note:** The Board's consultant—whose analysis
appears in Appendix A as part of the Board's response—is
incorrect to say there were no instances of wrongly assigned
supervision levels by the Board or its agents. In fact, in a
memorandum dated April 9, 2002, the Board's director for the
Western Region provides details that validate our finding of
wrongly assigned supervision levels. Moreover, according to the
documents we reviewed, the consultant is also incorrect to say
that supervision status overrides always *increased* the level of
supervision rather than decreased it.

A Performance Audit of the                                           Page 45
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

| | |
|---|---|
| **Conclusion 4:**<br><br>**The Parole Board sanctioned parolees ineffectively by sending mixed messages— sanctioning inconsistently or threatening violators with punishment but then not following through.** | The Parole Board typically sanctioned parolees' inappropriate behavior in ways that sent mixed messages to violators. Specifically, the Board repeatedly warned violators to stop their errant behavior, threatened them with punishment, and then did not follow through.   In addition, and equally troubling, the Board sanctioned parolees according to no clear method, making it impossible to know what violations would or would not be sanctioned and, if so, how.<br><br>We have no way of knowing how much, if any, of this problem was caused by Board philosophy—for example, an attitude of relaxed or "hands-off" enforcement.   But philosophy aside, we do know that a significant part of the problem was caused by poor procedures.  Specifically, the Board (1) left sanctioning up to agents in the field, not providing them with a standardized plan using graduated sanctions and (2) did not document sanctions in such a way that it could track either the sanctions themselves or the outcomes.<br><br>We note at the outset we are not suggesting the Board should be so retributive that a single minor infraction will send a parolee immediately back to prison.  But neither are we suggesting that the Board should continue to act in ways that minimize or ignore the conditions it imposes, or that it should be so inconsistent that parolees can easily figure out they have sizeable odds of not being sanctioned at all.<br><br>Sanctions are intended to change behaviors and, in turn, keep communities free of the risks associated with parolee violations. When parolees violate the terms of their parole, the Board can impose the ultimate sanction of parole revocation and incarceration.  As an alternative, the Board can impose intermediate sanctions first—certain punishments, special conditions, treatments, or instructions—to address violations. However, such alternatives should be considered only "to the |

A Performance Audit of the
                        Pennsylvania Board of Probation and Parole

                        Pennsylvania Department of the Auditor General

---

extent that public safety is not endangered and the possibility of
successful community adjustment exists."[31]

As laid out in the Board's procedural manual, these intermediate
sanctions include—but are not limited to—the following:

1. Increased reporting requirements
2. Written warning/instruction
3. Entry into an inpatient or outpatient treatment program
4. Curfew, including electronic monitoring
5. No residence changes except in emergency situations
6. Travel restrictions
7. Parole agent-imposed special conditions
8. Placement in structured living arrangements that do not
   require district director initiation
9. Placement in a community corrections center with
   concurrence by the district director
10. Placement in SAVE (Substance Abuse Violators Efforts)
    programs, if appropriate, with concurrence by the district
    director[32]

When we initially approached this section of the audit, we
expected to review our sample files, quantify the sanctions
according to the above classifications, and then analyze both the
imposition process and the outcomes. But quantifying and
classifying were impossible based on a system so incomplete and
inaccurate that the Board itself couldn't rely on the information in
its purported "treatment tracking system." Because the Board left
parole agents to their own judgment about what sanctions to
impose, and because not all agents entered sanctions into the
Board's tracking system, sanction information was neither
maintained nor administered in a consistent manner. Accordingly,
if the Board did not have reliable data showing if, how many, and

---

[31] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association,
Standard 3-3168, August 1998, p. 51.
[32] *Pennsylvania Board of Probation and Parole Procedures,* "Supervision Practices – Supervision
Sanctions and Tools," Volume III, Chapter IV, Procedure 4.12, Effective June 1, 2001.

A Performance Audit of the                                    Page 47
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

---

which sanctions were issued to each parolee at any one time, we
can reasonably conclude that the Board could not possibly have
analyzed the sanctions' effectiveness.  In fact, the Board admitted
to our auditors that it could not do so.

