counter to both the Board's own policy and the American Correctional Association's accreditation standards.

It is important to note that, as with our testing of home plan investigations, we allowed the Board considerable latitude in what we considered as documentation or evidence of employment or financial support. Again, however, the Board came up short.

### Questionable Board actions

Among the cases in which we found inadequate documentation of home or work plan investigations, there were two cases that had troubling issues *beyond* those already discussed.

In one of the two cases [Case file #20 – also see page 50], the Board had initially rejected the proposed home arrangements because the offender wanted to live near two of his victims—that is, within a mile of a victim he had violently assaulted, and *across the street* from an earlier victim against whom he had committed a sex crime. The Board paroled the offender to a community corrections center rather than deny him parole altogether, a questionable action in itself.

An equally questionable action arose when the parolee completed his time at the community corrections center. Inadequately documented residential arrangements aside, there was enough evidence to show that the Board approved a home location which was within 1.04 miles of the previously rejected address. In fact, there were indications in the file that even the *new* address had been rejected previously. (Both addresses are in the same very small town.) From that point on, the parolee committed numerous Board-chronicled violations until finally he was returned to prison.

CCC unit



A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

In the second case of questionable Board action [Case file #5 – also see pages 72 and 74], a parolee was permitted to leave a community corrections center and enter the community with no job, no other financial support, and with Board-documented misgivings about how he would fare overall.  The misgivings were evident in a notation found in this parolee's initial supervision report.  In that report, the agent documented a meeting with the parolee within days after his release from prison to the center:  "[This parolee] has at least 4 prior probation failures.  I do not harbor any illusions that this time will prove to be successful."

Not only would the Board have known about the prior probation failures when it made its decision to grant parole to this offender initially, but the agent proved to be correct in his subsequent assessment.  Six months later, the parolee was permitted to leave the community corrections center and move in with his mother.  From that point on, he lived in the community virtually unsupervised—*shooting a man in the face within the first two weeks*—until his arrest eight months later.

Our review of these two cases reveals that the Board had reason for serious doubt about whether parole should have been granted in the first place.   However, because our audit objectives did not include an analysis of initial decisions to grant parole, we can recommend only that such parole decisions be studied independently of this audit.

### Recommendations

- The Board should request an independent study of its decisions to grant parole to determine whether such decisions are appropriate.

- The Board should follow its policies and procedures when making decisions after the granting of parole, or it should

---

explain and document its reasons when it departs from those
policies and procedures.

- The Board should refuse parole to offenders who have not
  yet obtained employment, not proven they are employable, or
  have no alternative means of subsistence.

- The Parole Board should adequately document investigations
  of parolee home and work plans before releasing parolees
  into the community—whether the parolees are released
  directly from prison or from community corrections centers.

- The Board should evaluate how its staff can best carry out
  parole plan investigations effectively and efficiently, perhaps
  considering the creation of a specialized unit within each
  district office to complete parole plan investigations.

### Board of Probation and Parole Response

The Board's procedures define the process for investigating
parole plans for offenders. The parole agent must visit the
proposed place of residence and verify the proposed employment
during the investigation of the home and work plans. This
process begins while the inmate is incarcerated; the inmate
cannot be released from prison until a plan is approved. In some
instances, and with increasing frequency since September 1997,
the Board has taken action to parole offenders only to
Community Corrections Centers operated by, or under contract
with, the Pennsylvania Department of Corrections ("DOC"),
where the offenders must reside and are assisted in obtaining
employment and aftercare services within the community.

In the 50 cases reviewed, the DAG reached conclusions not
supported by the facts provided within the case files. (See
Appendix, Items 2 and 3)

A Performance Audit of the
                              Pennsylvania Board of Probation and Parole

                              Pennsylvania Department of the Auditor General

For example, in ten of the 50 cases that the DAG reviewed, the Board decided to parole the offender directly to a Community Corrections Center or a contract facility for a specified time period (usually between 90 to 180 days).  This was done so that the offenders could benefit from a structured reentry program in which they were under daily supervision and could develop a strong community plan, including residence and employment, with case management assistance provided by the Center and parole supervision staff.

