A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

With no established payment schedules, with poorly documented case files, and with no tracking system, the Board cannot possibly determine if court-ordered obligations have been paid or will be paid. Moreover, this inability to oversee the restitution process—and the parallel lack of respect for the courts—force taxpayers to fund costs that are the responsibility of the offender. Worst of all, however, is the grave injustice to the victims against whom the original crimes were committed—the laxity of the Board allows those same victims to be victimized yet again.

## Recommendations

- The Board should ensure that all records of offender-paid court-ordered costs, fines, restitutions, and outstanding balances are (1) obtained from the Department of Corrections in compliance with the Sentencing Code and (2) maintained in offenders' case records.

- The Board should require proof of a payment plan from offenders and maintain this documentation in offenders' case files.

- The Board should create and utilize an electronic tracking system to monitor the amounts owed by offenders for fines, costs, and restitution and the history of payments while under the Board's supervision.

- The Board should impose sanctions for non-payments of fines, costs, or restitution when payment of such obligations is a condition of parole.

- The Board should review offenders' payment status when they are charged with another type of parole violation and, if payments are delinquent, should cite an additional violation for that non-payment.



EXHIBIT

1-D

---

### Board of Probation and Parole Response

The DOC documents the court-ordered financial obligations that are owed by state offenders and provides the information to the Board when offenders are released on parole. However, such information is not always available from the DOC or the sentencing court. In addition, Act 84 of 1998, which streamlined the collection process contained in the Judicial Code, 42 Pa.C.S. § 9728, did not go into effect until October 1998. As a result, many of the 50 files sampled by the DAG did not fall under the Act 84 requirements. The DAG criticized the Board for "haphazard" payment information, without acknowledging that information concerning an offender's legal financial obligations was not always available to the Board.

The counties, and not the Board, are responsible for the collection of such fees. However, the Board does impose the following condition on those paroled offenders under its jurisdiction: "You shall pay fines, costs, and restitution imposed on you by the sentencing court. You shall establish with appropriate county authorities, within 30 days of your release from prison, a payment schedule for the fines, costs, and restitution owed for those cases for which you are now on state parole. Thereafter, you shall: (a) pay these obligations according to the established payment schedule or as ordered by the court; (b) provide proof of payment to parole supervision staff; and, (c) keep the parole supervision staff and the court informed of any changes in your financial ability to pay fines, costs and restitution."

This condition is supported by the Board's revised procedure pertaining to *Financial Obligations of Offenders*, issued 3/29/01, which requires that "all inmates released on supervision shall make continuing payments on restitution and any other court-ordered financial obligations," pursuant to Act 84 of 1998. The procedure sets forth the priority of payment: court-ordered financial obligations (such as fines, costs and restitution); urinalysis testing fees; and, supervision fees ($25/month). In

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

addition, parole agents impose a special condition on each
offender to set up a payment plan with the appropriate county
collections agency within 72 hours of release.

The Board acknowledges the DAG's recommendation to create
and utilize an electronic tracking system to monitor the amounts
owed by offenders for fines, costs and restitution, and the history
of payments while under the Board's supervision. The Board will
discuss opportunities to work with DOC, AOPC and JNET to
create an improved monitoring system.

### Department of the Auditor General Comments

The Board is wrong to conclude "many of the 50 files sampled
by the DAG did not fall under the Act 84 requirements."
Contrary to the Board's response, the Act 84 requirements for
collecting court-ordered obligations are not limited to offenders
who were transferred to a state institution after October 18, 1998.
Moreover, we are troubled both by the Board's application of
inaccurate information and by the dissemination of such
inaccurate information in the Board's response.

Pennsylvania law is clear that Act 84 of 1998 can be applied
retroactively to convictions for crimes that pre-date the
enactment of the Act. In addressing whether 42 Pa.C.S. section
9728 applies only to inmates transferred to state institutions after
the Act's effective date of October 18, 1998, the Superior Court
has stated that "[t]he legislature has enacted in § 9728 a
comprehensive provision for the collection of inmate obligations,
and we can conceive of no reason why it should be applicable
only to offenders prospectively. In reviewing the statute, we find
no such limitation." *Commonwealth v. Baker*, 782 A.2d 584,
585, 2001 Pa. Super. 240 (2001); *see also Payne v.
Commonwealth Dep't of Corrections*, 813 A.2d 918 (Pa.
Commw. 2002) (affirming that Act 84 does not involve an
impermissible retroactive application of the law);

Pennsylvania Department of the Auditor General

---

*Commonwealth v. Fleming,* 804 A.2d 669, 2002 Pa. Super. 239 (2002) (stating that Act 84 can be applied retroactively).