In the absence of Board-supplied summaries or measurements, we
used data from the offenders' files to show how the sanctioning
process unfolded.  Based on this evidence—which we present as
case examples on the following pages—we can illustrate how the
Board set conditions and issued warnings but did not enforce
them, how it imposed sanctions in some cases but not in others,
and how some of the information was unclear.

Page 48                         A Performance Audit of the
                               Pennsylvania Board of Probation and Parole

Chapter One


                               Pennsylvania Department of the Auditor General

---

| **Case File #1** | |
|---|---|
| **Who:**  Violent offender, paroled previously, history of drug and alcohol problems. | |
| **What Board did:**  Warned this man of *immediate* arrest but did not enforce warning, allowing him instead to commit repeated violations *without* arrest. | |
| February 2000 - Condition set of "mandatory" arrest for drug use. | Board paroled prisoner to a community corrections center.  One of the Board's release conditions was this: "Drug/alcohol use is a direct parole violation and will result in immediate arrest—mandatory." |
| July 2000 | Board released parolee to community to share home of woman living in what investigator noted was "a high crime neighborhood." |
| April 2001- No "mandatory" arrest for use of drugs after all. | Parolee used illegal drugs—"marijuana with cocaine and PCP." Board required parolee to attend conference with a supervisor, told him to discontinue drugs and to report weekly for drug testing, but did not make the "immediate arrest—mandatory" as prescribed. |
| May 2001 - More drugs; a "final" warning. | Parolee again used drugs; failed to report to agent.  Still no arrest. Instead, Board placed parolee on curfew and said:  "This is your final warning.  Continued drug consumption will lead to jail." |
| July 2001 - Final warning not really final. | Board cited parolee for drug use but did not enforce its "final warning." |
| October 2001 - More of the same. | Board again cited parolee for drug use—two different times—and again did not enforce its "final warning."  Also cited parolee for failure to report to agent for entire month of September.  Told parolee that failure to report may result in prison and that drug use should stop, effective "immediately," making it sound as if the warning were new. |
| Late October 2001 | Board ordered parolee to take certain measures, the nature of which are confidential. |
| March 2002 | Board declared parolee to be technical parole violator but still had not re-incarcerated or even detained him as of early March. |

Pennsylvania Department of the Auditor General

| | |
|---|---|
| **Case File #45** | |
| <u>Who</u>: **Offender with history of drug abuse, theft, criminal conspiracy, prohibited offensive weapons, harassment, and escape; also had four probation revocations.** | |
| <u>What Board did</u>: **Warned this man of** *immediate* **arrest but did not enforce its warning, allowing him instead to commit repeated violations** *without* **arrest.** | |
| February 2000 - Conditions set. | Board paroled prisoner to the community to live with mother and father. Among the Board's conditions were that (1) parolee must achieve negative results in drug screening tests applied randomly and (2) parolee would be subject to a curfew. |
| February 2000 - Conditions violated; warning issued. | Two days after release, parolee started using alcohol and cocaine. Board issued written warnings and instructions to attend community support meetings; also reissued its original conditions—including the two above—as "special conditions." Board warned parolee that, if *any* of the conditions were violated, he would "be subject to arrest and revocation of parole as if you had violated any of the original conditions." |
| March 2000 - Conditions violated again; more serious warning issued. | Parolee again used illegal drugs as indicated by positive ("hot") urine sample; Board required him to attend administrative conference with a parole supervisor and to report to agent more often. Agent wrote in record of interview: "Per [supervisor], next hot urine—incarcerate." |
| April – Sept. 2000 - Serious warning not enforced; zero tolerance warning issued. | Parolee accrued at least 7 more "hot" urine samples and remained free in spite of Board's threat to incarcerate. Board imposed other sanctions—including electronic monitoring, further administrative conferencing, and another measure (the nature of which is confidential). Finally, in late September, Board issued a condition of "zero tolerance" for drug usage. |
| October 2000 - Zero tolerance was really "three tolerance." | Despite its "zero tolerance," the Board tolerated two more positive drug tests before finally arresting parolee and returning him to prison after yet another positive test. |