Five of the 50 cases were ordered by the Board to be "Paroled to an approved plan;" however, either the offender could not provide a plan for the field staff to investigate, or the plan that they did submit had been rejected by the field staff.  When this occurred, institutional parole staff referred the cases for placement in Community Corrections Centers.  After these parolees obtained jobs and were able to establish residence in the community, agents investigated and approved their releases from the Community Corrections Centers.  In such instances, no formal investigation report is required.

The DAG did not clarify that two of the sampled cases were serving *county* jail sentences, which placed their release decisions under the jurisdiction of the county judges who sentenced them.  The PBPP had no opportunity to review and investigate the proposed release plans prior to these offenders being paroled by the judges.

Two additional offenders, while serving state sentences, did not achieve parole release during the time of the DAG's review, and were required to remain in prison until their maximum sentences were served.  When they were released from incarceration, they were under Board supervision for *consecutive probation* sentences that were imposed by the county judges to commence after their prison sentences expired.  The Board's supervision staff had no opportunity to investigate their release plans when they turned over to probation sentences.  Another case identified in this sample could not develop a parole plan in the community

and was released to a residential plan offered by the Salvation
Army that deals with ex-offenders.  The approval of this plan
was clearly documented.

### Department of the Auditor General Comments

First, the Board is wrong to say that we reached conclusions not
supported by the facts provided in the case files.  The Board
specifically cites two cases (Case Files #20 and #5) and
references them in Items 2 and 3 of the appendix to its response.
We stand by our conclusions and provide additional supporting
narrative directly following the Board's appendix items (See
Appendix A).  In Case File #20, for example, the Board's idle
threats allowed a violent offender to remain on parole for 18
months—even after he broke his girlfriend's jaw, threatened her
with a gun, and attempted to set her afire.  In Case File #5, the
Board lost track of a parolee who, within two weeks of his
release from a community corrections center and before he
absconded, shot a man in the face.

Second, our report clearly states that 25 case files—all parolees
and no probationers—had inadequate or unclear documentation
related to the Board's investigative actions when offenders were
ultimately released into the community (as opposed to a
community corrections center).  Yet the Board in its response
sheds no light on these deficiencies in these 25 files.  Instead, it
focuses on extraneous information, to which we nonetheless
respond as follows:

- We do not dispute the Board's assertion that it decided to
  parole offenders directly to community corrections centers in
  10 of the 50 cases reviewed.  The deficiencies we found were
  not related to the Board's release of offenders directly to a
  community corrections center; rather, deficiencies occurred
  in some cases when offenders were released *from* a
  community corrections center into the community.

- We also do not dispute that 5 of the 50 cases were ordered by the Board to be paroled to "an approved plan," nor was this ever an issue with us. Again, the fact that these 5 offenders were paroled to "an approved plan" has no bearing on the deficiencies related to an ultimate release *into the community* with an inadequately documented investigation. Moreover, it is not an acceptable response that the Board does not *require* a formal investigation report before releasing a parolee into the community from a community corrections center. Such a report *should* be required (as we have recommended), and the practice of not requiring a report is itself a questionable action.

- As far as our not clarifying that two of the sampled cases were serving county jail sentences, again these cases were never an issue in our findings. Indeed, these cases had nothing to do with the deficiencies we found regarding inadequately documented investigations.

- Regarding the two additional offenders who were under Board supervision for probation, these two probationers also had nothing to do with the deficiencies we found regarding inadequately documented investigations (all of which related only to parolees, not probationers).

- Also not at issue was the offender released to a residential plan offered by the Salvation Army. In fact, we agree with the Board that approval of this plan was clearly documented. A deficient investigation became the issue when the offender was released *from* the Salvation Army plan into the community.

In summary, the Board's response does not address the deficiencies we found of inadequately documented investigations in 25 cases. Our conclusion stands: The Parole Board inadequately documented some investigations of parolee home and work plans, and it took questionable actions beyond the inadequate documentation.