We are also troubled by the Board's claim that information regarding court-ordered obligations is not always available. Because the Board established the continued payment of court-ordered obligations as a parole condition, it is the Board's responsibility to ensure that this information is obtained and documented in the offender case file.

# Chapter Two

## Pursuing absconders

The Parole Board defines an absconder as "a parolee or probationer who absents himself or herself from supervision by parole or probation authorities."[44] An offender who deliberately makes himself/herself unavailable for supervision has violated the conditions governing his or her parole.

Once an offender has been determined unavailable for supervision, the Board's policy allows 30 days to make a diligent search to locate and return the offender to supervision. According to the Board's policy and procedures, a diligent search requires that personal contacts be made, including an immediate visit to the offender's last known residence to determine if personal items have been removed from the residence.[45] The offender's workplace, if applicable, might also be visited.

Upon verifying that the parolee is indeed delinquent, the Board has 48 hours to document its search efforts and record the parolee as an absconder. Information about the absconder is also placed into state and national criminal justice databases. Once parolees are declared absconders, the Board should continue to search for them "whenever possible," according to Board policy.

### Objectives and Methodology

Our objectives for this section of the audit were to determine if absconders were declared delinquent timely; warrants were issued timely; absconders were adequately pursued; absconders were found; and, if found, they were recommitted or sanctioned. To accomplish this objective we employed the following methodology:

---

[44] *Pennsylvania Board of Probation and Parole Procedures*, "Arrest Procedures – Glossary of Terms," Volume III, Chapter V, Procedure 5.10, Effective January 16, 2001.
[45] *Pennsylvania Board of Probation and Parole Procedures*, "Supervision Practices – Absconders and Delinquency," Volume III, Chapter IV, Procedure 4.11, Effective June 1, 2001.

A Performance Audit of the                                    Page 71
Pennsylvania Board of Probation and Parole

Chapter Two

Pennsylvania Department of the Auditor General

- Interviewed Board staff

- Examined whether proper procedures were followed when parolees absconded from Board supervision

- Reviewed statistics on the number of absconders the Board supervises

- Reviewed seven case files of absconders to determine what efforts were made by the Board to locate and return the offender to supervision

- Reviewed American Correctional Association standards relating to absconders

- Examined reports from other states on how they pursue absconders

| | |
|---|---|
| **Conclusion 1:**<br><br>**The Parole Board lost track of nearly 1,600 offenders and did not aggressively search for them.** | As of June 2001, the Parole Board had lost track of 1,560 parolees and probationers, or more than 6.5 percent of the offenders it was supposed to be supervising.  No matter how poorly or how well the Board was supervising its other "active" offenders, their whereabouts were generally known.  With absconders, on the other hand, the Board was unaware of where they were, who they were with, and what they were doing.  Accordingly, the general public was placed at risk. |

Among our sample of 50 offenders, there were 7 absconders, or 14 percent.  Of these, only one was found as a result of the Board's efforts.  Three had no documentation of any efforts whatsoever to locate them, meaning the Board in effect gave those absconders tacit permission to live openly in the community with no supervision.

In one of the 7 sample cases (Case file #5), the parolee—under maximum supervision and with a history of theft, drug abuse, and alcohol abuse—was verified delinquent on October 18, 2000, when the parole agent searched the parolee's apartment. This search occurred 5 days after the parolee missed his scheduled appointment with the agent but within the allowable 30 days to conduct a diligent search. Subsequently, there were no documented attempts to locate this now-verified absconder who—the Board didn't know this—had an outstanding warrant for his arrest on an attempted murder charge (shooting a man in the face within the first two weeks of his release from a community corrections center—see page 16).   He was finally arrested by the police in March 2001 on the new criminal charge.