| Case File #20 | |
|---|---|
| **Who:**  Offender with a history of violence, alcohol abuse, public drunkenness, assault, and sexual contact with a 12-year-old female. | |
| **What Board did:**  Chronicled repeated and increasingly serious errant behavior, including prohibited contact with a minor female, prohibited contact with girlfriend, and physical violence.  Did *not*, however, consistently impose sanctions or enforce warnings. | |
| March 2000 - "Mandatory" conditions set. | Board paroled prisoner to community corrections center.  Imposed conditions that included "mandatory" no alcohol and no contact with minor females. |
| May 2000 - Parolee violated conditions; warned. | Parolee released to live with aunt, warned not to contact minor females (including daughter), and set up on electronic monitor.  Saw daughter anyway.  Also used cocaine.  Board issued another warning. |
| June - July 2000 - Bad behavior rewarded. | Parolee failed to show up for scheduled meeting with district justice about money owed for past crimes.  Board imposed no sanction and later disconnected parolee's electronic monitor. |
| Oct. - Nov. 2000 - Parole revocation would have protected public, but the Board chose to let the parolee continue putting the community at risk. | Police reported that parolee broke girlfriend's jaw and trashed her apartment.  Parolee was located (the Board had evidence he was not living with his aunt as required), arrested, and sent to county jail, where he refused initially to sign the Board's "special condition" to stay away from girlfriend.  The parole agent appeared to recognize the enormous risk posed by this parolee, but the Board did not revoke parole.  Instead, parole supervisor released the parolee from jail, cited him for assaultive behavior and curfew violation, and put him on electronic monitoring. |
| Jan. - June 2001 - Parolee's errant behavior continued. | Parolee continued contact with girlfriend; police intervened at one point for dispute involving a gun.  Board imposed sanctions some times and not others.  Overall, however, sanctions had no apparent effect. |
| July 2001- Parolee committed violent acts against girlfriend. | Police reported that parolee poured gas or kerosene on tent while girlfriend was in it; she escaped. Girlfriend said that parolee became angry when she dumped his alcohol away. Later, parolee was arrested and detained for new acts: assaulting, stalking, harassing, intimidating, and threatening girlfriend. |
| October 2001 | After observing multiple parole violations for more than a year and a half, the Board finally rendered its decision to recommit parolee to prison for those violations. |

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Page 51

Chapter One

Pennsylvania Department of the Auditor General

<table>
<tr><td colspan="2" align="center"><strong>Case File #38</strong><br><br><u>Who</u>:  <strong>Offender with history of violence, drug abuse, and psychiatric issues.</strong><br><br><u>What Board did</u>:  <strong>Allowed this man to stay free—with few apparent sanctions—after using drugs repeatedly.</strong></td></tr>
<tr><td>January 2000 - Conditions set.</td><td>Board paroled prisoner under various conditions, including 90 days of electronic monitoring, no consumption of alcohol, no entering any establishments that sell or dispense alcohol, and no random test results showing the presence of controlled substances or designer drugs.  The Board also imposed two other conditions, the nature of which are confidential.</td></tr>
<tr><td>May 2000 - Instructions given to call or report.</td><td>Board released parolee to his residence and to employment.</td></tr>
<tr><td>June 2000  - Drug condition violated twice; conference held.</td><td>Parolee tested positive for—or admitted to—using cocaine two times within 4 days; sanctioned to an "administrative conference" with a supervisor who increased supervision to maximum level and presumably warned parolee to stop drug use.  Files are unclear.</td></tr>
<tr><td>October 2000 - Another drug violation; sanction unclear.</td><td>Parolee had a "very positive" urine test, according to agent's notes.  It is unclear from records if parolee was placed on electronic monitoring <em>one day before</em> this violation for some other reason, or if he was placed on electronic monitoring <em>the day of</em> the violation because of it.</td></tr>
<tr><td>Dec. 2000 - Feb. 2001 - Two more drug violations, but parolee stayed in community.  Finally recommitted after another violation.</td><td>Parolee again used drugs at least twice that the Board knew about, but Board allowed him to remain in the community. The parolee was recommitted to prison only after another drug violation in February.</td></tr>
</table>

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

Sending mixed messages to parolees and probationers, as illustrated in the preceding cases, is unacceptable. Threatening violators with punishment and then not following through signals to offenders that—at least on some occasions—they can violate even the "mandatory" terms of their parole and remain free. And with continued leniency, offenders can increase their noncompliance to the point where situations are no longer remediable—a losing situation for the Board and offenders alike.