A Performance Audit of the                                   Page 21
Pennsylvania Board of Probation and Parole

                                                            Chapter One

Pennsylvania Department of the Auditor General

---

**AN IMPORTANT NOTE:**  At the end of our audit, the Board
hired a consultant to audit the same 50 files that were in our
sample.  The consultant's report, which appears in Appendix A
as part of the Board's response, provides an evaluation
conducted over four days: one day of preparation, two days on
site, and one day for report preparation.   The report, however,
does not address the preceding finding about inadequately
documented investigations.  In fact, the report is general in
nature and—except for one item—does not contradict the very
specific exceptions or the particular case file details that we
reference in *any* of our findings.  Regarding the single item that
the consultant specifically contradicts (i.e., our finding that
supervision levels were lowered incorrectly by the Board or its
agents), we have a Board-written memorandum to us that clearly
validates our finding.  We discuss that issue further on page 44 in
our comments following Conclusion 3 of this chapter.

Page 22                    A Performance Audit of the
                           Pennsylvania Board of Probation and Parole

Chapter One


                           Pennsylvania Department of the Auditor General


---

| | |
|---|---|
| **Conclusion 2:** | Just as the Board's questionable approval of parole plans for inmates with no specific plans for employment must be addressed (as discussed in the previous conclusion), so should the issue of how little the Board attempted to increase employment opportunities for parolees. |
| **The Parole Board did little to increase employment opportunities for parolees.** | |

The ability to find a stable and adequate source of income upon release from prison is an important factor in an individual's transition from prison back to the community. Studies have shown that having a job with decent wages is associated with lower rates of reoffending.[16]

Unfortunately, finding a job—and particularly one with decent wages—is one of the immense barriers that parolees face upon their release. In Pennsylvania, according to the Department of Corrections, "the average inmate is a 35-year-old minority male who completed some high school, yet whose reading level is below eighth grade. This inmate has little to no labor skills, was more likely not to have been employed prior to his incarceration, [and] has a history of substance abuse. . . ."[17] It is unlikely that employers are eager to hire employees with such a profile.

Because of these barriers, it is both unrealistic and unattainable for the Board to require every inmate to have a specific job upon release. But it is equally problematic for the Board to release prisoners without employment. Indeed, the Board is subject to criticism for whichever action it takes—keeping inmates in prison longer than necessary because they have no job prospects or releasing inmates under that same unpromising scenario that allows them with too much free time on their hands.

Offender unemployment statistics are not positive. The Board noted that approximately 81 percent of offenders are unemployed

---

[16] A. L. Solomon, J. Travis, and M. Waul, *From Prison to Home: The Dimensions and Consequences of Prisoner Reentry*, The Urban Institute, Washington, D.C., 2001.

[17] Jeffrey A. Beard, Ph.D., "Reentry," *Budget Presentation*, Pennsylvania Department of Corrections, February 2002.

A Performance Audit of the                                         Page 23
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

at the time they committed their offenses and entered the state prison system. After prisoners are paroled, the statistics are significantly better but still leave room for improvement. For June 2001, for example, if we compute the percentage of unemployed based on the known parolee and probationer labor force, we find that the unemployment rate was 32 percent.[18] In contrast, the state's unemployment rate for that month was just 4.7 percent.[19] The disparity further illustrates the difficulties that parolees face in finding employment.

Using actual numbers for that same month, we find that only 10,724 of the Board's 23,735 parolees and probationers were employed, or 45 percent. The 13,011 remaining offenders comprised 5,100 unemployed, 5,498 non-reporting (e.g., absconders or detained parolees), 2,337 unable to work (including parolees with diagnosed mental illnesses), and 76 with an employment status unknown to the Board.[20]

During all the months of our audit period, the high unemployment rate was typical, dropping below 30 percent only once (in July 1999) and more often remaining above 40 percent. In spite of the inherent difficulties and barriers related to parolee employment, rates that high must be addressed.

Pennsylvania does have several programs that can help parolees to prepare for employment, but the Department of Corrections—not the Parole Board—funds most of the programs. Those programs are operated for inmates still in prison, which is where such programs should begin. Included, for example, are education, vocational training, and the recently established Community Orientation and Reintegration program that has an element of employment preparation.

---

[18] Labor force is considered both employed and unemployed offenders combined and does not include offenders whose employment status is classified as non-reporting, unable to work, or unknown.
[19] *Labor Force, Employment, and Unemployment in Pennsylvania,* Pennsylvania Department of Labor and Industry, n.d., <http://www.lmi.state.pa.us/palmids>(August 1, 2002).
[20] *Monthly Statistical Report,* Commonwealth of Pennsylvania, Board of Probation and Parole, June 2001.