In another troubling case (Case file #46) showing the Board's passivity, there were no attempts to locate a verified absconder over a *five-month period* because, according to notes in the file, "no attempts to locate [this parolee] were made due to no leads as to his whereabouts surfaced."  The following narrative describes the case of this parolee, illustrating both his poor supervision *and* the nonexistent attempts to find him.  In addition, the chart on the following page details the Board's uneven efforts to identify and pursue all 7 of the absconders whose files we reviewed.

A Performance Audit of the                                          Page 73
Pennsylvania Board of Probation and Parole

Chapter Two

Pennsylvania Department of the Auditor General

---

### Case File #46

**Poorly supervised drug abuser and absconder finally returned to prison with almost no help by Board.**

This parolee was imprisoned for possession of drugs with intent to deliver them. He was released on parole under maximum supervision on March 15, 2000, with conditions that included not using drugs. The Board classified him as a violent offender.

Within a month, the parolee tested positive for drugs. Subsequently, he was in and out of work, evicted from his residence, and continued his drug use. In spite of this compelling evidence of the need for supervision, the Board's agent missed 9 of 28 required visits.

In January 2001, the parolee left a facility without permission. The Board declared him delinquent and placed him into absconder status. But his parole agent was on long-term leave, and it took an entire month to transfer the parolee's file to another agent. During that month, the Board made *no* efforts to find him. Nor did the Board make any efforts to find him during the *next* four months because, according to Board documents, "no leads as to his whereabouts surfaced."

In June 2001, the Philadelphia Police Department arrested this man on a new criminal charge. It was only then that the Board took action, re-incarcerating the parolee for the technical violation of delinquency.

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Two


Pennsylvania Department of the Auditor General


### Pursuing Absconders – How much did the Board do?
*A chronology of Board efforts to locate 7 absconders from our sample*

| Case file # | Date of offender's last contact with Board | Date offender missed a required meeting | Date Board verified offender to be delinquent | Dates of Board attempts to locate the verified absconder | Methods to locate absconder | Outcome |
|---|---|---|---|---|---|---|
| #5 | 9-15-00 | 10-13-00 | 10-18-00 | **none** | **none** | Attempted to commit murder; arrested on 3-22-01; returned to prison. |
| #6 | 6-23-00 | 8-18-00 | 8-17-00* | **none** | **none** | Arrested for drug possession on 8-31-00; returned to prison. |
| #16 | 11-03-00 | 11-15-00 | 11-16-00 | every few days between 11-20-00 and 12-08-01 | phone calls, visits, pursuing various leads | Board was successful in locating, arresting, and returning this offender to prison with an additional charge of robbery. |
| #33 | 8-03-00 | 8-08-00 | 8-08-00 | every few days or daily between 8-10-00 and 9-07-00 | phone calls, visits, pursuing various leads | Arrested for new crime of retail theft on 9-11-00 and returned to prison. |
| #35 | 11-29-00 | 11-30-00 | 11-30-00 | 12-01-00, 12-04-00 | phone calls | Arrested on 12-07-00; Board imposed measures, the nature of which are confidential. |
| #36 | 7-13-01 | 8-22-01 | 8-22-01 | 10-22-01 | visit to police | Parolee surrendered on 10-24-01 and returned to parole. |
| #46 | 1-02-01 | 1-08-01 | 1-08-01 | **none** | **none** | Arrested for new crime of drug possession on 6-12-01 and returned to prison |

*The day before this parolee was due to meet agent in the office, the agent had looked for parolee at his residence and found him to be missing.

The Board should have been much more aggressive at finding absconders. The American Correctional Association accreditation standards require that the Board have a written policy and procedures that specify the types of actions required to locate and recover absconders. The ACA further notes the following:

> Field investigation should include inquiry at the last known residence and place of employment, and checks with family, friends, local jails, hospitals, welfare and service agencies, and other agencies with whom the offender may have had contact. Also, tracer letters should be mailed to all possible contacts, including those outside the immediate area. When appropriate, all law enforcement agencies should be notified and an arrest warrant issued.[46]

Overall, we found that up to the point where parolees were verified to be absconders (that is, within the initial 30-day "diligent search" period), the Board out-performed its own policy, not taking more than 5 days to make such verification. However, *after* the Board's verification, and after the absconders were placed into state and national criminal justice databases, the Board appeared to look for the absconders less diligently and depend more on other criminal justice agencies.