The Board's allowing of parole agents to issue sanctions on a case-by-case basis should be modified to implement a more defined system by which—still on a case-by-case basis—graduated sanctions are used. If the Board required graduated sanctioning according to specific standards and procedures based on type, severity, and repetition of violations, agents and offenders alike would know what to expect.

Finally, along with adopting more precise standards and procedures, the Board must clearly record, accurately track, consistently monitor, thoroughly analyze, and routinely evaluate the sanctions imposed on offenders in relationship to their violations. By not doing so, the Board's supervision will continue to demonstrate weaknesses such as those illustrated in our examples.

## Recommendations

- The Board should send clear messages to the offenders it supervises by following through with the warnings it issues and the sanctions it imposes.

- The Board should sanction more consistently by adopting clearly defined and clearly communicated standards and procedures that require agents to impose graduated sanctions for the individual parolees they supervise. The graduated

---

sanctions should be based on type, severity, and repetition of violations.

- The Board should ensure that violations and sanctions are clearly recorded, accurately tracked, consistently monitored, thoroughly analyzed, and routinely evaluated. Changes to the sanctioning process should be made based on the evaluation process as necessary.

### Board of Probation and Parole Response

The Board disagrees with the DAG's findings and conclusion. All offenders cannot be sanctioned in the same manner. An important part of the Board's mission is to assist offenders with their reintegration into society. This structured reintegration is accomplished on an individual level. While responses for certain behaviors have been established, there is no "cookie cutter" solution in the sanctioning process. Probation and parole agencies need to be able to mete out sanctions in response to the totality of the circumstances.

Certain sanctioning information, such as drug and alcohol treatment, is restricted from public dissemination by Pennsylvania's *Criminal History Records Information Act* ("CHRIA"). Accordingly, during the audit, the Office of Chief Counsel advised that CHRIA required the Board to redact confidential information that could not be lawfully disclosed to the DAG, a non-criminal justice agency. These redaction requirements imposed by CHRIA may have limited the DAG audit team from fully evaluating the total Agency efforts in response to violations committed by these offenders.

As stated previously, the supervision and sanctioning of offenders is tailored to the assessment of their specific risk and needs. Each offender's case is viewed in its totality and in accordance with the Board's policies and procedures.

The Board acknowledges the DAG's recommendations to follow
through with imposed sanctioning, define and communicate
standards and procedures for graduated sanctions, and ensure that
violations are correctly recorded, tracked, and analyzed
routinely. The Agency's procedures regarding the graduated
sanctioning process allow for movement up or down the scale of
sanctioning; alternatives for sanctioning depend upon the nature
of the violations *(e.g.,* a lesser sanction for the non-payment of
supervision fees versus illegal drug use). The Board's procedure
provides that "supervision staff may determine that there is need
for additional structure and/or treatment in lieu of arrest and
recommitment." This approach provides guidelines for the field
staff to use in an ever-evolving case history, enabling them to
respond appropriately to the current case management issues.

It is understandable that the DAG could look at a case file and
determine, with hindsight, that different steps should have been
taken in the supervision of certain cases. (See Appendix, Items,
5-8). However, the Board entrusts the parole agents to make
decisions based upon the totality of the circumstances concerning
the case that may not be evident in a review of the file. The field
agents balance the Board's mission and goals of protecting the
safety of the public while assisting the offender to become a
useful member of society.