Page 24

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

But programs should also be continued *outside* the prison walls, and the Board of Probation and Parole fell short by offering employment assistance in only one program and as just a component of a second program.

1.  The first program, Comprehensive Transitional Employment Program, or CTEP, is a collaboration with the Department of Corrections. CTEP involves various group classes that teach parolees how to search for jobs, what types of employment resources are available, and how to prepare resumes and application forms. CTEP began accepting referrals from the Board on July 9, 2001. Of the first class of 29 offenders, 27 have completed the program and 23 have obtained full-time employment.

2.  The second program—of which employment assistance is only an element—is the Parole Re-Entry Program, or PREP.[21] As part of PREP, parolees attend group classes that include, among other things, information about employment opportunities.[22] Unfortunately, results for PREP were largely unavailable and unmeasured. It is therefore difficult to know if the program was actually succeeding in decreasing parolee unemployment.

In addition, and to its credit, the Board has indicated that parole agents in the field consider it part of their daily job responsibilities to help parolees find employment. To this end, the individual relationships between parolees and their agents can play a critical role.

Keeping inmates incarcerated and denying them parole until they find employment is not a realistic solution. Therefore, Pennsylvania must work harder to find other solutions. To do so,

---

[21] PREP units throughout the state are intended to provide a structured environment and function as a day reporting center to which parolees report on weekdays.
[22] *Parole Re-Entry Programs (PREP Units)*, Pennsylvania Board of Probation and Parole, n.d., <http://sites.state.pa.us/PA_Exec/PBPP/spec.html>.

the Board must do a far better job of measuring and evaluating the work it already does to assist parolees with gaining employment, and in communicating with businesses and the community to garner support.

Earlier in its history, the Board appeared to be much more proactive in seeking employment for parolees than it is now. For example, in the mid-1960s, the Board published a pamphlet for distribution to employers. "Why should I help a parolee?" noted that parolees are good employees because they have an incentive "to make good on the job" (so they are not returned to confinement), and they are "eager to compete with other employees on an equal footing." Moreover, the pamphlet noted that employed parolees are taxpayers, rather than wards of the state being supported at state expense. Perhaps most saleable was the Board's statement to employers that parole "makes good citizens out of law violators" and provides them with "opportunities for normal living" (clearly a reference that includes employment) as opposed to living a life of crime.[23]

Today, we find that other states have been more aggressive than Pennsylvania at trying to address the parolee employment problem. Both Texas and Illinois, for example, have developed or linked themselves to programs that work with parolees and, at the same time, encourage employers to hire the offenders.

- **Texas** has Project RIO (Re-Integration of Offenders), which began in 1985 as a two-city experiment collaborating with the state's Workforce Commission to help parolees find employment. Initially, federal funds were tapped for the experiment; eventually, however, based on its success, the state legislature funded the program from general revenues and, in fact, expanded it. Now, Project RIO—while continuing its work with parolees—begins its employment

---

[23] *Why should I help a parolee?* Pennsylvania Board of Parole [as it was then called], April 1965.

Page 26                     A Performance Audit of the
                            Pennsylvania Board of Probation and Parole

Chapter One


                            Pennsylvania Department of the Auditor General

---

assistance and placement process even earlier with inmates
who are still in prison.[24]

- **Illinois** has the Chicago Safer Foundation, a not-for-profit
  organization developed in 1972 by two former priests to
  provide vocational training and help inmates get jobs.  The
  Safer Foundation tries to develop a mindset that holding a job
  is the traditional, accepted way to earn a living, a mindset
  often at odds with offenders.[25]


## Recommendations

- The Board should significantly increase its efforts to create
  additional employment opportunities by establishing
  relationships with prospective employers and initiating
  cooperative efforts with other state agencies to train and hire
  offenders.

- The Board should consider how it can implement or link
  itself to parolee employment assistance programs such as
  those administered in other states.