To its credit, beginning in early 2002 the Board started posting the profiles and photographs of absconders to its Web site. However, only 52 such profiles and photographs were posted by mid-September 2002. The board must not only continue this important effort but should also take additional steps to ensure public safety and return offenders to supervision and/or prison.

---

[46] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3170, August 1998, p. 51.

Page 76

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Two

Pennsylvania Department of the Auditor General

## Recommendations

- The Board should pursue absconders more aggressively, perhaps using a special task force to do so.

- The Board should ensure that all efforts to locate absconders are documented.

- The Board should revise its policy and procedures to reflect (1) a greater priority on locating absconders and (2) more detailed actions to be used in the search for absconders.

- The Board should post *all* absconders' photos and profiles on its Web site and should publicize this effort aggressively through news releases and other communications activities to both notify and involve the public.

## Board of Probation and Parole Response

Specific criteria are used to determine when an offender becomes an absconder. The Board's procedures require the supervision staff to conduct a diligent search for the offender before requesting that Parole Violation Wanted Notices be issued with state and national law enforcement databases. The Board's issuance of Parole Violation Wanted Notices significantly assists the Board and the criminal justice agencies to locate absconders.

The DAG claimed that, of the 50 offender files reviewed, there were seven absconders, "only one [of whom] was found as a result of the Board's efforts." In addition, the DAG contends that, as of June 2001, the Board "lost track of 1,560 parolees and probationers, or more than 6.5% of the offenders it was supposed to be supervising."

The Board takes exception to the conclusion that the Agency "lost track of" any offender. An offender's success while under

supervision may be successful or unsuccessful; there are some offenders who are not amenable to supervision. If they abscond, they are declared delinquent and are subject to diligent searches for their apprehension.   In fact, the national average for parole absconders on any given day is between 10% and 15%. ***Pennsylvania's absconder rate of 6.5% is significantly less than the national average.***

The DAG's report states "The Board should have been much more aggressive at finding absconders." The Board enlists the assistance of the entire law enforcement community in locating parole absconders, as evidenced by the two absconders in the sample who were apprehended in other states within two weeks of the Board declaring them to be absconders. (see Appendix, Items 9 – 15)

Since 1999, the Board has posted all of its parole absconders on the Commonwealth's Justice Network ("JNET"). In 2000, the Board's entire parolee and probationer caseload was posted in the JNET system. Additionally, the Board established a 24-hours/day, seven-days/week Operations Monitoring Center ("24/7 Unit") within its Central Office headquarters that receives inquiries about the offender population from the law enforcement community. Once a Wanted Notice is posted within the Commonwealth Law Enforcement Assistance Network (CLEAN) and the National Crime Information Center (NCIC), the 24/7 Unit receives an electronic message if an absconder is arrested or in police custody, or if information is being requested about a subject who is wanted as a parole violator by the Board. These "CLEAN hits" allowed the Agency to communicate with the arresting authority, confirm the subject's identity, confirm the offender's "wanted" status, forward a warrant immediately, and prevent the absconder from being released on bail (if arrested for new criminal charges).

The DAG suggested that the Board should utilize a special task force to pursue absconders more aggressively. The Board agrees that in certain instances (e.g., urban areas) a special task force is

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

practical.  An agent's knowledge of the offender, as well as
his/her interactions with the local law enforcement community
will achieve the best results for locating absconders.

It is important to note that the Board initiated the development
and implementation of a *Fugitive Apprehension Search Team*
("FAST") unit in early 2002 in the Philadelphia District. This
district had 50% of the statewide absconder population.  Once
the assigned parole agent concludes his/her diligent search
efforts to locate the offender, the case can be transferred to the
FAST Unit.

In the three months since the FAST's activation, it has been
responsible for the successful arrest of 35 absconders. Notably,
the unit made 17 absconder arrests in 17 working days during the
month of November 2002.

In addition to this new unit, the Board posts photos and
demographic information regarding over 1,000 absconders on its
web page.  The web page is updated regularly, adding new
absconders and noting those who were captured and returned to
custody.  Individuals viewing the Board's Parole Absconder
Website, (See Appendix, Item #16) are referred to the
appropriate office to report absconder information.