## Department of the Auditor General Comments

Sending mixed messages to parolees and probationers, as we
stated on page 52, is unacceptable. Case File #20 in particular
shows the appalling and inexcusable results of the Board's
meaningless warnings. Had the Board followed through with its
conditions and warnings, an abused woman could have been
spared (1) a broken jaw and (2) an attempt to set her afire.

On one hand, the Board alleges disagreement with our findings;
on the other hand, the Board acknowledges our recommendations

A Performance Audit of the                                           Page 55
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

to follow through with imposed sanctions, define and
communicate standards and procedures for graduated sanctions,
and ensure that violations are correctly recorded, tracked, and
analyzed routinely.

The Board's conflicting response may result because it did what
it warned us against: extended the findings from the sample to
the whole. But our finding was deliberately narrow, illustrated
with examples showing how the Board imposed sanctions
inconsistently and threatened violators with punishment but then
didn't follow through. This finding is unassailable based on the
case examples we used; the Board's acknowledgement of our
recommendations attests to that fact.

We do agree with several areas of the Board's response. Indeed,
such areas—despite the Board's implication to the contrary—
were never in dispute. For example, we agree that not all
offenders can be sanctioned in the same manner, and we did not
suggest such a cookie-cutter approach. We also agree that the
Board's CHRIA-imposed redactions limited our audit team from
fully evaluating certain case files. However, we note that the
deficiencies we found can stand on their own, unaffected by (and
by all appearances unrelated to) the redacted parts of the file.

Finally, the Board's statement that it entrusts parole agents "to
make decisions based on the totality of the circumstances" is
undercut by the fact that the Board's sanction tracking system
was neither maintained nor administered in a consistent manner.
This deficiency was found by our audit team and backed by the
Board's admission during interviews. Accordingly, with
incomplete sanctioning information available to them, it is
doubtful that parole agents could analyze a totality of
circumstances as the Board suggests.

| **Conclusion 5:** | Parolees and probationers are required by state law to pay a $25 monthly supervision fee to the Board unless the Board reduces, waives, or defers the fee.[33]  The Board is supposed to use the collected fees to supplement state and federal funds to improve adult probation services.[34]  Yet, of $14.9 million that could have been collected during the two fiscal years from July 1, 1999, to June 30, 2001, the Board collected just 8 percent, or $1.2 million.  That means the Board either waived or failed to collect more than $13.7 million that it could have used for improvements. |
|---|---|
| **The Parole Board did a poor job collecting $25-a-month supervisory fees from parolees and probationers, taking in only $1.2 million of nearly $15 million owed.** | |



**What happened to nearly $15 million in $25-a-month fees that the Board should have collected over two years?**

Collected 8%

Uncollected 45%

Waived 47%

| **$6.7 million** *uncollected* | **$1.2 million** *collected* | **$7 million** *waived* |
|---|---|---|

---

[33] Section 11.1102(d) of the Crime Victims Act, 18 P.S. section 11.1102(d), provides in pertinent part that "The board shall impose as a condition of supervision a monthly supervision fee of at least $25 on any offender under the board's supervision unless the board finds that such fee should be reduced, waived or deferred based on the offender's present inability to pay."

[34] Section 11.1102(b) of the Crime Victims Act, 18 P.S. section 11.1102(b).

---

Collecting just 8 percent of the total possible supervisory fees not only exemplifies a bad record, but it also sends a wrong message on two fronts.

- First, the message sent to parolees and probationers is that they need not be responsible citizens—a message that runs counter to the Board's mission.  It is important to remember that many ex-offenders have never accepted the mainstream philosophy of holding a full-time, well-paying job as the way to earn a living.[35]  For the Board to impose financial obligations but then allow them to remain unpaid is not an effective way of reinforcing this mainstream philosophy of responsible citizenship.

- Second, to impose fees and not collect them sends the wrong message to taxpayers who may already resent the idea of paying the way of people who have committed crimes.  Parolees and probationers who contribute toward their supervision are practicing a form of restitution and, according to research, the public is very supportive of the use of restitution.[36]

Despite the logic of having parolees and probationers contribute toward their supervision, despite the reasonableness of the $25-a-month fees, and despite being vested with the authority and the responsibility to collect them, the Board generally failed to compel offenders to make the required payments.  Indeed, our analysis of our sample 50 cases showed that only 30 offenders were ordered to pay all or part of their supervision fees.  And while at first glance it may look promising that those 30 sampled offenders should have paid a total of nearly $9,000 over our 18-month test period, it turns out that less than a third of that amount was actually collected.