## Board of Probation and Parole Response

The auditors noted the importance of obtaining employment in
relation to recidivism rates and acknowledged the immense
barriers parolees face when released from prison.  In the Fall
2002 issue of the DOC's "*Newsfront*," it was noted that, at the

---

[24] Peter Finn (Senior Research Associate, Abt Associates Inc. for Program Focus, Washington, D.C.),
*Texas' Project Rio (Re-Integration of Offenders)*, U.S. Department of Justice, National Institute of Justice,
1998, NCJ 168637.
[25] Peter Finn, *Chicago's Safer Foundation: A Road Back for Ex-Offenders,* U.S. Department of Justice,
National Institute of Justice, 1998, NCJ 167575.

time of receipt into DOC, the 10,486 inmates released in 2001
had the following profile:

- ➢ 40% read below the eighth grade level;
- ➢ 77% had no or very limited skilled vocational training or experience;
- ➢ 9% of males and 27% of females had mental health needs;
- ➢ 81% were unemployed at the time of offense;

The Board agrees with the DAG's conclusion that "it is unlikely
that employers are eager to hire employees with such a profile."

The DAG found that Pennsylvania has several DOC-funded
programs that can help parolees prepare for employment.
Although the DOC pays for the programs, the Board's
institutional and field agents work in close collaboration with the
DOC to deliver these programs.  For example, the PBPP is
working daily with the DOC regarding Phase 2 of the referenced
"Community Orientation and Reintegration" program.

In view of the fact that 81% of inmates released in 2001 were
unemployed at the time of their offense, the criticism leveled by
the DAG concerning the unemployment rate of 32% for the
parolee and probationer labor force in June 2001 is unreasonable.
The DAG's report lacks a clear explanation of the relationship
between parole agents and offenders regarding efforts undertaken
to secure employment. The needs of each offender are assessed
by supervision staff during the initial interview and reassessed
every six months, or more frequently if deemed appropriate.  The
*PBPP Manual of Operations and Procedures* recognizes the
importance of employment for offenders, and directs supervision
staff to make concerted efforts to assist offenders in securing
employment and upgrading their employment based upon each
offender's capabilities.  **The initial offender assessment leads
to an individually tailored Supervision Plan for each
parolee/probationer, jointly developed by the parole agent
and the offender.**  The supervision plan is modified, as needed,

in accordance with the offender's adjustment in the community.
Obtaining and/or maintaining employment, for those offenders
who are capable of working, have always been important goals
of the supervision staff.

The DAG's report notes that the Board "fell short by offering
employment assistance in only one program and as just a
component of a second program." **Each offender's employment
needs were being addressed _individually_ by supervision staff
in the specific district of residence, and not necessarily by a
"one-size-fits-all" statewide program. The referenced
programs are valuable but are only a small part of a larger
picture.**

The DAG recommends that the Board increase its efforts to
create employment opportunities. The Board has linked
appropriate offenders to the Commonwealth's Targeted Jobs Tax
Credit Program and has referred parolees and probationers to the
84 Career Link sites in Pennsylvania. Other efforts such as the
Board's ten Citizens Advisory Committees and the Board's
working relationship with the Pennsylvania Prison Society
continue to develop employment opportunities for parolees. The
Board agrees that employment issues need ongoing attention and
improvement.

### Department of the Auditor General Comments

The Board's final sentence in this response is the operative one:
"The Board agrees that employment issues need ongoing
attention and improvement."

Regarding the Board's contention that we criticized it for the
unemployment rate of 32 percent for parolees and probationers in
June 2001, we did not. The 81 percent and 4.7 percent figures
(81 percent of offenders were unemployed at the time they
committed their original crimes; 4.7 percent was the state's

unemployment rate for June 2001) were reported so that readers could put parolee and probationer unemployment figures in some perspective. Our criticism of the Board was not leveled at its 32 percent *rate*, but rather at the fact that the Board could do more *because* of the rate—a rate that illustrates the extraordinary difficulties that parolees and probationers face in finding employment.

Regarding the Board's inference that we did not give it as much credit as we gave to the Department of Corrections in the delivery of programs to prepare parolees for employment, we note that the Board itself has publicly credited primarily the Department of Corrections for such programs. For example, a Board member appearing on a public radio station in Philadelphia said this:

> I have to sound the praise for the Pennsylvania Department of Corrections. They have put together an incredible number of programs—both intensive and non-intensive programs—dealing with drug and alcohol addiction, mental illness, vocational training, decision-making, stress and anger, fatherhood groups, parenting programs, domestic violence….In terms of vocational programs, they're legitimate programs—heating ventilation, cooling, barber's license—so that there are skills which are very much transferable to meaningful employment when they get released.