## Department of the Auditor General Comments

The Board takes exception to our conclusion that it "lost track
of" any offender.  It is true the Board did not lose track of the
*names* of 1,560 absconders and where they lived before they
were declared missing (i.e., delinquent).  But a reasonable person
would doubtless conclude that if the Board did not know the
current whereabouts of 1,560 unsupervised parolees (absconders)
or what they were doing, then it lost track of them.  To state
otherwise is misleading and is further belied by the Board's
seeking help (which was the correct thing to do) from "the entire

law enforcement community" to locate these parolees whom it
now says it did not lose track of.

The Board's discussion noting that Pennsylvania's absconder
rate is less than the national average is not comforting.
Specifically, the Board is misguided to imply that
Pennsylvanians should rest assured because other states have
higher rates of unsupervised parolees living among the general
population, or because other states have lost track of even *more*
parolees.  Being the "best" when the problem is bad is still not
enough:  The Board must be more aggressive in searching for its
absconders—no matter how many or how few.

The Board's efforts with its new FAST unit in the Philadelphia
District, as well as the Board's addition of many more
absconders to its Web site, are notable.  Such efforts occurred
after we had completed our audit field work but, even so, they
are no less commendable.  Indeed, the Board should utilize the
FAST unit approach in the remaining Pennsylvania districts
rather than limiting it just to Philadelphia.

Page 80

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Chapter Three

Pennsylvania Department of the Auditor General

# Chapter Three

# Reducing recidivism

The Pennsylvania Department of Corrections has this to say about recidivism:

> There is no commonly accepted system for defining and calculating recidivism. Some jurisdictions use re-arrest, others re-incarceration, some use both. Some jurisdictions exclude technical parole violations from consideration, others include everything. These discrepancies make it difficult to rely upon recidivism as a universal measure to assess program outcome.[47]

Perhaps because there is no common definition, the American Correctional Association requires parole agencies to have a written definition of recidivism that is understood and used by all agency personnel; the ACA further notes that recidivism data are useful in evaluating an agency's performance. Indeed, we believe that the use of recidivism data is an especially important measure of the Board's performance as it relates to supervision.

According to the Parole Board procedure manual, recidivism is defined as "the term used to express the percentage of return to criminal activity [of] persons previously convicted of crimes."[48] Board officials indicated that they actually use an even more precise definition shared with the Department of Corrections: "the return of an individual to the custody of the Pennsylvania Department of Corrections for any reason within three years of initial release."[49] A return to prison can result from either a technical parole violation (a violation of a parole condition) or a criminal parole violation (the commission of a crime).

---

[47] Gary Zajac, Ph.D., and Kristofer Bret Bucklen, *Quehanna Motivational Boot Camp Performance Analysis and Evaluation*, Pennsylvania Department of Corrections, January 2002, p. 3.

[48] *Pennsylvania Board of Probation and Parole Procedures*, "Arrest Procedures – Glossary of Terms," Volume III, Chapter V, Procedure 5.10, Effective January 16, 2001.

[49] *Recidivism Overview 1996-2000*, Pennsylvania Department of Corrections, <http://www.cor.state.pa.us/info.html>.

Of the more than 8,000 offenders under Board supervision who recidivated during the two years from July 1, 1999, to June 30, 2001, nearly three-quarters (74 percent) were classified as technical parole violators, while the remaining quarter (26 percent) were classified as criminal parole violators.

## Objectives and Methodology

Our objectives for this portion of the audit were to determine how the Board tracked and analyzed recidivism rates and to determine what efforts the Board took to reduce recidivism in Pennsylvania. To accomplish these objectives, we employed the following methodology:

- Interviewed Board staff

- Reviewed recidivism statistics provided by the Board and the Pennsylvania Department of Corrections

- Examined reports outlining what other states have done to address the problem of offender recidivism

- Reviewed research reports regarding issues such as technical parole violators, consequences of prisoner reentry, aftercare and successful offender reentry, and community corrections facilities