---

[35] P. Finn, *Chicago's Safer Foundation: A Road Back for Ex-Offenders,* National Institute of Justice, Rep. No. NCJ 167575, 1998.
[36] J. V. Roberts and L. J. Stalans, "Sentencing and Parole," *Public Opinion, Crime, and Criminal Justice,* Westview Press, Boulder, Co., 2000, p. 213.

Board policy clearly indicates that parole agents are responsible for initiating appropriate sanctions against offenders who refuse to pay the assessed fee,[37] but our analysis disclosed that agents rarely imposed non-payment sanctions. In fact, we found that 20 parolees or probationers were in default status (meaning they had made no payments for more than 90 days), but the Board issued no related sanctions during our audit period. Sanctions that could have been imposed include, for example, increased curfew restrictions, electronic monitoring, and wage attachments.

The Board must take additional steps to identify why imposed fees are not being collected and then evaluate various methods for increasing the collections rate. As part of the Board's analysis, the issue of waivers should be examined thoroughly. As the pie chart shown earlier indicates, the Board granted $7 million in waivers over the two-year period. In theory, such waivers are granted to parolees and probationers who do not have the ability to pay. The waivers may run for as long as 6 months and are "renewable" at the end of that period.

Waivers were typically granted for offenders classified by the Board as indigent, meaning they had incomes at or below 130 percent of the federal poverty guidelines. In 2001, for example, 130 percent of the poverty guidelines for a family of two would have been $15,093, or about $290 weekly; for a family unit of one, $11,167, or about $215 weekly.[38] Waivers could also have been granted for offenders who were (1) disabled and unable to work, (2) receiving public assistance payments, (3) classified as full-time students, (4) enrolled in an inpatient treatment program, or (5) receiving Social Security payments as their only income.

---

[37] *Pennsylvania Board of Probation and Parole Procedures*, "Supervision Practices – Supervision Fees/Financial Obligations," Volume III, Chapter IV, Procedure 4.6, Effective June 1, 2001.

[38] This calculation is based on 130 percent of the 2001 poverty guidelines issued by the U.S. Department of Health and Human Services. These guidelines are issued yearly and published in the *Federal Register*. In 2001, the poverty guideline for a family of two was $11,610; for a family unit of one, $8,590. (The current 2003 guideline for a family of two is $12,120, and 130 percent of that number is $15,756, or $303 weekly; the 2003 guideline for a family unit of one is $8,980, and 130 percent of that number is $11,674, or about $225 weekly.)

A Performance Audit of the                                    Page 59
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

The granting of waivers is supposed to be supported by the appropriate documentation, including, for example, earnings statements, student identification cards, and public assistance verification.

Unfortunately, our analysis of the sample showed that the Board did not justify why it granted the waivers *in 73 percent of the cases*. This percentage is based on the 78 waivers that the Board granted to 42 of the 50 offenders in our sample.[39] Because of the Board's failure to document the reasons for waiving the majority of fees, it was impossible for us to determine if the waivers were appropriate.

Equally troubling was the Board's policy of forgiving unpaid fees when parolees or probationers were released from the Board's supervision. This policy not to pursue the collection of outstanding fees means it is likely that millions of dollars are forfeited that, instead, could be used to supplement program operations. In our sample alone, of the 10 offenders who were released from parole or probation, only $175 of a possible $2,150 was collected. That's 92 percent of the unpaid fees that the Board chose not to pursue.

Unlike other areas of poor Board performance that can be traced to a lack of technology, such is not the case in this area. Apart from the policy reasons that drove the large amounts of uncollected and waived fees, the only other reason for the poor performance is that the Board did not use its existing technology as a management tool. An established computer monitoring system allowed Board officials to view account balances for each and every offender showing payments made, balances owed, and waivers granted. But the Board either (1) failed to conduct routine reviews of this information or (2) failed to use the information as a management tool to initiate collection efforts against delinquent offenders. By using its available technology

---

[39] Each of the 42 offenders had been granted at least one 6-month waiver during our test period.