> Parole Board Member Richard Kipp, appearing with Mario Paparozzi on *Radio Times with Marty Moss-Coane*, WHYY 91FM, Philadelphia, on December 10, 2002.

Our conclusion stands as written: The Board must do more to increase employment opportunities for parolees.

Page 30

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

| | |
|---|---|
| **Conclusion 3:**<br><br>**The Parole Board was deficient in supervising paroled prisoners in our sample.** | We found the Board was deficient in performing some of the most basic elements related to supervising parolees and probationers. Primarily, the Board's agents did not make—or did not document—the required visits and contacts to keep track of 45 of the 50 offenders in our sample, or 90 percent. In addition, in a limited number of cases the agents did not classify offenders according to the correct supervision level. |

Supervision levels—minimum, medium, maximum, or enhanced—are generally set in one of two ways:

1. Least typical are the cases in which the Board imposes a supervision level at the same time it makes a parole decision. There were 4 parolee cases in our sample for which the Board imposed an enhanced level of supervision as a special condition of parole.

2. More typical, however, are the cases in which a parole agent sets the supervision level. The agent establishes this level when the agent and the offender first meet (for parolees, the meeting takes place during the first 24 hours after release). At that time, the offender undergoes an in-depth interview that includes a risk and needs assessment. As its name denotes, the risk and needs assessment determines (1) areas in which the offender is at risk, such as substance abuse or domestic violence, and (2) areas in which the offender has needs, such as drug and alcohol treatment or anger management. The parole agent also takes information about the offender's prior criminal history and other matters.

For parolees, the parole agent is required at this time to review all conditions imposed by the Board, as well as the consequences for violating them. It is here where the agent should note whether a parolee has already had a supervision level imposed by the Board. But in 3 of the 4 cases in our sample for which the Board did impose a special condition of enhanced supervision, the parole agents wrongly assigned the next *lower* level of supervision to the parolee instead.

A Performance Audit of the                                          Page 31
Pennsylvania Board of Probation and Parole

                                                                   Chapter One

Pennsylvania Department of the Auditor General

Each supervision level—whether for parolees or probationers—
carries with it specific standards dictating how the Board's agents
should conduct their day-to-day supervision of every offender. The
supervision not only protects the public by keeping track of the
offender, but it also helps to reintegrate the offender into the
community as a responsible and productive citizen.

The following table illustrates the minimum requirements for
each level of supervision:

| Supervision requirements | | |
|---|---|---|
| Level of supervision | Minimum number of face-to-face visits required | Minimum number of collateral visits required* |
| Minimum | 2 each quarter | 1 each quarter** |
| Medium | 1 each month | 1 each month |
| Maximum | 2 each month | 2 each month |
| Enhanced | 4 each month | 2 each month |

*Collateral visits are visits between the parole agent and someone other than the
offender, e.g., an employer.
**This collateral visit cannot occur in the same month as a face-to-face visit.

It is important to emphasize that these requirements are *minimum*
requirements for each level. Indeed, Board procedures specifically state
that the requirements "must not be construed as necessarily sufficient to
properly supervise the offender. The Parole Agent is expected to make
whatever additional contacts are necessary beyond the minimum
requirements...."[26]

It was troubling to find that the Board either did not meet or could
not prove that it met the above requirements for 45 of the 50 parolees
and probationers in our sample, including the 3 parolees whose
"enhanced" supervision levels had been wrongly lowered by the
Board's agents. Specifically, either the Board's agents (1) failed to
conduct the required minimum number of visits, (2) could not

---

[26] *Pennsylvania Board of Probation and Parole Procedures*, "Supervision Practices – Levels of
Supervision," Volume III, Chapter IV, Procedure 4.5, Effective June 1, 2001.

provide records of supervision, or (3) provided records that were illegible and, accordingly, un-reviewable.