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

| | |
|---|---|
| **Conclusion 1:**<br><br>**The Parole Board did not analyze recidivism data to see the effect of certain practices or characteristics.** | Recidivism, according to the Parole Board, occurs when probationers or parolees under its supervision are committed or recommitted to prison, whether for a violation of parole or for new criminal activity. Recidivism data, says the American Correctional Association, are "useful criteria for evaluating probation/parole agencies and offender performance."[50] Yet in spite of such usefulness, the Board did not analyze recidivism data in ways that allowed for that evaluation. |

Stated another way, if it had collected and analyzed recidivism information about its probationers and parolees according to certain conditions and characteristics, the Board could have learned what worked in its program, what didn't, and what changes were needed. For example, for analytical purposes, the Board could have asked the following questions and segregated data accordingly:

1.  Was the rate of recidivism greater in certain geographic areas?

2.  How much—if at all—did the rate of recidivism vary from district office to district office, or from agent to agent?

3.  Did certain types of original crimes appear to pose greater risks for recidivism and, if so, which crimes?

4.  Was the rate of recidivism greater depending on the level of violence of that initial crime?

5.  Was the rate of recidivism greater for drug and alcohol abusers?

6.  Was the rate of recidivism less when probationers and parolees had completed certain treatment and/or social programs and, if so, which ones?

---

[50] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3114, August 1998, p. 35.

A Performance Audit of the                                    Page 83
Pennsylvania Board of Probation and Parole

Chapter Three

Pennsylvania Department of the Auditor General

7.  Did recidivism increase or decrease based on certain
    probationer and parolee characteristics—e.g., age,
    employment versus lack of employment, stable family life
    versus unstable family life, type and duration of education?

8.  Was there a difference in recidivism rates between
    probationers versus parolees?

9.  Did certain sanctions appear to be effective in reducing
    recidivism?

10. Did the rate of recidivism decrease proportionately according
    to the amount of time a probationer or parolee had been
    living in the community?

Unfortunately, the Board segregated recidivism data only
according to two characteristics—whether parolees or
probationers were considered to be (1) "technical parole
violators" (i.e., committed or recommitted to prison because
probation or parole conditions were violated) or (2) "criminal
parole violators" (i.e., committed or recommitted to prison
because of a new crime). No other segregation of data was
routinely done; no data were analyzed to see how certain
practices or characteristics might affect recidivism.

To determine how many parolees and probationers recidivated
over a two-year time period, we asked the Board to provide a
breakdown—as of March 2002—for *all* parolees and
probationers that it had started to supervise in the first quarter of
2000. Of the 2,975 applicable offenders, the Board noted that
829—or 28 percent—had recidivated as of that date, with
another 320 technical and criminal parole violators—or 11
percent—awaiting Board action that might result in prison.
Altogether, then, that means that the recidivism rate over two
years for the 2,975 offenders was almost 40 percent, which is in
line with 1999 national parole statistics indicating that 43 percent

A Performance Audit of the
Pennsylvania Board of Probation and Parole

Pennsylvania Department of the Auditor General

of state parole discharges were returned to jail or prison.[51]   Both
the Board's percentage and the national percentage were lower
than the 54 percent recidivism rate for our own sample of 50
probationers and parolees.

Whatever the recidivism rate, it would certainly be useful for the
Board to look toward reducing it by asking the types of questions
we posed at the start of this conclusion and—based on the
answers and on conditions that the Board can control—
modifying its practices and programs accordingly.

### Recommendation

- The Board should track recidivism based on analytical
  criteria that would allow the Board to evaluate its
  performance and make changes where necessary.

### Board of Probation and Parole Response

Although the Board does not currently publish statewide
recidivism rate data to the general public, there is ongoing
analysis of recidivism data and evaluation of what works.
Recidivism data are used in the Board's internal program
evaluations and in program performance monitoring despite the
fact that a detailed breakdown of recidivism rates is not being
routinely published.

The Board produces monthly documentation of recidivism
counts and recidivism percentages to monitor and evaluate

---

[51] The 43 percent statistic came from *The Probation and Parole Condition* newsletter published by the
Pennsylvania Board of Probation and Parole in the spring of 2002, volume 7, issue 1. The *Condition*
credits the U.S. Department of Justice for the statistic, as well as for other national statistics on probation
and parole published in the same newsletter.

A Performance Audit of the                                    Page 85
Pennsylvania Board of Probation and Parole

Chapter Three

Pennsylvania Department of the Auditor General

program performance.  The Board analyzes performance in
specific programs using recidivism rates.