A Performance Audit of the
                          Pennsylvania Board of Probation and Parole

                          Pennsylvania Department of the Auditor General

---

to monitor payment histories, the Board could take action to
dramatically increase its collection of supervisory fees.


### Recommendations

- The Board should adhere to its policies in granting
  supervision fee waivers and should document each decision
  in the file.

- The Board should impose sanctions against offenders who
  are delinquent in their payment of fees.

- The Board should use its existing technology as a
  management tool for the tracking of payments and the
  collection of fees.

- The Board should require parole agents to enforce parole
  conditions regarding fee payments.

- The Board should implement collection efforts against
  offenders who leave the Board's supervision while fees
  remain unpaid.

- The Board should consider transferring the supervision fee
  collection efforts from parole agents to designated collection
  agents within each office.

- The Board should consider referring delinquent offenders to
  private agencies for additional collection efforts.


### Board of Probation and Parole Response

The DAG report analyzed the collection of state supervision fees
during the audit period in three categories: "collected,"

A Performance Audit of the                                    Page 61
Pennsylvania Board of Probation and Parole

                                                        Chapter One

Pennsylvania Department of the Auditor General

"uncollected" and "waived." The DAG acknowledged the
statutory authorization that the Board may find "such fee should
be reduced, waived or deferred based upon the *offender's present
inability to pay.*" 18 P.S. § 11.1102(d).  This provision is
particularly relevant in view of the problems offenders have
trying to find and keep employment.  Accordingly, the DAG
calculated that the Board, pursuant to its statutory authority,
*"waived"* 47% of the total amount.

Further, included in the *"uncollected"* category (45%) are
offenders who were in absconder status (7%) and offenders who
have been detained in prison (16%), from whom supervision fees
cannot be collected.

When considering all of the non-collectable categories of
offenders, it can be seen that the conclusion of "taking in only
$1.2 million of nearly $15 million owed" should be reported less
narrowly.  The Board's collections, together with those amounts
that were waived or were otherwise non-collectable, should be
reviewed more favorably.

The DAG's report did not discuss the proactive measures taken
by the Agency during the audit period to improve the collection
of supervision fees.  On 3/29/01, the Board issued updated
procedures regarding the *Financial Obligations of Offenders*.
These procedures addressed supervision responsibilities, the
granting of fee waivers, and sanctions to be utilized in cases of
non-payment.  Further, the priority of payment is as follows:
court-ordered obligations (such as fines, costs and restitution);
urinalysis testing fees; and, supervision fees.

In 2001, the Agency worked closely with the Administration on a
project to improve the process of supervision fees collection.
Two of the Administration's *"PRIME IT!"* assistants co-
facilitated process improvement workshops for four days.  As a
result of the *"PRIME IT!"* workshops and the increased
monitoring of offender payment obligations by supervision staff,
the total amount of supervision fees collected increased

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

---

significantly from $683,609 in FY2000-01 to $1,127,520 in
FY2001-02.  Projections for FY2002-03 are expected to exceed
last year's collections.

As already noted, the DAG's recommendations were already
practices of this Agency before the audit period concluded. The
remaining recommendations were discussed during the *PRIME
IT!* project and, if implemented, would require additional
resources and procedural changes.

### Department of the Auditor General Comments

The Board suggests that we should have reviewed more
favorably "those amounts that were waived or were otherwise
non-collectable."  While we agree that offenders who have been
detained in prison cannot be expected to pay supervision fees,
the Board should have performed much better at collecting fees
from others not detained.  In addition, despite what the Board
says, it is difficult to view favorably the "non-collectible"
status of absconders who, were it not for the Board's lack of
supervision, might never have absconded in the first place.
Finally, we have no inclination whatsoever to view the "waiver"
category more favorably—*47 percent of the total amount*—in
view of the fact that the Board did not document *any* justification
for three-quarters of the waivers we tested.