The chart of our test results, below, shows that the Board made the required number of visits to only 5 offenders (10 percent of our sample). For the remaining 90 percent of the sample, the Board did not meet its supervisory requirements. Specifically, the Board did not document whether *any* supervisory visits were made for 6 offenders (12 percent of our sample) and missed more than one-third of the required supervisory visits for the remaining 39 offenders (78 percent of our sample).

| Poor Board performance: Which offenders received their required visits, and did the Board record its visits?* | | | | |
|---|---|---|---|---|
| *Sample = 50 offenders (41 parolees and 9 probationers) placed under the Board's supervision beginning in the first quarter of 2000 Term of testing = January 1, 2000, through June 30, 2001* | | | | |
| **Offenders** | **Visits required** | **Visits made** | **Visits missed** | **Percent missed** |
| 39 did not receive their required visits | 1,675 | 1,090 | 585 | 35% |
| 5 received *all* their required visits | 99 | 99 | 0 | 0% |
| 6 may or may not have been visited: the Board had no record of *any* visits | 333 | unknown | unknown | unknown |

*Visits include both face-to-face and collateral visits*

More detailed narratives of three cases of poor supervision are presented on the following pages.

A Performance Audit of the                                              Page 33
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

---

### Case File #4

### Violent offender was wrongly assigned
### and poorly supervised

After shooting and killing a 22-year-old man in 1990, this offender was imprisoned for voluntary manslaughter.  In January 2000, he was paroled with numerous conditions, including a condition of "enhanced supervision."  Yet, upon this offender's release, the Board's agent assigned him incorrectly to the lower level of maximum.

Worse, Board records indicate that the agent did not have enough contacts with this parolee to meet even the requirements for *medium* supervision.

Six months later when this violent offender was again assessed as required, his agent correctly noted that the Board had stipulated enhanced supervision.  Even so, case file information indicates that *this parolee was seen by his agent only two times over the next nine months.*

Translating this data into missed visits, we found that the Board missed 48 of 56 required face-to-face visits and nearly *all* (27 of 28) of its required collateral visits.  Accordingly, the parolee continued to live in the community virtually unsupervised.

---

### Case File #12

**Violent offender with a drug and alcohol history, assigned incorrectly to a lower supervision level and poorly supervised.**

Parolee was imprisoned for burglary, robbery, and terroristic threats in 1989; he was paroled to a community corrections center (CCC) in March 2000. Although his conditions of parole included "enhanced supervision for the first six months of parole—mandatory," the agent assigned this parolee incorrectly to the lower level of maximum.

Within the first six months of the parolee's supervision, the agent missed 14 of 24 required face-to-face visits and 8 of the 12 required collateral visits. By missing those visits, the Board's supervision met only the medium level of supervision.

During the times that the Board *was* supervising this parolee with visits and collateral contacts, it found (in the first month) that the parolee had violated his curfew and changed his employment without the required notification. For those violations, the Board sanctioned the parolee with 30 days of house arrest.

The parolee's violation of terms early in his parole should have signaled the Board to watch this parolee closely for continued violations. In the seventh month of his parole, this poorly supervised parolee used cocaine, for which he was sanctioned. But in view of the Board's required but missed visits in the meantime, it is impossible to know what other violations may have occurred without the Board's knowledge.

Pennsylvania Department of the Auditor General

---

**Case File #18**

**Offender with history of violence and alcohol abuse,
poorly supervised,
given meaningless warnings.**

This parolee was released by the Board in February 2000 with
conditions including a curfew and no alcohol.  The agent noted a
"bad attitude" during the parolee's first visit and wrote that the
parolee had agreed to stay at an approved Salvation Army
residence just "to get out of jail." The agent told the parolee he
must stay there for 4 months.

Through May, the Board's agent missed 5 of 16 required contacts
but still issued weekend passes and furloughs.  The agent noted a
"negative attitude" and, at one point, wrote that the parolee left
the Salvation Army facility without permission because, among
other things, "he didn't feel good and it was raining."

In August and September, a different agent missed 3 of 8 required
contacts despite an indication that the parolee had been in a bar.
In November, the parolee was involved in a bar fight.  He was
cited and put on an electronic monitor for 30 days for "drinking,
being in a bar, and curfew violation."  The Board discharged him
from its supervision in February 2001 with a notation that he had
"successfully completed his state parole [but] barely."