- The Board produces monthly data on recidivism by
counting and comparing time trends of offenders returned
to prison for technical parole violations and new criminal
convictions.  These data are essential in the monitoring the
management of community risk and the reduction of crime.
While reducing recidivism is important, the reduction of
crime is more important.  **Among the total number of
parolees returned to prison, the number with new
criminal convictions** *declined* **from 43% in 1995 to 25%
in 2001, despite the fact that the total number of
returned cases decreased.**  *See* the graph and chart below.



| | | Returned to Correctional Institutions/County | | | | | |
|---|---|---|---|---|---|---|---|
| Fiscal Year End | 1995 | 1996 | 1997 | 1999 | 1998 | 2000 | 2001 |
| Parole Recommitment to Prison | 4,279 | 3,501 | 3,965 | 3,577 | 3,041 | 3,622 | 3,838 |
| *Percent New Convictions* | 43% | 36% | 39% | 26% | 33% | 25% | 25% |
| *Percent Technical Parole Violations* | 57% | 64% | 61% | 74% | 67% | 75% | 75% |

Page 86                    A Performance Audit of the
                          Pennsylvania Board of Probation and Parole

Chapter Three


                          Pennsylvania Department of the Auditor General

- The Board uses recidivism rates on a regular basis to
  evaluate specific programs.  Examples include diversion
  programs such as the Substance Abuse Violators Effort
  ("SAVE") program and the Residential Substance Abuse
  Treatment ("RSAT") program.

- The Pennsylvania Commission on Sentencing's annual
  evaluation report to the General Assembly regarding
  Pennsylvania's Motivational Boot Camp is based largely
  upon recidivism data supplied by the Board.

- The Board, in conjunction with George Washington
  University, has conducted ongoing research regarding the
  validation of risk assessment instruments, namely, the
  *Level of Service Inventory-Revised* ("LSI-R") and the
  *Static-99*.  These studies utilize recidivism data supplied by
  the Board.

To the extent that there is a perceived need to have general
descriptive recidivism statistics available, the Board will respond
and attempt to meet that need.


### Department of the Auditor General Comments

The Board's statement that it does not currently publish
statewide recidivism data for the general public is representative
of much of the Board's operation.  Indeed, the Board makes very
little information available to the same general public that it is
trying to protect.  Using recidivism data and other statistical data
(e.g., internal monthly statistical reports) only internally does not
allow the general public—and government agencies or watchdog
groups, for example—to evaluate the Board's performance.  In
fact, the information published here in the Board's response was
never before provided to our audit team in spite of our numerous
requests for all relevant data.  The limited data that the Board did
provide to us during our audit was generated especially for us

and was not characterized as part of any "routine" or "regular"
data that we saw or that the Board now claims to generate.

The Board's statement regarding availability of data is surprising
in its cavalier tone: "To the extent that there is a *perceived* need
to have *general* descriptive recidivism statistics available, the
Board will respond and *attempt* to meet that need." (Emphasis
added.) Such a statement signifies a disregard for the general
public and for anyone else who knows, rather than perceives, that
it is right and appropriate for the Board to share detailed
information and to be truly accountable for its work.

# Chapter Four

## Providing training and assistance to parole agents

During our audit period, the Parole Board had nearly 350 agents to supervise 23,800 offenders—19,500 on parole and 4,300 on probation. Effective supervision of parolees and probationers is necessary to ensure public safety; accordingly, parole agents have a critical job.

The Board is responsible for training its parole agents and for making sure they maintain their skills, including skills in the use of firearms. Unfortunately, as we will show in this chapter, the Board came up short in overseeing the training of its agents.

Before we proceed to the results of our testing, it is necessary to explain the parole agent's work. We can describe the nature of this work in the words of the State Civil Service Commission as it announced testing and sought applications for entry-level agents in February 2002:

> This is entry-level professional work managing a caseload of probationers and parolees in the state probation and parole system, and/or pre-parole counseling of inmates of correctional institutions. Employees attend and complete various training programs. They maintain contacts with offenders' families, friends, social service agencies, employers and clergy to assist in the transition to community life. The work includes developing parole plans. The work is physically demanding and there is an element of danger in working with offenders.