We also note that the Board's response fails to address why, of
the $6.7 million in fees not waived during our audit period, only
15 percent was collected.

Finally, we note that the Board failed to respond to our concern
about its policy of not pursuing unpaid fees when parolees or
probationers are released from Board supervision.  By forgiving
these unpaid fees, the Board not only forfeited millions of dollars
but also sent the wrong message about accountability and
responsibility to those offenders.

A Performance Audit of the                                                    Page 63
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

The "PRIME IT" project referenced by the Board appears to
offer one way to improve collection of payment obligations, and
the attempt is commendable.  A note of caution, however: The
increase in collections from fiscal year 2000-01 to FY 2001-02
appears significant at first glance, but the 2001-02 amount
collected is still just a fraction of the whole.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

| Conclusion 6: | Pennsylvania has established strong law and procedures related to the assessment and collection of court-ordered obligations. Unfortunately, the Board fell short in tracking these obligations during our test period. |
|---|---|
| **The Parole Board did not adequately enforce or track parolee and probationer court-ordered payments that should have been made to victims and others.** | The Pennsylvania Sentencing Code authorizes the collection of court-imposed "restitution, reparation, fees, costs, fines and penalties" from offenders.[40]  The Code also directs the Department of Corrections to document the amounts owed by each offender assigned to a state correctional institution and to provide that information to the Board when an offender is released to Board supervision.[41]  The Board, then, is required to set a parole condition that any offender released to the Board's supervision must make continuing payments on restitution or any other court-ordered financial obligations.[42] |

The American Correctional Association discusses court-ordered restitution in its standards for accreditation.  Financial obligations imposed as conditions of parole, says the applicable standard, should be part of a parole agency's supervision.[43]  Yet even with this standard and the requirements of the Sentencing Code, the Board failed to document if the mandated parole condition was fulfilled.

Of the 50 case files in our sample, we found that 5 files had insufficient information to determine amounts—if any—that the offenders owed in court-imposed obligations.  In the remaining 45 files, we found that the parolees and probationers owed approximately $200,000 in court obligations.  However, the absence of consistent record keeping and documentation made it impossible for us to determine how much of the $200,000 had actually been paid.

---

[40] 42 Pa.C.S.A. section 9728(a)(1).
[41] 42 Pa.C.S.A. section 9764(h).
[42] 42 Pa.C.S.A. section 9764(i).
[43] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3142, August 1998, p. 44.

The Board's poor performance in this area appeared to be caused
in large part by a lack of proper monitoring in the field.
Specifically, our testing showed that not only did the Board leave
obligations and payments unrecorded, but it also was inconsistent
in documenting what efforts agents made, if any, to require
offenders to make payments. Mostly we found notations made
only randomly throughout case files, sometimes in records of
interviews, other times in progress and conduct reports, and still
other times in supervision reports or letters from county
collection agencies or printouts from the courts. In short,
payment information was haphazard.

Record keeping and documentation were so poor that, when we
reviewed information about this finding with the Board, it could
corroborate only 12 of the 45 amounts that we had pulled from
the case files. For one offender, the Board's file listed that he
owed more than $20,000; indeed, the Board acknowledged to our
audit team that this offender actually owed $97,000.

The failure to document correct amounts that offenders owed is
particularly troubling because the Board should have been able to
obtain the information from the Department of Corrections prior
to an inmate's release on parole.

The Board was also deficient in imposing sanctions for non-
payment. Board policy and procedures dictate that sanctions
should be imposed when offenders are delinquent in their
financial obligations, yet none of the 50 case files in our sample
showed sanctions for non-payment of court-imposed obligations.
Even if delinquent offenders weren't sanctioned separately for
non-payment, surely they should have been cited when they were
charged with other, different violations of their parole. But even
the 24 offenders who were cited for other violations did not have
non-payment violations added to their record. By allowing non-
payment to continue unacknowledged, the Board sent a clear
message to parolees and probationers: Payment of court-ordered
obligations is not a priority.