The Board's performance, as illustrated by our narrative, our
chart, and the three preceding case examples, was
unacceptable—and certainly not reassuring—for a Board whose
mission is to protect the public.  By failing to monitor 90 percent
of our sampled offenders in accordance with its own
requirements, the Board also failed to carry out its mandate to
protect the public.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

The Board had almost 350 agents to monitor nearly 24,000
offenders; plus, there were 80 supervisors and managers in the
Board's 10 district offices to manage the agents' work. Some
Board staff whom we interviewed said that the hiring of agents
had not kept pace with their duties. And no matter what the
duties—conducting parole plan investigations, visiting offenders,
reviewing offenders' supervision fees and other payments,
pursuing absconders, attending trials and revocation hearings,
ensuring that parolees received drug and alcohol treatment—
there were paperwork requirements for every case. It is therefore
reasonable to ask if caseload numbers were a factor in the
Board's poor performance and, if not, whether the Board might
perform better by working more efficiently. One such way might
be to create specialized units to which certain duties—for
example, investigations or absconder searches—could be
delegated.

Although the analysis of caseload was not an objective of this
audit, we can relay that, as of December 31, 2000, the Board
reported that its average agent was responsible for 66 offenders.[27]
However, the Board claimed that, because some offenders require
more attention and supervisory time than others, an agent's actual
workload might be much greater than the caseload of 66 implies.[28]

For comparative purposes, the audit team reviewed caseload data
compiled by SEARCH, the National Consortium for Justice
Information and Statistics.[29] Of the seven states with state
probation and parole agencies similar in size (number of agents
and offenders) to Pennsylvania, only Florida (46 per agent) and

---

[27] This caseload number is a simple division of the total caseload at that time (23,071) by the number of
agents (347). Accordingly, 23,071 divided by 347 is 66.49.
[28] During the same time period, Pennsylvania's county-run probation offices had an average caseload of 165
offenders per agent.
[29] SEARCH, the National Consortium for Justice Information and Statistics, operates the automated index
database through funding received from the Bureau of Justice Statistics, U.S. Department of Justice. The
database (available online at www.search.org/Aindex/default.asp) is created from a national survey of
justice agencies. The criminal justice agency profiles contained in the database describe each agency in
terms of type, size, and jurisdiction.

A Performance Audit of the                                      Page 37
Pennsylvania Board of Probation and Parole

                                                                Chapter One

Pennsylvania Department of the Auditor General

New York (65 per agent) had lower average caseloads than Pennsylvania's 66 per agent.  The remaining states, Maryland (100), New Jersey (68), Ohio (130), South Carolina (105), and Washington (120) all had average offender caseloads higher than did Pennsylvania.

Aside from—or in conjunction with—the possibility of caseload issues that the Board should analyze, the Board's poor supervisory performance could have been caused by poor agent oversight on the part of district supervisors.

*Supervisors Role*

A supervisor can help to bring about maximum effectiveness in an agent's job performance; one such way is to identify deficiencies and require their correction.  To this end, the Board has developed an internal audit function to provide district offices with annual assessments of field operations.  We found that these internal reviews did indeed *identify* deficiencies related to poor supervision and record-keeping problems; unfortunately, we also learned that the district office supervisors did not ensure that the identified problems were *resolved*.

We further found that supervisors allowed their agents to ignore even the most basic levels of record keeping and organization: handwriting in numerous files was illegible [see two examples that follow], and some records were either missing or nonexistent.  In fact, during a January 15, 2002, meeting between our auditors and Board officials, the officials noted that some of the documentation we requested might not exist because parole agents may not have kept or recorded it.  This deficiency is particularly striking and in direct contradiction to American Correctional Association accreditation standards related to case records.[30]

---

[30] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3102, August 1998, p. 31.

Page 38                     A Performance Audit of the
                           Pennsylvania Board of Probation and Parole

Chapter One

                           Pennsylvania Department of the Auditor General

---

## Example #1 of illegible handwriting in Board files

A Performance Audit of the                                              Page 39
Pennsylvania Board of Probation and Parole

Chapter One

Pennsylvania Department of the Auditor General

---

## Example #2 of illegible handwriting in Board files