> Some positions are at field sites. Employees in these positions investigate offenders to determine if they are complying with conditions of their release, and arrest violators. Employees are required to make decisions directly affecting public safety and the personal liberties of offenders. Parole Agents have arrest powers and the option of carrying firearms.

Other positions are in correctional facilities throughout the state. Employees in these positions develop pre-parole plans and assist inmates in preparing for the transition to community life.[52]

The Civil Service Commission also noted that, in addition to passing a 2½-hour test covering individual and group behavior (including aberrant and criminal behavior), applicants were expected to meet the following requirements:

- Must be willing to travel (travel expenses paid)

- Must have a Pennsylvania driver's license

- Must be a state resident of good moral character and able to perform the essential functions of the job

- Must (for some positions) be willing to work nights and weekends when necessary, and to occasionally be on 24-hour call

- Must pass a background investigation, a medical examination, a psychological evaluation, and urinalysis screening

- Must have a bachelor's degree in Criminal Justice; or a bachelor's degree that includes six credits in certain social sciences; or an equivalent combination of experience and training

Finally, the Civil Service Commission listed the annual salary for a Parole Agent 1 as $33,716. A salary increase and promotion (to Parole Agent 2) were promised upon the agent's successful completion of a training period, the length of which was not defined.

---

[52] "Examination for Parole Agent 1," State Civil Service Commission, Commonwealth of Pennsylvania, Test Announcement Number 1997-772, amended and reissued February 22, 2002.

The oversight and monitoring of employee training should be a high priority for the Board. To that end, the American Correctional Association says this about training: "Training and its delivery and implementation is one of the major forces that affect employee performance. Its consistency, relevance, and impact should be of major concern to an agency."[53]

**Objectives and Methodology**

The overall objective for this chapter was to determine whether the Board ensured that its parole agents had access to and completed the required training.

To complete this objective, we did the following:

- Reviewed the applicable training requirements and plans, including the Board's policies and procedures and the accreditation standards of the American Correctional Association

- Interviewed Board officials and staff

- Examined and analyzed the training records for a sample of 50 Board-employed agents and supervisors for the period of July 1, 1999, to June 30, 2001

---

[53] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, August 1998, p. 22.

A Performance Audit of the                                      Page 91
Pennsylvania Board of Probation and Parole

Chapter Four

Pennsylvania Department of the Auditor General

| | |
|---|---|
| **Conclusion 1:**<br><br>**The Parole Board did not ensure that all agents in our sample received the 40 hours of training required annually, nor did the Board ensure that all training was "acceptable."** | Our testing of 50 agents and other field staff—both new and existing—disclosed that 11 did not receive the entire 40 hours of required annual training during at least one of the two years we reviewed. Two of the 11 were deficient in *each* of the two years, and one of the two agents received only 9.5 hours in the two years combined, meaning the agent in the latter case completed less than 12 percent of his training requirement over the two-year period. The Board noted that this particular case represented an exception based on serious personal circumstances.<br><br>In addition, the Board permitted 20 additional agents to count undocumented meetings toward the required training hours. The deficiencies in these instances mean that parolees and probationers were supervised by agents with incomplete—and at times unacceptable—training.<br><br>The Board's practice violated not only its own policies and procedures but also the accreditation standards of the American Correctional Association. Specifically, the Board's policy requires its professional and technical employees to complete a minimum of 40 hours of acceptable annual training.[54] The American Correctional Association also requires that probation and parole officers receive 40 hours of training each year; in addition, the ACA requires another 40 hours of first-year orientation.[55]<br><br>The Board was capable of ensuring that the 40-hour requirement was met, as evidenced by the facts that training opportunities were ample and that other agents in our sample received *more* than the minimum amount of required training. For example, most of the new employees in our sample received more than 300 hours of training during the first year alone. In addition, five existing agents in our sample completed more than 100 hours of |

---

[54] *Pennsylvania Board of Probation and Parole Procedures,* "Management Services – Human Resources Training and Development Annual Training Requirements," Volume III, Chapter IX, Procedure 9.4.4.2, Effective January 16, 2001.
[55] *Standards for Adult Probation and Parole Field Services*, 3rd ed., American Correctional Association, Standard 3-3085, August 1998, p. 26.